## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MYLAN PHARMACEUTICALS, INC., | : | |
| ROCHESTER DRUG CO-OPERATIVE, | : | |
| INC., MEIJER, INC., MEIJER | : | |
| DISTRIBUTION, INC., AMERICAN | : | |
| SALES COMPANY, LLC, WALGREEN | : | |
| CO., SAFEWAY INC., SUPERVALU | : | |
| INC., and HEB GROCERY CO. LP, et al., | : | |
| | : | Civ. No. 12-3824 |
| Plaintiffs, | : | CONSOLIDATED |
| | : | |
| v. | : | INDIRECT PURCHASER ACTION |
| | : | |
| WARNER CHILCOTT PUBLIC | : | |
| LIMITED COMPANY, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

## DEFENDANT WARNER CHILCOTT'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE THE DECLARATION AND TESTIMONY OF GORDON RAUSSER

## PUBLIC REDACTED VERSION

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 4

I.  IBEW Cannot Cure the Problems with Dr. Rausser's Opinions
    by Discussing Other Cases............................................................................. 4

    A.  Dr. Rausser's Prior Testimony in *Nexium* Supports Exclusion ............... 5

    B.  Other Cases Evaluating Dr. Rausser's Opinions Support Exclusion...................... 6

II. Dr. Rausser Cannot Hide the Fundamental Errors in His
    Consumer Impact Analysis ........................................................................... 11

    A.  Dr. Rausser's Failure to Exclude From His Opinions Whole
        Categories of Consumers that Now Have Been Excluded from
        the Classes Shows That His Impact Opinion Was Improper ................................ 13

    B.  There Is No Valid Explanation for Dr. Rausser's Failure to
        Account for Brand Loyal Consumers, Free Samples, and Deductibles................ 15

    C.  Dr. Rausser's "Transaction" Based Approach
        Contradicts Basic Economic Analysis .................................................. 19

III. Dr. Rausser's Third Party Payer Impact Analysis is Unreliable.................................. 20

    A.  No Impact for Reimbursement of Prescriptions for
        Brand Loyal Plan Members .............................................................. 20

    B.  Dr. Rausser Ignored the Individualized Inquiry Required
        to Determine Which Third Party Plans Were at Risk
        and Thus Potentially Impacted.............................................................. 21

    C.  Dr. Rausser Offers No Reasons for His Failure to Consider
        Important Economic Factors................................................................ 22

IV. Rausser Has No Answer for the OptumHealth Data ....................................................... 24

    A.  Dr. Rausser's Review Confirms Dr. Cremieux's Findings.................................... 25

    B.  The OptumHealth Data Confirm That Prices Paid Are
        Variable and Thus Require an Individualized Inquiry on Impact........................ 26

V.  Dr. Rausser's Rebuttal Cannot Cure the Fundamental Problems
    with His Sensitivity Analysis ........................................................... 28

i

VI.    IBEW Has No Answer for Dr. Rausser's Failure to Investigate
Key Assumptions or Fit His Opinions to the Facts............................................. 33

      A.    No Facts Support Dr. Rausser's Assumptions Regarding
Improvements to Doryx ........................................................................... 34

      B.    Dr. Rausser Improperly Rejects Economic Facts
That Rebut His Misreading of Documents .............................................. 39

      C.    No Facts Support Dr. Rausser's Assumptions
Regarding Potential Generic Entry .......................................................... 41

      D.    No Basis for "Overcharge" Assumptions as to Third Party Payers...................... 46

VII.    Dr. Rausser's Model Departs from IBEW's Product Hopping Theory ........................... 46

VIII.    Dr. Rausser's Fluid Recovery Damages Model Will Not Assist
the Trier of Fact and Fails under *Daubert* ....................................................... 47

CONCLUSION.................................................................................................... 49

# TABLE OF AUTHORITIES

**CASES**                                                                        **PAGE(S)**

*Allen v. Dairy Farmers of America, Inc.*, 279 F.R.D. 257 (D. Vt. 2011) ........................................7

*Allen v. Dairy Farmers of Am., Inc.*, No. 5:09-cv-230, 2012 WL 5844871
(D. Vt. Nov. 19, 2012) ...............................................................................................................7

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*,
247 F.R.D. 156 (C.D. Cal. 2007) .............................................................................................35

*Bickerstaff v. Vassar College*, 196 F.3d 435 (2d Cir. 1999) ...............................................*passim*

*Blades v. Monsanto Co.,* 400 F. 3d 562 (8th Cir. 2005) ........................................................13

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*,
203 F.3d 1028 (8th Cir. 2000) ...............................................................................................7, 8

*Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*,
383 F.3d 110 (3d Cir. 2004) ...................................................................................................12

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ...........................................................*passim*

*Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000)...........................20, 38

*Cowden v. Parker & Assocs., Inc.*, No. 5:09-323,
2013 WL 2285163 (E.D. Ky. May 22, 2013) .........................................................................48

*Daddio v. A.I. DuPont Hosp. for Children of the Nemours Found.*,
650 F. Supp. 2d 387 (E.D. Pa. 2009) .......................................................................................1

*Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000) ..............................................................29

*Execu-Tech Bus. Sys., Inc. v. Appleton Papers Inc.*, 743 So.2d 19
(Fla Dist. Ct. App. 1999) ........................................................................................................11

*Freeland v. AT&T Corp.*, 238 F.R.D. 130 (S.D.N.Y. 2006) ......................................................22

*Forrand v. Federal Exp. Corp.*, No. 08-1360, 2013 WL 1793951
(C.D. Cal. Apr. 25, 2013) .........................................................................................................48

*G.E. v. Joiner*, 522 U.S. 136 (1997) ...............................................................................21, 22, 46

*Hilton v. Horcher GmbH*, No. 03-6084-CV-SJ-GAF,
2004 WL 4056050 (W.D. Mo. Dec. 13, 2004) ...................................................................12

*In re Chocolate Confectionary Antitrust Litigation*,
289 F.R.D. 200 (M.D. Pa. 2012) .......................................................................................12

*In re Flonase Antitrust Litigation*, 284 F.R.D. 207 (E.D. Pa. 2012) .................................9, 10, 14

*In re High Fructose Corn Syrup Antitrust Litigation*,
156 F. Supp. 2d 1017 (C.D. Ill. 2001) ................................................................................8

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002) ..........................8

*In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966 (C.D. Cal. 2012) ..................................12

*In re Novatel Wireless Sec. Litig.*, 846 F. Supp. 2d 1104 (S.D. Cal. 2012) .................................12

*In re Pharm. Indus. Average Wholesale Price Litig.*,
491 F. Supp. 2d 20 (D. Mass. 2007) ...................................................................................12

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ............................................ *passim*

*In re Potash Antitrust Litigation*, 954 F. Supp. 1334 (D. Minn. 1997) .....................................7, 8

*In re Relafen*, 221 F.R.D. 260 (D. Mass. 2004) ...................................................................10

*In re Southeastern Milk Antitrust Litigation*,
801 F. Supp. 2d 705 (E.D. Tenn. 2011) ................................................................................8

*In re Terasozin Hydrochloride Antitrust Litigation*,
220 F.R.D. 672 (S.D. Fla. 2004) .........................................................................................23

*L.A. Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356 (9th Cir. 1986) .......................................19

*Malletier v. Dooney & Bourke, Inc.,* 525 F.Supp.2d 558 (S.D.N.Y. 2007) .................................13

*Martin v. Ford Motor Co.*, No. 10-2203,
2013 WL 3328231 (E.D. Pa. July 2, 2013) ..........................................................................48

*Meadows v. Anchor Longwall & Rebuild, Inc.*,
306 Fed. App'x 781 (3d Cir. 2009).......................................................................................1

*Miller v. Pfizer, Inc.*, 356 F.3d 1326 (10th Cir. 2004) .............................................................12

*Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000) ...................................................... *passim*

*Oxygenated Fuels Ass'n, Inc. v. Pataki*, 293 F. Supp. 2d 170
(N.D.N.Y. 2003) .................................................................................................................7

*Schachar v. American Academy of Opthamology, Inc.*,
870 F.2d 397 (7th Cir. 1989) .....................................................................40

*Shannon v. Hobart*, No. 09-5220,
2011 WL 442119 (E.D. Pa. Feb. 8, 2011) ..................................................1

*Snodgrass v. Ford Motor Co.*, No. 96-1814 (JBS),
2002 WL 485688 (D.N.J. Mar. 28, 2002) ..................................................42

*Teva Pharm. USA, Inc. v. Abbott Labs.*, 252 F.R.D. 213 (D. Del. 2008) ....................................18

*Weiss v. AstraZeneca*, No. BC323107 (Cal. Sup. 2008) .................................6

*Weiss v. AstraZeneca Pharm.*, 2010 WL 3387220
(Cal. Ct. App. Aug. 30, 2010) ....................................................................5

*Wolfe v. McNeil-PPC, Inc.*, Civil Action No. 07-348,
2011 WL 1673905 (E.D. Pa. May 4, 2011) .........................................36, 40

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012)................................4, 20

*Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co., Inc.*,
No. 99 C 4040, 2002 WL 398521 (N.D. Ill. Mar. 14, 2002),
*rev'd on other grounds*, 313 F.3d 385 (7th Cir. 2003) ................................13

## **RULES**

Fed. R. Evid. 702 ................................................................................4, 36

## **MISCELLANEOUS**

Berndt, Ernst R., et al., "Authorized Generic Drugs, Price Competition,
and Consumers' Welfare," *Health Affairs*, 26, no. 3 (2007) ........................30

Federal Judicial Center, *Manual on Scientific Evidence* (Third) (2011) ....................................46

ABA Section of Antitrust Law, *Proving Antitrust Damages:
Legal and Economic Issues* (2D ED. 2010) ................................................19

### INTRODUCTION

In its opening brief, Warner Chilcott explained why the expert declaration and testimony submitted on behalf of International Brotherhood of Electrical Workers Local 38, Health and Welfare Fund ("IBEW") by Dr. Gordon Rausser, Ph.D. fell far short of the minimum standards for admissibility and derivatively why class certification should be denied.  Simply stated, Dr. Rausser did not "employ[] . . . the same level of intellectual rigor that characterizes the practice of an expert" in his field.  *Daddio v. A.I. DuPont Hosp. for Children of the Nemours Found.*, 650 F. Supp. 2d 387, 403 (E.D. Pa. 2009).  Expert testimony that is not based on the methods and procedures of the expert's field and that is based on assumptions lacking foundation in the record is not relevant or reliable and thus properly excluded.  *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 Fed. App'x 781, 787 (3d Cir. 2009*); In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 743–44 (3d Cir. 1994); *Shannon v. Hobart*, No. 09-5220, 2011 WL 442119, at *2–4 (E.D. Pa. Feb. 8, 2011).

Dr. Rausser's opinions suffer from numerous disqualifying failures:  (1) He ignored key economic facts that he in the past has asserted should be included when analyzing impact in this kind of case.  When these factors are considered, they demonstrate that impact **cannot** be shown through common, formulaic proof.  In fact, as Dr. Rausser admitted, substantial numbers of the putative classes would not have been injured by the claimed delay in generic entry.  Most importantly, there is no common method for identifying such class members; (2) Rather than concede the inherently individualized issues presented by the classes proposed here—issues recognized by the *K-Dur* case and others as grounds to deny certification—Dr. Rausser asserted that the individualized issues could be address in an undefined claims administration process; (3) Dr. Rausser abdicated his role as an expert and accepted without analysis important assumptions

1

that are unsupported by the evidence; and (4) Dr. Rausser failed to link his damages model to IBEW's liability theory, a basic requirement of economics testimony, and an approach precluded by *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013).   These and other deficiencies require rejection of Dr. Rausser's opinions.

