**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MYLAN PHARMACEUTICALS, INC.,** : | |
| **ROCHESTER DRUG CO-OPERATIVE,** : | |
| **INC., MEIJER, INC., MEIJER** : | |
| **DISTRIBUTION, INC., AMERICAN** : | |
| **SALES COMPANY, LLC, WALGREEN** : | |
| **CO., SAFEWAY INC., SUPERVALU** : | |
| **INC., and HEB GROCERY CO. LP, et al.,** : | |
| : | **Civ. No. 12-3824** |
| **Plaintiffs,** : | **CONSOLIDATED** |
| : | |
| **v.** : | **INDIRECT PURCHASER ACTION** |
| : | |
| **WARNER CHILCOTT PUBLIC** : | |
| **LIMITED COMPANY, et al.,** : | |
| : | |
| **Defendants.** : | |
| : | |

**DEFENDANT WARNER CHILCOTT'S AMENDED OPPOSITION TO INDIRECT
PURCHASER PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION**

**PUBLIC REDACTED VERSION**

# <u>TABLE OF CONTENTS</u>

I.   PLAINTIFFS' SPECULATION FAILS TO ESTABLISH NUMEROSITY
     UNDER RULE 23(a)(1) ....................................................................................... 1

     A.   Plaintiffs Fail to Provide a Method to Reliably Specify the Number of
          Actual Class Members under Rule 23(a)(1) ........................................................ 1

          1.   Dr. Rausser's "Probabilistic" Class Membership and Speculation
               Cannot Specify the Number of Class Members for Rule 23(a)(1) ............. 2

          2.   Plaintiffs' Class Definitions Fail to Remove Unharmed Third Party
               Payers and Unharmed Consumers ............................................................. 4

     B.   Plaintiffs Ignore and Cannot Satisfy Rule 23's Ascertainability
          Requirement ........................................................................................................ 6

II.  ANY COMMON ISSUES EXISTING UNDER RULE 23(a)(2) ARE
     OVERWHELMED BY INDIVIDUAL ISSUES ..................................................... 8

III. PLAINTIFFS FAIL TO ESTABLISH TYPICALITY UNDER RULE 23(a)(3) ............... 8

IV.  PLAINTIFFS FAIL TO ESTABLISH ADEQUACY UNDER RULE 23(a)(4) ............. 10

V.   PLAINTIFFS' DAMAGES CLASSES FAIL TO SATISFY RULE 23(b)(3) ................ 13

     A.   Individual Issues Predominate over Common Questions ..................................... 13

          1.   Plaintiffs' Damages Theory Does Not Match Their Liability
               Theory, and Plaintiffs' Fail to Establish Predominance under Rule
               23(b)(3) .................................................................................................... 13

          2.   Individual Issues Predominate with Respect to Impact .......................... 16

               a.   Coupons and Samples Made Brand Cheaper than Generic .......... 17

               b.   Varying Deductibles, Co-Pays, and Coverage Caps.................... 19

               c.   Consumers Are Heterogeneous, and Many Are Brand
                    Loyal, Preferring Branded Drugs................................................. 20

               d.   Manufacturers' Varied Rebates and Cost Sharing...................... 21

               e.   Third Party Payers Enter into Complex Risk Sharing
                    Agreements, Which Are Highly Individualized .......................... 22

               f.   Third Party Payers Pass On Overcharges through Premiums....... 23

          3.   Individual Issues Predominate with Respect to Damages ........................ 24

     B.   Class Treatment Is Not the Superior Method of Adjudication ............................. 27

VI.  PLAINTIFFS' PROPOSED INJUNCTIVE RELIEF CLASS FAILS TO
     SATISFY RULE 23(b)(2) ................................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Allen v. Holiday Universal*,
    249 F.R.D. 166 (E.D. Pa. 2008)...................................................................................28, 29

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)...........................................................................................................11

*Baby Neal for & by Kanter v. Casey*,
    43 F.3d 48 (3d Cir. 1994) ..................................................................................................29

*Barabin v. Aramark Corp.*,
    210 F.R.D. 152 (E.D. Pa. 2002).........................................................................................29

*Barnes v. Am. Tobacco Co.*,
    161 F.3d 127 (3d Cir. 1998)...............................................................................................29

*Behrend v. Comcast Corp.*,
    655 F.3d 182 (3d Cir. 2011)...............................................................................................24

*Bell Atl. Corp. v. AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003) .............................................................................................16

*Bieneman v. City of Chicago*,
    864 F.2d 463 (7th Cir. 1988) .............................................................................................12

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*,
    138 F. Supp. 2d 357 (E.D.N.Y. 2001) ..............................................................................23

*Carrera v. Bayer Corp.*,
    727 F.3d 300 (3d Cir. 2013)................................................................................................7

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) ................................................................................................ passim

*Davis v. Kraft Foods N. Am.*,
    Civ. No. 03-6060, 2006 WL 237512 (E.D. Pa. Jan. 31, 2006) ...................................9

*Dewey v. Volkswagen*,
    681 F.3d 170 (3d Cir. 2012)........................................................................................10, 12

*Eisen v. Carlisle & Jacquelin*,
    479 F.2d 1005 (2d Cir. 1973), 417 U.S. 156 (1974)..................................................26

*Hayes v. Wal-Mart Stores, Inc.*,
    725 F.3d 349 (3d Cir. 2013)............................................................................................3, 7

*In re Flash Memory Antitrust Litig.*,
   Civ. No. 08-68, 2010 WL 2332081 (N.D. Cal. June 9, 2010) ...................................................25

*In re Graphic Processing Unit Antitrust Litig.*,
   253 F.R.D. 478 (N.D. Cal. 2008) ...................................................................................................25

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (2008) .................................................................................................1, 13, 16, 28

*In re K-Dur Antitrust Litig.*,
   MDL No. 1419, 2008 WL 2660723 (D.N.J. Mar. 27, 2008) ...................................................20

*In re Med. Waste Serv. Antitrust Litig.*,
   Civ. No. 03-1546, 2006 WL 538927 (D. Utah Mar. 3, 2006) ...................................................28

*In re Nexium Antitrust Litig.*,
   Civ. No. 12-2409, 2013 WL 6019287 (D. Mass. Nov. 14, 2013) ............................................29

*In re OSB Antitrust Litig.*,
   Civ. No. 06-826, 2007 WL 2253425 (E.D. Pa. Aug. 3, 2007) ............................................16, 26

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   725 F.3d 244 (D.C. Cir. 2013) ...................................................................................................14

*In re Schering Plough Corp. ERISA Litig.*,
   589 F.3d 585 (3d Cir. 2009)........................................................................................................11

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
   MDL No. 2343, 2014 WL 340903 (E.D. Tenn. Jan. 30, 2014).......................................8, 12, 23

*In re Wellbutrin XL Antitrust Litig.*,
   282 F.R.D. 126 (E.D. Pa. 2011)..................................................................................................13

*Ironworkers Local Union v. AstraZeneca Pharm.*,
   634 F.3d 1352 (11th Cir. 2011) ...................................................................................................23

*Lindsey v. Normet*,
   405 U.S. 56 (1972)........................................................................................................................27

*Makuc v. Am. Honda Motor Co.*,
   835 F.2d 389 (1st Cir. 1987)..........................................................................................................3

*Marcus v. BMW of N. Am., Inc.*,
   687 F.3d 583 (3d Cir. 2012)................................................................................................ passim

*McNair v. Synapse Group, Inc.*,
   Civ. No. 06-5072, 2010 WL 4777483 (D.N.J. Nov. 15, 2010) .................................................30

*Newton v. Merrill Lynch*,
   259 F.3d 154 (3d Cir. 2001)...........................................................................................27

*Reed v. Advocate Health Care*,
   268 F.R.D. 573 (E.D. Ill. 2009) ..............................................................................24, 25

*Rosario v. Livaditis*,
   963 F.2d 1013 (7th Cir. 1992) .......................................................................................11

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
   Civ. No. 04-5898, 2010 WL 3855552 (E.D. Pa. Sept. 30, 2010) ....................................16, 20, 21

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011)...................................................................................................27

*Weiner v. Snapple Beverage Co.*,
   Civ No. 07-8742, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010)..................................25

*Windham v. Am. Brands, Inc.*,
   565 F.2d 59 (4th Cir. 1977) ............................................................................................26

## STATUTES AND RULES

Fed. R. Civ. P. Rule 23 ............................................................................................. *passim*

## MISCELLANEOUS

ABA Section of Antitrust Law, *Proving Antitrust Damages:*
   *Legal and Economic Issues* (2d ed. 2010) ......................................................................6

2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (1995) ...................................16

Pursuant to the Court's February 6, 2014 Order (Dkt. 476), Defendants submit this Amended Opposition to the Indirect Purchaser Plaintiffs' January 7, 2014 Amended Motion for Class Certification ("Am. Mot.").