Apparently dissatisfied with Dr. Rausser's original report (and related testimony), IBEW filed a massive, 96-page "rebuttal" report from Dr. Rausser that is nothing more than a futile effort to shore up Dr. Rausser's deficient analysis.[1]   The rebuttal report, and IBEW's Opposition, only underscore why Dr. Rausser's opinions are inadmissible, and why these classes should not be certified.

*First*, IBEW argues that Dr. Rausser's opinions are admissible because his opinions have been admitted elsewhere.  But IBEW cannot avoid the fact that Dr. Rausser's opinions have been rejected by multiple courts.  And the key issue here, of course, is whether Dr. Rausser's opinions *in this case* pass muster, and they clearly do not.

*Second*, Dr. Rausser (and IBEW) now purports to redefine the classes to exclude tens of thousands of consumers who he originally asserted should be included in the classes, until confronted with the analysis of Warner Chilcott's expert, Dr. Cremieux.  Dr. Rausser grudgingly concedes that this belated exclusion is "appropriate," but he continues to quarrel with its necessity for at least some of the newly excluded consumers.  No matter.  Dr. Rausser's duty was to examine the facts regarding coupons, brand loyal consumers, deductibles, etc. *before* reaching his opinions, as he has done previously, not treat his original opinion as a first draft.  But even this attempt to define away the problem fails because it does not go far enough, and because Dr. Rausser has no way to identify many of the class members he now purports to exclude—itself an

---

[1] Dr. Rausser's rebuttal report should be stricken for the reasons set forth in Warner Chilcott's July 1 letter brief in support of its motion to strike.  ECF No. 343.

individualized inquiry that makes certification inappropriate.

*Third*, contrary to IBEW's contentions, Dr. Rausser's flaws can hardly be labeled as issues concerning the weight of his opinions. The problems are fundamental and destroy any hope that his testimony might be admissible. For example, there is no valid explanation for Dr. Rausser's failure to account for brand loyal consumers, free samples, and other factors that show that substantial ***additional*** categories of consumers and third party payers ("TPPs") were not impacted. Nor can Dr. Rausser walk away from the fact that he improperly applied his own sensitivity analysis, and inexplicably chose to ignore prescription-level data. His selective and incomplete work, which not surprisingly reached the wrong results, is irrelevant and unreliable.

*Fourth*, Dr. Rausser's rebuttal, like his original report, proposes no valid, formulaic way to identify and exclude ***any*** non-impacted class members, let alone the very substantial categories that IBEW concedes must be excluded from the classes. IBEW offers no basis, because there is none, for the Court to accept Dr. Rausser's word that when he finally puts his mind to it he will be able to create a formulaic methodology that will do the trick.

*Fifth*, IBEW claims that Dr. Rausser's assumptions on key issues, such as the use of an overcharge methodology, the timing and nature of generic entry in the "but-for" world, and the presumed "immaterial improvements" to the Doryx product, are "reasonable." But this argument ignores the fact that Dr. Rausser never reality-checked these assumptions ***before*** issuing his opinions—a critical and disqualifying departure from accepted economic principles and methods—and that his assumptions are entirely unjustified (*i.e.*, they do not "fit" the facts of the case), based on evidence IBEW cannot refute.

*Sixth*, IBEW argues that this case is nothing like *Comcast* because IBEW presents only a single "product hopping" theory of liability. This argument ignores the realities of IBEW's

claims, which all along had asserted that each product introduction was a distinct anticompetitive act.   Moreover, IBEW's claim that Dr. Rausser's model is sufficiently "flexible" to accommodate virtually any factual scenario is untrue because it cannot account for the presence of Doryx tablets in the "but-for" world, nor can it separate out harm from lawful conduct as opposed to that caused by allegedly unlawful product "hops."

*Finally*, Dr. Rausser persists in his view that at this stage he need only show how one could calculate a pot of damages, with no methodology for how damages might be assigned to individual class members.   This "fluid recovery" approach flies in the face of *Comcast*, which requires a proponent of certification to provide a methodology to show, or capable of showing, how "individual damages" can be calculated using common evidence, and which requires a damages model that is linked to the alleged unlawful conduct.

## ARGUMENT

### I.      IBEW Cannot Cure the Problems with Dr. Rausser's Opinions by Discussing Other Cases

Expert opinions are evaluated on a case-by-case basis to determine whether in a particular case the proposed expert applied reliable principles and methods in accordance with the standards of his profession to the relevant facts so that his opinions can be said to be relevant and reliable, and thus admissible.   Fed. R. Evid. 702.   Even if courts in unrelated cases deem an expert's testimony admissible, those determinations do not give the expert a free pass in later cases.   The court's gatekeeping role pursuant to Rule 702 and *Daubert* must be applied separately in each case.   Where the expert does not meet the basic standards of his profession, or abdicates his role as an expert to evaluate the facts, or does not fit his analysis to the facts of the case, his testimony should be excluded.   *See, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 294 (3d Cir. 2012) (affirming exclusion of expert and explaining "the trial judge must

4

determine whether the testimony has a 'reliable basis in the knowledge and experience of the relevant discipline'") (internal citations omitted).

IBEW seeks to buttress Dr. Rausser's testimony by discussing instances in which his opinions have been admitted. This argument, however, has the opposite effect, because it only serves to highlight (1) the 180-degree turn Dr. Rausser has taken from his testimony in *Nexium*, where he opposed class certification, and (2) the errors (repeated here) that caused other courts to reject Dr. Rausser's opinions.

### A.    Dr. Rausser's Prior Testimony in *Nexium* Supports Exclusion

IBEW attempts to distinguish Dr. Rausser's work in the *Nexium*[2] litigation on the basis that *Nexium* involved "two completely different drugs" (Nexium versus Prilosec and its generic equivalents) and centered on allegedly false claims by the manufacturer that Nexium was a superior product to Prilosec (and generic Prilosec). IPP Daubert Opp. at 25–26 (ECF No. 330). According to IBEW, the *Nexium* "[p]laintiffs' theory depended on individualized issues concerning why each consumer took Nexium, and the degree to which they were influenced by price, free samples, or other considerations." *Id.* Dr. Rausser claims the case required a "very specific form of analysis," but never explains what that was. Rausser Reb. Decl. ¶ 13. Dr. Rausser only asserts, again without explanation, that the *Nexium* litigation "is entirely unlike the present case . . . in which it is reasonable to presume that a consumer who actually bought the branded drug would have bought either the same brand or its less expensive generic equivalent had one been available." *Id.* ¶ 14.

These "distinctions" only serve to highlight why the principles and methodologies used by Dr. Rausser in *Nexium* to determine prices paid and likelihood of impact apply to this case as

---

[2] *Weiss v. AstraZeneca Pharm.*, No. B215901, 2010 WL 3387220 (Cal. Ct. App. Aug. 30, 2010) and related cases.

well to evaluate the exact same issues—prices paid and likelihood of impact. *See* Redacted Declaration of Gordon Rausser, Ph.D., in support of Defs. Opp. to Pls.' Mot. for Class Cert., *Weiss v. AstraZeneca*, No. BC323107 (Cal. Sup. 2008) ("Rausser Nexium Decl.") (attached as Ex. 11 to WC Class Cert. Opp. (Indirect) (ECF No. 234)). Just like in *Nexium*, the products at issue here—Doryx tablets and generic Doryx capsules—would not be AB-rated substitutes, and Dr. Rausser should have (but did not) evaluate whether in the but-for world a Doryx tablet patient would have continued to take Doryx tablets or instead switched to Doryx capsules or generic Doryx capsules. Those who would not have switched to generic capsules (brand loyal users) suffered no impact and should have been excluded from the classes, as Dr. Rausser argued in *Nexium*. *See id.* ¶¶ 90–97. Brand loyal users should ***not*** have been ignored, which is the approach he followed here.[3]

For consumers who would have switched to generic capsules in the but-for world, the actual price paid and the but-for price paid must be determined to evaluate whether impact could be shown on a classwide basis using evidence common to the classes. Thus, as Dr. Rausser argued in *Nexium,* because factors such as free goods, samples, and coupons (and others) affect those prices, such factors should have been examined—not ignored—when evaluating impact. The "distinctions" noted by IBEW have no impact on the procedures and methodologies that should have been, but were not, undertaken by Dr. Rausser to asses impact in this case.

**B.    Other Cases Evaluating Dr. Rausser's Opinions Support Exclusion**

IBEW's discussion of opinions that have criticized Dr. Rausser for failing to link his opinions to the facts of a case shows why his opinions should be excluded here.

---

[3] Dr. Rausser's model cannot accommodate brand loyal users because it concededly ignores them. *See infra* Part II.B.  IBEW's effort to dismiss brand loyal users as a non-issue fails because it rests on but-for world assumptions (multiple generic entry in July 2006, no Doryx tablet product, no product improvements) that, as shown in Part VI.C below, have no foundation in the record.

IBEW does not, because it cannot, contest that the court in *Allen v. Dairy Farmers of America, Inc.*, 279 F.R.D. 257 (D. Vt. 2011) rejected Dr. Rausser's analysis of common impact as "***fundamentally flawed***"—and thus inadmissible—because he ignored important variables and examined the wrong units of price comparison.  *Id.* at 269.  Instead, IBEW cites a later opinion in that litigation in which the court accepted a revised and corrected analysis from Dr. Rausser that addressed the court's concerns.[4]  IPP Daubert Opp. at 22.  Of course, this later opinion does not remedy the fact that Dr. Rausser's original opinion in that litigation was "fundamentally flawed" for many of the reasons that apply here.  *See* WC Daubert Mem. (Rausser) at 5 n.3 (ECF No. 236) (citing *Allen*).  Similarly, regarding *Oxygenated Fuels Ass'n, Inc. v. Pataki*, 293 F. Supp. 2d 170 (N.D.N.Y. 2003), IBEW concedes that Dr. Rausser "did not have an adequate evidentiary bases for his assumptions regarding a reduced supply of gasoline to New York."  IPP Daubert Opp. at 23.  Hence, the court's holding after a bench trial that "plaintiff has not made its case regarding the economic impacts," 293 F. Supp. 2d at 182, even though not technically a ruling on a *Daubert* challenge, supports Warner Chilcott's point that courts have rejected Dr. Rausser's opinions where (as here) they are not linked to the actual facts of the case.

IBEW likewise does not contest that *In re Potash Antitrust Litigation*, 954 F. Supp. 1334 (D. Minn. 1997) rejected his opinions because in that case, Dr. Rausser failed to take into account relevant market realities.  As IBEW concedes, the Eighth Circuit *en banc* "determined that Dr. Rausser's opinion was unavailing" because his opinion failed to take into account the facts of the case.  IPP Daubert Opp. at 24–25 (citing *Blomkest Fertilizer, Inc. v. Potash Corp. of*

---

[4] Even then, the court expressed concerns regarding Dr. Rausser's credibility from his change in theories.  *Allen v. Dairy Farmers of Am., Inc.*, No. 5:09-cv-230, 2012 WL 5844871, at *11 n.10 (D. Vt. Nov. 19, 2012) ("[The court] remains concerned that Dr. Rausser's damages theory has changed so appreciably in the course of class certification, especially when Dr. Rausser claimed that prior units of comparison and regression models possessed the same forceful explanatory power as the theory he currently espouses. . . . These concerns, however, implicate credibility determinations that are not required for purposes of class certification.").

*Saskatchewan*, 203 F.3d 1028 (8th Cir. 2000)).  IBEW's spin on this rejection—that *Potash* was a price fixing case and that "it was only a few pieces of evidence that were detrimental to the acceptance" of Dr. Rausser's opinion (*id*. at 25)—is irrelevant.  The court in *Potash* rejected Dr. Rausser's testimony because he failed to consider marketplace facts that mattered to the issue at hand, which is the same error he made here.