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). "Class certification is proper only 'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule 23 are met." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (2008) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). The Amended Motion should be denied because Indirect Purchaser Plaintiffs fail to satisfy Rule 23.

## I. PLAINTIFFS' SPECULATION FAILS TO ESTABLISH NUMEROSITY UNDER RULE 23(a)(1)

### A. Plaintiffs Fail to Provide a Method to Reliably Specify the Number of Actual Class Members under Rule 23(a)(1)

Plaintiffs propose three state indirect purchaser damages classes—Florida, Nevada, and West Virginia—and one national indirect purchaser injunction class.[1]  Each class consists of: (1) "third party payers" (i.e. "health benefit plans, health insurers, nursing homes and other healthcare providers, and self-insured employers") that reimbursed for Doryx prescriptions and (2) consumers who purportedly purchased Doryx.  Am. Mot., Dkt. 449 at 2–4 & n.4.

Plaintiffs must show that each proposed class is "so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a); Nov. 20, 2013 Order at 3 (setting forth standard for proving numerosity).  Plaintiffs' Amended Motion, like the initial one, does "not specify or even forecast the number of Class Members."  Nov. 20, 2013 Order at 5 (Dkt. 434).

---

[1] Plaintiffs are International Brotherhood of Electrical Workers Local 38 Health and Welfare Fund ("IBEW") and International Union of Operating Engineers Local 132 Health and Welfare Fund ("IUOE").  Defendants have moved to dismiss the IUOE Complaint, and that motion is pending.  Dkt. 448.  Defendants respectfully reserve the right to raise future arguments in opposition to IUOE's proposed class based on any discovery that may become necessary.

1.      **Dr. Rausser's "Probabilistic" Class Membership and Speculation Cannot Specify the Number of Class Members for Rule 23(a)(1)**

Dr. Rausser separately estimates the numbers of (1) putative third party payer class members and (2) putative consumer class members.   Dr. Rausser's analyses remain fundamentally flawed.[2]

**Third Party Payers**.   To calculate the number of third party payers in the proposed classes, Dr. Rausser relies on a "probabilistic" method.   Third party payers would be part of Plaintiffs' proposed classes only if they "reimbursed for" their insureds' purchases of branded Doryx.   Am. Mot. 2–4.   Yet, Dr. Rausser does not rely on data showing any ***actual*** reimbursements for Doryx purchases.   Supplemental Decl. of Pierre-Yves Cremieux, Jan. 31, 2014 ¶ 16 ("[T]he data sources Dr. Rausser uses to estimate the number of health plans that *would have* covered Doryx do not contain any records showing whether the health plans actually reimbursed patients for Doryx purchases.").   Instead, Dr. Rausser employs a convoluted formula to calculate the mere "***probability***" that a third party payer "***would have***" reimbursed for a Doryx prescription.   Supplemental Decl. of Gordon Rausser, Dec. 30, 2013 ¶ 7 (emphasis added) (theorizing "likelihood that a plan would actually have paid for a Doryx prescription").

For example, rather than rely on real-world reimbursement data, Dr. Rausser estimates that the University of Florida Foundation Cafeteria Plan has an 18.7% ***chance*** of having reimbursed for a Doryx prescription (Cremieux Supp. Decl. at 11), meaning the plan has only an 18.7% ***chance*** of being in the class.   Similarly, YMCA of Suncoast, Inc. Medical Plan has an 18.6% ***chance*** of having reimbursed for a Doryx prescription and of being a class member. Cremieux Supp. Decl. at 11, Table A (listing 15 plans in Florida alone with less than 20% chance

---

[2] Dr. Rausser's class certification opinions fail to meet minimum standards of relevance and reliability under the Federal Rules of Evidence and should be excluded.   *See* Defs.' Mot. to Exclude the Declarations, Reports, and Testimony of Gordon Rausser, Dkt. 478.

of class membership); Cremieux Supp. Decl. ¶ 17 ("For each of these 15 plans listed, Dr. Rausser estimates that <u>there is less than a 20 percent chance</u> that the plan reimbursed for a Doryx prescription during the five year period."). Dr. Rausser's "methodology provides no information on whether any of the[] TPPs [third party payers] in Florida, Nevada, and West Virginia **actually reimbursed even one Doryx prescription**." Cremieux Supp. Decl. ¶ 19 (emphasis added).

*All* of Dr. Rausser's estimates of third party payer class membership are "probabilistic." *Id.* ¶ 15. Such speculation has been rejected by this Court and cannot satisfy Plaintiffs' burden to establish numerosity. Nov. 20, 2013 Order at 5–6 (finding "number of plans that *would have* covered Doryx during a particular period" insufficient for numerosity); *see also Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 356–57 (3d Cir. 2013) ("Mere speculation as to the number of class members—even if such speculation is 'a bet worth making'—cannot support a finding of numerosity."); *Makuc v. Am. Honda Motor Co.*, 835 F.2d 389, 394–95 (1st Cir. 1987) (rejecting expert affidavit stating that one of every fifty Honda axles was "***probably*** defective" and finding contention regarding numerosity "purely speculative") (emphasis added).

Even Dr. Rausser's estimate for third party payer coverage of Doryx is flawed because he uses coverage data for a single date—July 14, 2010. Rausser Supp. Decl. ¶ 7b ("This data is a snapshot of health plans on a single date, July 14, 2010, so the list of plans is restricted to that date."). Dr. Rausser assumes that the plan coverage on that one day suffices to define the five-year class. But as Dr. Cremieux explained, formulary coverage—i.e. whether specific drugs are covered by a health plan—changes over time, and picking a single snapshot in time as representative of a five-year class period bears no connection to reality. *See* Cremieux Supp. Decl. ¶¶ 18–19 & nn.29–31. Many plans dropped Doryx over this time period. *See id.* ¶ 18 ("[P]lans may change their formularies throughout the course of a year."); *id.* nn.30–31. Further,

Dr. Rausser fails to exclude fully insured health plans from his numerosity analysis, even though such plans are not in any proposed class.  *See* Am. Mot. 2–4; Surrebuttal Decl. of Pierre-Yves Cremieux, July 11, 2013 ¶ 7.  Dr. Rausser does not show which (if any) third party payers actually reimbursed for Doryx prescriptions in the class period.

**Consumers**.  Plaintiffs similarly fail to demonstrate the actual number of consumer class members.  Dr. Rausser relies on IMS data to estimate consumer class membership, which "are aggregate sales data that contain no information on any individual consumers."  Cremieux Supp. Decl. ¶ 8.  His work relies on "transactions not persons."  *Id.* ¶ 10.  This Court previously rejected Dr. Rausser's speculative estimate of consumer class members that divided the number of Doryx prescriptions written nationally by the patient "average" of one Doryx prescription per month.  Nov. 20, 2013 Order at 4–5 ("Plaintiffs have not shown how many individuals had Doryx prescriptions filled . . . .").  But Dr. Rausser continues to base his estimate on an average—that is, the number of total ***prescriptions*** of Doryx filled divided by what he believes to be the average number of Doryx prescriptions per patient ████ to estimate the number of consumer class members.  Rausser Supp. Decl. ¶ 5.  Once again, Plaintiffs fail to offer evidence showing ***actual*** Doryx purchases by ***consumers*** that were injured by overpayment within the class period, leaving the Court only to speculate as to the number of potential class members.  *See Marcus v. BMW of N. Am., Inc.*, 687 F.3d 583, 596 (3d Cir. 2012) (numerosity lacking where court could "only speculate as to how many 2006–2009 BMWs were purchased or leased *in New Jersey* with *Bridgestone* RFTs that have *gone flat and been replaced*").