Warner Chilcott also cited *In re Southeastern Milk Antitrust Litigation*, 801 F. Supp. 2d 705 (E.D. Tenn. 2011) as another instance where Dr. Rausser's testimony was criticized and where a claim was dismissed in part because Dr. Rausser "ignored the commercial realities of the market."  WC Daubert Mem. (Rausser) at 5 n.3.  IBEW's argument that other portions of his opinions were not rejected does not diminish the point made by Warner Chilcott: courts have rejected Dr. Rausser's opinion in some instances because he ignored the pertinent facts of the case, and he has made the same mistake here.

IBEW also incorrectly argues that Warner Chilcott's reliance on *In re High Fructose Corn Syrup Antitrust Litigation*, 156 F. Supp. 2d 1017 (C.D. Ill. 2001) is inappropriate because the Seventh Circuit's opinion "adopted" Dr. Rausser's opinions in reversing the district court's decision.  IPP Daubert Opp. at 21–22.  This is not correct.  The Seventh Circuit reversed based on its own analysis of the underlying facts, not Dr. Rausser's.  *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655–56 (7th Cir. 2002).  At no point did the Seventh Circuit disagree with the district court's criticisms of Dr. Rausser's methods, much less "adopt" Dr. Rausser's opinions.  *See id.* at 660 (brief mention that expert gave uncontested testimony regarding market structure and performed a regression analysis).

### C.     IBEW's Reliance on *In re Flonase* Is Misplaced

IBEW relies heavily on the court's treatment of Dr. Rausser's opinion in *In re Flonase Antitrust Litigation*, 284 F.R.D. 207 (E.D. Pa. 2012), but that decision helps Warner Chilcott, not IBEW, and highlights Dr. Rausser's improper reliance on unsupported assumptions and failure to properly apply the procedures and methodologies of his profession.  First, in *Flonase*, the court only accepted Dr. Rausser's use of national average price data because he also examined actual price data for the ten states at issue and thus addressed some but not all of the court's concern that national average data would mask important price variability at the state level (the court removed uninsured consumers from the class for this reason).  284 F.R.D. at 228, 230.  Here, by contrast, Dr. Rausser's original report relied exclusively on national price data, and his rebuttal report does not contain the state-specific analysis required by *Flonase*.  *See infra* Part IV.A.  Moreover, an appropriate state-specific analysis shows that in this case, national pricing data masks substantial price variability for the two states at issue.  *Id*.

Second, Dr. Rausser's work in *Flonase* relied on the type of real world data that he improperly rejects here.  For example, Dr. Rausser used the actual world generic penetration rates for Flonase (88% after one month, 95% after a year, and 99% at the end of the class period) to model a but-for world for that product.  ██████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████.[5]  Dr. Cremieux, Warner Chilcott's economic expert, explained that using these real world data to infer the but-for world shows substantial members of the putative classes were not injured.  Cremieux Decl. ¶¶ 42–45

[5] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████

(consumers receiving rebates and/or coupons), 47–50 (uninsured consumers), 72–75 (various third party payers) (included with ECF No. 234).

Third, unlike the case in *Flonase*, Dr. Rausser's sensitivity analysis in this case ignores key variables and inputs that individually and collectively show no classwide impact. *See infra* Part V. For example, Dr. Rausser should have, but did not, include the Doryx tablet product in his but-for world. *Id.* He also should have, but did not, model generic-to-brand price ratios that were likely to prevail in the but-for world. *Id.* In fact, Dr. Cremieux showed that Dr. Rausser's sensitivity analysis was not capable of testing for common impact, and that when the model was adjusted for these and other factors, the analysis provided no support for Dr. Rausser's conclusion of common impact. *See, e.g.*, Cremieux Decl. ¶ 76.

Fourth, the *Flonase* court excused Dr. Rausser's inability to show injury to each class member, explaining that "inability to show injury as to a ***few*** does not defeat class certification." 284 F.R.D. at 227 (internal citations omitted). Here, by contrast, ***substantial numbers*** of putative class members were not injured. *See, e.g.*, *supra* Part II.B.

Lastly, in *Flonase*, Dr. Rausser actually demonstrated that the named plaintiffs suffered injury. 284 F.R.D. at 227. ██████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ Tellingly, despite otherwise embracing *Flonase*, IBEW seeks to distinguish it on this point. IPP Class Cert. Reply at 24 n.10 (ECF No. 331). IBEW claims instead that it should be treated like the "pre-generic" purchasers in *In re Relafen*, 221 F.R.D. 260 (D. Mass. 2004), but those entities never purchased the brand or the generic after generic entry, and the underlying claim included allegations that the brand price was inflated. *Id.* at 272. Here, by contrast, IBEW purchased the brand but not the generic after generic entry (making it

10

proper to infer it would have had the same experience in the but-for world), and IBEW does not allege that the price of Doryx was inflated (Dr. Rausser's assumes the price of Doryx would be the same in the but-for world). Moreover, *Relafan* **denied** certification of the proposed Florida indirect purchaser class, holding that the indirect plaintiffs did not make the stronger showing of impact required by Florida law. *Id.* at 280–82 (quoting *Execu-Tech Bus. Sys., Inc. v. Appleton Papers Inc.*, 743 So. 2d 19, 21–22 (Fla Dist. Ct. App. 1999)) (holding that plaintiffs did not "come forward with a methodology by which they would be able to show by generalized proof that [the allegedly illegal acts] had impacted each class member individually").

## II.    Dr. Rausser Cannot Hide the Fundamental Errors in His Consumer Impact Analysis

Warner Chilcott's opening brief exposed two fundamental—and disqualifying—errors in Dr. Rausser's impact analysis. First, Dr. Rausser failed to consider a variety of marketplace facts that indisputably affected the prices paid by consumers, *e.g.*, consumer / physician brand loyalty, use of coupons and samples, widely varying co-pay structures, and patient deductibles in insurance plans. A proper analysis of these factors revealed that seven categories of consumers, consisting of tens of thousands of putative class members, were not impacted. WC Daubert Mem. (Rausser) at II.a–b. Second, Dr. Rausser's sensitivity analysis—the basis for his impact opinion as to TPPs—included structural errors because it did not consider various market facts (*e.g.*, samples) that affected the price paid by TPPs, and was not reliably applied because several factors were considered improperly. *Id.* at 19 n.9.

IBEW obtains no refuge by claiming that these disqualifications are "not resolvable" on a *Daubert* challenge because they relate only to the weight, not the admissibility, of Dr. Rausser's opinions. Where, as here, the expert's opinions do "not suffer from mere technical flaws, but from fatal flaws," a court "fulfill[s] its duty as a gatekeeper in excluding [such] evidence."

11

*Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 120–21 (3d Cir. 2004) (finding plaintiff's argument that the Court's "critique" of its expert's methodology should only affect its evidentiary weight to be "unpersuasive" because the methodology used by plaintiff's expert was "fundamentally flawed"); *see also Miller v. Pfizer, Inc.*, 356 F.3d 1326, 1335 (10th Cir. 2004) (flawed foundation of expert opinions went to admissibility of testimony and not merely to weight); *In re Novatel Wireless Sec. Litig.*, 846 F. Supp. 2d 1104, 1108 (S.D. Cal. 2012) (loss causation expert excluded; "contention that this is a question of weight, not admissibility, unpersuasive"); *Hilton v. Horcher GmbH*, No. 03-6084-CV-SJ-GAF, 2004 WL 4056050, at *6 (W.D. Mo. Dec. 13, 2004) (foundation of testimony was insufficient, which went to admissibility of testimony and not simply to its weight).  IBEW's reliance on *In re Chocolate Confectionary Antitrust Litigation*, 289 F.R.D. 200 (M.D. Pa. 2012) is misplaced because the court there found that "the vast majority" of the factual findings used by the expert were undisputed, and there was nothing "controversial or unique" in the expert's opinion.  *Id.* at 210, 210 n.13.[6]  Here, among other things, Dr. Rausser diverges from opinions he has offered in the past, employs assumptions that have no factual support, and offers conclusions that do not fit the facts.

    IBEW's related claim that Warner Chilcott is only complaining "because [Dr. Rausser] did not adopt their interpretation of the evidence because he utilized data that is different than the data used by Defendants' own experts" is equally erroneous.  IPP Daubert Opp. at 27.  Court's routinely disqualify experts for failing to reliably apply accepted methodologies when they, for

---

[6] IBEW's other cases (IPP Daubert Opp. at 27 n.54) are similarly inapposite because they do not address situations with the type of critical failures present here.  *See, e.g., In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 86 (D. Mass. 2007) (the *sole* failure of an economist to consider certain data *if the expert explains her choice of data* goes to weight not admissibility) (emphasis added); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 973 (C.D. Cal. 2012) ("*As a general matter,* flaws in a proffered expert's analysis typically go to the weight, rather than the admissibility, of the expert's testimony.") (emphasis added).

example, ignore key factors or rely on unfounded assumptions.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 773 (expert's calculation, based on inaccurate assumptions and ignoring inter-laboratory comparison data, was unreliable under *Daubert*); *see also Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co., Inc.*, No. 99 C 4040, 2002 WL 398521, at *2 (N.D. Ill. Mar. 14, 2002), *rev'd on other grounds*, 313 F.3d 385 (7th Cir. 2003) (holding expert was unreliable where expert's conclusions "proceeded from the expert's commitment to a totally false premise about the nature of the litigation.  In the computer field such efforts, proceeding from a mistaken assumption to a necessarily mistaken conclusion, long ago earned the sobriquet 'GIGO': Garbage in, Garbage out."); *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449–50 (2d Cir. 1999) (affirming rejection of expert's regression analysis because it did not account for major variables or other possible alternatives); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 669 (S.D.N.Y. 2007) (rejecting expert's regression analysis because there was no "credible testimony from a knowledgeable witness that the obvious alternatives were considered, analyzed, and ruled out").[7]

### A.   Dr. Rausser's Failure to Exclude From His Opinion Whole Categories of Consumers that Now Have Been Excluded from the Classes Shows That His Impact Opinion Was Improper under *Daubert*

Dr. Rausser's testimony should be excluded because his methodology for assessing impact was not reliable—he failed to consider critical facts (such as coupons) and not surprisingly reached erroneous results.  For example, Dr. Rausser previously testified that "if you didn't take [coupons] into account, you would miss the ultimate assessment of common impact,

---

[7] Contrary to IBEW's assertion (IPP Daubert Opp. at 28), *Blades v. Monsanto Co.,* 400 F.3d 562 (8th Cir. 2005) shows why Dr. Rausser's testimony is inadmissible.  In affirming the district court's denial of certification, the court specifically stated that the "plaintiffs presume class-wide impact without any consideration of whether the markets or the alleged conspiracy at issue here actually operated in such a manner so as to justify that presumption.  Dr. Leitzinger [plaintiffs' expert] *assumes* the answer to this critical issue and plaintiffs, in turn, have asked the Court to rely on this *conclusion* as support for class certification."  *Id.* at 570.

and miss accurately measuring damages." Feb. 27, 2013 Trial Tr. at 192:3–5, *In re Flonase*, 284 F.R.D. 207 (Testimony of Dr. Rausser) (Ex. 23 to WC Class Cert. Opp. (Indirect)).   Here, uninsured and insured consumers received the benefit of approximately $350 million in discounts and rebates from Doryx coupons.  Dr. Rausser concedes that these coupons would not be available in the but-for world, yet he excluded them from his analysis of impact.