> **2.     Plaintiffs' Class Definitions Fail to Remove Unharmed Third Party Payers and Unharmed Consumers**

Plaintiffs claim that the proposed class definitions "remove persons from the classes who would not have been harmed by Defendants' conduct."  June 27, 2013 Reply Br. at 10 (Dkt.

331).  Plaintiffs' class definitions still fail to exclude many third party payers and consumers that suffered **no damages** and that should not be considered part of the classes.

Many putative class members purchased Doryx for free or at little cost with coupons offered by Warner Chilcott.  Dr. Cremieux has shown that "***tens, if not hundreds, of thousands of individuals***" purchased Doryx with coupons and had little or no co-pay, meaning that they were not harmed by the alleged conduct.  Cremieux Supp. Decl. ¶¶ 11–12 (emphasis added);

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████   In one of Plaintiffs' proposed carve-outs to each class, Plaintiffs remove consumers "who purchased branded Doryx with a coupon and never purchased branded Doryx without a coupon."   Am. Mot. 2–4; Cremieux Supp. Decl. ¶ 9.   However, consumers who used coupons in the real world would not have the benefit of using coupons in Plaintiffs' but-for world.  Cremieux Supp. Decl. ¶ 12.  Thus, they would pay **more** for generic Doryx in the but-for world than for Doryx (via coupon) in the real world.  *Id.*  Plaintiffs' attempt to carve out "coupon transactions" still leaves in class members who purchased Doryx with a coupon on one occasion but not another.  *Id.*  Many of these remaining class members suffered no harm, as they paid less overall for branded Doryx in the real world than they would have paid for generic Doryx capsules in the but-for world.  *Id.* ¶¶ 12–13.

All of a consumer's Doryx purchases—i.e. those made with and without coupons—must be considered together to determine whether a particular consumer was unharmed and thus should be excluded from the class.  Cremieux Surrebuttal ¶¶ 29–30; ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues*, at 61 (2d ed. 2010) (citing *L.A. Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1366–73 (9th Cir. 1986)).  Dr. Rausser

followed this approach in opposing class certification in the *Nexium* pharmaceutical class action case (Decl. of Gordon Rausser, Weiss v. AstraZeneca, Dkt. BC323107 (Cal. Sup. 2008) ¶ 98 ("Rausser *Nexium* Decl.")), but offers no support for abandoning it here.  Plaintiffs cannot satisfy numerosity when their proposed classes still contain so many "demonstrably uninjured" members.  Cremieux Supp. Decl. ¶ 10 ("Dr. Rausser's attempt to carve out patients who used Warner Chilcott coupons fails because the carve-outs seek to define the class in terms of *transactions* not *persons*."); *id.* ¶ 11.

Each proposed class also improperly includes several other large categories of putative class members that would have been unharmed, including (1) third party payers with only brand loyal members, or the brand loyal consumers themselves, who buy Doryx no matter what, (2) third party payers that passed-on any alleged overpayment through premiums, and (3) consumers who had reached their deductible limits and who thus paid nothing for their prescriptions.  *See* Cremieux Decl. ¶¶ 26–32, 54–56, 70, 72–73.  Again, Plaintiffs cannot satisfy numerosity without excluding these unharmed putative class members.  *See* Cremieux Surrebuttal ¶ 42 (estimating "over 47,500 class members [] were unharmed" if "one assumes only 5% of insured consumers were brand loyal"); Cremieux Supp. Decl. ¶ 20 ("The proposed class continues to include a large number of unharmed consumers, and Dr. Rausser's proposed methodology does not provide any basis to identify potential class members . . . .").

### B.    Plaintiffs Ignore and Cannot Satisfy Rule 23's Ascertainability Requirement

Rule 23 requires that class members be ascertainable.  *Marcus*, 687 F.3d at 592–93 (describing ascertainability as "essential prerequisite" to class certification).  The Third Circuit recently described ascertainability as a "preliminary" requirement to be addressed "[b]efore considering Rule 23(a) and Rule 23(b)(3)."  *Id.* at 591.  "Ascertainability mandates a rigorous approach at the outset because of the key roles it plays as part of a Rule 23(b)(3) class action

lawsuit." *Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013).  To be ascertainable, a class "must be defined with reference to objective criteria," and "there must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Hayes*, 725 F.3d at 355.  Here, Plaintiffs fail to identify ***any*** criteria by which this Court can determine membership in the proposed classes without individualized analysis.  *See* Section I.A (Plaintiffs' "probabilistic" class membership method).

Worse yet, Plaintiffs disregard the ascertainability requirement of Rule 23 altogether, proposing a Trial Plan that improperly relegates this "essential prerequisite" to the claims administration stage.  *See* Am. Mot. Ex. 52 at 1–2 (providing for "a trial on both liability and damages, and a post-trial 'prove up' process presided over by a Special Master"); *id.* at 2 ("Plaintiffs ***will present*** a Claims Administration Protocol to the Court setting forth their proposed procedures for the submission, processing, and resolution of claims . . . .") (emphasis added).  Dr. Rausser similarly assumes class membership could be figured out "down the road." *See, e.g.*, Rausser Apr. 1, 2013 Decl. ¶ 20 (Dkt. 472); Rausser Class Cert. Dep. Tr. 22:14–20, May 3, 2013 ("[T]here's ***no analysis*** that I've conducted about how to implement the claims administration.  That's not a question that I visited.  And that will be determined, I presume, ***down the road***.") (emphasis added).  Plaintiffs' approach to ascertainability—especially given Dr. Rausser's "probabilistic" approach to showing numerosity and his "transactions not persons" approach—contradicts the Third Circuit's mandates in *Marcus*, *Carrera*, and *Hayes* that Plaintiffs show "at the outset" that their proposed class members are objectively ascertainable. *See, e.g.*, *Carrera*, 727 F.3d at 307.

The *Skelaxin* court recently addressed ascertainability on similar facts and rejected class certification.  *In re Skelaxin (Metaxalone) Antitrust Litig.*, 2014 WL 340903 (E.D. Tenn. Jan. 30,

2014).  *Skelaxin* involved the same expert for the plaintiffs—Dr. Rausser—and the same complex web of insurers, employers, pharmacy benefit managers, and other intermediaries as potential class members.  *Id.* at *5–7, 13–16; *see generally* Cremieux Decl. ¶¶ 108–11.  The court refused to certify an indirect purchaser class in a "delayed generic entry" case because, like here, "[t]he question of who paid or reimbursed a portion of the purchase price for Skelaxin . . . [is] a question with no simple resolution" that would "require a transaction-by-transaction inquiry" to determine class membership.  *Skelaxin*, 2014 WL 340903, at *1, 16.  The court held that because Dr. Rausser had not proposed a method for identifying which third party payers had the ultimate payment risk, and thus qualified as class members, the class was not ascertainable and certification was not appropriate.  *Id.* at *13.  In *Skelaxin*, as here, "Dr. Rausser . . . characterized [class member ascertainability] as a 'claims administration' issue to be addressed following a determination of liability."  *Id.*  Plaintiffs and Dr. Rausser fail to provide a method for identifying class members here.  With no method for how, when, by whom, or under what criteria class members will be identified, Plaintiffs' proposed classes are not ascertainable.

## II.   ANY COMMON ISSUES EXISTING UNDER RULE 23(a)(2) ARE OVERWHELMED BY INDIVIDUAL ISSUES

Plaintiffs' claims in theory may raise certain common issues, but the many individual issues concerning liability and damages here predominate over any common issues and make class certification inappropriate, as described below in Section V.B.