Dr. Cremieux undertook the analysis that Dr. Rausser failed to do and found that tens of thousands of uninsured consumers would have been worse off in the but-for world.  Cremieux Decl. ¶ 49.  Dr. Cremieux's results were similar for insured patients, where he found over 300,000 Doryx prescriptions for which the insured consumer paid zero out of pocket for her prescription, and over 129,000 Doryx prescriptions for which the insured consumer paid $10 or less out of pocket for her prescription.  In each situation, there likely was no impact, because the generic co-pay likely would have been higher than the real world out-of-pocket expense for Doryx.  Cremieux Decl. ¶ 45.

IBEW cannot "cure" Dr. Rausser's error by redefining the classes to exclude insured and uninsured patients who used coupons for all of their Doryx purchases.[8]  His task was to apply the "intellectual rigor" of his profession and he did not do so.  Moreover, Dr. Rausser still has not provided a formulaic methodology for identifying the consumers (patients who used coupons for all, not just some, of their Doryx purchases and flat co-pay payers) that IBEW now concedes

---

[8] Dr. Rausser inexplicably continues to believe he did nothing wrong (despite his *Nexium* testimony), contending that these consumers—who are now excluded from the classes—were impacted by the unlawful conduct.  Rausser Reb. Decl. ¶ 20 ("Although I disagree with Defendants' arguments, the dispute can readily be avoided by excluding certain patients using coupons from the class definition  . . . .").  IBEW's willingness to ignore its expert's opinion and exclude tens of thousands of consumers from the classes to "avoid a dispute with Warner Chilcott," (IBEW Motion to Strike Opp. Ltr., dated July 10, 2013, at 3) proves that there is an inherent and disqualifying conflict between the interests of IBEW, a TPP that is unaffected by the exclusion, and consumers, who are affected.  WC Class Cert. Opp. (Indirect) at 3, 58–59.

14

must be excluded.[9]   IBEW claims "Dr. Rausser describes how he adjusted his methodology to account for the redefined class that excludes consumers who purchased Doryx with a coupon and never purchased Doryx or generic doxycycline hyclate DR without a coupon."  IPP Daubert Opp. at 31 n.59 (citing Rausser Reb. Decl. ¶¶ 21–23).  (IBEW does not contend that Dr. Rausser has offered a formulaic methodology for identifying the newly excluded flat co-pay consumers.)  But Dr. Rausser's "adjustment" does no such thing and merely perpetuates his improper "aggregate damages" approach.  By removing *all* coupon transactions from the calculation of damages, Dr. Rausser's modified approach fails to consider the benefit received by members of the revised classes that used coupons for some of their purchases.  These benefits allowed a substantial portion of the putative class to pay less for Doryx in the actual world than they would have in IBEW's but-for world.  This *underpayment* needs to be netted against any *overpayment* they may have made on non-coupon purchases to properly determine impact.  *See infra* Part II.C.  Of course, proper netting of these transactions likely would show that a significant share of the revised class was not impacted.  Further, such an analysis would require individual inquiry because the Warner Chilcott coupon data does not provide information on non-coupon purchases.

### B.    There Is No Valid Explanation for Dr. Rausser's Failure to Account for Brand Loyal Consumers, Free Samples, and Deductibles

Dr. Cremieux identified critical factors Dr. Rausser should have, but did not, address in his analysis.  These errors render Dr. Rausser's opinions unreliable and inadmissible.  *See, e.g.*, *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 773.

---

[9] IBEW describes another category of "excluded" consumers—consumers who purchased generic Doryx only—but such consumers were never part of the classes to begin with.  *See* IPP Class Cert. Mem. at 2 (ECF No. 156) (defining each of the three proposed classes as "[a]ll persons or entities . . . who reimbursed for, or indirectly purchased, other than for resale, *branded Doryx* . . . .") (emphasis added).

*Failure to account for the economic effect of free samples.*  Dr. Rausser opined in the *Nexium* litigation that "the number of free samples received" was a necessary and appropriate input to estimate damages for uninsured consumers in a class of this type, and he criticized the plaintiffs' expert for failing to consider the economic effect of samples.  WC Daubert Mem. (Rausser) at 11.  This of course makes sense, because a free sample directly reduces the overall price for a course of treatment.  For example, if a patient requires 90 days of Doryx therapy, and receives a free sample for 15 days, the patient's cost is reduced because she only needs to pay for 75 days of therapy, with the remaining 15 days being free by virtue of the sample.  In a but-for world without the sample, the patient would be required to pay her portion of the entire 90 day course of therapy.  Thus, in a real economic sense, the free sample affects the price paid by the consumer.

On rebuttal, Dr. Rausser asserts for the first time that "[f]ree samples are not purchased, and Class members did not pay for them.  Therefore, they fall outside the scope of the Class definition and are not included in this analysis."  Rausser Reb. Decl. ¶ 71.  If as suggested elsewhere in his report, Dr. Rausser limits this exclusion to "recipients of *only* free samples" (*id.* ¶ 73), he of course has failed to address the point, which is that samples are no different than coupons because they reduce the overall cost to a patient of a course of therapy.  *See* Surrebuttal Declaration of Pierre-Yves Cremieux ("Cremieux Sur. Decl.") ¶ 31.[10]  Thus, like coupons, samples must be factored into the overall price paid by a consumer for her Doryx therapy.  *See id.*

If instead Dr. Rausser contends free samples have no effect on the price paid by a patient for a course of therapy, he offers no reason for this wholesale—and incorrect—change in

---

[10] We are simultaneously seeking leave from the Court to file the Surrebuttal Declaration of Pierre-Yves Cremieux in response to Dr. Rausser's improper, 96-page rebuttal declaration.

position from the *Nexium* litigation.   In short, Dr. Rausser failed to consider a key factor affecting price—and thus impact—that he previously admitted should be considered and that, in this case, shows substantial numbers of consumers were not impacted.  *See* Cremieux Decl. ¶ 46 ("tens of thousands of consumers" received free samples); *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 773.

*Failure to exclude brand loyal consumers*.   IBEW does not dispute that brand loyal consumers suffered no impact because in the but-for world they would have stayed with the brand and their acquisition price would not have decreased.  Dr. Cremieux estimated that there likely were over 47,500 brand loyal, insured consumers over the class period.  Cremieux Decl. ¶ 32.  IBEW's own data confirm the substantial percentage of brand loyal users. ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████[11]. ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

Dr. Rausser's rebuttal (¶¶ 64–67) exposes the speculative, unscientific, and unreliable nature of his analysis on this issue.  First, he simply ignores the data from his own client, which shows a high percentage of brand loyal users.  Second, he compounds this error by misusing the

---

[11] IBEW did not produce this data until June 27, 2013.  *See* Email from W. Noss (Ex. 2).

data used by Dr. Cremieux.  For example, Dr. Rausser limits one analysis to 75 and 100 mg Doryx tablets one year after generic entry, but ignores IBEW's assertion (in reliance on him) that Warner Chilcott "restrict[ed] sales of these formulations" after launch of the 150 mg strength of Doryx tablets, IPP Daubert Opp. at 8, which of course makes the 75 mg and 100 mg tablet data useless as an indicator of brand loyalty.  *See also id.* at 9 ("Defendants 'hopped' to the 150 mg tablet resulting in the generic 75 mg and 100 mg tablets making no noticeable mark on brand sale."); Cremieux Sur. Decl. ¶ 43.  Even that result, which understates brand loyalty, would extrapolate to almost 47,000 insured consumers, a fact Dr. Rausser ignores.  Cremieux Sur. Decl. ¶ 42; Cremieux Decl. ¶ 32.  Third, Dr. Rausser's critique of the OptumHealth data showing examples of brand loyalists that paid more for the brand after generic entry (Rausser Reb. Decl. ¶ 65) likewise fails because he skews the analysis by using only a portion of the data and then speculates why the results he finds in the data are incorrect.  As Dr. Cremieux explains, to determine the real causes of these changes would require an individualized inquiry.  Cremieux Decl. ¶ 31; Cremieux Sur. Decl. ¶¶ 44.

IBEW cannot escape Dr. Rausser's failures by claiming that he "has presented a model that can take into account those parties that are determined to be uninjured . . . and in any event, the issue of determining which Class Members are brand loyalists relates to the quantum of damages as does not preclude Class certification."  IPP Daubert Opp. at 29.  Dr. Rausser confirms that he did not provide a formulaic methodology to identify and exclude brand loyal consumers; he rejected the need to do so.  Rausser Reb. Decl. ¶ 73 ("The remaining category, consumers who continued to buy the brand, are an insignificant percentage of the class and need not be excluded.").  And IBEW's citation to *Teva Pharmaceuticals v. Abbott Labs.* (Tricor), 252 F.R.D. 213 (D. Del. 2008) is inapposite because the court there applied a pre-*Comcast* analysis to

18

allegations that brand loyal users would have been impacted because the brand price allegedly would have been lower in the but-for world.  Here, by contrast, the opposite is true. ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

### C.    Dr. Rausser's "Transaction" Based Approach Contradicts Basic Economic Analysis

Contrary to basic economics, Dr. Rausser's rebuttal seems to take the position that impact and damages for putative class members should be based on only a subset of prescription transactions involving each proposed class member.  For example, if an insured consumer's Doryx course of therapy included (1) a free sample, (2) a prescription for which a coupon was used, and (3) a prescription for which no coupon was used, Dr. Rausser would apparently exclude the first two transactions from the putative class—where the consumer suffered no harm—but include the last one—where the consumer may have been harmed.  Doing so allows Dr. Rausser to claim "impact" as to all "transactions" included in the proposed class.  This tactic, which would improperly overstate the purported harm to class members, is contrary to the basic approach of economics to the question of individual impact.  See Cremieux Sur. Decl. ¶ 29; ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, at 61 (2D ED. 2010) (citing *L.A. Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1366–73 (9th Cir. 1986)) ("Similarly, the but-for principle requires that the calculated differential between the but-for and actual plaintiff incorporate benefits the plaintiff derived from the violation.  By definition, those benefits would not exist in the but-for world.  If the quantification of the but-for plaintiff is not adjusted to ensure that the offsetting benefits are accounted for, the differential will be overstated, and the plaintiff will be overcompensated.").

19

**III.    Dr. Rausser's Third Party Payer Impact Analysis is Unreliable and Must be Excluded under *Daubert***

Dr. Rausser ignored facts in favor of sweeping conclusions in his impact "analysis" for TPPs.  *See* WC Class Cert. Opp. (Indirect) at III.C.  Specifically, he ignored the following key marketplace realities that any expert should have addressed, most of which he himself emphasized in the *Nexium* case: brand loyal plan participants, risk sharing arrangements, pass on through premium adjustments, reimbursement timing, deductibles, and prescription benefit maximums.  When considered, each factor shows why an individualized inquiry would be required to determine impact.  Dr. Rausser's failure to apply the "intellectual rigor that characterizes the practice of an expert" in the field of economics to these market realities requires rejection of his opinions.  *ZF Meritor*, 696 F.3d at 290 (quoting *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000)) ("In an antitrust case, an expert opinion generally must 'incorporate all aspects of the economic reality' of the relevant market.").

**A.    No Impact for Reimbursement of Prescriptions for Brand Loyal Plan Members**

Dr. Rausser does not dispute that TPPs are not impacted when they reimburse for prescriptions of brand loyal plan members, because the cost to the third party payer for those prescriptions in the but-for world would be the same (or higher) in the actual world.  Dr. Rausser's failure to consider this factor, which requires a complex, plan-by-plan analysis, renders his testimony unreliable and shows why class certification should be denied.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 773 (district court did not err in concluding that expert's calculation, based on inaccurate assumptions and ignoring inter-laboratory comparison data, was unreliable under *Daubert*); *see also Comcast*, 133 S. Ct. at 1433 ("a model purport[ed] to serve as evidence of damages in [a] class action must measure only those damages attributable to that

theory"). IBEW cannot remedy this fundamental problem by claiming that in a *post hoc* analysis Dr. Rausser "determined that brand loyalists make up a minor portion of the proposed class" and that "few brand loyalists actually would have benefitted from the delay in generic entry." IPP Daubert Opp. at 29 (citing Rausser Reb. Decl. ¶ 64). Dr. Cremieux estimated that there likely were hundreds of TPPs that would have been uninjured because they only reimbursed brand loyalists. Cremieux Decl. ¶ 73.