## III.   PLAINTIFFS FAIL TO ESTABLISH TYPICALITY UNDER RULE 23(a)(3)

Rule 23 requires that the class representatives' claims be "typical of the claims . . . of the class."  Fed. R. Civ. P. 23(a)(3).  The typicality requirement requires the court to "screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class."  *Marcus*, 687 F.3d at 597.  The claims of class

representatives IBEW and IUOE are not typical of the class members' claims.

*First*, the named class representatives—union health plans—are not "typical" of the broad spectrum of putative "indirect purchaser" class members across the United States. Plaintiffs' proposed classes include not only union health plans, but also nationwide insurers, nursing homes, employer plans, individual insured consumers, and individual uninsured consumers. *See* Am. Mot. 2 n.4; Rausser Class Cert. Dep. Tr. at 16:13–21. IBEW's and IUOE's coverage—providing benefits to approximately 6,000 and 3,000 members, respectively—pales in comparison to mega-insurers such as Kaiser Permanente and Blue Cross-Blue Shield, which cover millions of patients nationwide. But class representatives IBEW and IUOE are larger and more sophisticated entities than individual consumer class members.

Union health plans are the only indirect purchaser class representatives in this case, and all other types of class members (*e.g.*, nursing homes, employer plans) have no representation of any kind. There is not a single **consumer** among the proposed class representatives. The wide and diverse range of putative class members cannot be considered "similarly situated" with the IBEW and IUOE health plans. *See, e.g.*, *Davis v. Kraft Foods N. Am.*, 2006 WL 237512 (E.D. Pa. Jan. 31, 2006) (denying certification for lack of typicality).

*Second*, IBEW and IUOE's claims are not typical of putative class members' claims because IBEW and IUOE have failed to show they are even members of the proposed damages classes. Plaintiffs base their damages claim on overcharges paid for branded Doryx when Plaintiffs allegedly would have preferred to buy generic Doryx capsules. *See, e.g.*, IBEW Compl. ¶ 110. But if a plaintiff continued to buy the branded product after the generic versions were launched, then the plaintiff has no basis to claim harm from generic delay. That class member would have purchased branded Doryx regardless of an available generic.

9



IBEW and IUOE thus suffered no harm from Defendants' alleged conduct, and their claims are not typical of the claims of other members of the proposed classes.

## IV.   PLAINTIFFS FAIL TO ESTABLISH ADEQUACY UNDER RULE 23(a)(4)

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[T]he adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Dewey v. Volkswagen*, 681 F.3d 170, 182 (3d Cir. 2012).

Divergent, antagonistic interests abound between and among the class representatives and putative class members. Plaintiffs propose to calculate damages by estimating a ***total*** overcharge amount and leaving the allocation of any damages award among class members for a later time. *See* Am. Mot. 37 ("Dr. Rausser's report demonstrates that ***class-wide damages*** can be reasonably calculated ***in the aggregate*** . . . .") (emphasis added). This method creates a zero-sum game for the class members, forcing them to argue that damages should be awarded to them instead of another class member or group of class members.

This tension and conflict is not hypothetical. Already proposed class counsel for IBEW and IUOE have taken action detrimental to the interests of non-union fund class members by

*removing* certain consumers from the proposed classes, but *leaving in* all third party payers, in response to Defendants' challenge to class certification.  Am. Mot. 2–3 (excluding "insured or uninsured *individuals* who purchased branded Doryx with a coupon") (emphasis added); Rausser Supp. Decl. ¶ 5b ("The Class definition excludes the *consumer portion* of transactions that were paid for with a consumer coupon . . . .") (emphasis added).  The named class representatives and their counsel appear willing to bargain away potential recovery to consumer class members so long as the decrease does not affect third party health fund payers.  This conduct illustrates how the proposed representatives will not adequately protect the interests of class members.  *See In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 602 (3d Cir. 2009) (vacating certification where class representative "may have different incentives" than class members).

In addition, the proposed class members here have divergent interests between and among class groups.  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 (1997) (affirming Third Circuit's decision to decertify class where "named parties with diverse medical conditions sought to act on behalf of a single giant class rather than on behalf of discrete subclasses"); *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) ("A class is not fairly and adequately represented if class members have antagonistic or conflicting claims.").  ████████████████

████████████████████████████████████████████

████████████████████████████████  As the court in *Skelaxin* explained, some third party payers, "such as PBMs, would be advantaged by arguing the first purchaser bears the price risk [and therefore suffers the antitrust injury] because PBMs are often the first purchaser.  On the other hand, commercial insurers and self-funded plans have an incentive to say they are the actual end payors and should receive the entire overcharge." 2014 WL 340903, at *21.  Risk-sharing agreements, therefore, create conflict across multiple

types of class members seeking to recover the same alleged overcharge:  "Not only do the different categories of potential class members have divergent interests . . . , but each *transaction* has potential class members who would have divergent interests regarding who, in that transaction, paid the overcharge."  *Id.*[3]  Similarly, because third party payers pass on through premiums the cost of Doryx reimbursements, third party payers and insured consumers will debate the rate of pass on and thus have conflicting claims to the same dollar of damages.  Rep. of Bruce Strombom, Aug. 9, 2013 ¶¶ 18–19.  Plaintiffs cannot demonstrate adequacy where each class member would be incentivized to maximize its own recovery to the detriment of others.

The named Plaintiffs are also not adequate class representatives because some class members actually ***benefitted*** from the alleged delay in generic entry.  For example, class members who were brand-loyal to Doryx—and would have purchased it regardless of generic competition—would have been ***worse off*** in Plaintiffs' but-for world of earlier generic entry. That is because the price of the brand increases after the launch of generic copies of Doryx. Cremieux Decl. ¶ 27.  The Third Circuit has held that "[a] fundamental conflict exists" barring certification "where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class."  *Dewey*, 681 F.3d at 184; *see also Bieneman v. City of Chicago*, 864 F.2d 463, 465 (7th Cir. 1988) (denying class certification where some proposed class members "undoubtedly derive great benefit" from challenged conduct).

Finally, as above, neither IUOE nor IBEW have demonstrated that they are even members of the proposed damages classes because they have presented no evidence that they suffered any injury.  In addition to making the class representatives' claims not typical of the class, IBEW and IUOE are inadequate class representatives.  In a "generic-delay" case, the

---

[3] Moreover, determining which third party payer should be awarded a particular overcharge is yet another individualized inquiry that Plaintiffs provide no method for resolving.

Eastern District of Pennsylvania excluded from a proposed indirect purchaser class entities that did not purchase or reimburse for a generic drug after it became available. *In re Wellbutrin XL Antitrust Litig.*, 282 F.R.D. 126, 131, 138 (E.D. Pa. 2011). *Wellbutrin* held that "a plaintiff that did not make generic purchases in a class state cannot demonstrate antitrust impact with common evidence and, therefore, cannot be a class representative." *Id.* at 138. IBEW and IUOE have failed to establish that they would be adequate class representatives under Rule 23(a)(4).

## V.   PLAINTIFFS' DAMAGES CLASSES FAIL TO SATISFY RULE 23(b)(3)

Rule 23(b)(3) permits class certification only if "the court finds that the questions of law or fact common to class members ***predominate*** over any questions affecting only individual members, and that a class action is ***superior*** to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added).

### A.   Individual Issues Predominate over Common Questions

The predominance test is "a standard far more demanding than the commonality requirement." *Hydrogen Peroxide*, 552 F.3d at 310–11. "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Id.*

### 1.   Plaintiffs' Damages Theory Does Not Match Their Liability Theory, and Plaintiffs' Fail to Establish Predominance under Rule 23(b)(3)

To meet the predominance requirement of Rule 23(b)(3), "any model supporting a plaintiff's damages case must be consistent with its liability case, ***particularly*** with respect to the alleged anticompetitive effect of the violation." *Comcast*, 133 S. Ct. at 1433 (emphasis added). The court "must conduct a 'rigorous analysis' to determine whether that is so." *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)). If a plaintiffs' expert's model is not consistent with the plaintiffs' liability theory, then the expert could "identif[y] damages that are not the result of the wrong." 133 S. Ct. at 1434. As a result, the court would have to conduct

individual inquiries to determine which damages were caused by lawful conduct and which were caused by unlawful conduct. *Comcast*'s "close look" will "frequently entail overlap with the merits of the plaintiff's underlying claim." 133 S. Ct. at 1432. "Predicating class certification on a model divorced from the plaintiffs' theory of liability, the [*Comcast*] Court held, indicates a failure to conduct the rigorous analysis demanded by Rule 23." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013).