> **B.** **Dr. Rausser Ignored the Individualized Inquiry Required to Determine Which Third Party Plans Were at Risk and Thus Potentially Impacted**

Dr. Rausser acknowledges that determining whether an entity is ultimately responsible for the cost of reimbursement is central to evaluating impact, but he admittedly provides no methodology for undertaking this inquiry. WC Daubert Mem. (Rausser) at 17–18; ████████ ████████████████████████ Even for the "fully insured health plans" that Dr. Rausser agrees were not impacted and must be excluded from the class, Dr. Rausser provides no formulaic methodology for identifying and removing such plans. WC Daubert Mem. (Rausser) at 18.

For plans that share only part of the risk of prescription drug costs, an individualized inquiry would be required to identify and evaluate such plans to determine impact. Cremieux Decl. ¶ 60; Rausser Nexium Decl. ¶ 98 (contractual relationships "are highly variable across [third party payers]"). Rather than contest this point, IBEW claims "risk sharing" does not impact the analysis (IPP Daubert Opp. at 12–13, n.22), but only cites Dr. Rausser's say so for this position, an approach routinely rejected by courts.[12] *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000) (excluding expert who merely provided statements based on his professional training; the experts "*ipse dixit*" does not withstand *Daubert* scrutiny); *see also G.E.*

---

[12] As discussed below, Dr. Rausser's sensitivity analysis does not solve this problem because risk sharing was not a factor examined in that analysis.

*v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). IBEW further claims that Dr. Rausser's failure to consider risk sharing and related factors is excusable because he "is not required to address every possible variable—instead, he applied a well-established methodology that included variables that he considered to be the most relevant to his determination of Class-wide common impact." IPP Daubert Opp. at 13 n. 22. But a failure to consider factors that matter warrants exclusion. *See, e.g.*, *Bickerstaff*, 196 F.3d at 449–50; *see also Freeland v. AT&T Corp.*, 238 F.R.D. 130, 143–49 (S.D.N.Y. 2006) (holding plaintiff's expert's regression analysis was "so incomplete as to be inadmissible as irrelevant" when expert excluded a quality variable without persuasive explanation) (internal quotations omitted). Dr. Rausser's unsupported dismissal of these factors is even more egregious here because he elsewhere has asserted that they are critical for examining impact in similar situations. Rausser Nexium Decl. ¶ 98.

### C.    Dr. Rausser Offers No Reasons for His Failure to Consider Important Economic Factors Bearing on Class Certification

#### 1.    Dr. Rausser Failed to Consider Third Party Payer Pass On of Prescription Drug Costs

Dr. Rausser's failure to consider pass on of the alleged overcharge fatally undermines his impact conclusion because any basic economic analysis of harm would include an analysis of whether and to what extent a party was able to pass on the alleged overcharge. *See* WC Daubert Mem. (Rausser) at ¶¶ 19–20 (citing cases discussing the premium setting process). If a third party payer passed on any alleged "overcharge" through premiums charged to insured plan members, then those TPPs would not be impacted. Evaluating pass on would require an

individualized inquiry to determine whether and to what extent the pass on occurred. *Id.* IBEW does not contest application of the pass on defense, nor does it contest the fact that Dr. Rausser did not even attempt to analyze pass on. Instead, IBEW claims pass on is a "red herring" because Dr. Rausser's sensitivity analysis concluded that "virtually all third-party payers were harmed by Defendants' anti-competitive conduct." IPP Daubert Opp. at 30 (citing Rausser Decl. ¶ 108). This assertion makes no sense, because Dr. Rausser's sensitivity analysis did not consider the issue of pass on. That is one of the many reasons why his sensitivity analysis—and his impact opinion—are unreliable.

Moreover, IBEW's explanation regarding its own plan (contributions taken from union members' salary increases are what funds the increase in the plan's prescription drug expenditures) shows that union members, not IBEW, bear any alleged "overcharge," but Dr. Rausser ignores this pass on ████████████████████████████████████████

████████████████[13] Cremieux Decl. ¶ 70. IBEW does not (and cannot) show that TPPs set premiums expecting a generic Doryx launch that was purportedly "delayed" by Warner Chilcott. Nor does IBEW claim that TPPs set premiums expecting certain prices on Doryx by actually paying higher (*i.e.*, inflated) prices for Doryx because of alleged monopoly conduct. IBEW's excuses consequently provide no cover for Dr. Rausser's failure to analyze this issue.

### 2. Failure to Address the Impact of Deductibles and Prescription Benefit Maximums

Dr. Rausser concedes that he did not consider patient deductibles and prescription benefit maximums in his sensitivity analysis, even though these factors affect the cost of a prescription

---

[13] IBEW's reference to *In re Terasozin Hydrochloride Antitrust Litigation*, 220 F.R.D. 672 (S.D. Fla. 2004) (IPP Class Cert. Reply at 26) does not excuse this error because that case involved allegations that the price for the brand name product was inflated resulting in an overcharge. *Id.* at 686–87. Dr. Rausser's analysis here, however, assumes no "inflation" of the price of Doryx. Instead, the "overcharge" allegedly flows from TPPs' inability to take advantage of assumed lower prices on a generic Doryx capsule (not tablet) product, a materially different situation.

to a third party payer (deductibles shift some or all of the cost of a prescription to a consumer, until the deductible is met).  Cremieux Sur. Decl. ¶¶ 24–25.  Dr. Rausser now claims he was right to ignore deductibles, citing to OptumHealth data to conclude that only a minimal number of consumers in any particular year will get to December (*i.e.*, the end of the plan year) without reaching the applicable deductible.  Rausser Reb. Decl. ¶ 87.  But, whether a third party plan is injured depends on all of the transactions for which it reimburses, not just those in December, and even a small number of prescriptions affected by a deductible can have a significant effect on the impact analysis because, as IBEW's own data show, third party plans may only reimburse for a handful of Doryx prescriptions.  *See* Cremieux Sur. Decl. ¶¶ 25–26 (61% of the plans in the OptumHealth data reimbursed for at least one Doryx prescription that was at least partially paid for by a consumer deductible).

Dr. Rausser's statistics regarding out of pocket maximums, which potentially shift costs from a consumer to a third party payer, are irrelevant because Dr. Cremieux does not discuss this issue when evaluating Dr. Rausser's sensitivity analysis.  Instead, Dr. Cremieux explained the implications of Dr. Rausser's failure to address prescription benefit maximums, which potentially shift costs in the opposite direction (from third party plans to consumers), and thus must be assessed when considering whether a third party plan may avoid being injured on the purchases made by a plan member during the class period.  Cremieux Sur. Decl. ¶ 24; Cremieux Decl. ¶ 68.

## IV.  Rausser Has No Answer for the OptumHealth Data Which Show Dr. Rausser Failed to Apply Accepted Principles and Methods

Actual prescription-level data provides important marketplace information for evaluating impact and damages in a case like this one.  Dr. Rausser has used such data in the past to oppose class certification because, as he explained, such data provides "individual transaction prices

reveal[ing] meaningful differences" from average retail price data.  Rausser Nexium Decl. ¶ 55.

Here, Dr. Rausser failed to look at prescription-level data, ████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████  Dr. Cremieux took the steps that

Dr. Rausser did not and analyzed a commonly used data set from OptumHealth that was

compiled from actual prescriptions paid by insurance companies—exactly the type of data Dr.

Rausser has relied on in the past.

      **A.**     **Dr. Rausser's Review Confirms the OptumHealth Data Are Reliable**

Dr. Cremieux used the OptumHealth data set primarily to derive prices and

prescription/patient counts.  The data showed that (1) Dr. Rausser's use of national prices hid

important price variability across TPPs at the state level (Cremieux Decl. ¶¶ 102–03 & Exhibits

13.1–13.3); (2) in many instances, the price paid by TPPs for Doryx 100 mg tablets (before

considering the effect of manufacturer rebates or samples, which were available for Doryx but

would not be available for generic versions) was similar to, or even less than, prices paid for

generic versions, a finding nowhere accounted for in Dr. Rausser's impact analysis (Cremieux

Decl. ¶ 74 & Exhibits 12.1–12.7); and (3) there are a number of examples of brand-loyal patients

who paid the same or more for the 100 mg brand product after generic entry when compared to

the amount paid before generic entry, suggesting that brand loyalists benefited from the alleged

delay (Cremieux Decl. ¶ 30).  These data show that Dr. Rausser did not follow the principles and

methods in his field in reaching his opinions.

Dr. Rausser's rebuttal seeks to divert attention from his failings by claiming that the

OptumHealth data set, which has been cited in over 180 peer-reviewed articles,[14] included 14

---

[14] Cremieux Sur. Decl. ¶ 10.

types of "errors" purportedly impacting 34% of the records.  Rausser Reb. Decl. ¶ 28–31.  But Dr. Rausser's claim is a mirage because when he purports to "clean" the data set to "correct" for these errors, he makes adjustments affecting **less than** 3% of the transactions in the database, the rest of the supposed "errors" are ignored.  This confirms that the OptumHealth data set is actually very reliable.  Cremieux Sur. Decl. ¶ 10.  More importantly, Dr. Rausser (1) concedes that Dr. Cremieux already addressed any so-called "errors" relevant to his analysis, Cremieux Sur. Decl. ¶ 10; Rausser Reb. Decl. ¶ 29, and (2) does not claim that these "errors" impacted any of Dr. Cremieux's calculations, results, or opinions.  Cremieux Sur. Decl. ¶¶ 11–14.  In short, the supposed "errors" in the data set are meaningless.  *Id.*

### B.   The OptumHealth Data Confirm That Prices Paid Are Variable and Thus Require an Individualized Inquiry on Impact

Dr. Rausser claims that the OptumHealth data show that there is little price variability, but his new calculations do not measure anything relevant.  Dr. Rausser calculates the non-mail order total payment per pill (both consumer portion and third party payer portion) and shows that this price does not vary by state for any particular third party payer.  Rausser Reb. Decl. ¶ 45. But, Dr. Rausser's analysis is useless for looking at state-to-state variability, because it controls for variation in prices across plans that Dr. Rausser's proposed data source cannot control for. Cremieux Sur. Decl. ¶ 39.   Dr. Rausser does not dispute that agreements affecting TPP reimbursement are highly variable.[15]  Thus, by presenting his new analysis on a plan-by-plan basis, Dr. Rausser **removes** a significant amount of the variation in prices (*i.e.*, the variation between plans) and thus measures nothing relevant.  *Id.*   Dr. Cremieux presents the same

---

[15] For example, agreements between TPPs and PBMs with respect to the share of rebates the PBM passes on to the TPP vary.  Agreements between TPPs and plan members likewise vary in terms of the cost sharing between the plan and its members.  Cremieux Sur. Decl. ¶ 38.

analysis, but includes transactions for multiple companies, and shows **substantial** price variability.  Cremieux Sur. Decl. ¶¶ 37–39 & Exhibits 3.1–3.4.[16]

Dr. Rausser's second analysis using OptumHealth data is equally irrelevant.  He calculated the total payment per pill for each purchase of 75 mg or 100 mg Doryx tablets and their generic equivalents for each plan.  His graphs separate brand from generic and mail order from non-mail order.  This analysis is irrelevant because (1) it does not exclude the amount paid by the patient, which likely will vary depending on whether the brand or the generic drug is reimbursed; (2) it looks myopically at a particular plan, but reimbursement rates vary from plan to plan, and it is that variability among third party plans that matters; (3) it separates out mail order and retail reimbursement, which adds nothing to the analysis because a plan typically uses separate rates for each channel of distribution; and (4) it fails to include manufacturer rebates, which would increase variability.  Cremieux Sur. Decl. ¶ 38.