Plaintiffs rely solely on Dr. Rausser to meet their burden of showing predominance under Rule 23(b)(3), but Dr. Rausser's impact analysis and damages model do not follow Plaintiffs' theory of liability—violating *Comcast*. Last fall, Plaintiffs revised their "product hopping" liability theory so that only the ***combination*** of a new product introduction coupled with the withdrawal of the older product is allegedly anticompetitive conduct. Plaintiffs concede that the launch of new products alone, even ones that do not offer new medical benefits to patients, could not cause antitrust injury; only by going further and also stopping the sale of older Doryx is the test articulated by Plaintiffs' expert Dr. Kesselheim violated. Rep. of Aaron S. Kesselheim, Oct. 18, 2013 ¶ 2 ("I do not contend, nor do I understand the Plaintiffs to be arguing, that Warner-Chilcott/Mayne cannot introduce and lawfully promote new versions of Doryx, such as a tablet . . . . Rather, it was Warner-Chilcott/Mayne's admitted 'anti-generic' strategy . . . [that] included taking affirmative steps to eliminate the capsule market by, for example, stopping production of Doryx capsules and buying up much of the remaining inventory in anticipation of the approval of a capsule version from a generic competitor . . . ."); Rausser Merits Dep. Tr. 199:18–200:3, Jan. 8, 2014.

14

██████████████████████████████████████████

███████████████████████████████████████

Thus, only Warner Chilcott's 2005 switch from older Doryx capsules to new Doryx 75 mg and 100 mg tablets possibly could be illegal under the Kesselheim/Rausser view, because only then did Warner Chilcott allegedly "stop[] production of" capsules and "buy[] up" remaining capsule inventory.  But there was no such "stopping production" or "buying up" of inventory for newer Doryx versions such as the 150 mg tablet product in July 2008, because Warner Chilcott kept the older versions—75 mg and 100 mg tablet products—on the market for years.  *See* Rep. of Pierre Yves-Cremieux, Oct. 18, 2013 Ex. 1 ("Cremieux Merits Rep.") (timeline of product introductions).  Similarly, Warner Chilcott introduced the 200 mg product in July 2013, and the 150 mg tablet product is still on the market today.  *Id.*  Therefore, under *Comcast*, Dr. Rausser was ***required*** to analyze class impact and damages without including the 150 mg Doryx tablet.  Plaintiffs admit that this should be the appropriate analysis:  "Plaintiffs' damages all flow from Defendants' initial switch or product hop from capsules to tablets."  Am. Mot. 12.  But Dr. Rausser's classes (and damages) are based on ***all*** of Defendants' transactions, including purchases of 150 mg Doryx tablet products.  *See* Rep. of Gordon Rausser, Aug. 9, 2013 ¶ 142 ("Rausser Merits Rep.") (explaining that in his damages analysis, he "convert[ed] each 150mg tablet sold into two equivalent 75mg capsules on the basis that there would have been no 150mg tablet in the but-for world"); Decl. of Gordon Rausser, Apr. 1, 2013 ¶ 122 ("Rausser Decl.") ("Because the 150mg tablet would not have been available in the but-for world (never having been introduced by Defendants as part of their product hoping [sic] strategy) twice the number of 75mg capsules would be substituted for the 150mg tablets.").  And the 150 mg tablets represent a substantial amount of Plaintiffs' claimed damages, as the 150 mg had captured

15

approximately 90% of total Doryx prescriptions by the time Plaintiffs' damages period began in

July 2008.  *See* Mylan Compl.  ¶ 62.  Dr. Rausser's analysis is inconsistent with Plaintiffs'

liability theory and directly violates *Comcast* by "identif[ying] damages that are not the result of

the wrong."  133 S. Ct. at 1434.

### 2.       Individual Issues Predominate with Respect to Impact

"In antitrust cases, impact often is critically important for purposes of evaluating Rule

23(b)(3)'s predominance requirement because it is an element of the claim that may call for

individual, as opposed to common, proof."  *Hydrogen* Peroxide, 552 F.3d at 311.  It is

"***immensely difficult*** to determine classwide economic impact in indirect purchaser antitrust

actions."  *In re* OSB, 2007 WL 2253425, at *7 (E.D. Pa. Aug. 3, 2007) (emphasis added).

Where many putative class members were not impacted, individual determinations must

be made and the class denied.  *See id.* at *8 (predominance lacking where "Plaintiffs will have to

prove economic impact customer by customer, exactly what [the Third Circuit] condemned")

(citing *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 156, 158 (3d Cir. 2002)); *Sheet Metal*

*Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 2010 WL 3855552 (E.D.

Pa. Sept. 30, 2010) (denying certification because some members suffered no impact); *see also*

*Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302–05 (5th Cir. 2003) ("[W]e have repeatedly

held that where fact of damages cannot be established for every class member through proof

common to the class, the need to establish antitrust liability for individual class members defeats

[certification]."); 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 356d (1995)

("[T]he fact that some class members may not have been damaged at all generally defeats class

certification because the fact of injury, or 'impact,' must be established by common proof.").

Plaintiffs allege that Defendants' conduct resulted in common impact to all proposed

class members in the form of higher prices paid for branded Doryx than class members would

have paid if a generic were available.  Am. Mot. 35.  But when Dr. Rausser purports to evaluate class member impact, he ignores several critical—and undisputed—facts, including many key factors affecting both the prices paid by putative class members as well as the difficulty of determining these prices.  Dr. Rausser previously has conceded that these facts must be evaluated at the class certification phase in a pharmaceutical industry litigation.  Rausser Nexium Decl. ¶ 14.  But here he ignores the key factors affecting class impact:

    a.    Coupons and samples;
    b.    Deductibles, co-pays, and coverage;
    c.    Brand loyalty;
    d.    Manufacturer rebates and reduction in cost-sharing;
    e.    Complex risk-sharing agreements; and
    f.    Pass-on of overcharges through premium increases.

Considering these factors, Dr. Cremieux estimated that ***tens of thousands*** of proposed class members would have suffered no harm.  Cremieux Decl. ¶ 25; Cremieux Supp. Decl. ¶ 12.

### a.    Coupons and Samples Made Brand Cheaper than Generic

Warner Chilcott offered consumers ████████████████████ cost relief through aggressive couponing and millions of free samples during the class period.  One coupon even reduced insured consumers' co-pays to $0.  Cremieux Supp. Decl. ¶ 12.

Tens and perhaps hundreds of thousands of patients used coupons to purchase Doryx. ██
████████████████████████████████████████████████████████████
██████████████.  Thus, many consumers paid little or nothing out of pocket when purchasing Doryx.  Many of those consumers who purchased Doryx with a coupon may have purchased Doryx without a coupon on other occasions, leaving the consumers within Plaintiffs' proposed classes, at least with respect to the transactions in which they paid something.  Cremieux Supp. Decl. ¶¶ 11–13.  But determining which transactions and consumers make it into the proposed classes would require individualized determinations that Plaintiffs' model is incapable of

performing.  *Id.* ¶¶ 11–13.  Similarly, the ██████████████████ free samples of Doryx distributed by Warner Chilcott—a consumer benefit that would not have been offered by generics in the but-for world—also lowered the effective cost of therapy for consumers. Cremieux Decl. ¶ 46 & n.29.  As Dr. Rausser has stated, "[b]ecause generic drug manufacturers seldom offer incentives of this type, any analysis that fails to factor in the effect of consumer coupons and rebates will provide a deceptive picture of the relative costs of the [brand] and [generic]."  Rausser Nexium Decl. ¶ 39.