When Dr. Rausser's analysis is corrected to analyze just the third party payment portion of the reimbursement, it confirms Dr. Cremieux's findings that the price paid by TPPs for Doryx was similar to, or even less than, prices paid for generic Doryx.  Cremieux Sur. Decl. ¶¶ 40–41 and Exhibits 4.1–4.2.  Dr. Cremieux's analysis finds examples of companies that actually had a **higher** average price for the generic, not the brand, and the price ranges show that for each plan, the price paid for the generic is not always less than the price paid for the brand.  *Id.*  This analysis does not even consider the effect of rebates paid to TPPs by Warner Chilcott, which would only add to the variability shown in the data.  *See id.*  These simple calculations show why

---

[16] ███████████████████████████████████████████████

individualized inquiry is necessary in this case, and why Dr. Rausser's use of averages and total prices is fundamentally flawed.  *See id.* ¶¶ 39–41.

## V.  Dr. Rausser's Rebuttal Report Cannot Cure the Fundamental Problems with His Sensitivity Analysis

Warner Chilcott's opening brief explained why Dr. Rausser's sensitivity analysis—the basis for his impact opinion regarding TPPs—was selective and incomplete and thus unreliable. WC Daubert Mem. (Rausser) at 19 n.9.  Dr. Rausser's sensitivity analysis modeled various levels of patient co-payments and manufacturer rebates and claimed that in all co-payment / rebate scenarios, all TPPs would have been impacted.  But Dr. Rausser did not reliably apply this analytical tool, as he ignored a number of key variables in his analysis.  *See infra* Part V.A.  This includes samples, which lower (as he has conceded elsewhere) the actual, effective price paid by TPPs and which would not be available in the but-for world.  More importantly, a critical part of Dr. Rausser's analysis was his assumptions regarding the but-for world (including the generic-to-brand price ratio).  *Id.*  As Dr. Cremieux explained, however, running Dr. Rausser's model with different generic-to-brand price ratios taken from the article cited by Dr. Rausser (while holding all else the same) drastically changes his results, and shows how this analysis provides no support for Dr. Rausser's conclusion of common impact.  Cremieux Sur. Decl. ¶ 22 & Exhibit A; Cremieux Decl. ¶ 65.  Dr. Rausser's sensitivity analysis thus did nothing to disprove Warner Chilcott's point that the third party payer impact analysis would require an individualized inquiry.

In short, Dr. Rausser selected the most favorable data to use in his model, ignoring variables that would drastically change his results.  *See* Cremieux Sur. Decl. ¶ 22; Cremieux Decl. ¶ 65.  Because his selection of data used in his model is based on "subjective belief or unsupported speculation" his opinion should be excluded under *Daubert*.  *Oddi*, 234 F.3d at 155

(quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 745 (3d Cir. 2000)); *see also Bickerstaff*, 196 F.3d at 449–50.

A.    **The Sensitivity Analysis Actually Shows an Individual Inquiry Would Be Required to Assess Impact**

Dr. Rausser's rebuttal does nothing to alter the conclusion that an individual inquiry is necessary to assess impact.

*Basic testing shows Dr. Rausser did not reliably use his own tool.*   Dr. Rausser claims Dr. Cremieux used "unreasonable" generic-to-brand price ratios when he tested Dr. Rausser's assertions regarding his sensitivity analysis.   Rausser Reb. Decl. ¶ 75.   But, Dr. Rausser's fundamental contention is that his damages model can be adjusted to accommodate ***any*** change in the assumptions used to generate the but-for world, including: (i) the generic entry date; (ii) the quantity of Doryx and its generic equivalents that would have been sold each month following such generic entry; (iii) the rate of conversion from brand to generic; (iv) the prices charged for the brand and the generics; and (v) the amount paid for Doryx and its generic equivalents in the actual world.[17]   It is hardly open to Dr. Rausser to complain about an analysis that simply tests this assertion—and proves that it is wrong—with examples from articles and documents relied on by Dr. Rausser.

Specifically, Dr. Cremieux altered—in Dr. Rausser's supposedly "flexible" model—the generic-to-brand price ratio in the but-for world (item iv in Dr. Rausser's list) by using additional data from an academic study relied upon by Dr. Rausser.   Dr. Cremieux found that Dr. Rausser's conclusion that nearly all TPPs were harmed no longer held under these alternative assumptions.[18]   Dr. Rausser's only complaint, buried in a footnote, is that this normal testing of

---

[17] Rausser Reb. Decl. ¶ 93.
[18] Cremieux Decl. ¶ 75.

his model was an "unwarranted modification" that was "completely unrealistic."[19]   But, Dr. Rausser provides no support for this reaction because there is none.

Indeed, Dr. Cremieux found that using alternative generic-to-brand price ratios from the same article relied upon by Dr. Rausser changed the "conclusion" that all plans were harmed. For example, leaving all else the same but using an alternative ratio from the academic study cited by Dr. Rausser,[20] his sensitivity model shows periods during the proposed class period when plans are not damaged (damages are negative).  Cremieux Sur. Decl. ¶ 22; Cremieux Decl. ¶ 65.  Exhibit 2 of Dr. Cremieux's Surrebuttal Declaration shows the estimated damages for all 44 companies in the OptumHealth data with at least one Doryx prescription between September 21, 2008 and Q1 2012 for a member residing in Florida.  Dr. Cremieux found that 11 companies (25.0%) would not be harmed, even if they had the other plan characteristics (rebates and co-payment amounts) used by Dr. Rausser in his TPP "Sensitivity 1" analysis.[21]

It bears emphasizing that these are not isolated examples.  While they reflect a particular set of alternative assumptions about the generic-to-brand price ratio, holding all else in Dr. Rausser's sensitivity analysis constant, Dr. Cremieux has found similar results using academic articles that contain results on generic-to-brand price ratios, as well as using the Hausman declaration cited by Dr. Rausser.  Cremieux Sur. Decl. ¶ 23, n.28.

*Basic testing shows Dr. Rausser had no basis for his conclusion.*  Dr. Rausser complains that another test that disproved the "flexibility" of his model—replacing his choice of a $30 generic co-pay with a $0 generic co-pay—is "unrealistic because the high-end brand co-pay

---

[19] Rausser Reb. Decl. at 66 n.107.

[20] Berndt, Ernst R., et al., "Authorized Generic Drugs, Price Competition, and Consumers' Welfare," *Health Affairs*, 26, no. 3 (2007): 790–799, at p. 793, Exhibit 1.

[21] Whether or not the plans in the OptumHealth data have these particular rebate and co-payment provisions is irrelevant to Dr. Cremieux's critique because Dr. Rausser's sensitivity is based on a "hypothetical" TPP.

would not be coupled with the low-end generic co-pay in the same plan."[22]   Dr. Rausser's response, however, ignores his own rationale for performing the sensitivity analysis, which was to examine a "hypothetical 'extreme case' third party payer . . . [that] ha[s] a very high difference between its brand and generic co-pays." [23]   Dr. Cremieux's analysis thus was an appropriate—indeed better—test because it used the **_greatest difference_** between brand and generic co-pays considered by Dr. Rausser.   Cremieux Sur. Decl. ¶ 17.   Moreover, Dr. Rausser's complaint ignores the fact that IBEW itself utilized a "very high difference between its brand and generic co-pays."

███████████████████████████████████████████████

████████████████████.[24]   ███████████████   This difference, which Dr. Rausser inexplicably ignores, is substantially greater than the one used to critique Dr. Rausser's sensitivity analysis.

### B.   Dr. Rausser's Distortions Cannot Cure the Problems with His Opinions

Dr. Rausser claims that Dr. Cremieux used the wrong date range to re-calculate damages using Dr. Rausser's sensitivity analysis.   But, Dr. Cremieux merely followed Dr. Rausser's approach.   In his sensitivity analysis, when Dr. Rausser estimated damages for his "hypothetical 'extreme case' third party payer," he used the period Q3 2006 to Q1 2013, which starts two years

---

[22] Rausser Reb. Decl. ¶ 78.
[23] Rausser Reb. Decl. ¶ 76.
[24] ████████████████████████████████████████

prior to the beginning of the class damages period.[25]  Thus, when explaining the problems with Dr. Rausser's sensitivity analysis, Dr. Cremieux naturally used the same date range as Dr. Rausser, an approach Dr. Cremieux explained in his report.  *See, e.g.*, Cremieux Decl. Exhibits 10–11 ("Damages calculations begin in Q3 2006 per Dr. Rausser's analysis.").[26]

Most important, the date range used when exploring Dr. Rausser's third party payer analysis does not affect Dr. Cremieux's fundamental criticisms or conclusions.  Even if the inputs and assumptions used to construct the hypothetical situation included in his critique of Dr. Rausser's sensitivity analysis were to be changed (including the dates used to estimate damages), Dr. Cremieux's conclusion that individualized inquiry would be necessary to determine injured plans would remain.  *Id.* ¶ 67. [27]  Dr. Rausser cannot shift the spotlight away from the substantive problems with his analysis by focusing on the trivial issue of the date range **he chose** for his analysis.

Even though the distinction is set out clearly in Dr. Cremieux's report, Dr. Rausser suggests that Dr. Cremieux's critiques of Dr. Rausser's sensitivity analysis are Dr. Cremieux's affirmative analysis.[28]  That of course is not the case.  Dr. Cremieux explained why Dr. Rausser

---

[25] *See*, e.g., TPP sensitivity analysis.xlsx in Rausser backup (using Q3 2006 as starting date for damages calculations in sensitivity analysis).

[26] Dr. Rausser's report claimed that different damages periods "may" eventually be used, and so the most appropriate way to critique his work was to start from the damages period that he actually used in his TPP model. *See* Rausser Decl. ¶ 8 ("Although the wrongful conduct alleged dates back as far as 2005, I [sic] that the damage period *may* be limited to the four years immediately preceding the filing of the Complaint.") (emphasis added).

[27]

[28] IBEW incorrectly claims that "[t]he Cremieux Report uses class periods that begin over three years before the actual class periods set forth in Plaintiff's motion.  This fundamental error fatally undermines the Cremieux Report's conclusions that certain third-party payers were not harmed during the class periods."  IPP Class Cert. Reply at 15;

failed to test and prove common impact to TPPs by, among other things, examining Dr. Rausser's analysis.[29]  But Dr. Cremieux also undertook a separate, economically sound analysis to support his conclusion that a substantial number of TPPs were in fact unharmed.  Cremieux Decl. § III.D ("Empirical Analysis of Injury to Third-Party Payers").

Dr. Rausser cries foul over the statement in Dr. Cremieux's report that 9 out of 52 companies in the OptumHealth data set "might not have been harmed," claiming that the condition "*if they had the extreme-value rebates and co-pays used in his 'corrected' version of my sensitivity analysis*" was "misleadingly" omitted.  Rausser Reb. Decl. ¶ 77 (citing Cremieux Decl. ¶ 67).  But, Dr. Cremieux described that "condition" in the very next sentence: "To be sure, these calculations are based on the parameters assumed by Dr. Rausser in his analysis (and the flawed assumptions underlying Dr. Rausser's but-for world).  The actual terms will vary from plan to plan and will have to be individually analyzed."  Cremieux Decl. ¶ 67.  ████████████

████████████████████████.[30]

## VI.   IBEW Has No Answer for Dr. Rausser's Failure to Investigate Key Assumptions or Fit His Opinions to the Facts

As Warner Chilcott's opening brief explained, Dr. Rausser improperly built his opinions on classwide impact and damages on assumptions that he made no attempt to verify, and otherwise refused to let the facts get in the way of his theories.  His upside down approach

---

*see also* Rausser Reb. Decl. ¶ 80 (". . . so [Dr. Cremieux's] analysis provides no evidence against common impact.").