"An economic analysis of individual injury requires an analysis of all impacts, not just those that harm the individual."  Cremieux Surrebuttal ¶ 29.  But, as explained in the numerosity discussion in Section I.A.2, instead of looking at all of the transactions that affected consumers in his analysis, Dr. Rausser considered the proposed class to be defined in terms of  "*transactions not persons*."  Cremieux Supp. Decl. ¶ 10 (emphasis in original); *see also* Rausser Merits Dep. Tr. at 351:9–354:7.  He excludes coupon transactions from the classes, but leaves in consumers that used coupons for Doryx on one occasion but not another.  Am. Mot. 3–4.  Dr. Rausser does this despite having conceded elsewhere that ignoring such factors would overstate damages. Rausser Nexium Decl. ¶ 39.  In fact, Dr. Cremieux estimated that, due to the effect of coupons and samples, tens of thousands of proposed class members were better off in the real world— which included the new Doryx products—than they would have been in Dr. Rausser's hypothetical "but-for world" involving sales of primarily generic Doryx capsules.  Cremieux Merits Rep. ¶¶ 94, 99.  As Dr. Rausser has proposed no method of identifying those potentially unharmed individuals that still remain in the classes, Plaintiffs have failed to prove predominance of common issues with respect to impact.

#### b.      Varying Deductibles, Co-Pays, and Coverage Caps

Insurance coverage varies widely from third party payer to third party payer and from consumer to consumer.  The extent to which any class member paid for Doryx and allegedly experienced impact, therefore, varies widely among class members.  Dr. Rausser has conceded that "a covered consumer's co-pay is not predictable.  One must have ***specific information*** about the consumer's particular prescription drug plan and the date when the purchase was made . . . ." Rausser Nexium Decl. ¶ 42 (emphasis added).  These individualized inquiries concerning impact make class certification inappropriate.

Co-pays and deductibles are cost-sharing mechanisms that will vary from class member to class member.  Insured consumers often pay their pharmacy only a co-payment or deductible for covered prescriptions.  The insurance provider then pays the rest of the cost under an agreement between the provider (or its pharmacy benefits manager) and the pharmacy.  Rausser Decl. ¶ 100.  These cost-sharing mechanisms vary greatly from one insurance provider to another:  some insurance plans offer deductibles in which the consumer is responsible only for prescription costs up to a certain limit.  A consumer who already has reached her deductible limit before being prescribed Doryx pays nothing for the prescription, thus suffering no injury in that transaction.  To ascertain whether a consumer reached a deductible limit and suffered no impact from buying Doryx would require individualized inquires for each transaction and class member.

Dr. Cremieux explained that even a small number of Doryx prescriptions filled by a consumer with a deductible could have a "significant effect on the number of plans impacted" by Defendants' alleged conduct.  Cremieux Surrebuttal ¶ 26 (61% of the plans in the OptumHealth data he analyzed had "at least one Doryx prescription that was at least partially paid for by a

consumer deductible").[4]   The need for such individual inquiries has led courts to reject certification of classes similar to those proposed here.  *See, e.g.*, *In re K-Dur Antitrust Litig.*, MDL No. 1419, 2008 WL 2660723, at *11 (D.N.J. Mar. 27, 2008) (varying co-pay structures meant that some class members presumably suffered no injury, which prevented class certification); *Sheet Metal Workers*, 2010 WL 3855552, at *25–26 (rejecting class certification based on complex web of co-pay structures and varying categories of consumers).

Insurance coverage also changes over time and can lead to individualized inquiries. Consumers may be insured one day but not the next.  The ever-changing nature of insurance coverage is difficult to track, especially across a five-year class period, without inquiring into each insured's individual history.   Dr. Rausser has acknowledged that consumers' evolving/changing coverage status is important for a class certification analysis, but difficult to track in a formulaic manner:  "[E]ven fundamental characteristics (such as whether an individual is insured or uninsured) will change over time (as he or she is employed or unemployed) in ways which cannot be tracked."  Rausser Nexium Decl. ¶ 160.

### c. Consumers Are Heterogeneous, and Many Are Brand Loyal, Preferring Branded Drugs

Many consumers prefer branded drugs over generics, regardless of cost.  Brand-loyal consumers of Doryx would have continued to pay for branded Doryx regardless of whether a generic was being sold.  These consumers cannot be impacted by any alleged "delay" in generic entry, and if as here brand prices increased after generic entry,[5] then those consumers were worse off when the generic launched.  Third party payers with brand-loyal customers also would not be

---

[4] Dr. Cremieux used OptumHealth data, which is a "widely-used source of health economics data concerning individual patent prescription histories" and includes prescription reimbursement claims "for over 16.4 million privately insured individuals covered by 69 self-insured Fortune 500 companies" from January 1999 through March 2012.  Cremieux Decl. ¶¶ 12–13.
[5] *See* Cremieux Decl. ¶ 31 (higher average brand price post-generic entry).

impacted by Defendants' conduct.  Yet, Dr. Rausser does not exclude brand-loyal consumers, or their insurance plans, from the proposed classes, and neither can be readily identified.

Dr. Cremieux's Doryx reimbursement data show that a substantial number of third party payers had **only** brand-loyal members.  *See* Cremieux Decl. ¶ 73 (hundreds of third party payers nationwide likely had only brand-loyal members).  ██████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████ Dr. Rausser estimates that at least ████ of patients would have stayed with the brand after generic entry—i.e. nearly 60,000 consumers during the class period.  *See* ████████████████████; Cremieux Decl. ¶ 32 (indicating 47,500 consumers would be unharmed if 5% of consumers were brand loyalists).  Using OptumHealth Doryx-specific reimbursement data, Dr. Cremieux estimates that 180,500 brand-loyal insured consumers would not have been impacted by a delay in generic entry.  *See* Cremieux Decl. ¶¶ 30, 32 & n.19 (19% of the 950,000 insured patients receiving Doryx stuck with branded Doryx in real world despite generic alternatives).  Plaintiffs present no methodology for identifying and excluding brand-loyal consumers from the proposed classes, leaving the court to conduct individualized inquiries.  *See Sheet Metal Workers*, 2010 WL 3855552, at *25–26 (denying class certification where brand-loyal purchasers could not be identified in a formulaic manner).

### d.     Manufacturers' Varied Rebates and Cost Sharing

Manufacturer rebates and co-pays significantly affect whether third party payers were impacted by Defendants' conduct, particularly where, as here, the price of the brand and generic drugs are similar.  Cremieux Decl. ¶ 74.  Dr. Rausser has conceded that third party payers may not be harmed by an alleged generic delay depending on changes to manufacturer rebates and co-pays after generic entry.  Rausser Nexium Decl. ¶ 80 n.52.  Dr. Cremieux identified scores of

21

examples in which third party payers paid roughly the same or less for Doryx tablets than they did for the generic, and his analysis did not even consider other factors such as samples, which would have lowered the net effective cost for Doryx (but not the generic) even further. Cremieux Decl. ¶¶ 74–75; Cremieux Surrebuttal ¶¶ 21–22.

Aware of these problems, Dr. Rausser performed a flawed "sensitivity analysis" that he claims establishes that the rebate/co-pay effects would not lead to **any** third party payer being worse off as a result of reimbursing for generic Doryx. *See* Rausser Merits Rep. ¶¶ 121–27. First, Dr. Rausser's analysis ignores factors such as deductibles, prescription benefit maximums, and samples that can have a significant effect on third party payer costs.[6] Second, Dr. Rausser's analysis shows that many third party payers would not be impacted by Defendants' conduct if Dr. Rausser's assumptions were replaced with reasonable alternatives. For example, Dr. Rausser's sensitivity analysis relies on generic-to-brand price ratios that are inconsistent with the academic literature. Cremieux Surrebuttal ¶ 26. Dr. Cremieux found that when these price ratios were replaced with alternative ratios from the academic literature, 25% of the health care payers Dr. Rausser considered from September 2008 through Q1 2012 were not harmed at all by Defendants' conduct. *Id.* ¶ 22. The lack of harm to so many potential class members highlights the need for individualized inquiries to determine which class members were injured by Defendants' conduct, and which were not.