[29] *See* Cremieux Decl. ¶¶ 63–69; ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

[30] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████

contradicts Rule 702, which requires an expert to apply recognized principles and methodologies in a reliable way to the facts of the case.  WC Daubert Mem. (Rausser) at 25 (citing cases).  His rebuttal repeats this improper approach.

**A.      No Facts Support Dr. Rausser's Assumptions Regarding Improvements to Doryx**

Dr. Rausser rests his entire analysis on the assumption that Warner Chilcott engaged in so-called "product hopping," which in this case supposedly means that each change to Doryx was an "immaterial modification."  He thus assumes away all product improvements in the but-for world.  Dr. Rausser—who admittedly is not a doctor, pharmacologist, scientist, or otherwise qualified to evaluate the materiality of modifications to a prescription drug[31]—undertook no steps to test this assumption.  Had he done so, he would have seen it was invalid.  An expert's opinions are not admissible when they are based on invalid assumptions.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 773 (district court did not err in concluding that expert's calculation, based on inaccurate assumptions and ignoring inter-laboratory comparison data, was unreliable under *Daubert*); *see also* WC Daubert Mem. (Rausser) at 24–25 (citing cases).

*First*, as Warner Chilcott's opening brief explained, overwhelming evidence shows that each Doryx change was an improvement.  *See* WC Daubert Mem. (Rausser) at 29; *see also* WC Class Cert. Opp. (Indirect) at II.C; *see generally* Webster Decl. (ECF No. 237).  These facts regarding increased safety, stability, response to competition, etc., are unrebutted.  Although he admitted that even the documents cited in his original report in fact discussed improvements to Doryx (WC Daubert Mem. (Rausser) at 29), Dr. Rausser tries to summarily reject these documents—████████████████████████████████████████████████████████████ ██████████████████████—as "pretextual" (████████████████████████████████████), but that does

---

[31] Rausser Reb. Decl. ¶¶ 112, 114.

not qualify as economic analysis. *See, e.g., Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 165–66 (C.D. Cal. 2007) (denying class certification where, among other things, plaintiffs relied on Tyco strategy documents to establish the but-for world, rather than conducting any meaningful market analysis).

*Second*, Dr. Rausser completely ignores the opinion of Dr. Guy Webster, an expert in clinical dermatology, acne, and acne vulgaris. Webster Decl. ¶ 12. Dr. Webster's declaration shows that each new version of Doryx offered clear benefits to patients and doctors, benefits that translated into substantial adoption of the new versions—even when lower cost generic copies were available—and additional sales for Warner Chilcott. *See generally id.*; *see also* WC Daubert Reply (Leitzinger) at Part V.A.

Moreover, Dr. Rausser cannot divert attention from the disqualifying flaws in his work by misstating the opinions of Warner Chilcott's expert, Dr. Jasti, who is a noted academic and leading scientist in the area of drug delivery and novel dosage forms, and thus qualified to offer opinions regarding pharmaceutical product modifications and related benefits to patients. Jasti Decl. ¶¶ 1–6 & Exhibit A (ECF No. 238). Dr. Jasti opined that Doryx tablets provided greater ease of administration, a reduction in side effects— ████████████████████████████████ ████████████████████████████████████████ ████[32]—and increased dissolution stability as compared to Doryx capsules. Jasti Decl. ¶¶ 13, 15, 56–74; ████ ████████████████████████████████. In support of his opinions, Dr. Jasti cited peer-reviewed scientific publications and internal pharmaceutical development documents.[33] Jasti Decl. Exhibits K–R.

---

[32] ████████████████████████████████████████████████████████████████████████
████████████████████

[33] IBEW does not challenge Dr. Jasti's expertise or the admissibility of his opinions.

Dr. Rausser is an economist with **no** relevant qualifications in Dr. Jasti's fields of expertise.[34]  Dr. Rausser's commentary must be rejected for this reason alone.  Fed. R. Evid. 702 (expert cannot offer opinion unless qualified "by knowledge, skill, experiences, training or education"); *see Wolfe v. McNeil-PPC, Inc.*, Civil Action No. 07-348, 2011 WL 1673905, at *11 (E.D. Pa. May 4, 2011) (holding that expert with "no expertise" in relevant area could not issue an opinion on this issue as it was "beyond the scope of his qualifications").  In any event, Dr. Rausser's fumbling efforts actually underscore the fact that Dr. Jasti's opinions are unrebutted.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████[35]  Nor does Dr. Rausser dispute that Dr. Jasti relied on **published scientific studies of doxycycline**—the active ingredient at issue in this case—showing that esophageal ulceration is more frequent with capsules than tablets, in one study by a factor of 22.[36]  Jasti Decl. ¶¶ 60–61 & Exhibits M–O.  Dr. Rausser merely cites a publication that he claims (without the benefit of any relevant expertise) shows a general consumer preference for capsules over tablets using capsules filled with no drug at all, hardly a

---

[34] ██████████████████████████████████████████████████████████ *also* IBEW Motion to Strike Opp. Ltr. at 6 ("Dr. Rausser's assessment of Dr. Jasti's testimony is not based on any asserted medical expertise.").

[35] ██████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████

[36] Dr. Rausser's claim that he is "aware" of no basis to conclude that Warner Chilcott "would have pursued the tablet approval unless they could use it as a way to convert the market prior to generic capsule introduction" (Rausser Reb. Decl. ¶ 115) simply ignores the mass of evidence in Warner Chilcott's opposition to class certification (*see* ECF No. 234 at 5–7), as well as documents he cites. ████████████████
████████████████████████████████████████████████████████████████
█████████████████████████████████████

relevant study.[37]   Rausser Reb. Decl. ¶ 111.   Dr. Rausser also wrongly concludes that publications reporting esophageal injuries relied on by Dr. Jasti pertained to "elderly" patients, a population that Dr. Rausser asserts is "unrepresentative of the typical Doryx user."   *Id.*   The subjects in these studies, however, were not "elderly."   Their ages ranged from 16-31 years.   Jasti Decl. Exhibits M–O.

Dr. Rausser similarly displays his lack of expertise in his discussion of Dr. Jasti's opinion regarding improved dissolution stability.   Dr. Rausser ignores the substantial evidence relied on by Dr. Jasti and highlights a single development report that plots the results of a single dissolution study.   ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████   Dr. Rausser's related conjecture—that the same tested drug pellets would have greater stability in a capsule than in a tablet (the implication being dissolution stability was not in fact improved in tablets) due to the effect of "moisture present in the tablet" on the drug flow in the component pellet (Rausser Reb. Decl. ¶ 113)—also is easily ignored.   Dr. Jasti's Declaration addressed this exact point, explaining that "given the nature of gelatin capsules, the adverse impact of moisture on dissolution stability is ***even more likely to occur with capsules***."   Jasti Decl. ¶ 93 (emphasis added);   ███████████████████████████████[38]

---

[37] As noted below, the data in this case reveal a consumer preference for tablets.   *See infra* p. 38.

[38] ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████

*Lastly*, Dr. Rausser's claim (Rausser Reb. Decl. ¶ 114) that the pricing of Doryx—tablets were introduced at the same prices as capsules, and 150 mg tablets were introduced at the same price as two 75 mg tablets—shows that the product changes were not "improvements" fails because it ignores the economic realities of the market.  Cremieux Decl. ¶ 80–82.  Dr. Rausser does not dispute that when the follow-on Doryx products were launched, in each instance, the products faced substantial, direct competition from Adoxa, Solodyn, and other products, but he does not consider these critical factors.  *See, e.g.,* WC Class Cert. Opp. (Direct) at 17–18 (citing evidence showing that "[m]any of the improvements to the Doryx product were in response to improvements and changes made by branded competitors, including Adoxa and Solodyn").  Courts reject expert opinions that ignore key marketplace facts.  *See, e.g.*, *Concord Boat Corp.*, 207 F.3d at 1056–57 (damages model was mere speculation because it was not grounded in the economic reality of the market).

Had Dr. Rausser applied an economic analysis, he would have looked for preferences revealed by actual marketplace behavior, and found that patients preferred Doryx tablets to capsules, and preferred the 150 mg Doryx tablet to the 75 and 100 mg versions of Doryx and generic Doryx, clear indications of product improvements.



In short, Dr. Rausser has no basis for his "immaterial modification" assumption, which collapses his entire analysis.  WC Daubert Mem. at 31–32; *see also* WC Class Cert. Opp. (Indirect) at Part III.C.2a.

**B.    Dr. Rausser Improperly Rejects Economic Facts That Rebut His Misreading of Documents**

Despite these incontestable facts regarding Warner Chilcott's improvements to Doryx, in particular the benefits (both commercial and medical) from bringing the tablet formulation of the product to market, Dr. Rausser inexplicably continues with the contention that in the but-for world the clock would have stopped and Warner Chilcott only would have sold 75 and 100 mg capsules.  Warner Chilcott's motion and opposition to class certification explained why this contention lacked any basis in reality.  WC Daubert Mem. at Part IV.B; WC Class Cert. Opp. at Part III.C.2.

Dr. Rausser's rebuttal merely repeats the errors from his opening report.  For example, he cites carefully selected portions of a few Mayne documents that refer to the development of Doryx tablets—which began in 1998—as an "anti-generic strategy."  *See* Rausser Decl. ¶ 34 (citing eight Mayne documents); IPP Class Cert. Reply at 31 ███████████████████████ ███████████████████████).  Dr. Rausser concludes that because some documents contain the phrase "anti-generic strategy," that phrase has only a single universal meaning and as an ***economic matter*** the product offered only a "trivial" improvement and never would have been launched.  Of course, the fact that Defendants had a desire to stay ahead of generic competitors (███████████████████████████████████████████)[39] reflects nothing

───────────────

[39] ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████

more than lawful competition, and says nothing about whether the new Doryx products were improvements over the old ones. *See* WC Opp. to IPP Class Cert. at 43; *Schachar v. Am. Acad. of Opthamology, Inc.*, 870 F.2d 397, 399–400 (7th Cir. 1989) ("Warfare among suppliers and their different products is competition . . . Animosity, even if rephrased as 'anticompetitive intent,' is not illegal without anticompetitive effects."). Moreover, the very same documents **rebut** Dr. Rausser's assumption, because they discuss certain of the improvements to Doryx.[40] And, as noted above, overwhelming evidence (which Dr. Rausser ignores) confirms the valid reasons for the marketing of all the follow-on products.[41]  *See supra* VI.A.  Courts routinely reject experts who, like Dr. Rausser here, abandon expert analysis and rely on implausible assumptions that lead to unscientific conclusions. *See, e.g.*, *Wolfe*, 2011 WL 1673905, at *11.

As Warner Chilcott's opening brief explained, Dr. Rausser was entitled to assume only a world that removes what IBEW claims is illegal, that is to say, a world in which Warner Chilcott



[40]

[41] Dr. Rausser discussion of other material is equally flawed.  For example, his reliance on the Herendeen declaration is misplaced (Rausser Reb. Decl. ¶ 107), because it evaluated a marketplace *after* Warner Chilcott already had implemented the product improvements that IBEW claim would not have existed in the but-for world.

introduces new versions of Doryx but also keeps the older versions on the market.  WC Daubert Mem. (Rausser) at 35.  Dr. Rausser's approach to impact and damages, however, does not account for a but-for world where both Doryx capsules and tablets are on the market. Nor does it account for the '161 patent, which Warner Chilcott would have commercialized in any but-for world.  WC Daubert Mem. (Rausser) at 31–32.  An economic analysis that fails to consider such critical market facts in the but-for world must be rejected.  *See Bickerstaff*, 196 F.3d at 449–50; *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 773.