### e.   Third Party Payers Enter into Complex Risk Sharing Agreements, Which Are Highly Individualized

Through risk-sharing and administration agreements, multiple parties are often involved

---

[6] Dr. Rausser argues that he does not need to consider these factors because he believes they would have "little or no bearing on common impact." Rausser Merits Rep. ¶ 128. Dr. Cremieux's analysis disproves that. *See, e.g.*, Cremieux Surrebuttal ¶ 26 (61% of plans considered had "at least one Doryx prescription that was at least partially paid for by a consumer deductible" and that "[e]ven a small number of prescriptions paid for by consumers who are under the deductible can have a significant effect on the number of plans that are impacted").

in reimbursement for the same prescription, but only one payer actually bears the ultimate cost. Dr. Rausser ignores the need to evaluate such risk sharing to determine whether third party payers have been impacted.  Rausser Class Cert. Dep. Tr. 63:13–22.  But identifying if a third party payer bore the risk is critical to assessing antitrust impact.  ███████████████████ ██████████████████████████████████████████ the Court would need to conduct individualized inquiries into each third party payers' relationships.  *See Skelaxin*, 2014 WL 340903, at *13–16 (refusing to grant class certification because complicated set of contracts and risk sharing agreements between third party payers made individual inquiry necessary to determine which consumers and entities were part of class); *see also* Section I.B, above (discussing Rule 23's ascertainability requirement).

### f.  Third Party Payers Pass On Overcharges through Premiums

If a third party payer is "overcharged" but is able to pass-on that "overcharge" to employers or insurers through increased charges or premiums, then the third party payer is not impacted by the alleged overcharge.  *See Ironworkers Local Union v. AstraZeneca Pharm.*, 634 F.3d 1352, 1364–65 (11th Cir. 2011) (discussing premium setting process); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 138 F. Supp. 2d 357, 360 (E.D.N.Y. 2001) (expert's observation that "as costs increase . . . insurers can pass the majority of [anticipated claim] costs onto the insurance buyers through subsequent premium increases.").  As Warner Chilcott's expert Dr. Bruce Strombom (an economist with extensive experience in the health insurance industry) explained, insurers seek to pass-on medical costs to consumers and insurers through premium increases, and are highly successful in doing so.  Rebuttal Rep. of Bruce Strombom, Dec. 23, 2013 ¶¶ 26–32 ("Strombom Rebuttal Rep.") (analysis demonstrating high correlation— 99.9%—between health care premiums and health care costs is indicative of pass-on).

Here, an individual, plan-by-plan inquiry would be required to measure pass-on. Dr. Rausser offers no evidence to the contrary. He suggests that pass-on did not occur or that, if it did occur, it took place in a different time period than when the overcharge was paid and therefore it should be ignored. Rebuttal Rep. of Gordon Rausser, Oct. 17, 2013 at 12–13. But Dr. Rausser ignores that: (1) insurers can and do adjust premiums in the same year as when a cost is incurred; (2) there is no legal or economic rule requiring a pass-on to occur within a set amount of time after a reimbursement; and (3) Plaintiffs themselves allege that an overcharge had been in place for two years before the start of the class period and thus already was being passed on at the time the claimed overcharges began. ██████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████ Individualized inquiries therefore are necessary to assess whether third party payers passed on any alleged overpayment.

### 3.      Individual Issues Predominate with Respect to Damages

Class certification is not appropriate under Rule 23(b)(3) when "[c]omplex and individual questions of damages . . . weigh against finding predominance." *Behrend v. Comcast Corp.*, 655 F.3d 182, 204 (3d Cir. 2011). Here, Plaintiffs fail to offer a method by which class members' damages could be proven with common evidence, and class certification should be denied.

*First*, Dr. Rausser proposes to calculate class member damages using **national average** prices for three states—Florida, Nevada, and West Virginia. Dr. Rausser fails to account for variations in branded or generic prices among the states or differences from national averages. Dr. Rausser's reliance on national averages has been rejected before and should be here. *See Reed v. Advocate Health Care*, 268 F.R.D. 573, 590–92 (E.D. Ill. 2009). Dr. Rausser admits that ignoring price variations among states can lead to incorrect classwide damage estimates. Rausser Nexium Decl. ¶ 117 ("Ignoring this variability by employing averages or median prices

leads to an inaccurate and unfair damage estimate."); *id.* n.50 (criticizing practice of "attempting to calculate class-wide damages in reliance on means, averages, or distributions").

In *Reed*, for example, the court found "fundamental problems with Dr. Rausser's analysis that go to the core of the predominance issue and persuade us that plaintiffs cannot meet their burden of demonstrating that they have a viable method showing class-wide injury with common proof." 268 F.R.D. at 589. In particular, the "first, and critical, flaw" was Dr. Rausser's "***reliance on averages***." *Id.* at 590–91 (emphasis added) (rejecting reliance on average wages where evidence showed "substantial variation" among compensation by individual class members); *see also, e.g.*, *Weiner v. Snapple Beverage Co.*, 2010 WL 3119452, at *9–10 (S.D.N.Y. Aug. 5, 2010) (rejecting reliance on averages for Rule 23); *In re Flash Memory Antitrust Litig.*, 2010 WL 2332081, at *12 (N.D. Cal. June 9, 2010) (same); *In re Graphic Processing Unit Antitrust Litig.*, 253 F.R.D. 478, 493–94 (N.D. Cal. 2008) (same).

Dr. Rausser's use of average prices masks individual variation. Using state-level prescription data from OptumHealth, Dr. Cremieux showed that (1) prices paid by patients in Nevada and Florida varied substantially and were, in most cases, ***lower than the national average*** Dr. Rausser relied upon, and (2) prices paid varied substantially among plans within Florida and among plans within Nevada, due to individualized agreements between PBMs, pharmacies, plan members, and the plan. Cremieux Decl. ¶¶ 102–03, Exs. 13.1, 13.2; Cremieux Surrebuttal ¶ 39. Dr. Rausser's damages analysis leads to an "inaccurate and unfair damage estimate" and cannot prove class-wide damages with common evidence as Rule 23(b)(3) requires. Rausser Nexium Decl. ¶ 117 (criticizing use of averages).

*Second*, Dr. Rausser's damages methodology calculates a lump-sum and is not capable of calculating damages to individual class members. Am. Mot. 37 (Dr. Rausser calculates class

damages "in the aggregate"); Rausser Merits Rep. at 13 ("I understand that the division of class-wide damages . . . is a matter for claims administration and need not be resolved now.").  Dr. Rausser's damages model not only defers calculating class member damages, but it also fails to offer any method for performing this calculation later.  Promises to develop an adequate damages method in the future do not satisfy Rule 23, particularly after *Comcast*.  133 S. Ct. at 1433 ("individual damages calculations" must not "overwhelm issues common to the class").[7]

*Third*, Dr. Rausser's damages model inflates the number of generic products that Plaintiffs hypothetically would have purchased in the absence of Defendants' conduct.  Dr. Rausser improperly assumes that, after hypothetical generic entry, total branded and generic Doryx sales would have been the same as (or greater than) they were before generic entry. Rausser Decl. ¶ 122; Rausser Merits Rep. ¶¶ 149, 154.  But that assumption contradicts Dr. Rausser's other "but-for world" assumption that Warner Chilcott would have abandoned the Doryx franchise after generic entry and ceased promoting Doryx.  Rausser Merits Rep. ¶ 83. The "Doryx abandonment" assumption suggests that total branded and generic Doryx prescriptions **would decline substantially** after generic entry without the brand's marketing. Cremieux Merits Rep. ¶ 67.  Further, Dr. Rausser ignores key data that shows significant switching between delayed release doxycycline hyclate and other forms of doxycycline, such as immediate release.  Cremieux Merits Rep. ¶¶ 68, 70; Rep. of Sumanth Addanki, Oct. 18, 2013 ¶ 116, Attachment 9b.  Such switching away from Doryx only would have increased in the

---

[7] Plaintiffs' "fluid recovery" (aggregate damages) approach was questionable even before *Comcast*. *OSB Antitrust Litig.*, 2007 WL 2253425, at *14 ("Awarding damages through fluid recovery is controversial," and "several district courts in this Circuit have condemned it."); *see Windham v. Am. Brands, Inc.*, 565 F.2d 59, 72 (4th Cir. 1977) ("[T]he difficulties inherent in proving individual damages [cannot] be avoided by the use of . . . 'fluid recovery.'"); *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005, 1018 (2d Cir. 1973) (fluid recovery is "illegal, inadmissible as a solution of the manageability problems of class actions and wholly improper").

absence of Doryx promotion.  Thus, Dr. Rausser's damages analysis both overstates damages and reveals that individualized inquiries would be necessary to determine which customers in the but-for world even would have purchased Doryx and suffered an alleged overcharge.