### C.    No Facts Support Dr. Rausser's Assumptions Regarding Potential Generic Entry

Dr. Rausser does not contest the fact that he simply accepted IBEW's representations and assumed, without any foundation, that "multiple" generic capsules would have entered the market in the but-for world, and that Warner Chilcott would have launched an authorized generic in the but-for world.  These assumptions, which are rebutted by facts and data, require exclusion under Rule 702 and *Daubert*.

*No Authorized Generic*.  Dr. Rausser now recognizes that Warner Chilcott as a matter of contract had no authority to launch an authorized generic.  Rausser Reb. Decl. ¶¶ 99–100.  His conjecture that the contract might have been renegotiated is baseless, as is his stubborn failure to acknowledge the fact that in the actual world, where Doryx has faced AB-rated competition from Mylan, Warner Chilcott has not launched an authorized generic, but instead most recently extended its Doryx investment by launching a 200 mg strength of the product.  Dr. Rausser's cherry picking of a few projections to try and buttress his original assumption[42]—and his misrepresentation of Dr. Jasti's testimony[43]—cannot stand in the face of these actual market facts

---

[42] *See* WC Daubert Reply (Leitzinger) at V.B (discussing projections)

[43] ████████████████████████████████████████████████████████

41

to the contrary.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 773; *see also Snodgrass v. Ford Motor Co.*, No. 96-1814, 2002 WL 485688, at *12 (D.N.J. Mar. 28, 2002) (granting motion *in limine* to exclude plaintiff's expert's testimony, which was based on incorrect assumptions and on "subjective inclusion and exclusion of data [, which] suggest[s] that [the plaintiff's expert] manipulated the data to achieve a desired result.").

*No substantial generic competition*.  Dr. Rausser concedes that he assumed—but did not take steps to verify—that multiple generic manufacturers would have been ready, willing, and able to enter the market with a capsule product in July 2006.  Rausser Reb. Decl. ¶ 96.  IBEW bears the burden of establishing the reasonableness of its assumptions and has failed to do so.  *Comcast*, 133 S. Ct. at 1438–39.  ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████  Further, the evidence showed that no other generic manufacturer would have been able to enter the market any earlier than it did in the actual world.  *See* WC Class Cert. Opp. (Indirect) at Part III.C.2.c ("Dr. Rausser Wrongly Assumes that Multiple Generic Competitors would be Ready, Willing and Able to Launch Generic Doryx Capsules in July 2006"); *see also* Jasti Decl. ¶¶ 75–125; WC Class Cert. Opp. (Direct) at Part III.C.2.

Dr. Rausser offers nothing in response.  ██████████████████████████

███████████████████████████████████████████████████████  But

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████████████

this fact helps Warner Chilcott, not Dr. Rausser, ███████████████████████



These and other unrebutted facts support Dr. Jasti's conclusion that Doryx is "difficult" to manufacture.  These facts show conclusively that generic competition by 2006 or 2008 was not a plausible reality,

even if Warner Chilcott had not withdrawn its capsule product from the market and had never launched its tablet product.

Having provided ***no evidence*** to support his speculation that generic manufacturers would have been ready, willing, and able to enter in 2006, Dr. Rausser resorts to misrepresenting Dr. Jasti's testimony and declaration, the admissibility of which IBEW does not challenge. *See* Rausser Reb. Decl. ¶¶ 96–99, 109–13. Again, because he has no relevant qualifications, his conjecture is inadmissible under Rule 702, and, not surprisingly, wrong.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████

At bottom, Dr. Rausser only offers the conjecture that "[t]he fact that some [potential generic manufacturers] fell away as the products they had targeted repeatedly disappeared before their eyes is not surprising and is not indicative of what would have happened in the [but-for world]."  Rausser Reb. Decl. ¶ 96.  He provides no citation for this speculation. ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████ In short, Dr. Rausser has **no basis** for his assumption that any generic would have entered any earlier in the but-for world than they did in the actual world.

*Citizen's Petitions are concededly irrelevant.*  IBEW brazenly repeats another baseless assumption by Dr. Rausser—that Defendants filed "sham" Citizen's Petitions to "assist" with the product "hops," IPP Daubert Opp. at 8; *see also id.* at 6—but IBEW **previously disclaimed this assumption,** stating specifically it was **not arguing** sham petitioning.  WC Class Cert. Opp. (Indirect) at 16 n.24.

45

### D.      No Basis for "Overcharge" Assumption as to Third Party Payers

Warner Chilcott explained that Dr. Rausser's reflexive use of an overcharge approach does not comport with economic reality as to TPPs because, among other reasons, it makes little sense as an economic matter to measure damages for TPPs based on the price difference between two different products.  WC Daubert Mem. (Rausser) at 25–30; Cremieux Decl. ¶ 100.  Thus, Dr. Rausser's discussion of consumer welfare and lost profits in the context of consumers is irrelevant.  *See* IPP Daubert Opp. at 34–35.  Moreover, Dr. Rausser's unexplained assertion (IPP Daubert Opp. at 35) that TPPs "are not engaging in profit seeking behavior" when they pay a pharmacy for reimbursing a prescription, "but rather [are] reimbursing a cost," makes no sense.  IBEW does not dispute that insurers establish premiums based on past experience, (Cremieux Decl. ¶ 70) and that they set premiums in order to make a profit.

"The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event."  Federal Judicial Center, MANUAL ON SCIENTIFIC EVIDENCE (THIRD) at 432 (2011); WC Daubert Mem. (Rausser) at 26.  Dr. Rausser in essence skipped this step by ***assuming instead of determining*** that the economic reality of the market required an overcharge approach for TPPs.  WC Daubert Mem. (Rausser) at 25–30.  Dr. Rausser's unexplained conclusions leave the Court with no connection between the facts and Dr. Rausser's methodology, which is built on an unsupported assumption.  *See Joiner*, 522 U.S at 146; *Oddi*, 234 F.3d at 158.

## VII.    Dr. Rausser's Model Departs from IBEW's Product Hopping Theory

IBEW does not dispute that "any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive-effect of the violation."  *Comcast* 133 S. Ct. at 1433.  IBEW claims that Dr. Rausser's approach matches

its liability case because IBEW "has set forth one theory of liability: product hopping."  IPP Daubert Opp. at 37.  But this is just an illusion.  Because IBEW's own liability theory agrees that the introduction of a new pharmaceutical product alone cannot be viewed as predatory, the allegedly unlawful conduct here is the removal of prior formulations from the market, not the launch of improved versions of Doryx.  WC Daubert Mem. at 35.

Dr. Rausser's model departs from this theory because it does not consider a marketplace including the initial Doryx tablets, or any of the other follow on products, whether alone or in combination.  (As noted above, Dr. Rausser improperly assumes away all Doryx tablet products.  *See infra* p. 34).  Dr. Rausser consequently cites no sources for an erosion or pricing model to use in any scenarios involving Doryx tablets and nowhere explains how his damages model could be used to address such scenarios.  Dr. Rausser's model simply is not designed to separate out lawful conduct (launching different versions of Doryx) from allegedly unlawful conduct (removing prior versions of Doryx from the market).  Hence, it fails under *Comcast.*[45]

## VIII.  Dr. Rausser's Aggregate, Fluid Recovery Damages Model Will Not Assist the Trier of Fact and Must Be Rejected under *Daubert*

In response to the clear authority, including from this Court, cited in Warner Chilcott's opening memorandum concerning the impropriety of calculating only a "pot of damages" to be sorted out later, IBEW continues to embrace its "fluid recovery" model.  IBEW claims that Dr. Rausser's approach is appropriate because "exact damage calculations are not necessary at this stage."  IPP Daubert Opp. at 37.  Despite this assertion, IBEW assures the Court that Dr. Rausser can do the job down the road by looking at some Warner Chilcott documents, getting a new data set, and performing some different analyses.  *Id.* at 38–39.

---

[45] *See also* WC Daubert Reply (Leitzinger) at Part IV (discussing Plaintiffs inappropriate amendment to case theory to survive *Daubert* challenge).

But *Comcast* requires IBEW to come forward with a formulaic method to determine if each class member in fact was injured, and to what extent, by the alleged conduct. *Comcast*, 133 S. Ct. at 1433 (requiring that "individual *damages calculations*" not "overwhelm issues common to the class" and that "*damages* must be susceptible of measurement *across the entire class*") (emphasis added). Dr. Rausser's model does not meet that standard, and IBEW (erroneously) disclaims any obligation to do so. *See* IPP Daubert Opp. at 37–38. Recent cases applying *Comcast*, however, confirm that a damages model that does not even attempt to show how damages to class members could be determined is insufficient and inevitably would lead to the "labyrinthine" individual damages calculations the Supreme Court warned about. *See Martin v. Ford Motor Co.*, No. 10-2203, 2013 WL 3328231, at *21–22 (E.D. Pa. July 2, 2013) (rejecting plaintiff's expert's proposed damages model and denying certification for two of the proposed classes because individual questions regarding calculation of damages prevented plaintiffs from meeting predominance requirement); *Cowden v. Parker & Assocs., Inc.*, No. 5:09-323, 2013 WL 2285163, at *6 (E.D. Ky. May 22, 2013) (relying on *Comcast* and denying certification because damages calculation required individualized inquiries that overwhelmed common questions); *Forrand v. Fed. Express Corp.*, No. 08-1360, 2013 WL 1793951, at *5 (C.D. Cal. Apr. 25, 2013) (denying class certification in light of *Comcast* because "the need for individualized fact inquiries dominates the determination of liability and damage issues").

## CONCLUSION

For the foregoing reasons and those set forth in Warner Chilcott's opening memorandum, this Court should exclude the proposed testimony and declarations of Dr. Rausser under Rule 702 and *Daubert*.

Dated July 11, 2013

By:  /s/ J. Mark Gidley                                              By:  /s/ Edward D. Rogers

         J. Mark Gidley (admitted PHV)                                        David H. Pittinsky
         Peter J. Carney (admitted PHV)                                   Edward D. Rogers
         WHITE & CASE LLP                                            Evan W. Krick
         701 Thirteenth Street, NW                                 BALLARD SPAHR LLP
         Washington, DC 20005-3807                              1735 Market Street
         Telephone No.: 202-626-3600                         Philadelphia, Pennsylvania 19103-7599
         Fax No.: 202-639-9355                                     Telephone No.: 215-665-8500
         mgidley@whitecase.com                                   Fax No.: 215-864-8999
         pcarney@whitecase.com                                   pittinsky@ballardspahr.com
                                                   rogerse@ballardspahr.com
         and                                                      kricke@ballardspahr.com

         Michael J. Gallagher (admitted PHV)
         Jack E. Pace III (admitted PHV)                            *Attorneys for Defendants Warner Chilcott*
         WHITE & CASE LLP                                        *Public Limited Company, Warner Chilcott,*
         1155 Avenue of the Americas                          *LLC, Warner Chilcott (US), LLC, and Warner*
         New York, New York 10036-2787                    *Chilcott Laboratories Ireland Ltd.*
         Telephone No.: 212-819-8200
         Fax No.: 212-354-8113
         jpace@whitecase.com

## CERTIFICATE OF SERVICE

I, Jack E. Pace III, hereby certify that on July 11, 2013, I caused true and correct copies of Defendant Warner Chilcott's Reply in Support of Its Motion to Exclude the Declaration and Testimony of Gordon Rausser to be served by electronic mail upon all counsel of record.

By: /s/ Jack E. Pace III

Jack E. Pace III
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036-2787
Telephone No.: 212-819-8200
Fax No.: 212-354-8113
jpace@whitecase.com

8904206

50