### B.    Class Treatment Is Not the Superior Method of Adjudication

Plaintiffs must demonstrate "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Here, the proposed class action would violate Defendants' due process rights as it strips Defendants of their right to present defenses relating to the individualized impact and damages and thus is not superior.

"Due process requires that there be an opportunity to present every available defense."  *Lindsey v. Normet*, 405 U.S. 56, 66 (1972).  The class action device cannot strip Defendants of their due process rights to present individualized defenses or an assessment of damages for each plaintiff.  *Dukes*, 131 S. Ct. at 2561 ("[A] class cannot be certified on the premise that [defendant] will not be entitled to litigate its statutory defenses to individual claims.") (citing 28 U.S.C. § 2072(b)).  This Circuit has insisted on proof of actual injury: "[A]ctual injury cannot be presumed, and defendants have the right to raise individual defenses against each class member."  *Newton v. Merrill Lynch*, 259 F.3d 154, 191–92 (3d Cir. 2001).  Here, this individualized process would require evaluating facts about each plaintiff-consumer's sample use, coupon use, insurance coverage across time, and brand loyalty, and would "present ***insurmountable manageability problems***."  *Id.* at 192 (affirming district court's denial of certification because, among other things, plaintiffs could not satisfy superiority requirement) (emphasis added).

Indeed, the individualized impact and damages determinations would require a mini-trial for virtually every putative plaintiff.  *See Marcus*, 687 F.3d at 593 ("class action is inappropriate" where "class members are impossible to identify without extensive and

individualized fact-finding or 'mini-trials'").  Neither Plaintiffs nor Dr. Rausser offer a method for dividing the aggregate damages figure among members of the separate classes, instead promising to determine damages "down the road" in a claims administration process.  Rausser Class Cert Dep. Tr. 22:14–23:13 (agreeing that "the claims administration process is a way to divide up an aggregate pot of damages"); *see* Am. Mot. Ex. 52 at 2 ("Plaintiffs **will present** a Claims Administration Protocol to the Court setting forth their proposed procedures for the submission, processing, and resolution of claims . . . .") (emphasis added).  Vague promises to determine damages "down the road" cannot satisfy the requirement that Plaintiffs provide a "concrete, workable formula" for damages "before certification is granted."  *In re Med. Waste Serv. Antitrust Litig.*, 2006 WL 538927, at *8 (D. Utah Mar. 3, 2006).  A claims administrator is not equipped to resolve the massive undertaking of myriad "no impact" inquiries. *See, e.g.*, *Hydrogen Peroxide*, 552 F.3d at 311 ("Importantly, [antitrust impact] is an element of the cause of action; to prevail on the merits, every class member must prove at least some antitrust impact resulting from the alleged violation.").

## VI.   PLAINTIFFS' PROPOSED INJUNCTIVE RELIEF CLASS FAILS TO SATISFY RULE 23(b)(2)

Rule 23(b)(2) requires that Plaintiffs prove that Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  Further, it is well-established in this Circuit that "certification under Rule 23(b)(2) . . . is inappropriate where the primary relief sought is ***not*** injunctive or declaratory relief." *Allen v. Holiday Universal*, 249 F.R.D. 166, 189 (E.D. Pa. 2008) (emphasis added); *see also Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 142 (3d Cir. 1998) ("Subsection (b)(2) class actions are limited to those class actions seeking primarily injunctive or corresponding declaratory relief.").  The

Third Circuit has observed that Rule 23(b)(2) "most frequently [serves] as the vehicle for civil rights actions and other institutional reform cases that receive class action treatment." *Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 58–59 (3d Cir. 1994). This Court has held that, when cases involve claims for money damages, "monetary relief predominates in (b)(2) class actions unless it is **incidental** to requested injunctive or declaratory relief." *Barabin v. Aramark Corp.*, 210 F.R.D. 152, 160–61 (E.D. Pa. 2002) (emphasis added).

This is a money damages case, plain and simple, and Plaintiffs' request for injunctive relief is an afterthought. Plaintiffs cannot seriously contend that they are "***primarily***" seeking injunctive relief. Plaintiffs' handful of references to injunctive relief in their lengthy complaints and briefs are telling. *See* Am. Mot. 26–27 (three sentences in support of injunctive relief class); IBEW Compl. (mentioning "injunctive relief" in only 5 of 166 paragraphs); IUOE Compl. ("injunctive relief" in only 7 of 157 paragraphs). And Plaintiffs never explain how injunctive relief here would make any sense, as generic entry already has occurred. As in *Allen*, certification of a 23(b)(2) class is improper where "the Court cannot find that the primary relief sought is injunctive and/or declaratory in nature." 249 F.R.D. at 189; *In re Nexium Antitrust Litig.*, 2013 WL 6019287, at *4 (D. Mass. Nov. 14, 2013) ("Based upon the cursory arguments provided by the End-Payors, the Court concludes that the requirements for Rule 23(b)(2) class certification have not been met.").

Further, the variation in interests among class members provides another reason why the proposed injunctive relief class fails to meet the requirements of Rule 23(b)(2). "Under Rule 23(b)(2), for a plaintiff to meet his burden of showing cohesion, he must demonstrate that the relief sought will benefit the entire class." *McNair v. Synapse Group, Inc.*, 2010 WL 4777483, at *6–7 (D.N.J. Nov. 15, 2010) (rejecting certification of injunctive relief class because "named

29

plaintiffs and the proposed class members' factual circumstances differ in significant respects," and "not all of the Plaintiffs" were harmed).  As discussed above, some class members were worse off after generic entry, and an injunction against Defendants' conduct would not be in their interests.

For the reasons set forth above, Plaintiffs' Amended Motion for Class Certification should be denied.

Respectfully submitted this 21st day of February, 2014.

By:  /s/  J. Mark Gidley                         By:    /s/  Edward D. Rogers

J. Mark Gidley
Peter J. Carney
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005-3807
Telephone No.: 202-626-3600
Fax No.: 202-639-9355
mgidley@whitecase.com
pcarney@whitecase.com

and

Jack E. Pace III
Michael J. Gallagher
WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone No.: 212-819-8200
Fax No.: 212-354-8113
jpace@whitecase.com
mgallagher@whitecase.com

Edward D. Rogers
Jonathan Satinsky
BALLARD SPAHR LLP
1735 Market Street
Philadelphia, Pennsylvania 19103-7599
Telephone No.: 215-665-8500
Fax No.: 215-864-8999
rogerse@ballardspahr.com
satinskyj@ballardspahr.com

*Attorneys for Defendants Warner Chilcott Public Limited Company, Warner Chilcott, LLC, Warner Chilcott (US), LLC, and Warner Chilcott Laboratories Ireland Ltd.*

30

<u>CERTIFICATE OF SERVICE</u>

I, Jack E. Pace III, hereby certify that on February 21, 2014, I caused true and correct copies of Defendant Warner Chilcott's Amended Opposition to Indirect Purchaser Plaintiffs' Amended Motion for Class Certification to be served by electronic mail upon all counsel of record.

By: <u>/s/ Jack E. Pace III</u>

Jack E. Pace III
WHITE & CASE LLP
1155 Avenue of the Americas
New York, NY 10036-2787
Telephone No.: 212-819-8200
Fax No.: 212-354-8113
jpace@whitecase.com