# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 10-K

☒ **Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
**For the fiscal year ended December 31, 2013**
**OR**
☐ **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
**For the transition period from to**
**Commission file number 001-01011**

# CVS CAREMARK CORPORATION

(Exact name of Registrant as specified in its charter)

| **Delaware** | **050494040** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **One CVS Drive, Woonsocket, Rhode Island** | **02895** |
| (Address of principal executive offices) | (Zip Code) |

**(401) 765-1500**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Exchange Act:

| **Common Stock, par value $0.01 per share** | **New York Stock Exchange** |
|---|---|
| Title of each class | Name of each exchange on which registered |

Securities registered pursuant to Section 12(g) of the Exchange Act: **None**
Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐
Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer, or a smaller reporting company. See definition of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer ☒ | Accelerated filer ☐ |
|---|---|
| Non-accelerated filer ☐<br>(Do not check if a smaller reporting company) | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the registrant's common stock held by non-affiliates was approximately $69,980,197,924 as of June 30, 2013, based on the closing price of the common stock on the New York Stock Exchange. For purposes of this calculation, only executive officers and directors are deemed to be the affiliates of the registrant.

As of February 4, 2014, the registrant had 1,182,427,156 shares of common stock issued and outstanding.

## DOCUMENTS INCORPORATED BY REFERENCE

Filings made by companies with the Securities and Exchange Commission sometimes "incorporate information by reference." This means that the company is referring you to information that was previously filed or is to be filed with the SEC, and this information is considered to be part of the filing you are reading. The following materials are incorporated by reference into this Form 10-K:

· Portions of our Annual Report to Stockholders for the fiscal year ended December 31, 2013 are incorporated by reference in our response to Items 7, 8 and 9 of Part II.

· Information contained in our Proxy Statement for the 2014 Annual Meeting of Stockholders is incorporated by reference in our response to Items 10 through 14 of Part III.

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| **Part I** | | |
| Item 1: | Business | 3 |
| Item 1A: | Risk Factors | 15 |
| Item 1B: | Unresolved Staff Comments | 20 |
| Item 2: | Properties | 21 |
| Item 3: | Legal Proceedings | 23 |
| Item 4: | Mine Safety Disclosures | 25 |
| Executive Officers of the Registrant | | 26 |
| **Part II** | | |
| Item 5: | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 28 |
| Item 6: | Selected Financial Data | 29 |
| Item 7: | Management's Discussion and Analysis of Financial Condition and Results of Operations | 30 |
| Item 7A: | Quantitative and Qualitative Disclosures About Market Risk | 30 |
| Item 8: | Financial Statements and Supplementary Data | 30 |
| Item 9: | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 30 |
| Item 9A: | Controls and Procedures | 30 |
| Item 9B: | Other Information | 30 |
| **Part III** | | |
| Item 10: | Directors, Executive Officers and Corporate Governance | 31 |
| Item 11: | Executive Compensation | 31 |
| Item 12: | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 31 |
| Item 13: | Certain Relationships and Related Transactions and Director Independence | 31 |
| Item 14: | Principal Accountant Fees and Services | 31 |
| **Part IV** | | |
| Item 15: | Exhibits and Financial Statement Schedules | 32 |
| Signatures | | 37 |

## PART I

### Item 1. Business

### Overview

CVS Caremark Corporation ("CVS Caremark", the "Company", "we," "our" or "us"), together with its subsidiaries, is the largest integrated pharmacy health care provider in the United States. We are uniquely positioned to deliver significant benefits to health plan sponsors through effective cost management solutions and innovative programs that engage plan members and promote healthier and more cost-effective behaviors. Our integrated pharmacy services model enhances our ability to offer plan members and consumers expanded choice, greater access and more personalized services to help them on their path to better health. We effectively manage pharmaceutical costs and improve health care outcomes through our pharmacy benefit management ("PBM"), mail order and specialty pharmacy division, CVS Caremark® Pharmacy Services; our more than 7,600 CVS/pharmacy®, Longs Drugs® and Drogaria Onofre® retail stores; our retail-based health clinic subsidiary, MinuteClinic®; and our online retail pharmacies, CVS.com® and Onofre.com.br.

We currently have three reportable segments: Pharmacy Services, Retail Pharmacy and Corporate.

### Pharmacy Services Segment

The Pharmacy Services Segment provides a full range of PBM services, as described more fully below, to our clients consisting primarily of employers, insurance companies, unions, government employee groups, managed care organizations ("MCOs") and other sponsors of health benefit plans and individuals throughout the United States. In addition, through our SilverScript Insurance Company ("SilverScript") subsidiary, we are a national provider of drug benefits to eligible beneficiaries under the Federal Government's Medicare Part D program. The Pharmacy Services Segment operates under the CVS Caremark® Pharmacy Services, Caremark®, CVS Caremark®, CarePlus CVS/pharmacy®, RxAmerica®, Accordant®, SilverScript® and Novologix® names. As of December 31, 2013, the Pharmacy Services Segment operated 25 retail specialty pharmacy stores, 11 specialty mail order pharmacies and four mail service dispensing pharmacies located in 22 states, Puerto Rico and the District of Columbia.

**Pharmacy Services Business Strategy** - Our business strategy centers on providing innovative pharmaceutical solutions and quality client service in order to enhance clinical outcomes for our clients' health benefit plan members while assisting our clients and their plan members in better managing overall health care costs. Our goal is to produce superior results for our clients and their plan members by leveraging our expertise in core PBM services, including: plan design and administration, formulary management, discounted drug purchase arrangements, Medicare Part D services, mail order, specialty pharmacy and infusion services, retail pharmacy network management services, prescription management systems, clinical services, disease management services and medical spend management.

In addition, as a fully integrated pharmacy services company, we are able to offer our clients and their plan members a variety of programs and plan designs that benefit from our integrated information systems and the ability of our more than 26,000 pharmacists, nurse practitioners and physician assistants to interact personally with the many plan members who shop our stores every day. Through our multiple member touch points (retail stores, mail order and specialty pharmacies, retail clinics, call centers, proprietary websites and mobile devices), we seek to engage plan members in behaviors that lower cost and improve health care outcomes. Examples of these programs and services include: Maintenance Choice®, a program where eligible client plan members can elect to fill their maintenance prescriptions at our retail pharmacy stores for the same price as mail order; Pharmacy Advisor®, a program that facilitates face-to-face and telephone counseling by our pharmacists to help participating plan members with certain chronic diseases, such as diabetes and cardiovascular conditions, to identify gaps in care, adhere to their prescribed medications and manage their health conditions; compliance and persistency programs designed to ensure that patients take their medications in the proper manner; enhanced disease management programs that are targeted at managing chronic disease states; and an ExtraCare® Health Card program which offers discounts to eligible plan members on certain over-the-counter health care products sold in our CVS/pharmacy stores. In addition, MinuteClinic® is an important and differentiated part of the enterprise capabilities available to PBM members. Ways we are working with our clients include partnerships with health plan clients sponsoring patient centered medical homes, biometric screening opportunities, closing gaps in care, co-pay reductions to encourage use of MinuteClinic and onsite clinics at client corporate headquarters.

**PBM Services** - Our PBM services are described more fully below.

*Plan Design and Administration* - Our clients sponsor pharmacy benefit plans that facilitate the ability of eligible members in these plans to receive prescribed medications. We assist our clients in designing pharmacy benefit plans that minimize the costs to the client while prioritizing the welfare and safety of the clients' members. We also administer these benefit plans for our

clients and assist them in monitoring the effectiveness of these plans through frequent, informal communications as well as through a formal annual client review.

We make recommendations to our clients encouraging them to design benefit plans promoting the use of the lowest cost, most clinically appropriate drug. We help our clients control costs by recommending plan designs that encourage the use of generic equivalents of brand name drugs when such equivalents are available. Our clients also have the option, through plan design, to further lower their pharmacy benefit plan costs by setting different member payment levels for different products on their drug lists.

*Formulary Management* - We utilize an independent panel of doctors, pharmacists and other medical experts, referred to as our Pharmacy and Therapeutics Committee, to select drugs that meet the highest standards of safety and efficacy for inclusion on our drug lists. Our drug lists provide recommended products in numerous drug classes to ensure member access to clinically appropriate alternatives under the client's pharmacy benefit plan. To improve clinical outcomes for members and clients, we conduct ongoing, independent reviews of all drugs, including, but not limited to, those appearing on the drug lists and generic equivalent products, as well as our clinical programs. Many of our clients choose to adopt our drug lists as part of their plan design.

*Discounted Drug Purchase Arrangements* - We negotiate with pharmaceutical companies to obtain discounted acquisition costs for many of the products on our drug lists, and these negotiated discounts enable us to offer reduced costs to clients that choose to adopt our drug lists. The discounted drug purchase arrangements we negotiate typically provide for volume discounts and/or the payment by the pharmaceutical companies of retroactive discounts, or rebates, from established list prices. For certain products that are purchased by our pharmacies, we receive discounts at the time of purchase and/or discounts for prompt payment of invoices. We also receive various purchase discounts under our wholesale contracts, which may include retroactive discounts, or rebates, if we exceed contractually-defined purchase volumes. We record these discounts, regardless of their form, as a reduction of our cost of revenues.

*Medicare Part D Services* - We participate in the administration of the drug benefit added to the Medicare program under Part D of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("Medicare Part D") through the provision of PBM services to our health plan clients and other clients that have qualified as Medicare Part D prescription drug plans ("PDP"). We also participate (i) by offering Medicare Part D pharmacy benefits through our subsidiary, SilverScript, which has been approved as a PDP by the Centers for Medicare and Medicaid Services ("CMS"), and (ii) by assisting employer, union and other health plan clients that qualify for the retiree drug subsidy available under Medicare Part D by collecting and submitting eligibility and/or drug cost data to CMS in order for them to obtain the subsidy.

*Mail Order Pharmacy* - As of December 31, 2013, we operated four mail service dispensing pharmacies in the United States. Plan members or their prescribers submit prescriptions or refill requests, primarily for maintenance medications, to these pharmacies via mail, telephone, fax, e-prescribing or the Internet. We also operate a network of smaller mail service specialty pharmacies described below. Our staff pharmacists review mail service prescriptions and refill requests with the assistance of our prescription management systems. This review may involve communications with the prescriber and, with the prescriber's approval, can result in generic substitution, therapeutic interchange or other actions designed to reduce cost and improve quality of treatment. These pharmacies have been awarded Mail Service Pharmacy accreditation from Utilization Review Accreditation Commission ("URAC"), a Washington DC-based health care accrediting organization that establishes quality standards for the health care industry.

*Specialty Pharmacy* - Our specialty pharmacies support individuals that require complex and expensive drug therapies. As of December 31, 2013, our specialty pharmacies were comprised of 11 specialty mail order pharmacies located throughout the United States that are used for delivery of advanced medications to individuals with chronic or genetic diseases and disorders. Substantially all of these pharmacies have been accredited by the Joint Commission, which is an independent, not-for-profit organization that accredits and certifies more than 20,000 health care organizations and programs in the United States. These pharmacies have also been awarded Specialty Pharmacy accreditation from URAC. As of December 31, 2013, the Company operated a network of 25 retail specialty pharmacy stores, which operate under the CarePlus CVS/pharmacy® name. These stores average 2,600 square feet in size and sell prescription drugs and a limited assortment of front store items such as alternative medications, homeopathic remedies and vitamins. In January 2014, we enhanced our offerings of specialty infusion services and began offering enteral nutrition services through our subsidiary Coram LLC ("Coram"), which we acquired on January 16, 2014. Coram is one of the nation's largest providers of comprehensive infusion services, caring for approximately 165,000 patients annually.

*Retail Pharmacy Network Management* - We maintain a national network of nearly 68,000 retail pharmacies, consisting of approximately 41,000 chain pharmacies (which includes our CVS/pharmacy stores) and 27,000 independent pharmacies, in the

United States, including Puerto Rico and the District of Columbia. When a customer fills a prescription in a retail pharmacy, the pharmacy sends prescription data electronically to us from the point-of-sale. This data interfaces with our proprietary prescription management systems, which verify relevant plan member data and eligibility, while also performing a drug utilization review to evaluate clinical appropriateness and safety and confirming that the pharmacy will receive payment for the prescription.

*Prescription Management Systems* - We dispense prescription drugs both directly, through one of our mail service or specialty pharmacies, or through a network of retail pharmacies. All prescriptions, whether they are filled through one of our mail service dispensing pharmacies or through a pharmacy in our retail network, are analyzed, processed and documented by our proprietary prescription management systems. These systems assist staff and network pharmacists in processing prescriptions by automating review of various items, including, but not limited to, plan eligibility, early refills, duplicate dispensing, appropriateness of dosage, drug interactions or allergies, over-utilization and potential fraud.

*Clinical Services* - We offer multiple clinical programs and services to help clients manage overall pharmacy and health care costs in a clinically appropriate manner. Our programs are primarily designed to promote safety, and to target inappropriate utilization and non-adherence to medication, each of which may result in adverse medical events that negatively impact member health and client pharmacy and medical spend. In this regard, we offer various utilization management, medication management, quality assurance, adherence and counseling programs to complement the client's plan design and clinical strategies.

*Disease Management Programs* - Our clinical services utilize advanced protocols and offer clients convenience in working with health care providers and other third parties. Our Accordant® programs include integrated rare disease management programs, which cover diseases such as rheumatoid arthritis, Parkinson's disease, seizure disorders and multiple sclerosis. The majority of these integrated programs are accredited by the National Committee for Quality Assurance, a private, not-for-profit organization that evaluates, accredits and certifies a wide range of health care organizations. They have also been awarded Case Management Accreditation from URAC.

*Medical Pharmacy Management* - We offer a technology platform that helps identify and capture cost savings opportunities for specialty drugs billed under the medical benefit and helps ensure appropriate clinical use of these drugs.

**Pharmacy Services Information Systems** - We currently operate several adjudication platforms to support our Pharmacy Services Segment. The information systems incorporate architecture that centralizes the data generated from filling mail service prescriptions, adjudicating retail pharmacy claims and fulfilling other services we provide to PBM clients.

**Pharmacy Services Clients** - Our clients are primarily sponsors of health benefit plans (employers, insurance companies, unions, government employee groups and MCOs) and individuals located throughout the United States. We provide pharmaceuticals to eligible members in benefit plans maintained by our clients and utilize our information systems, among other things, to perform safety checks, drug interaction screening and generic substitution. We generate substantially all of our Pharmacy Services Segment net revenue from dispensing prescription drugs to eligible members in benefit plans maintained by our clients. No single PBM client accounted for 10% or more of our total consolidated revenues in 2013. Our client agreements are subject to renegotiation of terms. See "Risk Factors — Efforts to reduce reimbursement levels and alter health care financing practices" and "Risk Factors — Risks of declining gross margins in the PBM industry." During the year ended December 31, 2013, our PBM filled or managed approximately 902 million prescriptions.

**Pharmacy Services Seasonality** - The majority of our Pharmacy Services Segment revenues are not seasonal in nature.

**Pharmacy Services Competition** - We believe the primary competitive factors in the industry include: (i) the ability to negotiate favorable discounts from drug manufacturers; (ii) the ability to negotiate favorable discounts from, and access to, retail pharmacy networks; (iii) responsiveness to clients' needs; (iv) the ability to identify and apply effective cost management programs utilizing clinical strategies; (v) the ability to develop and utilize preferred drug lists; (vi) the ability to market PBM products and services; (vii) the commitment to provide flexible, clinically-oriented services to clients; and (viii) the quality, scope and costs of products and services offered to clients and their members. The Pharmacy Services Segment has a significant number of competitors offering PBM services (e.g., Express Scripts, OptumRx, Catamaran and Prime Therapeutics) including large, national PBM companies, PBMs owned by large national health plans and smaller standalone PBMs.

**Retail Pharmacy Segment**

As of December 31, 2013, the Retail Pharmacy Segment included 7,660 retail drugstores, of which 7,603 operated a pharmacy, our online retail pharmacy websites, CVS.com and Onofre.com.br, 17 onsite pharmacy stores and our retail health care clinics.

The retail drugstores are located in 43 states, the District of Columbia, Puerto Rico and Brazil operating primarily under the CVS/pharmacy®, Longs Drugs® and Drogaria Onofre® names. We currently operate in 95 of the top 100 U.S. drugstore markets and hold the number one or number two market share in 86 of these markets. CVS/pharmacy stores sell prescription drugs and a wide assortment of over-the-counter and personal care products, beauty and cosmetic products, and general merchandise, which we refer to as "front store" products. Existing retail stores range in size from approximately 5,000 to 30,000 square feet, although most new stores range in size from approximately 8,000 to 13,000 square feet and typically include a drive-thru pharmacy. During 2013, we filled 734 million retail prescriptions, or approximately 21% of the U.S. retail pharmacy market.

As of December 31, 2013, we operated 800 retail health care clinics in 28 states and the District of Columbia under the MinuteClinic® name, 792 of which were located within CVS/pharmacy stores.

**Retail Pharmacy Business Strategy** - Our integrated pharmacy services model has enhanced the ability of our retail pharmacy stores to expand customer access to care while helping to lower overall health care costs and improve health outcomes. In that regard, the role of our retail pharmacist is shifting from primarily dispensing prescriptions to also providing services, including flu vaccinations as well as face-to-face patient counseling with respect to adherence to drug therapies, closing gaps in care and more cost effective drug therapies. In addition, personalization is core to our retail strategy. We have a number of initiatives underway, such as ExtraCare and a weekly individually tailored circular that acts as a personal shopper for the customer, that are designed to help us connect directly with individual consumers to deliver a personalized experience. We also provide a broad assortment of quality merchandise at competitive prices using a retail format that emphasizes service, innovation and convenience. One of the keys to our strategy is technology, which allows us to focus on constantly improving service and exploring ways to provide more personalized product offerings and services. We believe that continuing to be the first to market with new and unique products and services, using innovative marketing and adjusting our mix of merchandise to match our customers' needs and preferences is very important to our ability to continue to improve customer satisfaction.

**Retail Pharmacy Products and Services** - A typical CVS/pharmacy store sells prescription drugs and a wide assortment of high-quality, nationally advertised brand name and proprietary brand merchandise. Front store categories include over-the-counter drugs, beauty products and cosmetics, photo finishing services, seasonal merchandise, greeting cards and convenience foods. We purchase our merchandise from numerous manufacturers and distributors. We believe that competitive sources are readily available for substantially all of the products we carry and the loss of any one supplier would not likely have a material effect on the business.

Retail Pharmacy Segment net revenues by major product group are as follows:

| | Percentage of Net Revenues(1) | | |
|---|---|---|---|
| | 2013 | 2012 | 2011 |
| Prescription drugs | 69.5% | 68.8% | 68.3% |
| Over-the-counter and personal care | 11.0 | 10.9 | 10.9 |
| Beauty/cosmetics | 4.9 | 5.0 | 5.2 |
| General merchandise and other | 14.6 | 15.3 | 15.6 |
| | 100.0% | 100.0% | 100.0% |

(1) Percentages are estimates based on store point-of-sale ("POS") data.

*Pharmacy* - Pharmacy revenues represented more than two-thirds of Retail Pharmacy revenues in each of 2013, 2012 and 2011. We believe that our pharmacy operations will continue to represent a critical part of our business due to favorable industry trends (e.g., an aging American population consuming a greater number of prescription drugs, pharmaceuticals being used more often as the first line of defense for managing illness, and the impact of expanded health insurance coverage through the Affordable Care Act), the introduction of new pharmaceutical products, Medicare Part D and our ongoing program of purchasing customer lists from independent pharmacies. We believe our pharmacy business benefits from our investment in both people and technology. Given the nature of prescriptions, people want their prescriptions filled accurately by professional pharmacists using the latest tools and technology, and ready when promised. Consumers need medication management programs and better information to help them get the most out of their health care dollars. To assist our customers with these needs, we have introduced integrated pharmacy health care services that provide an earlier, easier and more effective approach to engaging them in behaviors that can help lower costs, improve health, and save lives. Examples include: our Patient Care Initiative, an enhanced medication adherence program; Maintenance Choice®, a program where eligible client plan members can elect to fill their maintenance prescriptions at our retail pharmacy stores for the same price as mail order; and Pharmacy Advisor®, our program that facilitates pharmacist counseling, both face-to-face and over the telephone, to help participating

plan members with certain chronic diseases, such as diabetes and cardiovascular conditions, to identify gaps in care, adhere to their prescribed medications and manage their health conditions. Further evidencing our belief in the importance of pharmacy service is our continuing investment in technology, such as our Drug Utilization Review system that checks for harmful interactions between prescription drugs, over-the-counter products, vitamins and herbal remedies; our pharmacy fulfillment system, Rx Connect; our prescription refill program, ReadyFill®; and our online business, CVS.com®.

*Front Store* - Front store revenues benefited from our strategy to be the first to market with new and unique products and services, using innovative marketing and adjusting our mix of merchandise to match our customers' needs and preferences. A key component of our front store strategy is our ExtraCare® card program, which is helping us continue to build our loyal customer base. The ExtraCare program is one of the largest and most successful retail loyalty programs in the United States. In addition, the ExtraCare program allows us to balance our marketing efforts so we can reward our best customers by providing them automatic sale prices, customized coupons, ExtraBucks® rewards and other benefits. Another component of our front store strategy is our unique product offerings, which include a full range of high-quality CVS/pharmacy® and proprietary brand products that are only available through CVS/pharmacy stores. We currently carry over 4,300 CVS/pharmacy and proprietary brand products, which accounted for approximately 18% of our front store revenues during 2013. Furthermore, we are tailoring certain groups of stores, such as our urban cluster stores, to better meet the needs of our customers.

*MinuteClinic* - As of December 31, 2013, we operated 800 MinuteClinic® locations in 28 states and the District of Columbia; of which 792 were located in CVS/pharmacy stores. MinuteClinics are staffed by nurse practitioners and physician assistants who utilize nationally recognized protocols to diagnose and treat minor health conditions, perform health screenings, monitor chronic conditions and deliver vaccinations. Many locations have also begun treating a variety of chronic conditions. Insurers value MinuteClinic because it provides convenient, high-quality, cost-effective care, in many cases offering an attractive alternative to more expensive sites of care. As a result, visits paid for by employers, health insurers or other third parties accounted for approximately 85% of MinuteClinic's total revenues in 2013. We anticipate opening up approximately 150 new clinics in CVS/pharmacy stores during 2014. MinuteClinic is collaborating with our Pharmacy Services Segment to help meet the needs of CVS Caremark's client plan members by offering programs that can improve member health and lower costs. MinuteClinic is now affiliated with 30 major health systems.

*Onsite Pharmacies* - We also operate a limited number of small pharmacies located at client sites under the CarePlus CVS/pharmacy® or CVS/pharmacy® name, which provide certain health plan members and customers with a convenient alternative for filling their prescriptions.

**Retail Pharmacy Store Development** - The addition of new stores has played, and will continue to play, a major role in our continued growth and success. Our store development program focuses on three areas: entering new markets, adding stores within existing markets and relocating stores to more convenient, freestanding sites. During 2013, we opened 169 new retail pharmacy stores, relocated 78 stores and closed 13 stores. During the last five years, we opened more than 1,300 new and relocated stores, and acquired 82 stores. During 2014, we expect square footage growth of between 2% to 3%. We believe that continuing to grow our store base and locating stores in desirable geographic markets are essential components to compete effectively in the current health care environment. As a result, we believe that our store development program is an integral part of our ability to maintain our leadership position in the retail drugstore industry.

**Retail Pharmacy Information Systems** - We have continued to invest in information systems to enable us to deliver exceptional customer service, enhance safety and quality, and expand our patient care services while lowering operating costs. In 2012, we completed the rollout of our proprietary WeCARE Workflow to all retail pharmacy locations. WeCARE Workflow is an integrated suite of enhancements to our RxConnect fulfillment system, pharmacy POS terminals and phone system to support our pharmacy colleagues and customers by seamlessly integrating and prioritizing prescription fulfillment, prescriber contact management, customer service actions and patient care interventions into a cohesive workflow. In the near term, this solution delivers improved efficiency and enhances the customer experience. Longer term, the solution provides a framework to accommodate the evolution of pharmacy practice and the expansion of our clinical programs. Our Consumer Engagement Engine® technology and proprietary clinical algorithms enable us to identify opportunities for our pharmacists to deliver face-to-face counseling regarding patient health and safety matters, including adherence issues, gaps in care and management of certain chronic health conditions. Our digital strategy empowers the consumer to navigate their pharmacy experience and manage their condition through our on-line and mobile tools that offer utility and convenience. CVS.com gained a new look and added new tools, such as access to world-class drug information and personalization of pharmacy services. We experienced strong adoption of our digital solutions with our mobile app receiving critical acclaim for ease of use and our text message program experiencing unprecedented growth.

**Retail Pharmacy Customers** - Managed care organizations, government-funded health care programs (including state Medicaid plans and Medicare Part D drug plans), commercial employers and other third party plans accounted for 97.9% of our

2013 pharmacy revenues. The loss of any one payor should not have a material effect on our business. No single retail payor accounts for 10% or more of our total consolidated revenues. However, the success of our retail drugstore business is dependent upon our ability to establish and maintain contractual relationships with PBMs and other payors on acceptable terms. Our contracts with commercial payors and government-funded programs are subject to renegotiation of reimbursement rates. See “Government Regulation — Reimbursement” and Item 1A., “Risk Factors — Efforts to reduce reimbursement levels and alter health care financing practices.”

**Retail Pharmacy Seasonality** - The majority of our revenues, particularly pharmacy revenues, are generally not seasonal in nature. However, front store revenues tend to be higher during the December holiday season. For additional information, we refer you to Note 16 “Quarterly Financial Information” in our Annual Report to Stockholders for the year ended December 31, 2013, which section is incorporated by reference herein.

**Retail Pharmacy Competition** - The retail drugstore business is highly competitive. We believe that we compete principally on the basis of: (i) store location and convenience, (ii) customer service and satisfaction, (iii) product selection and variety and (iv) price. In the markets we serve, we compete with other drugstore chains, supermarkets, discount retailers, independent pharmacies, membership clubs, Internet companies, and retail health clinics, as well as other mail order pharmacies and PBMs.

**Corporate Segment**

Our Corporate Segment provides management and administrative services to support the overall operations of the Company. The Corporate Segment consists of certain aspects of our executive management, corporate relations, legal, compliance, human resources, corporate information technology and finance departments.

**Generic Sourcing Venture**

In December 2013, we announced the signing of an agreement with Cardinal Health, Inc. ("Cardinal Health") to form a generic pharmaceutical sourcing entity. This entity is expected to be operational as soon as July 1, 2014, and will have an initial term of ten years. Under this arrangement, both companies are contributing their sourcing and supply chain expertise to this entity and are committing to source and negotiate generic pharmaceutical supply contracts for both CVS Caremark and Cardinal Health through the entity.

**Working Capital Practices**

We fund the growth of our business through a combination of cash flow from operations, commercial paper, proceeds from sale-leaseback transactions and long-term borrowings. For additional information on our working capital practices, we refer you to the caption “Liquidity and Capital Resources” in our Annual Report to Stockholders for the year ended December 31, 2013, which section is incorporated by reference herein. The majority of our non-pharmacy revenues are paid in cash, debit or credit cards, while managed care and other third party insurance programs, which typically settle in less than 30 days, represented approximately 99.2% of our consolidated pharmacy revenues, including both Retail Pharmacy and Pharmacy Services combined, in 2013. The remainder of consolidated pharmacy revenues are paid in cash, debit or credit cards. Our customer returns are not significant.

**Colleague Development**

As of December 31, 2013, we employed approximately 208,000 colleagues, which included more than 26,000 pharmacists, nurse practitioners and physician assistants. The total included, approximately 78,000 part-time colleagues who work less than 30 hours per week. To deliver the highest levels of service to our customers, we devote considerable time and attention to our people and service standards. We emphasize attracting and training knowledgeable, friendly and helpful associates to work in our organization.

**Intellectual Property**

We have registered and/or applied to register a variety of our trademarks and service marks used throughout our business, as well as domain names, and rely on a combination of copyright, patent, trademark and trade secret laws, in addition to contractual restrictions, to establish and protect our proprietary rights. We regard our intellectual property as having significant value in our Pharmacy Services and Retail Pharmacy segments. We are not aware of any facts that could materially impact our continuing use of any of our intellectual property.

**Government Regulation**

**Overview** - Our business is subject to federal and state laws and regulations that govern the purchase, sale and distribution of prescription drugs and related services, including administration and management of prescription drug benefits. Many of our PBM clients and our payors in the Retail Pharmacy Segment, including insurers and MCOs, are themselves subject to extensive regulations that affect the design and implementation of prescription drug benefit plans that they sponsor. The application of these complex legal and regulatory requirements to the detailed operation of our business creates areas of uncertainty, particularly following the enactment of the Medicare Modernization Act ("MMA") and the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act (collectively, "ACA"), some of the most significant legal and regulatory developments in the past 50 years. In addition to the MMA and ACA, there are numerous proposed health care laws and regulations at the federal and state levels, some of which could adversely affect our business if they are enacted. We are unable to predict what federal or state legislation or regulatory initiatives may be enacted in the future relating to our business or the health care industry in general, or what effect any such legislation or regulations might have on our business. Any failure or alleged failure to comply with applicable laws and regulations as summarized below, or any adverse applications of, or changes in, the laws and regulations affecting our business, could have a material adverse effect on our operating results and/or financial condition.

**Anti-Remuneration Laws** - Federal law prohibits, among other things, an entity from knowingly and willfully offering, paying, soliciting or receiving, subject to certain exceptions and "safe harbors," any remuneration to induce the referral of individuals or the purchase, lease or order (or the arranging for or recommending of the purchase, lease or order) of items or services for which payment may be made under Medicare, Medicaid or certain other federal health care programs. A number of states have similar laws, some of which are not limited to services paid for with government funds. State laws and exceptions or safe harbors vary and have been infrequently interpreted by courts or regulatory agencies. Sanctions for violating these federal and state anti-remuneration laws may include imprisonment, criminal and civil fines, and exclusion from participation in Medicare, Medicaid and other government-sponsored health care programs. The federal anti-remuneration law has been interpreted broadly by some courts, the Office of Inspector General (the "OIG") within the United States Department of Health and Human Services ("HHS") and administrative bodies. See Item 3, "Legal Proceedings" for further information.

**Antitrust and Unfair Competition** - The Federal Trade Commission ("FTC") has authority under Section 5 of the Federal Trade Commission Act ("FTCA") to investigate and prosecute practices that are "unfair trade practices" or "unfair methods of competition." Numerous lawsuits have been filed throughout the United States against pharmaceutical manufacturers, retail pharmacies and/or PBMs under various state and federal antitrust and unfair competition laws challenging, among other things: (i) brand drug pricing practices of pharmaceutical manufacturers, (ii) the maintenance of retail pharmacy networks by PBMs, and (iii) various other business practices of PBMs and retail pharmacies. To the extent that we appear to have actual or potential market power in a relevant market, our business arrangements and uses of confidential information may be subject to heightened scrutiny from an anti-competitive perspective and possible challenge by state or federal regulators or private parties. See Item 3, "Legal Proceedings" for further information.

**Consumer Protection Laws** - The federal government has many consumer protection laws, such as the FTCA, the Federal Postal Service Act and the FTC's Telemarketing Sales Rule. Most states also have similar consumer protection laws. These laws have been the basis for investigations, lawsuits and multi-state settlements relating to, among other matters, the marketing of loyalty programs and health care services, pricing accuracy, expired front store products and financial incentives provided by drug manufacturers to pharmacies in connection with therapeutic interchange programs.

**Contract Audits** - We are subject to audits of many of our contracts, including our PBM client contracts, our PBM rebate contracts, our contracts relating to Medicare Part D and the agreement our pharmacies enter into with payors. Because some of our contracts are with state or federal governments or with entities contracted with state or federal agencies, audits of these agreements are often regulated by the federal or state agencies responsible for administering federal or state benefits programs, including those which operate Medicaid fee for service plans, Managed Medicaid plans, Medicare Part D plans or Medicare Advantage organizations.

**Disease Management Services Regulation** - We provide disease management programs to PBM plan members for rare medical conditions and arrange for them to receive disease management programs for common medical conditions. State laws regulate the practice of medicine, the practice of pharmacy and the practice of nursing. Clinicians engaged in a professional practice in connection with the provision of disease management services must satisfy applicable state licensing requirements.

**Environmental Regulation** - Our business is subject to various federal, state and local laws, regulations and other requirements pertaining to protection of the environment and public health, including, for example, regulations governing the management of waste materials and waste waters. Governmental agencies on the federal, state and local levels have, in recent

years, increasingly focused on the retail sector's compliance with such laws and regulations, and have at times pursued enforcement activities.

**ERISA Regulation** - The Employee Retirement Income Security Act of 1974, as amended ("ERISA"), provides for comprehensive federal regulation of certain employee pension and benefit plans, including private employer and union sponsored health plans and certain other plans that contract with us to provide PBM services. In general, we assist plan sponsors in the administration of the prescription drug portion of their health benefit plans, in accordance with the plan designs adopted by the plan sponsors. We do not believe that the conduct of our business subjects us to the fiduciary obligations of ERISA, except when we have specifically contracted with a plan sponsor to accept limited fiduciary responsibility, such as for the adjudication of initial prescription drug benefit claims and/or the appeals of denied claims under a plan, and with respect to the Contraceptive Coverage Mandate, one of the health reforms included in ACA. We and other PBMs have been named in lawsuits alleging that we act as a fiduciary, as such term is defined by ERISA, with respect to health benefit plans and that we have breached certain fiduciary obligations under ERISA.

In addition to its fiduciary provisions, ERISA imposes civil and criminal liability on service providers to health plans and certain other persons if certain forms of illegal remuneration are made or received. These provisions of ERISA are similar, but not identical, to the health care anti-remuneration statutes discussed above, although ERISA lacks the statutory and regulatory "safe harbor" exceptions incorporated into the health care statutes. Similar to these health care statutes, the corresponding provisions of ERISA are broadly written and their application to specific business practices is often uncertain.

State laws discussed in this Government Regulation section that may be applicable to us or to plan sponsors that are our customers may be preempted in whole or in part by ERISA. However, the scope of ERISA preemption is uncertain and is subject to conflicting court rulings.

**False Claims and Fraudulent Billing Statutes** - A range of federal civil and criminal laws target false claims and fraudulent billing activities. One of the most significant of these laws is the Federal False Claims Act ("FCA"), which prohibits the submission of a false claim or the making of a false record or statement in order to secure reimbursement from, or limit reimbursement to, a government-sponsored program. The Fraud Enforcement and Recovery Act of 2009 ("FERA") implemented substantial changes to the FCA which expands the scope of FCA liability, provides for new investigative tools and makes it easier for *qui tam* relators (often referred to as "whistleblowers") to bring and maintain FCA suits on behalf of the government. ACA further eased the burden for whistleblowers to bring and maintain FCA suits by modifying the "public disclosure" and "original source" provisions of the FCA. Most states have passed substantially similar acts. In recent years, federal and state government authorities have launched several initiatives aimed at uncovering practices that violate false claims or fraudulent billing laws, and they have conducted numerous investigations of pharmaceutical manufacturers, PBMs, pharmacies and health care providers with respect to false claims, fraudulent billing and related matters. See Item 3, "Legal Proceedings" for further information.

**FDA Regulation** - The United States Food and Drug Administration ("FDA") generally has authority to regulate drugs, drug classifications and drug promotional information and materials that are disseminated by a drug manufacturer or by other persons on behalf of a drug manufacturer. The FDA also has the regulatory authority (i) over many of the products sold through retail pharmacies, including certain food items, cosmetics, dietary supplements and over-the-counter ("OTC") medications, and (ii) to require the submission and implementation of a risk evaluation and mitigation strategy ("REMS") if the FDA determines that a REMS is necessary for the safe and effective marketing of a drug. To the extent we dispense products subject to REMS requirements or provide REMS services to pharmaceutical manufacturers, we are subject to audit by the FDA and the pharmaceutical manufacturer. The FDA also has regulatory authority over medical devices such as OTC genetic tests and genetic tests conducted by medical laboratories, and the FDA continues to evaluate the need for further regulation of such tests.

**Federal Employee Health Benefits Program** - We have a contractual arrangement with the BlueCross BlueShield Association ("BCBSA") to provide pharmacy services to federal employees, postal workers, annuitants, and their dependents under the Government-wide Service Benefit Plan, as authorized by the Federal Employees Health Benefits Act ("FEHBA") and as part of the Federal Employees Health Benefits Program ("FEHBP"). This arrangement subjects us to FEHBA, and other federal regulations, such as the Federal Employees Health Benefits Acquisition Regulation, that otherwise are not applicable to us.

**Formulary Regulation** - A number of states regulate the administration of prescription drug benefits. Additionally, the National Association of Insurance Commissioners ("NAIC") has developed a model law, the "Health Carriers Prescription Drug Benefit Management Model Act," that addresses formulary regulation issues for risk-bearing entities regulated by state insurance commissioners and could form the basis of state legislation. Medicare Part D regulates how formularies are developed and administered, including requiring the inclusion of all drugs in certain classes and categories, subject to limited exceptions, on a Medicare Part D plan's formulary. ACA's Essential Health Benefits Rule also imposes minimum drug coverage

requirement for health plans subject to these requirements, including plans offered through the Federal or State Exchanges. The increasing government regulation of formularies could significantly affect our ability to develop and administer formularies on behalf of our insurer, MCO and other clients.

**Government Agreements and Mandates** - In March 2008, the Company entered into a settlement agreement with the federal government and a number of states related to the dispensing of the generic drug ranitidine at its retail pharmacies. At the same time, the Company entered into a corporate integrity agreement with the OIG for a period of five years applicable to certain retail and mail service operations of the Company. This 2008 corporate integrity agreement requires, among other things, maintenance of our compliance program, employee training, specific reviews by an independent review organization and various government reporting obligations. In April 2011, we entered into an amendment of the corporate integrity agreement in connection with the previously announced settlement of a federal and state government investigation of certain retail pharmacy billing practices with respect to "dual eligible" customers having both Medicaid coverage and other third-party insurance coverage. This amendment requires the Company to comply with the corporate integrity agreement, as amended, for a period of three years and further requires, among other things, additional employee training obligations, additional reporting obligations and periodic Medicaid billing reviews by an independent review organization. Failure to meet our obligations under this corporate integrity agreement, as amended, could result in stipulated financial penalties, and failure to comply with material terms could lead to exclusion of our applicable business from participation in federal health care programs.

In January 2009, we entered into separate settlement agreements with the FTC and the HHS Office for Civil Rights ("OCR") resolving a joint investigation of disposal of patient information at a limited number of CVS/pharmacy locations. As part of the FTC settlement, we agreed to maintain an appropriate enterprise-wide information security program during the twenty-year term of the agreement with biennial compliance monitoring by an external assessor. As part of the OCR settlement, we agreed to maintain confidential waste disposal policies and procedures, training and employee sanctions at our retail stores. The OCR settlement provided for annual compliance monitoring by an external assessor. In June 2013, we received from the OCR a closure letter that noted we were in material compliance with our OCR settlement agreement and we had significantly improved our retail store processes surrounding protected health information and that our mandatory monitoring and reporting obligations were satisfied.

In October 2010, the Company entered into a non-prosecution agreement and civil settlement agreement with the U.S. Department of Justice ("DOJ") and various United States Attorneys' Offices relating to the sale and distribution of pseudoephedrine products at certain CVS/pharmacy stores, primarily in California and Nevada. The Company also entered into a related memorandum of agreement with the U.S. Drug Enforcement Administration ("DEA"). The non-prosecution agreement and the memorandum of agreement contain certain ongoing compliance requirements for the Company, and failure to comply with the terms of these documents could lead to civil or criminal remedies, financial penalties and/or administrative remedies against the DEA registrations for our retail pharmacies and distribution centers. The term of the non-prosecution agreement was three years and ended in October 2013. The term of the memorandum of agreement is five years.

In May 2012, a previously announced proposed consent order between the FTC and the Company became final and concluded an FTC investigation of the Company that commenced in 2009. The final consent order prohibits the Company from misrepresenting the price or cost of Medicare Part D prescription drugs or other prices or costs associated with Medicare Part D prescription drug plans.

On October 12, 2012, the DEA Administrator published its Final Decision and Order revoking the DEA license registrations for dispensing controlled substances at two of our retail pharmacy stores in Sanford, Florida. The license revocations for the two stores formally became effective on November 13, 2012. The pharmacies had voluntarily suspended dispensing controlled substances since April 2012, and have continued operating in that manner in compliance with the DEA Order.

In addition to the government agreements described above, the Company and/or its various affiliates are subject to other consent decrees or settlement agreements with various federal, state and local authorities that may contain certain ongoing reporting, monitoring or other compliance requirements for the Company. These agreements relate to such matters as privacy practices, waste disposal practices, selling expired products, environmental and safety matters, tobacco sales, marketing and advertising practices, pharmacy operations and various other business practices.

**Health Reform Legislation** - Congress passed major health reform legislation in 2010 referred to in this document as ACA. This legislation affects virtually every aspect of health care in the country. In addition to establishing the framework for every individual to have health coverage beginning in 2014, ACA enacted a number of significant health care reforms. While not all of these reforms affect our business directly, many affect the coverage and plan designs that are or will be provided by many of our health plan clients. As a result, these reforms could indirectly impact many of our services and business practices, and, in many other cases, directly impact our services and business practices. Given that many of the regulations implementing ACA

are still being finalized and that ongoing sub-regulatory guidance is still being issued, there is considerable uncertainty as to its full impact on our Company.

**Managed Care Reform** - In addition to health reforms enacted by ACA, proposed legislation has been considered at the state level, and legislation has been enacted in several states, aimed primarily at providing additional rights and access to drugs to individuals enrolled in managed care plans. This legislation may impact the design and implementation of prescription drug benefit plans sponsored by our PBM health plan clients and/or the services we provide to them. Both the scope of the managed care reform proposals considered by state legislatures and reforms enacted by states to date vary greatly, and the scope of future legislation that may be enacted is uncertain.

**Medicare Part D** - The Medicare Part D program, which makes prescription drug coverage available to eligible Medicare beneficiaries through private insurers, regulates all aspects of the provision of Medicare drug coverage, including enrollment, formularies, pharmacy networks, marketing, and claims processing. The Medicare Part D program has undergone significant legislative and regulatory changes since its inception, including changes made by ACA.

In April 2012, CMS issued a rule that requires coverage other than basic prescription drug coverage offered through Medicare Part D employer group waiver plans ("EGWPs") to be included in the definition of "other health or prescription drug coverage," starting January 1, 2014. CMS has clarified that, because the supplemental benefits primarily reduce cost sharing on claims covered under the basic benefit, they will continue as a practical matter to be subject to the Medicare Part D rules.

Medicare Part D continues to attract a high degree of legislative and regulatory scrutiny, and the applicable government rules and regulations continue to evolve. CMS sanctions for non-compliance may include suspension of enrollment and even termination from the program. CMS has imposed restrictions and consent requirements for automatic prescription delivery programs, further limited the circumstances under which Medicare Part D plans may recoup payments to pharmacies for claims that are subsequently determined not payable under Medicare Part D and, is expected to issue a proposed regulation that may limit the ability of Medicare Part D plans to establish preferred pharmacy networks. Accordingly, it is possible that legislative and regulatory developments and regulatory oversight could materially affect our Medicare Part D business or profitability.

**Network Access Legislation** - A majority of states now have some form of legislation affecting the ability to limit access to a pharmacy provider network or remove network providers. Certain "any willing provider" legislation may require us or our clients to admit a non-participating pharmacy if such pharmacy is willing and able to meet the plan's price and other applicable terms and conditions for network participation. These laws vary significantly from state to state in regard to scope, requirements and application. To the extent any state or federal any willing provider laws are determined to apply to us or to certain of our clients or to the pharmacy networks we manage for our PBM clients, such laws could negatively impact the services and economic benefits achievable through a limited pharmacy provider network.

**PBM Laws and Regulation** - Legislation seeking to regulate PBM activities in a comprehensive manner has been introduced or enacted in a number of states. This legislation varies in scope and often contains provisions that may impact our Company. To the extent states or other government entities enact legislation regulating PBMs that survive legal challenges to their enforceability, such legislation could adversely impact our ability to conduct business on commercially reasonable terms in locations where the legislation is in effect.

In addition, certain quasi-regulatory organizations, including the National Association of Boards of Pharmacy and the NAIC have issued model regulations or may propose future regulations concerning PBMs and/or PBM activities. Similarly, credentialing organizations such as the National Committee for Quality Assurance and the URAC may establish voluntary standards regarding PBM or specialty pharmacy activities. While the actions of these quasi-regulatory or standard-setting organizations do not have the force of law, they may influence states to adopt their requirements or recommendations and influence client requirements for PBM or specialty pharmacy services. Moreover, any standards established by these organizations could also impact our health plan clients and/or the services we provide to them.

**Pharmacy and Professional Licensure and Regulation** - We are subject to state and federal statutes and regulations governing the operation of retail and mail pharmacies, the transfer of prescriptions, repackaging of drug products, wholesale distribution, dispensing of controlled substance and listed chemical products, and medical and controlled substance waste disposal. Federal and state statutes and regulations govern the labeling, packaging, advertising and adulteration of prescription drugs and the dispensing of controlled substances, and some state regulations require compliance with standards established by the United States Pharmacopeia with respect to the packaging, storing and shipping of pharmaceuticals. Federal and state controlled substance laws require us to register our pharmacies and distribution centers with the DEA and state controlled substances agencies and to comply with security, recordkeeping, inventory control, personnel and labeling standards in order to

possess and dispense controlled substances and listed chemical products. We undergo audits by these regulatory bodies on a regular basis.

**Plan Design Legislation** - Some states have enacted legislation that prohibits a health plan sponsor from implementing certain restrictive design features, and many states have introduced legislation to regulate various aspects of managed care plans, including provisions relating to pharmacy benefits. Legislation imposing plan design mandates may apply to certain of our clients and could have the effect of limiting the economic benefits achievable through PBM services we provide.

**Privacy and Confidentiality Requirements** - Many of our activities involve the receipt, use and disclosure by us of personally identifiable information ("PII") as permitted in accordance with applicable federal and state privacy and data security laws, which require organizations to provide appropriate privacy protections and security safeguards for such information. In addition to PII, we use and disclose de-identified data for analytical and other purposes.

The federal Health Insurance Portability and Accountability Act of 1996 and the regulations issued thereunder (collectively "HIPAA") impose extensive requirements on the way in which health plans, health care providers, health care clearinghouses (known as "covered entities") and their business associates use, disclose and safeguard protected health information ("PHI"). HIPAA also gives individuals certain rights with respect to their PHI. For most uses and disclosures of PHI other than for treatment, payment, health care operations or certain public policy purposes, HIPAA generally requires that covered entities obtain the individual's written authorization. Criminal penalties and civil sanctions may be imposed for failing to comply with HIPAA standards. In January 2013, HHS issued a rule implementing the Health Information Technology for Economic and Clinical Health Act (the "HITECH Act"), enacted as part of the American Recovery and Reinvestment Act of 2009. Among other things, the rule expands the circumstances under which authorizations are required to send communications to individuals that are funded by third parties and extends HIPAA privacy and security requirements and penalties directly to business associates of covered entities.

In addition to HIPAA, most states have enacted health care information confidentiality laws which limit the disclosure of confidential medical information. These state laws supersede HIPAA to the extent they are more protective of individual privacy than is HIPAA.

HHS has also issued regulations requiring federal and state exchanges to impose privacy and security standards on non-Exchange entities to protect PII obtained through the exchanges beginning in 2014. In proposed regulations, HHS has defined the term "non-exchange entities" to include insurers offering plans through the exchanges and would require that these entities in turn impose the same or more stringent privacy and security standards on their "downstream entities". If this rule is finalized as proposed, unless HIPAA-covered entities are able to negotiate with an exchange to accept compliance with HIPAA privacy and security standards as a substitute for complying with the exchange privacy and security standards, insurers offering plans through the exchanges and their business associates could potentially be subject to additional privacy and security standards in addition to HIPAA and existing more stringent state laws.

**Reimbursement** - A significant portion of our net revenue is derived directly from Medicare, Medicaid and other government-sponsored health care programs, and we are therefore subject to, among other laws and regulations, federal and state reimbursement laws and regulatory requirements, anti-remuneration laws, the Stark Law and/or federal and state false claims laws. (See the "Self-Referral Laws" section below for explanation of the Stark Law.) Sanctions for violating these federal and/or state laws may include, without limitation, recoupment or reduction of government reimbursement amounts, criminal and civil penalties and exclusion from participation in Medicare, Medicaid and other government health care programs. See Item 3, "Legal Proceedings," for further information.

Changes in reporting of Average Wholesale Price ("AWP"), Average Manufacturer Price ("AMP"), or Average Sales Price, which are pricing elements common to most payment formulas, or other adjustments that may be made regarding the reimbursement of drug payments by Medicaid and Medicare could impact our pricing to customers and other payors and/or could impact our ability to negotiate discounts or rebates with manufacturers, wholesalers, PBMs or retail and mail pharmacies. In some circumstances, such changes could also impact the reimbursement that we receive from Medicare or Medicaid programs for drugs covered by such programs and from MCOs that contract with government health programs to provide prescription drug benefits.

**Reimportation** - The MMA amended the Food, Drug and Cosmetic Act by providing that the FDA should promulgate rules that would permit pharmacists and wholesalers to import prescription drugs from Canada into the United States under certain circumstances. However, the promulgation of such rules is subject to a precondition that the FDA certify to Congress that such reimportation would not pose any additional risk to the public's health and safety and that it would result in a significant cost reduction. To date, the FDA has not provided such a certification. The FDA continues to strongly oppose efforts

to allow the widespread importation of drugs from Canada and elsewhere, citing concerns that such activities undermine the FDA's ability to oversee the quality and safety of the nation's drug supply. If the FDA changes its position and permits the broader importation of drugs from Canada in the future, or if new or pending health legislation or regulations permit the importation of drugs from the European Union or other countries in the future, our pharmacy services could be impacted.

**Retail Clinics** - States regulate retail clinics operated by nurse practitioners or physician assistants through physician oversight, lab licensing and the prohibition of the corporate practice of medicine. A number of states have implemented or proposed laws or regulations that impact certain components of retail clinic operations such as physician oversight, signage, third party contracting requirements, bathroom facilities, and scope of services. These laws and regulations may affect the operation and expansion of our owned and managed retail clinics.

**Safety Regulations** - The Occupational Safety and Health Act of 1970, as amended ("OSHA"), establishes certain employer responsibilities, including maintenance of a workplace free of recognized hazards likely to cause death or serious injury, compliance with standards promulgated under OSHA, and various record keeping, reporting and procedural requirements. Many of these OSHA standards, as well as various state and local laws and regulations pertaining to employee safety and health, including some that apply specifically to healthcare employees, apply to our operations. Any failure to comply with these regulations could result in fines or other sanctions by government authorities.

**Self-Referral Laws** - The federal law commonly known as the "Stark Law" prohibits a physician from referring Medicare or Medicaid beneficiaries for "designated health services" (which include, among other things, outpatient prescription drugs, home health services and durable medical equipment and supplies) to an entity with which the physician or an immediate family member of the physician has a "financial relationship" and prohibits the entity receiving a prohibited referral from presenting a claim to Medicare or Medicaid for the designated health service furnished under the prohibited referral. State statutes and regulations also prohibit payments for the referral of individuals by physicians to health care providers with whom the physicians have a financial relationship. Some of these state statutes and regulations apply to services reimbursed by governmental as well as private payors.

Violation of these laws may result in prohibition of payment for services rendered, loss of pharmacy or health care provider licenses, fines and criminal penalties. The laws and exceptions or safe harbors may vary from the federal Stark Law and vary significantly from state to state. The laws are often vague, and, in many cases, have not been interpreted by courts or regulatory agencies.

**State Insurance Laws** - PDPs and our PBM service contracts, including those in which we assume certain risk under performance guarantees or similar arrangements, are generally not subject to insurance regulation by the states. However, if a PBM offers to provide prescription drug coverage on a capitated basis or otherwise accepts material financial risk in providing pharmacy benefits, laws and regulations in various states may be applicable. Such laws may require that the party at risk become licensed as an insurer, establish reserves or otherwise demonstrate financial viability. Laws that may apply in such cases include insurance laws and laws governing MCOs and limited prepaid health service plans. The Company offers a PDP through SilverScript, which is subject to state insurance laws regarding licensure and solvency.

Some states have laws that prohibit submitting a false claim or making a false record or statement in order to secure reimbursement from an insurance company. These state laws vary, and violation of them may lead to the imposition of civil or criminal penalties. Additionally, several states have passed legislation governing the prompt payment of claims that requires, among other things, that health plans and payors pay claims within certain prescribed time periods or pay specified interest penalties. These laws vary from state to state in regard to scope, requirements and application, and it is not clear the extent to which they may apply to our clients or to us. Certain health plans and payors may be exempt from such laws on the basis of ERISA preemption, but the scope of ERISA preemption is unclear.

**Telemarketing and Other Outbound Contacts** - Certain federal and state laws, such as the Telephone Consumer Protection Act ("TCPA"), give the FTC, Federal Communications Commission ("FCC") and state attorneys general law enforcement tools to regulate telemarketing practices and certain automated outbound contacts such as phone calls, texts or emails. These laws may, among other things, impose registration requirements, require disclosures of specific information, prohibit misrepresentations, limit when, where and how consumers may be contacted, require consumer consent prior to being contacted, require transmission of Caller ID information, prohibit certain abandoned outbound calls, prohibit unauthorized billing, set payment restrictions for the sale of certain goods and services, require the establishment of certain policies and training of personnel and require the retention of specific business records. In October 2013, new FCC rules went into effect aimed at better aligning the FCC's regulatory response under the TCPA with the FTC's response, as well as requiring written prior consent for calls using an automatic telephone dialing system (call to a mobile number) or an artificial or prerecorded

voice (call to a residential or mobile number). The Company's use of telemarketing and other outbound contacts could be impacted by these laws and regulations.

**Third Party Administration and Other State Licensure Laws** - Many states have licensure or registration laws governing certain types of administrative organizations, such as preferred provider organizations, third party administrators and companies that provide utilization review services. Several states also have licensure or registration laws governing the organizations that provide or administer consumer card programs (also known as cash card or discount card programs). The scope of these laws differs significantly from state to state, and the application of such laws to our activities often is unclear.

**Whistleblower Statutes** - Certain federal and state laws, including the FCA, contain provisions permitting the filing of *qui tam* or "whistleblower" lawsuits alleging violations of such laws. Whistleblower provisions allow private individuals to bring lawsuits on behalf of the federal or state government alleging that the defendant has defrauded the government, and there is generally no minimum evidentiary or legal threshold required for bringing such a lawsuit. These lawsuits are typically filed under seal with the applicable federal or state enforcement authority, and such authority is required to review the allegations made and to determine whether it will intervene in the lawsuit and take the lead in the litigation. Because a *qui tam* lawsuit typically is filed under seal pending a government review of the allegations, the defendant generally may not be aware of the lawsuit until the government determines whether or not it will intervene or until the lawsuit is otherwise unsealed, a process which may take years. See Item 3, "Legal Proceedings," for further information.

Although we believe that we are in material compliance with existing laws and regulations applicable to our various business lines, we cannot give any assurances that our business, financial condition and results of operations will not be materially adversely affected, or that we will not be required to materially change our business practices, based on: (i) future enactment of new health care or other laws or regulations; (ii) the interpretation or application of existing laws or regulations, including the laws and regulations described in this Government Regulation section, as they may relate to our business, the pharmacy services, retail pharmacy or retail clinic industry or to the health care industry generally; (iii) pending or future federal or state governmental investigations of our business or the pharmacy services, retail pharmacy or retail clinic industry or of the health care industry generally; (iv) institution of government enforcement actions against us; (v) adverse developments in any pending *qui tam* lawsuit against us, whether sealed or unsealed, or in any future *qui tam* lawsuit that may be filed against us; or (vi) adverse developments in other pending or future legal proceedings against us or affecting the pharmacy services, retail pharmacy or retail clinic industry or the health care industry generally.

**Available Information**

CVS Caremark Corporation is a Delaware corporation. Our corporate office is located at One CVS Drive, Woonsocket, Rhode Island 02895, telephone (401) 765-1500. Our common stock is listed on the New York Stock Exchange under the trading symbol "CVS." General information about CVS Caremark is available through the Company's Web site at *http://info.cvscaremark.com*. Our financial press releases and filings with the U.S. Securities and Exchange Commission ("SEC") are available free of charge within the Investors section of our Web site at *http://www.cvscaremark.com/investors*. In addition, the SEC maintains an internet site that contains reports, proxy and information statements and other information regarding issuers, such as the Company, that file electronically with the SEC. The address of that Web site is *http://www.sec.gov.*

**Item 1A. Risk Factors**

Our business is subject to various industry, economic, regulatory and other risks and uncertainties. Our business, financial condition, results of operations, cash flows and prospects could be materially adversely affected by any one or more of the following risk factors and by additional risks and uncertainties not presently known to us or that we currently deem to be immaterial:

***The health of the economy in general and in the markets we serve.***

Our business is affected by the economy in general, including changes in consumer purchasing power, preferences and/or spending patterns. Although an economic recovery might be underway, it is possible that a worsening of the economic environment will cause a decline in drug utilization, and dampen demand for pharmacy benefit management services as well as consumer demand for products sold in our retail stores. Further, interest rate fluctuations, changes in capital market conditions and regulatory changes may affect our ability to obtain necessary financing on acceptable terms, our ability to secure suitable store locations under acceptable terms and our ability to execute sale-leaseback transactions under acceptable terms. These circumstances could result in an adverse effect on our business and financial results.

***Efforts to reduce reimbursement levels and alter health care financing practices.***

The continued efforts of health maintenance organizations, managed care organizations, PBM companies, government entities, and other third party payors to reduce prescription drug costs and pharmacy reimbursement rates may impact our profitability. In particular, increased utilization of generic pharmaceuticals (which normally yield a higher gross profit rate than equivalent brand named drugs) has resulted in pressure to decrease reimbursement payments to retail and mail order pharmacies for generic drugs, causing a reduction in the generic profit rate. Historically, the effect of this trend on generic profitability has been mitigated by our efforts to negotiate reduced acquisition costs of generic pharmaceuticals with manufacturers. However, in recent years, there has been significant consolidation within the generic manufacturing industry, and it is possible that this dynamic may enhance the ability of manufacturers to sustain or increase pricing of generic pharmaceuticals and diminish our ability to negotiate reduced acquisition costs.

In addition, during the past several years, the U.S. health care industry has been subject to an increase in governmental regulation at both the federal and state levels. Efforts to control health care costs, including prescription drug costs, are underway at the federal and state government levels. Changing political, economic and regulatory influences may significantly affect health care financing and reimbursement practices.

ACA made several significant changes to Medicaid rebates and to reimbursement. One of these changes was to revise the definition of AMP and the reimbursement formula for multi-source (i.e., generic) drugs. In addition, ACA made other changes that affect the coverage and plan designs that are or will be provided by many of our health plan clients, including the requirement for health insurers to meet a minimum medical loss ratio to avoid having to pay rebates to enrollees. These ACA changes may not affect our business directly, but they could indirectly impact our services and/or business practices.

***The possibility of PBM client loss and/or the failure to win new PBM business.***

Our PBM business generates net revenues primarily by contracting with clients to provide prescription drugs and related health care services to plan members. PBM client contracts often have terms of approximately three years in duration, so approximately one third of a PBM's client base typically is subject to renewal each year. In some cases, however, PBM clients may negotiate a shorter or longer contract term or may require early or periodic renegotiation of pricing prior to expiration of a contract. In addition, the reputational impact of a service-related incident could negatively affect our ability to grow and retain our client base. Further, the PBM industry has been impacted by consolidation activity that may continue in the future. In the event one or more of our PBM clients is acquired by an entity that is not also our client, we may be unable to retain all or a portion of the acquired business. These circumstances, either individually or in the aggregate, could result in an adverse effect on our business and financial results. Therefore, we continually face challenges in competing for new PBM business and retaining or renewing our existing PBM business. There can be no assurance that we will be able to win new business or secure renewal business on terms as favorable to us as the present terms.

***Risks related to the frequency and rate of the introduction of generic drugs and brand name prescription products.***

The profitability of our business is dependent upon the utilization of prescription drug products. Utilization trends are affected by, among other factors, the introduction of new and successful prescription pharmaceuticals as well as lower-priced generic alternatives to existing brand name products. Accordingly, our business could be impacted by a slowdown in the introduction of new and successful prescription pharmaceuticals and/or generic alternatives (the sale of which normally yield higher gross profit margins than brand name equivalents).

***Risks relating to the market availability, suppliers and safety profiles of prescription drugs that we purchase and sell.***

We dispense significant volumes of brand-name and generic drugs from our retail and mail-order pharmacies and through our PBM's network of retail pharmacies. When increased safety risk profiles or manufacturing or other supply issues of specific drugs or classes of drugs occur, or drugs become subject to greater restrictions as controlled substances, physicians may cease writing prescriptions for these drugs or the utilization of these drugs may be otherwise reduced. Additionally, adverse publicity regarding drugs with higher safety risk profiles may result in reduced consumer demand for such drugs. On occasion, products are withdrawn by their manufacturers or transition to over-the-counter products, which can result in lower prescription utilization. In addition, future FDA rulings could restrict the supply or increase the cost of products sold to our customers. Our volumes, net revenues, profitability and cash flows may decline as a result of such regulatory rulings or market changes.

***Risks of declining gross margins in the PBM industry.***

The PBM industry has been experiencing margin pressure as a result of competitive pressures and increased client demands for lower prices, enhanced service offerings and/or higher service levels. In that regard, we maintain contractual relationships with generic pharmaceutical manufacturers and brand name pharmaceutical manufacturers that provide for purchase discounts and/or rebates on drugs dispensed by pharmacies in our retail network and by our mail order pharmacies (all or a portion of which may be passed on to clients). Manufacturer rebates often depend on a PBM's ability to meet contractual market share or other requirements, including in some cases the placement of a manufacturer's products on the PBM's formularies. If we lose our relationship with one or more pharmaceutical manufacturers, or if the discounts or rebates provided by pharmaceutical manufacturers decline, our business and financial results could be adversely affected. Further, competitive pressures in the PBM industry have caused our PBM and other PBMs to share with clients a larger portion of rebates and/or discounts received from pharmaceutical manufacturers. In addition, market dynamics and regulatory changes have impacted our ability to offer plan sponsors pricing that includes the use of retail "differential" or "spread", which could negatively impact our future profitability. Further, changes in existing federal or state laws or regulations or the adoption of new laws or regulations relating to patent term extensions, purchase discount and rebate arrangements with pharmaceutical manufacturers, or to formulary management or other PBM services could also reduce the discounts or rebates we receive. Our Retail Pharmacy Segment has also been impacted by the margin pressures described above.

***Regulatory and business changes relating to our participation in Medicare Part D.***

Since its inception in 2006, Medicare Part D has resulted in increased utilization and decreased pharmacy gross margin rates as higher margin business, such as cash and state Medicaid customers, migrated to Medicare Part D coverage. Further, as a result of ACA and changes to Medicare Part D, such as the elimination in 2013 of the tax deductibility of the retiree drug subsidy payment received by sponsors of retiree drug plans, our PBM clients could decide to discontinue providing prescription drug benefits to their Medicare-eligible members. To the extent this occurs, the adverse effects of increasing customer migration into Medicare Part D may outweigh the benefits we realize from growth of our Medicare Part D business. In addition, if the cost and complexity of Medicare Part D exceed management's expectations or prevent effective program implementation or administration; if changes to the regulations regarding how drug costs are reported for Medicare Part D and retiree drug subsidy purposes are implemented in a manner that impacts the profitability of our Medicare Part D business; if the government alters Medicare program requirements or reduces funding because of the higher-than-anticipated cost to taxpayers of Medicare Part D or for other reasons; if we fail to design and maintain programs that are attractive to Medicare participants; if CMS imposes restrictions on our Medicare Part D business as a result of audits or other regulatory actions; if we fail to successfully implement corrective action or other remedial measures sufficient to prevent or remove any applicable restrictions that may be imposed by CMS; if we fail to effectively integrate and operate the Medicare Part D businesses we have acquired; or if we are not successful in retaining enrollees, or winning contract renewals or new contracts under Medicare Part D's competitive bidding process, our Medicare Part D services and the ability to expand our Medicare Part D services could be impacted.

***Possible changes in industry pricing benchmarks.***

It is possible that the pharmaceutical industry or regulators may evaluate and/or develop an alternative pricing reference to replace AWP, which is the pricing reference used for many of our PBM client contracts, pharmaceutical purchase agreements, retail network contracts, specialty payor agreements and other contracts with third party payors. Future changes to the use of AWP or to other published pricing benchmarks used to establish pharmaceutical pricing, including changes in the basis for calculating reimbursement by federal and state health programs and/or other payors, could impact the reimbursement we receive from Medicare and Medicaid programs, the reimbursement we receive from PBM clients and other payors and/or our ability to negotiate rebates and/or discounts with pharmaceutical manufacturers, wholesalers, PBMs and retail pharmacies. The effect of these possible changes on our business cannot be predicted at this time.

***An extremely competitive business environment.***

Each of the retail pharmacy business and the pharmacy services business currently operates in a highly competitive and evolving health care environment. Our competitive success is impacted by the ability of our retail pharmacy business to establish and maintain contractual relationships with PBMs and other payors on acceptable terms and by the ability of our pharmacy services business to establish and maintain contractual relationships with network pharmacies in an environment where some PBM clients are considering adopting narrow or restricted retail pharmacy networks.

As a pharmacy retailer, we compete with other drugstore chains, supermarkets, discount retailers, independent pharmacies, membership clubs, Internet companies and retail health clinics, as well as other mail order pharmacies and PBMs. In that

regard, many pharmacy benefit plans have implemented plan designs that mandate or provide incentives to fill maintenance medications through mail order pharmacies. To the extent this trend continues, any negative impact in our retail pharmacy could out-weigh an increase in our own mail order business and/or an increase in participation in our Maintenance Choice program. In addition, some of these competitors may offer services and pricing terms that we may not be willing or able to offer. Competition may also come from other sources in the future.

Competitors in the PBM industry (e.g., Express Scripts, OptumRx, Catamaran and Prime Therapeutics), include large, national PBM companies, PBMs owned by large national health plans and smaller standalone PBMs. Some of these competitors may offer services and pricing terms that we may not be willing or able to offer. In addition, competition may also come from other sources in the future. Unless we can demonstrate enhanced value to our clients through innovative product and service offerings, particularly in a rapidly changing industry, we may be unable to remain competitive. In addition, changes in the overall composition of our pharmacy networks, or reduced pharmacy access under our networks, could adversely affect our claims volume and/or our competitiveness generally.

***Relationship with our retail customers and the demand for our products and services***

The success of our retail business depends in part on customer loyalty, superior customer service and our ability to persuade customers to purchase products in additional categories and our proprietary brands. Failure to timely identify or effectively respond to changing consumer preferences and spending patterns, an inability to expand the products being purchased by our customers, or the failure or inability to obtain or offer particular categories of products could negatively affect our relationship with our customers and the demand for our products and services.

***Reform of the U.S. health care system.***

Congressional efforts to reform the U.S. health care system finally came to fruition in 2010 with the passage of ACA, which is resulting in significant structural changes to the health insurance system. See “Business - Government Regulation”.
Many of the structural changes enacted by ACA are being implemented in 2014, and some of the applicable regulations and sub-regulatory guidance have not yet been issued and/or finalized. Therefore, there remains considerable uncertainty as to the full impact of ACA on our business. While these reforms may not affect our business directly, they affect the coverage and plan designs that are or will be provided by many of our health plan clients. As a result, they could indirectly impact many of our services and business practices. We cannot predict what effect, if any, the ACA changes may have on our retail pharmacy and pharmacy services businesses, and it is possible that other legislative or market-driven changes in the health care system that we cannot anticipate could also occur.

***The failure or disruption of our information technology systems, our information security systems and our infrastructure to support our business and to protect the privacy and security of sensitive customer and business information.***

Many aspects of our operations are dependent on our information systems and the information collected, processed, stored, and handled by these systems. Throughout our operations, we receive, retain and transmit certain confidential information, including personally identifiable information that our customers and clients provide to purchase products or services, enroll in programs or services, register on our websites, interact with our personnel, or otherwise communicate with us. In addition, for these operations, we depend in part on the secure transmission of confidential information over public networks. Our information systems are subject to damage or interruption from power outages, computer and telecommunications failures, computer viruses, security breaches including credit card information breaches, vandalism, catastrophic events and human error. Although we deploy a layered approach to address information security threats and vulnerabilities, including ones from a cybersecurity standpoint, designed to protect confidential information against data security breaches, a compromise of our information security controls or of those businesses with whom we interact, which results in confidential information being accessed, obtained, damaged, or used by unauthorized or improper persons, could harm our reputation and expose us to regulatory actions and claims from customers and clients, financial institutions, payment card associations and other persons, any of which could adversely affect our business, financial position, and results of operations. Moreover, a data security breach could require that we expend significant resources related to our information systems and infrastructure, and could distract management and other key personnel from performing their primary operational duties. If our information systems are damaged, fail to work properly or otherwise become unavailable, or if we are unable to successfully complete our planned consolidation of our PBM claims adjudication platforms, we may incur substantial costs to repair or replace them, and may experience loss of critical information, customer disruption and interruptions or delays in our ability to perform essential functions and implement new and innovative services. In addition, compliance with changes in privacy and information security laws and standards may result in considerable expense due to increased investment in technology and the development of new operational processes.

***Risks related to compliance with a broad and complex regulatory framework.***

Our business is subject to numerous federal, state and local laws and regulations. See "Business — Government Regulation." Changes in these regulations may require extensive system and operating changes that may be difficult to implement. Untimely compliance or noncompliance with applicable laws and regulations could adversely affect the continued operation of our business, including, but not limited to: imposition of civil or criminal penalties; suspension or disgorgement of payments from government programs; loss of required government certifications or approvals; loss of authorizations to participate in or exclusion from government reimbursement programs, such as the Medicare and Medicaid programs; or loss of registrations or licensure. The regulations to which we are subject include, but are not limited to: the laws and regulations described in the Government Regulation section; accounting standards; securities laws and regulations; tax laws and regulations; laws and regulations relating to the protection of the environment and health and safety matters, including those governing exposure to, and the management and disposal of, hazardous materials and wastes; and regulations of the FDA, the FTC, the FCC, the DEA, and the Consumer Product Safety Commission, as well as state regulatory authorities, governing the sale, advertisement and promotion of products that we sell. In addition, our business interests outside of the United States are subject to the Foreign Corrupt Practices Act and other applicable domestic and international laws and regulations. We are also subject to the terms of various government agreements and mandates, including those described in the Government Regulation section. In that regard, our business, financial position and results of operations could be affected by existing and new government legislative and regulatory action, including, without limitation, any one or more of the following:

- federal and state laws and regulations governing the purchase, distribution, tracking, management, dispensing and reimbursement of prescription drugs and related services, whether at retail or mail, and applicable registration or licensing requirements;
- the effect of the expiration of patents covering brand name drugs and the introduction of generic products;
- the frequency and rate of approvals by the FDA of new brand name and generic drugs, or of over-the-counter status for brand name drugs;
- FDA regulation affecting the retail or PBM industry;
- consumer protection laws affecting our health care services, our loyalty programs, the products we sell, the informational calls we make and/or the marketing of our goods and services;
- rules and regulations issued pursuant to HIPAA and the HITECH Act; and other federal and state laws affecting the collection, use, disclosure and transmission of health or other personal information, such as federal laws on information privacy precipitated by concerns about information collection through the Internet, state security breach laws and state laws limiting the use and disclosure of prescriber information;
- administration of Medicare Part D, including legislative changes and/or CMS rulemaking and interpretation;
- government regulation of the development, administration, review and updating of formularies and drug lists;
- federal, state and local waste management laws and regulations applicable to our business, including the management of pharmaceutical wastes and photo processing solutions, as well as the storage and transportation of hazardous materials;
- state laws and regulations establishing or changing prompt payment requirements for payments to retail pharmacies;
- impact of network access legislation or regulations, including "any willing provider" laws, on our ability to manage pharmacy networks;
- health care reform, managed care reform and plan design legislation;
- insurance licensing and other insurance regulatory requirements applicable to offering Medicare Part D programs and services or other health care services; and
- direct regulation of pharmacies or PBMs by regulatory and quasi-regulatory bodies.

***Risks related to litigation and other legal proceedings.***

Pharmacy services and retail pharmacy are highly regulated and litigious industries. We are currently subject to various litigation matters, investigations, audits, government inquiries, regulatory and legal proceedings. Litigation, and particularly securities and collective or class action litigation, is often expensive and disruptive. We cannot predict the outcome of such matters, and the costs incurred may be substantial regardless of outcome. Our business, financial condition and results of operations may be adversely affected, or we may be required to materially change our business practices, as a result of such proceedings. We refer you to Item 3, "Legal Proceedings" for additional information.

The foregoing is not a comprehensive listing of all possible risks and there can be no assurance that we have correctly identified and appropriately assessed all factors affecting the business. As such, we refer you to "Management's Discussion and Analysis of Financial Condition and Results of Operations," which includes our "Cautionary Statement Concerning Forward-Looking Statements" at the end of such section of our Annual Report to Stockholders for the year ended December 31, 2013, which section is incorporated by reference.

**Item 1B. Unresolved Staff Comments**

There are no unresolved SEC Staff Comments.

**Item 2. Properties**

We lease most of our stores under long-term leases that vary as to rental amounts, expiration dates, renewal options and other rental provisions. For additional information on the amount of our rental obligations for our leases, we refer you to Note 7 "Leases" in our Annual Report to Stockholders for the year ended December 31, 2013, which section is incorporated by reference herein.

As of December 31, 2013, we owned approximately 5.9% of our 7,660 retail stores. Net selling space for our retail drugstores increased to 75.0 million square feet as of December 31, 2013. More than one third of our store base was opened or significantly remodeled within the last five years.

We own ten distribution centers located in Alabama, California, Hawaii, New York, Rhode Island, South Carolina, Tennessee and Texas and lease ten additional distribution facilities located in Arizona, Florida, Indiana, Michigan, New Jersey, Pennsylvania, Texas, Virginia and Brazil. The 20 distribution centers total approximately 11.5 million square feet as of December 31, 2013.

As of December 31, 2013, we owned one mail service dispensing pharmacy located in Texas and leased three additional mail service dispensing pharmacies located in Hawaii, Illinois and Pennsylvania. We leased call centers located in Missouri, Pennsylvania, Tennessee and Texas. As of December 31, 2013, we leased 17 onsite pharmacy stores and 25 specialty pharmacy stores, and operated 11 specialty mail order pharmacies, one of which we owned.

We own our corporate offices located in Woonsocket, Rhode Island, which totals approximately 1,000,000 square feet. In addition, we lease large corporate offices in Scottsdale, Arizona, Northbrook, Illinois, Irving, Texas and Sao Paulo, Brazil.

In connection with certain business dispositions completed between 1991 and 1997, we continue to guarantee lease obligations for approximately 73 former stores. We are indemnified for these guarantee obligations by the respective purchasers. These guarantees generally remain in effect for the initial lease term and any extension thereof pursuant to a renewal option provided for in the lease prior to the time of the disposition. For additional information, we refer you to Note 12 "Commitments and Contingencies" in our Annual Report to Stockholders for the year ended December 31, 2013, which section is incorporated by reference herein.

Management believes that its owned and leased facilities are suitable and adequate to meet the Company's anticipated needs. At the end of the existing lease terms, management believes the leases can be renewed or replaced by alternate space.

The following is a breakdown by state, District of Columbia, Puerto Rico and Brazil of our retail stores, onsite pharmacy stores, specialty pharmacy stores, specialty mail order pharmacies and mail service dispensing pharmacies as of December 31, 2013:

| | Retail Stores | Onsite Pharmacy Stores | Specialty Pharmacy Stores | Specialty Mail Order Pharmacies | Mail Service Dispensing Pharmacies | Total |
|---|---|---|---|---|---|---|
| United States: | | | | | | |
| Alabama | 155 | — | 1 | — | — | 156 |
| Arkansas | 1 | — | — | — | — | 1 |
| Arizona | 139 | — | 1 | — | — | 140 |
| California | 856 | — | 4 | 1 | — | 861 |
| Colorado | — | — | 1 | — | — | 1 |
| Connecticut | 149 | 1 | — | — | — | 150 |
| Delaware | 12 | — | — | — | — | 12 |
| District of Columbia | 58 | — | 1 | — | — | 59 |
| Florida | 716 | — | 1 | 1 | — | 718 |
| Georgia | 316 | 2 | 1 | — | — | 319 |
| Hawaii | 53 | — | 1 | — | 1 | 55 |
| Iowa | 17 | 1 | — | — | — | 18 |
| Illinois | 274 | 1 | 1 | 1 | 1 | 278 |
| Indiana | 297 | — | — | — | — | 297 |
| Kansas | 35 | — | — | 1 | — | 36 |
| Kentucky | 65 | — | — | — | — | 65 |
| Louisiana | 109 | — | — | — | — | 109 |
| Maine | 22 | — | — | — | — | 22 |
| Maryland | 171 | 1 | — | — | — | 172 |
| Massachusetts | 355 | — | 2 | 1 | — | 358 |
| Michigan | 248 | 1 | — | 1 | — | 250 |
| Minnesota | 57 | 1 | — | — | — | 58 |
| Mississippi | 50 | — | — | — | — | 50 |
| Missouri | 77 | 1 | 1 | — | — | 79 |
| Montana | 14 | — | — | — | — | 14 |
| Nebraska | 18 | — | — | — | — | 18 |
| Nevada | 85 | — | — | — | — | 85 |
| New Hampshire | 41 | — | — | — | — | 41 |
| New Jersey | 277 | 2 | — | 1 | — | 280 |
| New Mexico | 15 | — | — | — | — | 15 |
| New York | 471 | — | 1 | — | — | 472 |
| North Carolina | 312 | — | 1 | 1 | — | 314 |
| North Dakota | 6 | — | — | — | — | 6 |
| Ohio | 317 | 2 | — | — | — | 319 |
| Oklahoma | 53 | — | — | — | — | 53 |
| Oregon | — | — | 1 | — | — | 1 |
| Pennsylvania | 404 | 1 | 1 | 1 | 1 | 408 |
| Puerto Rico | 19 | — | — | 1 | — | 20 |
| Rhode Island | 62 | — | 1 | — | — | 63 |
| South Carolina | 194 | — | 1 | — | — | 195 |
| Tennessee | 134 | 1 | — | 1 | — | 136 |
| Texas | 588 | 1 | 3 | — | 1 | 593 |
| Utah | 2 | — | — | — | — | 2 |
| Vermont | 5 | — | — | — | — | 5 |
| Virginia | 271 | — | — | — | — | 271 |
| Washington | — | — | 1 | — | — | 1 |
| West Virginia | 50 | — | — | — | — | 50 |
| Wisconsin | 45 | 1 | — | — | — | 46 |
| Total United States | 7,615 | 17 | 25 | 11 | 4 | 7,672 |
| Brazil | 45 | — | — | — | — | 45 |
| Total | 7,660 | 17 | 25 | 11 | 4 | 7,717 |

**Item 3. Legal Proceedings**

**I. Legal Proceedings**

1. Caremark (the term "Caremark" being used herein to generally refer to any one or more PBM subsidiaries of the Company, as applicable) was a defendant in a *qui tam* lawsuit initially filed by a relator on behalf of various state and federal government agencies in Texas federal court in 1999. The case was unsealed in May 2005. The case sought monetary damages and alleged that Caremark's processing of Medicaid and certain other government claims on behalf of its clients (which allegedly resulted in underpayments from Caremark clients to the applicable government agencies) on one of Caremark's adjudication platforms violated applicable federal or state false claims acts and fraud statutes. The United States and the States of Texas, Tennessee, Florida, Arkansas, Louisiana and California intervened in the lawsuit, but Tennessee and Florida withdrew from the lawsuit in August 2006 and May 2007, respectively. Thereafter, in 2008, the Company prevailed on several motions for partial summary judgment and, following an appellate ruling from the Fifth Circuit Court of Appeals in 2011 that affirmed in part and reversed in part these prior rulings, the claims asserted in the case against Caremark were substantially narrowed. In December 2013, this case was dismissed following a settlement between the Company and the plaintiffs.

   In a related matter, in December 2007, the Company received a document subpoena from the Office of Inspector General ("OIG") within the U.S. Department of Health and Human Services ("HHS"), requesting information relating to the processing of Medicaid and other government agency claims on a different adjudication platform of Caremark. The Company has provided documents and other information in response to this request for information. The Company has been conducting discussions with the United States Department of Justice ("DOJ") and the OIG regarding a possible settlement of this legal matter.

2. Caremark was named in a putative class action lawsuit filed in October 2003 in Alabama state court by John Lauriello, purportedly on behalf of participants in the 1999 settlement of various securities class action and derivative lawsuits against Caremark and others. Other defendants include insurance companies that provided coverage to Caremark with respect to the settled lawsuits. The Lauriello lawsuit seeks approximately $3.2 billion in compensatory damages plus other non-specified damages based on allegations that the amount of insurance coverage available for the settled lawsuits was misrepresented and suppressed. A similar lawsuit was filed in November 2003 by Frank McArthur, also in Alabama state court, naming as defendants, among others, Caremark and several insurance companies involved in the 1999 settlement. This lawsuit was stayed as a later-filed class action, but McArthur was subsequently allowed to intervene in the Lauriello action. Following the close of class discovery, the trial court entered an Order on August 15, 2012 that granted the plaintiffs' motion to certify a class pursuant to Alabama Rule of Civil Procedures 23(b)(3) but denied their request that the class also be certified pursuant to Rule 23(b)(1). In addition, the August 15, 2012 Order appointed class representatives and class counsel. The defendants' appeal and plaintiffs' cross-appeal are pending before the Alabama Supreme Court. The proceedings in the trial court are stayed by statute pending a decision on the appeal and cross-appeal by the Alabama Supreme Court.

3. Various lawsuits have been filed alleging that Caremark has violated applicable antitrust laws in establishing and maintaining retail pharmacy networks for client health plans. In August 2003, Bellevue Drug Co., Robert Schreiber, Inc. d/b/a Burns Pharmacy and Rehn-Huerbinger Drug Co. d/b/a Parkway Drugs #4, together with Pharmacy Freedom Fund and the National Community Pharmacists Association filed a putative class action against Caremark in Pennsylvania federal court, seeking treble damages and injunctive relief. This case was initially sent to arbitration based on the contract terms between the pharmacies and Caremark. In October 2003, two independent pharmacies, North Jackson Pharmacy, Inc. and C&C, Inc. d/b/a Big C Discount Drugs, Inc., filed a putative class action complaint in Alabama federal court against Caremark and two PBM competitors, seeking treble damages and injunctive relief. The North Jackson Pharmacy case against two of the Caremark entities named as defendants was transferred to Illinois federal court, and the case against a separate Caremark entity was sent to arbitration based on contract terms between the pharmacies and Caremark. The Bellevue arbitration was then stayed by the parties pending developments in the North Jackson Pharmacy court case.

   In August 2006, the Bellevue case and the North Jackson Pharmacy case were both transferred to Pennsylvania federal court by the Judicial Panel on Multidistrict Litigation for coordinated and consolidated proceedings with other cases before the panel, including cases against other PBMs. Caremark appealed the decision which vacated an order compelling arbitration and staying the proceedings in the Bellevue case and, following the appeal, the Court of Appeals reinstated the order compelling arbitration of the Bellevue case. Following remand, plaintiffs in the Bellevue case sought dismissal of their complaint to permit an immediate appeal of the reinstated order compelling arbitration and pursued an appeal to the Third Circuit Court of Appeals. In November 2012, the Third Circuit Court reversed the district court ruling and directed

the parties to proceed in federal court. Motions for class certification in the coordinated cases within the multidistrict litigation, including the North Jackson Pharmacy case, remain pending, and the court has permitted certain additional class discovery and briefing. The consolidated action is now known as the In Re Pharmacy Benefit Managers Antitrust Litigation.

4. In November 2009, a securities class action lawsuit was filed in the United States District Court for the District of Rhode Island purportedly on behalf of purchasers of CVS Caremark Corporation stock between May 5, 2009 and November 4, 2009. Plaintiffs subsequently amended the lawsuit to allege a class period beginning October 30, 2008. The lawsuit names the Company and certain officers as defendants and includes allegations of securities fraud relating to public disclosures made by the Company concerning the PBM business and allegations of insider trading. In addition, a shareholder derivative lawsuit was filed in December 2009 in the same court against the directors and certain officers of the Company. This lawsuit, which was stayed pending developments in the related securities class action, includes allegations of, among other things, securities fraud, insider trading and breach of fiduciary duties and further alleges that the Company was damaged by the purchase of stock at allegedly inflated prices under its share repurchase program. In January 2011, both lawsuits were transferred to the United States District Court for the District of New Hampshire. In June 2012, the court granted the Company’s motion to dismiss the securities class action. The plaintiffs subsequently appealed the court’s ruling on the motion to dismiss. In May 2013, the First Circuit Court of Appeals vacated the prior ruling and remanded the case to the district court for further proceedings. In December 2013, the district court denied the Company's renewed motion to dismiss the lawsuit. The derivative lawsuit will remain stayed until the Company answers the securities class action complaint.

5. In March 2010, the Company learned that various State Attorneys General offices and certain other government agencies were conducting a multi-state investigation of certain of the Company's business practices similar to those being investigated at that time by the U.S. Federal Trade Commission ("FTC"). Twenty-eight states, the District of Columbia and the County of Los Angeles are known to be participating in this investigation. The prior FTC investigation, which commenced in August 2009, was officially concluded in May 2012 when the consent order entered into between the FTC and the Company became final. The Company has cooperated with the multi-state investigation.

6. In March 2010, the Company received a subpoena from the OIG requesting information about programs under which the Company has offered customers remuneration conditioned upon the transfer of prescriptions for drugs or medications to the Company's pharmacies in the form of gift cards, cash, non-prescription merchandise or discounts or coupons for non-prescription merchandise. The subpoena relates to an investigation of possible false or otherwise improper claims for payment under the Medicare and Medicaid programs. The Company has provided documents and other information in response to this request for information.

7. The Company received a subpoena from the U.S. Securities and Exchange Commission (“SEC”) in February 2011 and subsequently received additional subpoenas and other requests for information. The SEC’s requests related to, among other things, public disclosures made by the Company during 2009, transactions in the Company’s securities by certain officers and employees of the Company during 2009 and the purchase accounting for the Longs Drug Stores acquisition. The Company has provided the documents and other information requested by the SEC and has been cooperating with the SEC in this investigation. The Company has reached an agreement in principle with the staff of the Boston Regional Office of the SEC to settle certain allegations that, during the third and fourth quarters of 2009, the Company violated certain provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934, including certain anti-fraud provisions of those statutes. The agreement in principle will be entered into by the Company on a “no admit or deny” basis, and the Company will not be restating its financial statements for any reporting period. The Company has agreed to pay a $20 million civil penalty when the settlement is finalized, and this amount has been fully reserved in the Company's financial statements. The Company will continue to cooperate with the SEC to document the settlement terms, and the settlement remains subject to approval by the Commission and federal court as required.

8. In January 2012, the United States District Court for the Eastern District of Pennsylvania unsealed a first amended *qui tam* complaint filed in August 2011 by an individual relator, who is described in the complaint as having once been employed by a firm providing pharmacy prescription benefit audit and recovery services. The complaint seeks monetary damages and alleges that Caremark's processing of Medicare claims on behalf of one of its clients violated the federal false claims act. The United States, acting through the U.S. Attorney's Office in Philadelphia, Pennsylvania, declined to intervene in the lawsuit. Caremark filed a motion to dismiss the amended complaint and the DOJ filed a Statement of Interest with regard to Caremark’s motion to dismiss. In December 2012, the court denied Caremark's motion to dismiss the amended complaint.

9. In January 2012, the Company received a subpoena from the OIG requesting information about its Health Savings Pass program, a prescription drug discount program for uninsured or underinsured individuals, in connection with an investigation of possible false or otherwise improper claims for payment involving HHS programs. In February 2012, the Company also received a civil investigative demand from the Office of the Attorney General of the State of Texas requesting a copy of information produced under this OIG subpoena and other information related to prescription drug claims submitted by the Company's pharmacies to Texas Medicaid for reimbursement. The Company is providing documents and other information in response to these requests for information.

10. A purported shareholder derivative action was filed on behalf of nominal defendant CVS Caremark Corporation against certain of the Company's officers and members of its Board of Directors. The action, which alleged a single claim for breach of fiduciary duty relating to the Company's alleged failure to properly implement internal regulatory controls to comply with the Controlled Substances Act and the Combat Methamphetamine Epidemic Act, was originally filed in June 2012. In addition, an amended complaint was filed in November 2012 and a Supplemental Complaint was filed in April 2013. In October 2013, the court granted the Company's motion to dismiss and entered judgment dismissing the action, without prejudice. Following dismissal of the action, the same purported shareholder sent a letter to the Company's Board of Directors demanding that the Board investigate her allegations and pursue legal action against certain directors and officers of the Company. A committee of the Board of Directors is conducting a review and intends to respond to the letter as appropriate.

11. In November 2012, the Company received a subpoena from the OIG requesting information concerning automatic refill programs used by pharmacies to refill prescriptions for customers. The Company has been cooperating and providing documents and other information in response to this request for information.

The Company is also a party to other legal proceedings, inquiries and audits arising in the normal course of its business, none of which is expected to be material to the Company. We can give no assurance, however, that our business, financial condition and results of operations will not be materially adversely affected, or that we will not be required to materially change our business practices, based on: (i) future enactment of new health care or other laws or regulations; (ii) the interpretation or application of existing laws or regulations, including the laws and regulations described in "Business — Government Regulation", as they may relate to our business, the pharmacy services, retail pharmacy or retail clinic industry or to the health care industry generally; (iii) pending or future federal or state governmental investigations of our business or the pharmacy services, retail pharmacy or retail clinic industry or of the health care industry generally; (iv) institution of government enforcement actions against us; (v) adverse developments in any pending *qui tam* lawsuit against us, whether sealed or unsealed, or in any future *qui tam* lawsuit that may be filed against us; or (vi) adverse developments in other pending or future legal proceedings against us or affecting the pharmacy services, retail pharmacy or retail clinic industry or the health care industry generally.

**II. Environmental Matters**

Item 103 of SEC Regulation S-K requires disclosure of certain environmental legal proceedings if management reasonably believes that the proceedings involve potential monetary sanctions of $100,000 or more. On January 8, 2014, a Settlement Agreement was signed with the State of New Jersey to resolve claims of alleged noncompliance with hazardous and medical waste regulations in connection with certain of the Company's facilities in New Jersey. As part of this settlement, the Company has agreed to pay $132,000 in civil penalties to resolve these claims.

**Item 4. Mine Safety Disclosures**

Not applicable.

**Executive Officers of the Registrant**

*Executive Officers of the Registrant*

The following sets forth the name, age and biographical information for each of our executive officers as of February 11, 2014. In each case the officer's term of office extends to the date of the board of directors meeting following the next annual meeting of stockholders of the Company. Previous positions and responsibilities held by each of the executive officers over the past five years are indicated below:

*Lisa G. Bisaccia*, age 57, Senior Vice President and Chief Human Resources Officer of CVS Caremark Corporation since January 2010; Vice President, Human Resources of CVS Pharmacy, Inc. from September 2004 through December 2009.

*Eva C. Boratto*, age 47, Senior Vice President and Controller and Chief Accounting Officer of CVS Caremark Corporation since July 2013; Senior Vice President of PBM Finance from July 2010 through June 2013; Vice President, U.S. Market Finance Leader of Merck & Co., Inc. ("Merck") from June 2009 through June 2010; Vice President of Investor Relations of Merck from April 2008 through May 2009.

*Troyen A. Brennan, M.D.*, age 59, Executive Vice President and Chief Medical Officer of CVS Caremark Corporation since November 2008; Executive Vice President and Chief Medical Officer of Aetna, Inc. from February 2006 through November 2008.

*David M. Denton*, age 48, Executive Vice President and Chief Financial Officer of CVS Caremark Corporation since January 2010; Senior Vice President and Controller/Chief Accounting Officer of CVS Caremark Corporation from March 2008 until December 2009; Senior Vice President, Financial Administration of CVS Caremark Corporation and CVS Pharmacy, Inc. from April 2007 to March 2008.

*Helena B. Foulkes*, age 49, Executive Vice President of CVS Caremark Corporation and President of CVS/pharmacy since January 2014; Executive Vice President and Chief Health Care Strategy and Marketing Officer of CVS Caremark Corporation from March 2011 through December 2013; Executive Vice President and Chief Marketing Officer of CVS Caremark Corporation from January 2009 through February 2011; Senior Vice President of Health Services of CVS Caremark Corporation from May 2008 through January 2009, and of CVS Pharmacy, Inc. from October 2007 through January 2009.

*Stephen J. Gold*, age 54, Senior Vice President and Chief Information Officer for CVS Caremark Corporation since July 2012; Senior Vice President and Chief Information Officer of Avaya, Inc. from May 2010 through June 2012; Executive Vice President, Chief Information Officer and Chief Technology Officer of GSI Commerce, Inc. from February 2005 through April 2010.

*J. David Joyner*, age 49, Executive Vice President of CVS Caremark Corporation since March 2011 and Executive Vice President of Sales and Account Services, CVS Caremark Pharmacy Services since March 2004.

*Per G.H. Lofberg*, age 66, Executive Vice President of CVS Caremark Corporation; Executive Vice President of CVS Caremark Corporation and President of CVS Caremark Pharmacy Services from January 2010 through August 2012; President and Chief Executive Officer of Generation Health, Inc., a pharmacogenomics company, from November 2008 through December 2009.

*Larry J. Merlo*, age 58, President and Chief Executive Officer of CVS Caremark Corporation since March 2011; President and Chief Operating Officer of CVS Caremark Corporation from May 2010 through March 2011; President of CVS/pharmacy from January 2007 through August 2011; Executive Vice President of CVS Caremark Corporation from January 2007 through May 2010; also a director of CVS Caremark Corporation since May 2010.

*Thomas M. Moriarty*, age 50, Executive Vice President and General Counsel of CVS Caremark Corporation since October 2012; General Counsel of Celgene Corporation, a global biopharmaceutical company, from May 2012 through September 2012; General Counsel and Corporate Secretary of Medco Health Solutions, Inc. ("Medco"), a pharmacy benefit management company, from March 2008 through April 2012; also President of Global Pharmaceutical Strategies of Medco from March 2011 through April 2012; Senior Vice President, Pharmaceutical Strategies and Solutions of Medco from September 2007 through March 2011.

*Jonathan C. Roberts*, age 58, Executive Vice President of CVS Caremark Corporation and President of CVS Caremark Pharmacy Services since September 2012; Executive Vice President of CVS Caremark Corporation and Chief Operating

Officer of CVS Caremark Pharmacy Services from October 2010 through August 2011; Executive Vice President, Rx Purchasing, Pricing and Network Relations of CVS Caremark Corporation from January 2009 through October 2010; Senior Vice President and Chief Information Officer of CVS Caremark Corporation from May 2008 until January 2009, and of CVS Pharmacy, Inc. from January 2006 until January 2009.

*Andrew J. Sussman, M.D.*, age 48, Senior Vice President and Associate Chief Medical Officer of CVS Caremark Corporation since March 2011 and President of MinuteClinic, L.L.C., the Company's retail-based health clinic subsidiary, since September 2009; Executive Vice President and Chief Operating Officer of the University of Massachusetts Memorial Medical Center, the major teaching affiliate of UMass Medical School, from May 2004 through August 2009.

## PART II

### Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.

Our common stock is listed on the New York Stock Exchange under the symbol "CVS." The table below sets forth the high and low sale prices of our common stock on the New York Stock Exchange Composite Tape and the quarterly cash dividends declared per share of common stock during the periods indicated.

| | | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Year |
|---|---|---|---|---|---|---|
| 2013 | High | $ 56.07 | $ 60.70 | $ 62.36 | $ 71.99 | $ 71.99 |
| | Low | $ 49.00 | $ 53.94 | $ 56.68 | $ 56.32 | $ 49.00 |
| | Cash dividends per common share | $ 0.22500 | $ 0.22500 | $ 0.22500 | $ 0.22500 | $ 0.90000 |
| 2012 | High | $ 45.88 | $ 46.93 | $ 48.69 | $ 49.80 | $ 49.80 |
| | Low | $ 41.01 | $ 43.08 | $ 43.65 | $ 44.33 | $ 41.01 |
| | Cash dividends per common share | $ 0.16250 | $ 0.16250 | $ 0.16250 | $ 0.16250 | $ 0.65000 |

CVS Caremark has paid cash dividends every quarter since becoming a public company. Future dividend payments will depend on the Company's earnings, capital requirements, financial condition and other factors considered relevant by the Company's Board of Directors. As of February 4, 2014, there were 22,602 registered shareholders according to the records maintained by our transfer agent.

On December 17, 2013, the Company's Board of Directors authorized a new share repurchase program for up to $6.0 billion of outstanding common stock (the "2013 Repurchase Program"). On September 19, 2012, the Company's Board of Directors authorized a share repurchase program for up to $6.0 billion of outstanding common stock (the "2012 Repurchase Program", and together with the 2013 Repurchase Program, "the Repurchase Programs") The Repurchase Programs, which were effective immediately, permit the Company to effect repurchases from time to time through a combination of open market repurchases, privately negotiated transactions, accelerated share repurchase transactions, and/or other derivative transactions. The Repurchase Programs may be modified or terminated by the Board of Directors at any time.

Pursuant to the authorization under the 2012 Repurchase Program, effective October 1, 2013, we entered into a $1.7 billion fixed dollar accelerated share repurchase ("ASR") agreement with Barclays Bank PLC ("Barclays"). Upon payment of the $1.7 billion purchase price on October 1, 2013, we received a number of shares of our common stock equal to 50% of the $1.7 billion notional amount of the ASR agreement or approximately 14.9 million shares at a price of $56.88 per share. The Company received approximately 11.7 million shares of common stock on December 30, 2013 at an average price of $63.83 per share, representing the remaining 50% of the $1.7 billion notional amount of the ASR agreement and thereby concluding the agreement. The total of 26.6 million shares of common stock delivered to the Company by Barclays over the term of the October 2013 ASR agreement were placed into treasury stock.

During the year ended December 31, 2013, the Company repurchased an aggregate of 66.2 million shares of common stock for approximately $4.0 billion under the 2012 Repurchase Program. As of December 31, 2013, there remained an aggregate of approximately $6.7 billion available for future repurchases under the Repurchase Programs.

| Fiscal Period | Total Number of Shares Purchased | Average Price Paid per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| October 1, 2013 through October 31, 2013 | 14,866,352 | $ 56.88 | 14,866,352 | $ 692,873,727 |
| November 1, 2013 through November 30, 2013 | — | $ — | — | $ 692,873,727 |
| December 1, 2013 through December 31, 2013 | 11,768,973 | $ 63.83 | 11,768,973 | $ 6,692,873,727 |
| | 26,635,325 | | 26,635,325 | |

**Item 6. Selected Financial Data**

The selected consolidated financial data of CVS Caremark Corporation as of and for the periods indicated in the five-year period ended December 31, 2013 have been derived from the consolidated financial statements of CVS Caremark Corporation. The selected consolidated financial data should be read in conjunction with the consolidated financial statements and the audit reports of Ernst & Young LLP, which are incorporated elsewhere herein.

| In millions, except per share amounts | 2013 | 2012[4] | 2011 | 2010 | 2009 |
|---|---|---|---|---|---|
| **Statement of operations data:** | | | | | |
| Net revenues | $ 126,761 | $ 123,120 | $ 107,080 | $ 95,766 | $ 98,144 |
| Gross profit | 23,783 | 22,488 | 20,562 | 20,215 | 20,348 |
| Operating expenses | 15,746 | 15,278 | 14,231 | 14,082 | 13,933 |
| Operating profit | 8,037 | 7,210 | 6,331 | 6,133 | 6,415 |
| Interest expense, net | 509 | 557 | 584 | 536 | 525 |
| Loss on early extinguishment of debt | — | 348 | — | — | — |
| Income tax provision[1] | 2,928 | 2,436 | 2,258 | 2,178 | 2,196 |
| Income from continuing operations | 4,600 | 3,869 | 3,489 | 3,419 | 3,694 |
| Income (loss) from discontinued operations, net of tax[2] | (8) | (7) | (31) | 2 | (4) |
| Net income | 4,592 | 3,862 | 3,458 | 3,421 | 3,690 |
| Net loss attributable to noncontrolling interest[3] | — | 2 | 4 | 3 | — |
| Net income attributable to CVS Caremark | $ 4,592 | $ 3,864 | $ 3,462 | $ 3,424 | $ 3,690 |
| **Per common share data:** | | | | | |
| Basic earnings per common share: | | | | | |
| Income from continuing operations attributable to CVS Caremark | $ 3.78 | $ 3.05 | $ 2.61 | $ 2.50 | $ 2.58 |
| Loss from discontinued operations attributable to CVS Caremark | $ (0.01) | $ (0.01) | $ (0.02) | $ — | $ — |
| Net income attributable to CVS Caremark | $ 3.77 | $ 3.04 | $ 2.59 | $ 2.50 | $ 2.57 |
| Diluted earnings per common share: | | | | | |
| Income from continuing operations attributable to CVS Caremark | $ 3.75 | $ 3.02 | $ 2.59 | $ 2.49 | $ 2.55 |
| Loss from discontinued operations attributable to CVS Caremark | $ (0.01) | $ (0.01) | $ (0.02) | $ — | $ — |
| Net income attributable to CVS Caremark | $ 3.74 | $ 3.02 | $ 2.57 | $ 2.49 | $ 2.55 |
| Cash dividends per common share | $ 0.900 | $ 0.650 | $ 0.500 | $ 0.350 | $ 0.305 |
| **Balance sheet and other data:** | | | | | |
| Total assets | $ 71,526 | $ 66,221 | $ 64,852 | $ 62,457 | $ 61,918 |
| Long-term debt | $ 12,841 | $ 9,133 | $ 9,208 | $ 8,652 | $ 8,756 |
| Total shareholders' equity | $ 37,938 | $ 37,653 | $ 38,013 | $ 37,661 | $ 35,732 |
| Number of stores (at end of year) | 7,702 | 7,508 | 7,388 | 7,248 | 7,095 |

See Note 1 - Significant Accounting Policies (Revenue Recognition - Retail Pharmacy Segment) to the consolidated financial statements.

(1) Income tax provision includes the effect of the following: (i) in 2010, the recognition of $47 million of previously unrecognized tax benefits, including interest, relating to the expiration of various statutes of limitation and settlements with tax authorities, and (ii) in 2009, the recognition of $167 million of previously unrecognized tax benefits, including interest, relating to the expiration of various statutes of limitation and settlements with tax authorities.

(2) As discussed in Note 3 to the consolidated financial statements, the results of the TheraCom business are presented as discontinued operations and have been excluded from continuing operations for all periods presented.

In connection with certain business dispositions completed between 1991 and 1997, the Company retained guarantees on store lease obligations for a number of former subsidiaries, including Linens 'n Things which filed for bankruptcy in 2008. The Company's income (loss) from discontinued operations includes lease-related costs which the Company believes it will likely be required to satisfy pursuant to its Linens 'n Things lease guarantees.

Below is a summary of the results of discontinued operations:

| *In millions* | Year Ended December 31, 2013 | 2012 | 2011 | 2010 | 2009 |
|---|---|---|---|---|---|
| Income from operations of TheraCom | $ — | $ — | $ 18 | $ 28 | $ 13 |
| Gain on disposal of TheraCom | — | — | 53 | — | — |
| Loss on disposal of Linens 'n Things | (12) | (12) | (7) | (24) | (19) |
| Income tax benefit (provision) | 4 | 5 | (95) | (2) | 2 |
| Income (loss) from discontinued operations, net of tax | $ (8) | $ (7) | $ (31) | $ 2 | $ (4) |

(3) Represents the minority shareholders' portion of the net loss from our then-majority owned subsidiary, Generation Health, Inc., acquired in the fourth quarter of 2009. In June 2012, the Company acquired the remaining 40% interest in Generation Health, Inc. from minority shareholders and employee option holders.

(4) Effective January 1, 2012, the Company changed its methods of accounting for prescription drug inventories in the Retail Pharmacy Segment. Additional details of the accounting change are discussed in Note 2 to the consolidated financial statements.

## Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

We refer you to "Management's Discussion and Analysis of Financial Condition and Results of Operations," which includes our "Cautionary Statement Concerning Forward-Looking Statements" at the end of such section of our Annual Report to Stockholders for the year ended December 31, 2013, which section is incorporated by reference herein.

## Item 7A. Quantitative and Qualitative Disclosures about Market Risk

As of December 31, 2013, the Company had no derivative financial instruments or derivative commodity instruments in place and believes that its exposure to market risk associated with other financial instruments, principally interest rate risk inherent in its debt portfolio, is not material.

## Item 8. Financial Statements and Supplementary Data

We refer you to the "Consolidated Statements of Income," "Consolidated Statements of Comprehensive Income," "Consolidated Balance Sheets," "Consolidated Statements of Shareholders' Equity," "Consolidated Statements of Cash Flows," "Notes to Consolidated Financial Statements," and "Report of Independent Registered Public Accounting Firm" of our Annual Report to Stockholders for the fiscal year ended December 31, 2013, which sections are incorporated by reference herein.

## Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

## Item 9A. Controls and Procedures

**Evaluation of disclosure controls and procedures:** The Company's Chief Executive Officer and Chief Financial Officer, after evaluating the effectiveness of the design and operation of the Company's disclosure controls and procedures (as defined in Exchange Act Rules 13a-15 (f) and 15d-15(f)) as of December 31, 2013, have concluded that as of such date the Company's disclosure controls and procedures were adequate and effective at a reasonable assurance level and designed to ensure that material information relating to the Company and its subsidiaries would be made known to such officers on a timely basis.

**Internal control over financial reporting:** We refer you to "Management's Report on Internal Control Over Financial Reporting" and "Report of Independent Registered Public Accounting Firm" of our Annual Report to Stockholders for the fiscal year ended December 31, 2013, which are incorporated by reference herein, for Management's report on the Registrant's internal control over financial reporting and the Independent Registered Public Accounting Firm's report with respect to the effectiveness of internal control over financial reporting.

**Changes in internal control over financial reporting:** There have been no changes in our internal controls over financial reporting identified in connection with the evaluation required by paragraph (d) of Rule 13a-15 or Rule 15d-15 that occurred during the fourth quarter ended December 31, 2013 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B. Other Information**

No events have occurred during the fourth quarter that would require disclosure under this item.

## PART III

**Item 10. Directors, Executive Officers and Corporate Governance**

We refer you to our Proxy Statement for the 2014 Annual Meeting of Stockholders under the captions "Committees of the Board," "Code of Conduct," "Director Nominations," "Audit Committee Report," "Biographies of our Board Nominees," and "Section 16(a) Beneficial Ownership Reporting Compliance," which sections are incorporated by reference herein. Biographical information on our executive officers is contained in Part I of this Annual Report on Form 10-K.

**Item 11. Executive Compensation**

We refer you to our Proxy Statement for the 2014 Annual Meeting of Stockholders under the captions "Executive Compensation and Related Matters," including "Compensation Discussion & Analysis" and "Management Planning and Development Committee Report," which sections are incorporated by reference herein.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

We refer you to our Proxy Statement for the 2014 Annual Meeting of Stockholders under the captions "Share Ownership of Directors and Certain Executive Officers," and "Share Ownership of Principal Stockholders" which sections are incorporated by reference herein, for information concerning security ownership of certain beneficial owners and management and related stockholder matters.

The following table summarizes information about the Company's common stock that may be issued upon the exercise of options, warrants and rights under all of our equity compensation plans as of December 31, 2013.

| | Number of securities to be issued upon exercise of outstanding options, warrants and rights[1] | Weighted average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in first column) [1] |
|---|---|---|---|
| Equity compensation plans approved by stockholders | 34,738 | $ 41.40 | 37,557 |
| Equity compensation plans not approved by stockholders | — | — | — |
| Total | 34,738 | $ 41.40 | 37,557 |

(1) Shares in thousands.

**Item 13. Certain Relationships and Related Transactions and Director Independence**

We refer you to our Proxy Statement for the 2014 Annual Meeting of Stockholders under the caption "Independence Determinations for Directors" and "Certain Transactions with Directors and Officers," which sections are incorporated by reference herein.

**Item 14. Principal Accountant Fees and Services**

We refer you to our Proxy Statement for the 2014 Annual Meeting of Stockholders under the caption "Item 2: Ratification of Appointment of Independent Registered Public Accounting Firm," which section is incorporated by reference herein.

## PART IV

### Item 15. Exhibits and Financial Statement Schedules

**A. Documents filed as part of this report:**

**1. Financial Statements:**

The following financial statements are incorporated by reference from our Annual Report to Stockholders for the fiscal year ended December 31, 2013, as provided in Item 8 hereof:


| | |
|---|---|
| Consolidated Statements of Income for the Years Ended December 31, 2013, 2012 and 2011 | 26 |
| Consolidated Statements of Comprehensive Income for the Years Ended December 31, 2013, 2012 and 2011 | 27 |
| Consolidated Balance Sheets as of December 31, 2013 and 2012 | 28 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2013, 2012 and 2011 | 29 |
| Consolidated Statements of Shareholders' Equity for the Years Ended December 31, 2013, 2012, and 2011 | 30 |
| Notes to Consolidated Financial Statements | 31 |
| Report of Independent Registered Public Accounting Firm | 60 |


**2. Financial Statement Schedules**

All financial statement schedules are omitted because they are not applicable, not required under the instructions, or the information is included in the consolidated financial statements or related notes.

**B. Exhibits**

Exhibits marked with an asterisk (*) are hereby incorporated by reference to exhibits or appendices previously filed by the Registrant as indicated in brackets following the description of the exhibit.

| Exhibit | Description |
|---|---|
| 2.1* | Agreement and Plan of Merger dated as of November 1, 2006 among, the Registrant, Caremark Rx, Inc. and Twain MergerSub Corp. (incorporated by reference to Exhibit 2.1 to the Registrant's Registration Statement No. 333-139470 on Form S-4 filed December 19, 2006). |
| 2.2* | Amendment No. 1 dated as of January 16, 2007 to the Agreement and Plan of Merger dated as of November 1, 2006 among the Registrant, Caremark Rx, Inc. and Twain Merger Sub Corp. (incorporated by reference to Exhibit 2.2 to the Registrant's Registration Statement No. 333-139470 on Form S-4/A filed January 16, 2007). |
| 2.3* | Waiver Agreement dated as of January 16, 2007 between the Registrant and Caremark Rx, Inc. with respect to the Agreement and Plan Merger dated as of November 1, 2006 by and between Registrant and Caremark Rx, Inc (incorporated by reference to Exhibit 2.3 to the Registrant's Registration Statement No. 333-139470 on Form S-4/A filed January 16, 2007). |
| 2.4* | Amendment to Waiver Agreement, dated as of February 12, 2007, between Registrant and Caremark Rx, Inc. (incorporated by reference to Exhibit 99.2 to the Registrant's Current Report on Form 8-K dated February 13, 2007; Commission File No. 001-01011). |
| 2.5* | Amendment to Waiver Agreement, dated as of March 8, 2007, between Registrant and Caremark Rx, Inc. (incorporated by reference to Exhibit 99.2 to the Registrants' Current Report on Form 8-K dated March 8, 2007; Commission File No. 001-01011). |
| 2.6* | Agreement and Plan of Merger dated as of August 12, 2008 among, the Registrant, Longs Drug Stores Corporation and Blue MergerSub Corp. (incorporated by reference to Exhibit 2.1 to the Registrant's Current Report on Form 8-K dated August 13, 2008; Commission File No. 001-01011). |
| 3.1* | Amended and Restated Certificate of Incorporation of the Registrant (incorporated by reference to Exhibit 3.1 of Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 1996; Commission File No. 001-01011). |

| | |
|---|---|
| 3.1A* | Certificate of Amendment to the Amended and Restated Certificate of Incorporation, effective May 13, 1998 (incorporated by reference to Exhibit 4.1A to Registrant's Registration Statement No. 333-52055 on Form S-3/A dated May 18, 1998). |
| 3.1B* | Certificate of Amendment to the Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.1 to Registrant's Current Report on Form 8-K dated March 22, 2007; Commission File No. 001-01011). |
| 3.1C* | Certificate of Merger dated May 9, 2007 (incorporated by reference to Exhibit 3.1C to Registrant's Quarterly Report on Form 10-Q dated November 1, 2007; Commission File No. 001-01011). |
| 3.1D* | Certificate of Amendment to the Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.1 to Registrant's Current Report on Form 8-K dated May 13, 2010; Commission File No. 001-01011). |
| 3.1E* | Certificate of Amendment to the Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.1 to the Registrant's Current Report On Form 8-K dated May 10, 2012; Commission File No. 001-01011). |
| 3.2* | By-laws of the Registrant, as amended and restated (incorporated by reference to Exhibit 3.2 to the Registrant's Current Report on Form 8-K dated January 9, 2014; Commission File No. 001-01011). |
| 4 | Pursuant to Regulation S-K, Item 601(b)(4)(iii)(A), no instrument which defines the rights of holders of long-term debt of the Registrant and its subsidiaries is filed with this report. The Registrant hereby agrees to furnish a copy of any such instrument to the Securities and Exchange Commission upon request. |
| 4.1* | Specimen common stock certificate (incorporated by reference to Exhibit 4.1 to the Registration Statement of the Registrant on Form 8-B dated November 4, 1996; Commission File No. 001-01011). |
| 10.1* | Stock Purchase Agreement dated as of October 14, 1995 between The TJX Companies, Inc. and Melville Corporation, as amended November 17, 1995 (incorporated by reference to Exhibits 2.1 and 2.2 to Melville's Current Report on Form 8-K dated December 4, 1995; Commission File No. 001-01011). |
| 10.2* | Stock Purchase Agreement dated as of March 25, 1996 between Melville Corporation and Consolidated Stores Corporation, as amended May 3, 1996 (incorporated by reference to Exhibits 2.1 and 2.2 to Melville's Current Report on Form 8-K dated May 5, 1996; Commission File No. 001-01011). |
| 10.3* | Distribution Agreement dated as of September 24, 1996 among Melville Corporation, Footstar, Inc. and Footstar Center, Inc. (incorporated by reference to Exhibit 99.1 to Melville's Current Report on Form 8-K dated October 28, 1996; Commission File No. 001-01011). |
| 10.4* | Tax Disaffiliation Agreement dated as of September 24, 1996 among Melville Corporation, Footstar, Inc. and certain subsidiaries named therein (incorporated by reference to Exhibit 99.2 to Melville's Current Report on Form 8-K dated October 28, 1996; Commission File No. 001-01011). |
| 10.5* | Stockholder Agreement dated as of December 2, 1996 between the Registrant, Nashua Hollis CVS, Inc. and Linens 'n Things, Inc. (incorporated by reference to Exhibit 10(i)(6) to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 1997; Commission File No. 001-01011). |
| 10.6* | Tax Disaffiliation Agreement dated as of December 2, 1996 between the Registrant and Linens 'n Things, Inc. and certain of their respective affiliates (incorporated by reference to Exhibit 10(i)(7) to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 1997; Commission File No. 001-01011). |
| 10.7* | Four Year Credit Agreement dated as of May 12, 2011 by and among the Registrant, the lenders party thereto, Barclays Capital and JP Morgan Chase Bank, N.A., as Co-Syndication Agents, Bank of America, N.A. and Wells Fargo Bank, N.A., as Co-Documentation Agents, and the Bank of New York Mellon, as Administrative Agent (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2011; Commission File No. 001-01011). |
| 10.8* | Amendment No. 1, dated as of November 22, 2011, to the Credit Agreement dated as of May 12, 2011 by and among the Registrant, the Lenders party thereto, the Co-Syndication Agents and Co-Documentation Agents named therein, and The Bank of New York Mellon, as Administrative Agent (incorporated by reference to Exhibit 10.45 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2011; Commission File No. 001-01011). |

10.9* Five Year Credit Agreement dated as of February 17, 2012, by and among the Registrant, the lenders party thereto, Barclays Capital and JPMorgan Chase Bank, N.A., as Co-Syndication Agents, Bank of America, N.A. and Wells Fargo Bank, N.A., as Co-Documentation Agents, and The Bank of New York Mellon, as Administrative Agent (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2012 (Commission File No. 001-01011).

10.10* Credit Agreement dated as of May 23, 2013, by and among the Registrant, the lenders party thereto, Barclays Bank PLC and JPMorgan Chase Bank, N.A., as Co-Syndication Agents, Bank of America, N.A. and Wells Fargo Bank, N.A., as Co-Documentation Agents, and The Bank of New York Mellon, as Administrative Agent. (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2013 (Commission File No. 001-01011).

10.11* Amendment No. 2, dated as of May 23, 2013, to the Credit Agreement dated as of May 12, 2011, by and among the Registrant, the lenders party thereto, Barclays Capital and JPMorgan Chase Bank, N.A., as Co-Syndication Agents, Bank of America, N.A. and Wells Fargo Bank, N.A., as Co-Documentation Agents, and The Bank of America, N.A. and Wells Fargo Bank, N.A., as Co-Documentation Agents, and The Bank of Bank of New York Mellon, as Administrative Agent, as previously amended by Amendment No. 1, dated as of November 22, 2011 (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2013 (Commission File No. 001-01011).

10.12* Supplemental Retirement Plan for Select Senior Management of CVS Caremark Corporation I as amended and restated in December 2008 (incorporated by reference to Exhibit 10.6 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2009; Commission File No. 001-01011).

10.13* CVS Caremark Corporation 1996 Directors Stock Plan, as amended and restated November 5, 2002 (incorporated by reference to Exhibit 10.18 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 28, 2002; Commission File No. 001-01011).

10.14* 1997 Incentive Compensation Plan as amended through December 2008 (incorporated by reference to Exhibit 10.8 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2009; Commission File No. 001-01011).

10.15* Caremark Rx, Inc. 2004 Incentive Stock Plan (incorporated by reference to Exhibit 99.2 of the Registrant's Registration Statement No. 333-141481 on Form S-8 filed March 22, 2007).

10.16* CVS Caremark Deferred Stock Compensation Plan, as amended and restated (incorporated by reference to Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2009; Commission File No. 001-01011).

10.17 CVS Caremark Deferred Compensation Plan, as amended and restated.

10.18* 2010 Incentive Compensation Plan, as amended through January 15, 2013 (incorporated by reference to Exhibit 10.30 to the Registrant's Annual Report on Form10-K for the fiscal year ended December 31, 2012; Commission file No. 001-01011).

10.19* 2007 Employee Stock Purchase Plan (incorporated by reference to Exhibit D of the Registrant's Definitive Proxy Statement filed April 4, 2007; Commission File No. 001-01011).

10.20 The Registrant's 2013 Management Incentive Plan.

10.21 The Registrant's 2013 Long-Term Incentive Plan.

10.22 The Registrant's Partnership Equity Program amended as of August 2013.

10.23 The Registrant's Severance Plan for Non-Store Employees amended as of April 2013.

10.24 The Registrant's Performance-Based Restricted Stock Unit Plan amended as of April 2013.

10.25 Form of Enterprise Non-Competition, Non-Disclosure and Developments Agreement between the Registrant and certain of the Registrant's executive officers.

| | |
|---|---|
| 10.26* | Universal 409A Definition Document dated December 31, 2008 (incorporated by reference to Exhibit 10.7 to the Registrant's Quarterly Report on Form 10-Q for the quarter ended June 30, 2009; Commission File No. 001-01011). |
| 10.27 | Form of Non-Qualified Stock Option Agreement between the Registrant and selected employees of the Registrant. |
| 10.28 | Form of Restricted Stock Unit Agreement - Annual Grant - between the Registrant and selected employees of the Registrant. |
| 10.29 | Form of Performance-Based Restricted Stock Unit Agreement between the Registrant and selected employees of the Registrant. |
| 10.30 | Form of Partnership Equity Program Participant Purchased RSUs, Company Matching RSUs and Company Matching Options Agreement (Pre-Tax). |
| 10.31 | Form of Partnership Equity Program Participant Purchased RSUs, Company Matching RSUs and Company Matching Options Agreement (Post-Tax). |
| 10.32* | Amended and Restated Employment Agreement dated as of December 22, 2008 between the Registrant and the Registrant's President and Chief Executive Officer (incorporated by reference to Exhibit 10.38 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2008; Commission File No. 001-01011). |
| 10.33* | Amendment dated December 21, 2012 to the Amended and Restated Employment Agreement dated as of December 22, 2008 between the Registrant and the Registrant's President and Chief Executive Officer (incorporated by reference to Exhibit 10.31 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2012; Commission File No. 001-01011). |
| 10.34 | Form of Non-Qualified Stock Option Agreement between the Registrant and the Registrant's President and Chief Executive Officer. |
| 10.35 | Form of Restricted Stock Unit Agreement between the Registrant and the Registrant's President and Chief Executive Officer. |
| 10.36* | Change in Control Agreement dated December 22, 2008 between the Registrant and the Registrant's Executive Vice President and Chief Financial Officer (incorporated by reference to Exhibit 10.39 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2010; Commission File No. 001-01011). |
| 10.37* | Amendment dated as of December 31, 2012 to the Change in Control Agreement dated December 22, 2008 between the Registrant and the Registrant's Executive Vice President and Chief Financial Officer (incorporated by reference to Exhibit 10.32 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2012; Commission File No. 001-01011). |
| 10.38* | Change in Control Agreement dated December 22, 2008 between the Registrant and the Registrant's Executive Vice President and President of CVS Caremark Pharmacy Services (incorporated by reference to Exhibit 10.33 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2012; Commission File No. 001-01011). |
| 10.39* | Amendment dated as of December 31, 2012 to the Change in Control Agreement dated December 22, 2008 between the Registrant and the Registrant's Executive Vice President and President of CVS Caremark Pharmacy Services; incorporated by reference to Exhibit 10.34 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2012 (Commission File No. 001-01011). |
| 10.40* | Letter Agreement dated August 5, 2011 between the Registrant and the Registrant's former Executive Vice President and President - CVS/pharmacy (incorporated by reference to Exhibit 10.41 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2011; Commission File No. 001-01011). |

| | |
|---|---|
| 10.41* | Change in Control Agreement dated September 1, 2011 between the Registrant and the Registrant's former Executive Vice President and President - CVS/pharmacy (incorporated by reference to Exhibit 10.42 to the Registrant's Annual Report on Form 10-K for the fiscal year ended December 31, 2011; Commission File No. 001-01011). |
| 10.42 | Separation Agreement between the Registrant and the Registrant's former Executive Vice President and President - CVS/pharmacy dated December 10, 2013. |
| 10.43 | Change in Control Agreement dated December 1, 2008 between the Registrant and the Registrant's Former Executive Vice President and Chief Medical Officer. |
| 13 | Portions of the 2013 Annual Report to Stockholders of CVS Caremark Corporation, which are specifically designated in this Form 10-K as being incorporated by reference. |
| 21 | Subsidiaries of the Registrant. |
| 23 | Consent of Ernst & Young LLP. |
| 31.1 | Certification by the Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification by the Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification by the Chief Executive Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification by the Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101 | The following materials from the CVS Caremark Corporation Annual Report on Form 10-K for the year ended December 31, 2013 formatted in Extensible Business Reporting Language (XBRL): (i) the Consolidated Statements of Income, (ii) the Consolidated Balance Sheets, (iii) the Consolidated Statements of Cash Flows and (iv) related notes. |

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Annual Report on Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized.

CVS CAREMARK CORPORATION

Date: February 10, 2014

By: /s/ DAVID M. DENTON

**David M. Denton**
**Executive Vice President and Chief Financial Officer**

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

| Signature | Title(s) | Date |
|---|---|---|
| /s/ C. DAVID BROWN II<br>**C. David Brown II** | Director | February 10, 2014 |
| /s/ EVA C. BORATTO<br>**Eva C. Boratto** | Senior Vice President —<br>Finance and Controller<br>(Principal Accounting Officer) | February 10, 2014 |
| /s/ DAVID M. DENTON<br>**David M. Denton** | Executive Vice President and Chief Financial Officer (Principal Financial Officer) | February 10, 2014 |
| /s/ NANCY-ANN M. DEPARLE<br>**Nancy-Ann M. DeParle** | Director | February 10, 2014 |
| /s/ DAVID W. DORMAN<br>**David W. Dorman** | Chairman of the Board and Director | February 10, 2014 |
| /s/ ANNE M. FINUCANE<br>**Anne M. Finucane** | Director | February 10, 2014 |
| /s/ LARRY J. MERLO<br>**Larry J. Merlo** | President and Chief Executive Officer (Principal Executive Officer) and Director | February 10, 2014 |
| /s/ JEAN-PIERRE MILLON<br>**Jean-Pierre Millon** | Director | February 10, 2014 |
| /s/ RICHARD J. SWIFT<br>**Richard J. Swift** | Director | February 10, 2014 |
| /s/ WILLIAM C. WELDON<br>**William C. Weldon** | Director | February 10, 2014 |
| /s/ TONY L. WHITE<br>**Tony L. White** | Director | February 10, 2014 |

**Exhibit 13**

**Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis should be read in conjunction with our audited consolidated financial statements and Cautionary Statement Concerning Forward-Looking Statements that are included in this Annual Report.*

***Overview of Our Business***

CVS Caremark Corporation ("CVS Caremark", the "Company", "we", "our" or "us"), together with its subsidiaries, is the largest integrated pharmacy health care provider in the United States. We are uniquely positioned to deliver significant benefits to health plan sponsors through effective cost management solutions and innovative programs that engage plan members and promote healthier and more cost-effective behaviors. Our integrated pharmacy services model enhances our ability to offer plan members and consumers expanded choice, greater access and more personalized services to help them on their path to better health. We effectively manage pharmaceutical costs and improve health care outcomes through our pharmacy benefit management, mail order and specialty pharmacy division, CVS Caremark® Pharmacy Services; our more than 7,600 CVS/pharmacy® and Drogaria Onofre® retail stores; our retail-based health clinic subsidiary, MinuteClinic®; and our online retail pharmacies, CVS.com® and Onofre.com.br.

We currently have three reportable segments: Pharmacy Services, Retail Pharmacy and Corporate.

***Overview of Our Pharmacy Services Segment***

Our Pharmacy Services business provides a full range of PBM services, including mail order and specialty pharmacy and infusion services, plan design and administration, formulary management, discounted drug purchase arrangements, Medicare Part D services, retail pharmacy network management services, prescription management systems, clinical services and disease management services.

Our clients are primarily employers, insurance companies, unions, government employee groups, managed care organizations and other sponsors of health benefit plans and individuals throughout the United States.

As a pharmacy benefits manager, we manage the dispensing of pharmaceuticals through our mail order pharmacies, specialty pharmacies and national network of nearly 68,000 retail pharmacies, consisting of approximately 41,000 chain pharmacies (which includes our CVS/pharmacy stores) and 27,000 independent pharmacies, to eligible members in the benefit plans maintained by our clients and utilize our information systems to perform, among other things, safety checks, drug interaction screenings and brand to generic substitutions.

Our specialty pharmacies support individuals that require complex and expensive drug therapies. Our specialty pharmacy business includes mail order and retail specialty pharmacies that operate under the CVS Caremark® and CarePlus CVS/pharmacy® names. Substantially all of our mail service specialty pharmacies have been accredited by The Joint Commission, which is an independent, not-for-profit organization that accredits and certifies health care organizations and programs in the United States.

We also provide health management programs, which include integrated disease management for 17 conditions, through our Accordant® rare disease management offering. The majority of these integrated programs are accredited by the National Committee for Quality Assurance.

In addition, through our SilverScript Insurance Company ("SilverScript") subsidiary, we are a national provider of drug benefits to eligible beneficiaries under the Federal Government's Medicare Part D program. We currently provide Medicare Part D plan benefits to approximately 4.3 million beneficiaries through SilverScript.

Our Pharmacy Services Segment generates net revenues primarily by contracting with clients to provide prescription drugs to plan members. Net revenues are also generated by providing additional services to clients, including administrative services such as claims processing and formulary management, as well as health care-related services such as disease management.

The Pharmacy Services Segment operates under the CVS Caremark® Pharmacy Services, Caremark®, CVS Caremark®, CarePlus CVS/pharmacy®, RxAmerica®, Accordant®, SilverScript® and Novologix® names. As of December 31, 2013, the Pharmacy Services Segment operated 25 retail specialty pharmacy stores, 11 specialty mail order pharmacies and four mail service dispensing pharmacies located in 22 states, Puerto Rico and the District of Columbia.

***Overview of Our Retail Pharmacy Segment***

Our Retail Pharmacy Segment sells prescription drugs and a wide assortment of general merchandise, including over-the-counter drugs, beauty products and cosmetics, photo finishing, seasonal merchandise, greeting cards and convenience foods through our CVS/pharmacy®, Longs Drugs® and Drogaria Onofre® retail stores and online through CVS.com® and Onofre.com.br. Our Retail Pharmacy Segment derives the majority of its revenues through the sale of prescription drugs, which are dispensed by our more than 23,500 retail pharmacists. The role of our retail pharmacists is shifting from primarily dispensing prescriptions to also providing services, including flu vaccinations as well as face-to-face patient counseling with respect to adherence to drug therapies, closing gaps in care, and more cost-effective drug therapies. Our integrated pharmacy services model enables us to enhance access to care while helping to lower overall health care costs and improve health outcomes.

Our Retail Pharmacy Segment also provides health care services through our MinuteClinic® health care clinics. MinuteClinics are staffed by nurse practitioners and physician assistants who utilize nationally recognized protocols to diagnose and treat minor health conditions, perform health screenings, monitor chronic conditions, and deliver vaccinations. We believe our clinics provide high quality services that are affordable and convenient.

Our proprietary loyalty card program, ExtraCare®, has approximately 70 million active cardholders, making it one of the largest and most successful retail loyalty card programs in the country.

As of December 31, 2013, our Retail Pharmacy Segment included 7,660 retail drugstores (of which 7,603 operated a pharmacy) located in 43 states, the District of Columbia, Puerto Rico and Brazil operating primarily under the CVS/pharmacy®, Longs Drugs® and Drogaria Onofre® names, 17 onsite pharmacies and 800 retail health care clinics operating under the MinuteClinic® name (of which 792 were located in CVS/pharmacy stores), and our online retail websites, CVS.com® and Onofre.com.br.

***Overview of Our Corporate Segment***

The Corporate Segment provides management and administrative services to support the Company. The Corporate Segment consists of certain aspects of our executive management, corporate relations, legal, compliance, human resources, corporate information technology and finance departments.

***Results of Operations***

**Summary of our Consolidated Financial Results**

| *In millions, except per common share amounts* | Year Ended December 31, 2013 | 2012 | 2011 |
|---|---|---|---|
| Net revenues | $ 126,761 | $ 123,120 | $ 107,080 |
| Cost of revenues | 102,978 | 100,632 | 86,518 |
| Gross profit | 23,783 | 22,488 | 20,562 |
| Operating expenses | 15,746 | 15,278 | 14,231 |
| Operating profit | 8,037 | 7,210 | 6,331 |
| Interest expense, net | 509 | 557 | 584 |
| Loss on early extinguishment of debt | — | 348 | — |
| Income before income tax provision | 7,528 | 6,305 | 5,747 |
| Income tax provision | 2,928 | 2,436 | 2,258 |
| Income from continuing operations | 4,600 | 3,869 | 3,489 |
| Loss from discontinued operations, net of tax | (8) | (7) | (31) |
| Net income | 4,592 | 3,862 | 3,458 |
| Net loss attributable to noncontrolling interest | — | 2 | 4 |
| Net income attributable to CVS Caremark | $ 4,592 | $ 3,864 | $ 3,462 |
| Diluted earnings per common share: | | | |
| Income from continuing operations attributable to CVS Caremark | $ 3.75 | $ 3.02 | $ 2.59 |
| Loss from discontinued operations attributable to CVS Caremark | $ (0.01) | $ (0.01) | $ (0.02) |
| Net income attributable to CVS Caremark | $ 3.74 | $ 3.02 | $ 2.57 |

***Net revenues*** increased $3.6 billion in 2013 compared to 2012, and increased $16.0 billion in 2012 compared to 2011. As you review our performance in this area, we believe you should consider the following important information:

- During 2013, net revenues in our Pharmacy Services Segment increased 3.8% and net revenues in our Retail Pharmacy Segment increased 3.1% compared to the prior year.
- During 2012, net revenues in our Pharmacy Services Segment increased by 24.7% and net revenues in our Retail Pharmacy Segment increased 6.8% compared to the prior year.
- The increase in our generic dispensing rates in both of our operating segments continued to have an adverse effect on net revenue in 2013 as compared to 2012, as well as in 2012 as compared to 2011. In 2012, the Pharmacy Services Segment had a greater impact from net new business as compared to 2013.

Please see the Segment Analysis later in this document for additional information about our net revenues.

***Gross profit*** increased $1.3 billion, or 5.8% in 2013, to $23.8 billion, or 18.8% of net revenues, as compared to $22.5 billion, or 18.3% of net revenues in 2012. Gross profit increased $1.9 billion, or 9.4% in 2012, to $22.5 billion, or 18.3% of net revenues, as compared to $20.6 billion, or 19.2% of net revenues in 2011.

- During 2013, gross profit in our Pharmacy Services Segment and Retail Pharmacy Segment increased by 11.3% and 5.3%, respectively, compared to the prior year. For the year ended December 31, 2013, gross profit as a percent of net revenues in our Pharmacy Services Segment and Retail Pharmacy Segment was 5.6% and 30.6%, respectively.
- During 2012, gross profit in our Pharmacy Services Segment and Retail Pharmacy Segment increased by 16.1% and 9.3%, respectively, compared to the prior year. For the year ended December 31, 2012, gross profit as a percent of net revenues in our Pharmacy Services Segment and Retail Pharmacy Segment was 5.2% and 30.0%, respectively.
- The increased weighting toward the Pharmacy Services Segment, which has a lower gross profit than the Retail Pharmacy Segment, resulted in a decline in consolidated gross profit as a percent of net revenues in 2012 as compared to 2011. In addition, gross profit for 2013, 2012 and 2011 has been negatively impacted by the efforts of managed care

organizations, pharmacy benefit managers and governmental and other third-party payors to reduce their prescription drug costs.

- In addition, for the three years 2011 through 2013, our gross profit continued to benefit from the increased utilization of generic drugs (which normally yield a higher gross profit rate than equivalent brand name drugs) in both the Pharmacy Services and Retail Pharmacy segments. This contributed to the increase in gross profit as a percent of net revenues in 2013 as compared to 2012.

Please see the Segment Analysis later in this document for additional information about our gross profit.

***Operating expenses*** increased $468 million, or 3.1% in the year ended December 31, 2013, as compared to the prior year. Operating expenses as a percent of net revenues remained flat at 12.4% in the year ended December 31, 2013, despite the dampening effect of generics on net revenues. The increase in operating expenses in the year ended December 31, 2013 was primarily due to incremental store operating costs associated with a higher store count as compared to the prior year, as well as strategic initiatives. The increase was partially offset by a $72 million gain on a legal settlement recorded in the third quarter.

Operating expenses increased $1.0 billion in the year ended December 31, 2012 as compared to the prior year. Operating expenses as a percent of net revenues improved approximately 90 basis points to 12.4% in the year ended December 31, 2012. The increase in operating expense dollars in the year ended December 31, 2012 was primarily due to incremental store operating costs associated with a higher store count as compared to the prior year, as well as the expansion of our Medicare Part D business. The improvement in operating expenses as a percent of net revenues is primarily due to expense leverage from net revenue growth and expense control initiatives.

Please see the Segment Analysis later in this document for additional information about operating expenses.

***Interest expense, net*** for the years ended December 31 consisted of the following:

| ***In millions*** | 2013 | 2012 | 2011 |
|---|---|---|---|
| Interest expense | $ 517 | $ 561 | $ 588 |
| Interest income | (8) | (4) | (4) |
| Interest expense, net | $ 509 | $ 557 | $ 584 |

Net interest expense decreased $48 million during the year ended December 31, 2013, which resulted from lower average interest rates during 2013. During 2012, net interest expense decreased by $27 million, to $557 million compared to 2011, due to a reduction in our average outstanding short-term and long-term debt.

***Income tax provision*** - Our effective income tax rate was 38.9%, 38.6% and 39.3% in 2013, 2012 and 2011, respectively. The effective income tax was higher in 2013 than in 2012 primarily due to certain permanent items in 2012. These same items were the principal factors for the lower effective income tax rate in 2012 compared to 2011.

***Income from continuing operations*** increased $731 million or 18.9% to $4.6 billion in 2013. Income from continuing operations increased $380 million or 10.9% to $3.9 billion in 2012 as compared to $3.5 billion in 2011. The 2013 increase in income from continuing operations was primarily related to increases in generic dispensing rates for both operating segments, increased volume across all channels in our Pharmacy Services Segment, as well as increased sales in the Retail Pharmacy Segment.

***Loss from discontinued operations*** - In connection with certain business dispositions completed between 1991 and 1997, the Company retained guarantees on store lease obligations for a number of former subsidiaries, including Linens ‘n Things, which filed for bankruptcy in 2008. The Company’s loss from discontinued operations includes lease-related costs which the Company believes it will likely be required to satisfy pursuant to its Linens ‘n Things lease guarantees.

We incurred a loss from discontinued operations of $8 million in 2013, a loss from discontinued operations of $7 million in 2012 and a loss from discontinued operations of $31 million in 2011. The loss from discontinued operations in 2013 and 2012 was primarily due to costs related to Linens ‘n Things lease guarantees. The loss from discontinued operations in 2011 was primarily due to the disposition of our TheraCom subsidiary. We recognized a $53 million pre-tax gain and a $37 million after-tax loss on the sale of TheraCom. The after-tax loss was caused by the income tax treatment of TheraCom’s nondeductible goodwill.

See Note 3 "Discontinued Operations" to the consolidated financial statements for additional information about discontinued operations and Note 12 "Commitments and Contingencies" for additional information about our lease guarantees.

***Net loss attributable to noncontrolling interest*** represents the minority shareholders' portion of the net loss from our subsidiary, Generation Health, Inc., prior to June 2012. We acquired the remaining 40% interest of Generation Health, Inc. on June 29, 2012 and as a result, there was no longer a noncontrolling interest in Generation Health, Inc. for the year ended December 31, 2013. The net loss attributable to noncontrolling interest for the years ended December 31, 2012 and 2011 was $2 million and $4 million, respectively.

***Net income attributable to CVS Caremark*** increased $728 million or 18.8% to $4.6 billion (or $3.74 per diluted share) in 2013. This compares to $3.9 billion (or $3.02 per diluted share) in 2012 and $3.5 billion (or $2.57 per diluted share) in 2011. As discussed previously, the 2013 increase in net income attributable to CVS Caremark was primarily related to increased generic drug dispensing in both operating segments, increased volume across all channels in our Pharmacy Services Segment, and increased sales in our Retail Pharmacy Segment. The increase in net income attributable to CVS Caremark per diluted share was also driven by increased share repurchase activity in 2013 and 2012.

***Segment Analysis***

We evaluate the performance of our Pharmacy Services and Retail Pharmacy segments based on net revenues, gross profit and operating profit before the effect of certain intersegment activities and charges. The Company evaluates the performance of its Corporate Segment based on operating expenses before the effect of discontinued operations and certain intersegment activities and charges. The following is a reconciliation of the Company's business segments to the consolidated financial statements:

| *In millions* | Pharmacy Services Segment[1][2] | Retail Pharmacy Segment[2] | Corporate Segment | Intersegment Eliminations[2] | Consolidated Totals |
|---|---|---|---|---|---|
| 2013: | | | | | |
| Net revenues | $ 76,208 | $ 65,618 | $ — | $ (15,065) | $ 126,761 |
| Gross profit | 4,237 | 20,112 | — | (566) | 23,783 |
| Operating profit (loss) | 3,086 | 6,268 | (751) | (566) | 8,037 |
| 2012: | | | | | |
| Net revenues | $ 73,444 | $ 63,641 | $ — | $ (13,965) | $ 123,120 |
| Gross profit | 3,808 | 19,091 | — | (411) | 22,488 |
| Operating profit (loss) | 2,679 | 5,636 | (694) | (411) | 7,210 |
| 2011: | | | | | |
| Net revenues | $ 58,874 | $ 59,579 | $ — | $ (11,373) | $ 107,080 |
| Gross profit | 3,279 | 17,469 | — | (186) | 20,562 |
| Operating profit (loss) | 2,220 | 4,913 | (616) | (186) | 6,331 |

(1) Net revenues of the Pharmacy Services Segment include approximately $7.9 billion, $8.4 billion and $7.9 billion of Retail Co-Payments for 2013, 2012 and 2011, respectively. See Note 1 to the consolidated financial statements for additional information about Retail Co-Payments.

(2) Intersegment eliminations relate to two types of transactions: (i) Intersegment revenues that occur when Pharmacy Services Segment customers use Retail Pharmacy Segment stores to purchase covered products. When this occurs, both the Pharmacy Services and Retail Pharmacy segments record the revenue on a standalone basis, and (ii) Intersegment revenues, gross profit and operating profit that occur when Pharmacy Services Segment customers, through the Company's intersegment activities (such as the Maintenance Choice® program), elect to pick-up their maintenance prescriptions at Retail Pharmacy Segment stores instead of receiving them through the mail. When this occurs, both the Pharmacy Services and Retail Pharmacy segments record the revenue, gross profit and operating profit on a standalone basis. Beginning in the fourth quarter of 2011, the Maintenance Choice eliminations reflect all discounts available for the purchase of mail order prescription drugs. The following amounts are eliminated in consolidation in connection with the item (ii) intersegment activity: net revenues of $4.3 billion, $3.4 billion and $2.6 billion for the years ended December 31, 2013, 2012 and 2011, respectively; gross profit and operating profit of $566 million, $411 million and $186 million for the years ended December 31, 2013, 2012 and 2011, respectively.

**Pharmacy Services Segment**

The following table summarizes our Pharmacy Services Segment's performance for the respective periods:

| | Year Ended December 31, | | |
|---|---|---|---|
| ***In millions*** | **2013** | **2012** | **2011** |
| Net revenues | $ 76,208 | $ 73,444 | $ 58,874 |
| Gross profit | $ 4,237 | $ 3,808 | $ 3,279 |
| Gross profit % of net revenues | 5.6% | 5.2% | 5.6% |
| Operating expenses | $ 1,151 | $ 1,129 | $ 1,059 |
| Operating expenses % of net revenues | 1.5% | 1.5% | 1.8% |
| Operating profit | $ 3,086 | $ 2,679 | $ 2,220 |
| Operating profit % of net revenues | 4.1% | 3.6% | 3.8% |
| Net revenues[(1)] : | | | |
| Mail choice[(2)] | $ 24,791 | $ 22,843 | $ 18,616 |
| Pharmacy network[(3)] | $ 51,211 | $ 50,411 | $ 40,040 |
| Other | $ 206 | $ 190 | $ 218 |
| Pharmacy claims processed[(1)] : | | | |
| Total | 902.1 | 880.5 | 774.6 |
| Mail choice[(2)] | 83.3 | 81.7 | 70.6 |
| Pharmacy network[(3)] | 818.8 | 798.8 | 704.0 |
| Generic dispensing rate[(1)] : | | | |
| Total | 80.8% | 78.5% | 74.1% |
| Mail choice[(2)] | 76.0% | 72.0% | 64.9% |
| Pharmacy network[(3)] | 81.3% | 79.1% | 75.0% |
| Mail choice penetration rate | 22.6% | 22.7% | 22.3% |

(1) Pharmacy network net revenues, claims processed and generic dispensing rates do not include Maintenance Choice, which are included within the mail choice category.

(2) Mail choice is defined as claims filled at a Pharmacy Services mail facility, which includes specialty mail claims, as well as 90-day claims filled at our retail stores under the Maintenance Choice program.

(3) Pharmacy network is defined as claims filled at retail pharmacies, including our retail drugstores, but excluding Maintenance Choice activity.

***Medicare Part D Update*** - The Company participates in the Medicare Part D program by (1) providing Medicare Part D-related PBM services to our health plan and other clients that have qualified as Medicare Part D plans, and (2) offering Medicare Part D pharmacy benefits through the Company's own SilverScript PDP, which offers benefits to individual members and through employer group waiver plans ("EGWPs"). At the beginning of the 2013 Medicare Part D plan year, the Company implemented an enrollment systems conversion process and other actions to consolidate its Medicare Part D PDPs into the Company's SilverScript PDP. These consolidation efforts impacted certain enrollment and coverage determination services the Company provided to SilverScript enrollees following commencement of the 2013 plan year. Effective January 15, 2013, Centers for Medicare and Medicaid Services ("CMS") imposed intermediate sanctions on the SilverScript PDP, consisting of immediate suspension of further plan enrollment and marketing activities. On December 20, 2013, the Company announced that CMS completed its review of the corrective actions taken to address the coverage determination issues resulting from the Company's plan consolidation efforts and the sanctions were removed.

***Net revenues*** in our Pharmacy Services Segment increased $2.8 billion, or 3.8%, to $76.2 billion for the year ended December 31, 2013, as compared to the prior year. The increase in net revenues was primarily due to drug cost inflation in the specialty pharmacy business. Conversely, the increase in our generic dispensing rate had a negative impact on our revenue in 2013, as it did in 2012.

Net revenues increased $14.6 billion, or 24.7%, to $73.4 billion for the year ended December 31, 2012, as compared to the prior year. The increase in 2012 was primarily due to new client starts on January 1, 2012, drug cost inflation and the growth of

our Medicare Part D business. Additionally, the increase in our generic dispensing rate had a negative impact on our revenue in 2012 as it did in 2011.

As you review our Pharmacy Services Segment's revenue performance, we believe you should also consider the following important information:

- Our mail choice claims processed increased 1.9% to 83.3 million claims in the year ended December 31, 2013, compared to 81.7 million claims in the prior year. The increase in mail choice claim volume was primarily due to increased claims associated with the continuing client adoption of our Maintenance Choice offerings. During 2012, our mail choice claims processed increased 15.7% to 81.7 million claims. The increase in mail choice claim volume was primarily due to a significant number of 2012 new client starts, as well as increased claims associated with the continued adoption of our Maintenance Choice offerings.

- During 2013 and 2012, our average revenue per mail choice claim increased by 6.5% and 6.0%, compared to 2012 and 2011, respectively. This increase was primarily due to drug cost inflation particularly in our specialty business, partially offset by increases in the percentage of generic prescription drugs dispensed and changes in client pricing.

- Our mail choice generic dispensing rate was 76.0%, 72.0% and 64.9% in the years ended December 31, 2013, 2012 and 2011, respectively.

- Our pharmacy network generic dispensing rate increased to 81.3% in the year ended December 31, 2013, compared to 79.1% in the prior year. During 2012, our pharmacy network generic dispensing rate increased to 79.1% compared to our pharmacy network generic dispensing rate of 75.0% in 2011. These continued increases in both mail choice and pharmacy network generic dispensing rates were primarily due to the impact of new generic drug introductions, primarily in 2012, and our continuous efforts to encourage plan members to use generic drugs when they are available. We believe our generic dispensing rates will continue to increase in future periods, albeit, at a slower pace. This increase will be affected by, among other things, the number of new generic drug introductions and our success at encouraging plan members to utilize generic drugs when they are available and clinically appropriate.

- Our pharmacy network claims processed increased 2.5% to 818.8 million claims in the year ended December 31, 2013, compared to 798.8 million claims in the prior year. During 2012, our pharmacy network claims processed increased 13.5% to 798.8 million compared to 704.0 million pharmacy network claims processed in 2011. The increase in the pharmacy network claim volume was primarily due to higher claims activity associated with our Medicare Part D program.

- Our average revenue per pharmacy network claim processed decreased 0.9% in the year ended December 31, 2013 as compared to the prior year. This decrease was primarily due to increases in the generic dispensing rate. During 2012, our average revenue per pharmacy network claim processed increased by 11.0%, compared to 2011. This increase was primarily due to drug cost inflation partially offset by increases in the generic dispensing rate.

- The Pharmacy Services Segment recognizes revenues for its pharmacy network transactions based on individual contract terms. In accordance with ASC 605, *Revenue Recognition*, CVS Caremark Pharmacy Services' contracts are predominantly accounted for using the gross method.

***Gross profit*** in our Pharmacy Services Segment includes net revenues less cost of revenues. Cost of revenues includes (i) the cost of pharmaceuticals dispensed, either directly through our mail service and specialty retail pharmacies or indirectly through our pharmacy network, (ii) shipping and handling costs and (iii) the operating costs of our mail service dispensing pharmacies, customer service operations and related information technology support.

Gross profit increased $429 million, or 11.3% to $4.2 billion in the year ended December 31, 2013, as compared to the prior year. Gross profit as a percentage of net revenues increased to 5.6% for the year ended December 31, 2013, compared to 5.2% in the prior year. The increase in gross profit dollars and gross profit as a percentage of net revenues in the year ended December 31, 2013 was primarily due to an increase in generic dispensing.

During 2012, gross profit increased $529 million, or 16.1%, to $3.8 billion in the year ended December 31, 2012, as compared to the prior year. Gross profit as a percentage of net revenues was 5.2% for the year ended December 31, 2012, compared to 5.6% in the prior year. The increase in gross profit dollars in the year ended December 31, 2012 was primarily due to a significant number of 2012 new client starts, an increase in generic dispensing and drug cost inflation. The decrease in gross profit as a percentage of revenue was driven primarily by client pricing compression, increased payroll and other expenses

associated with our mail and specialty operations, and expanding Medicare Part D operations, which has lower margins. The increase in expenses associated with our mail operations was the result of the significant number of 2012 new client starts.

As you review our Pharmacy Services Segment's performance in this area, we believe you should consider the following important information:

- Our gross profit dollars and gross profit as a percentage of net revenues continued to be impacted by our efforts to (i) retain existing clients, (ii) obtain new business and (iii) maintain or improve the rebates and/or discounts we received from manufacturers, wholesalers and retail pharmacies. In particular, competitive pressures in the PBM industry have caused us and other PBMs to continue to share a larger portion of rebates and/or discounts received from pharmaceutical manufacturers with clients. In addition, market dynamics and regulatory changes have impacted our ability to offer plan sponsors pricing that includes retail network "differential" or "spread". We expect these trends to continue. The "differential" or "spread" is any difference between the drug price charged to plan sponsors, including Medicare Part D plan sponsors, by a PBM and the price paid for the drug by the PBM to the dispensing provider. The increased use of generic drugs has positively impacted our gross profit margins but has resulted in third party payors augmenting their efforts to reduce reimbursement payments for prescriptions. This trend, which we expect to continue, reduces the benefit we realize from brand to generic product conversions.

- We review our network contracts on an individual basis to determine if the related revenues should be accounted for using the gross method or net method under the applicable accounting rules. CVS Caremark Pharmacy Services' network contracts are predominantly accounted for using the gross method, which results in higher revenues, higher cost of revenues and lower gross profit rates.

- Our gross profit as a percentage of revenues benefited from the increase in our total generic dispensing rate, which increased to 80.8% and 78.5% in 2013 and 2012, respectively, compared to our generic dispensing rate of 74.1% in 2011. These increases were primarily due to new generic drug introductions and our continued efforts to encourage plan members to use generic drugs when they are available. We expect these trends to continue, albeit at a slower pace.

***Operating expenses*** in our Pharmacy Services Segment, which include selling, general and administrative expenses, depreciation and amortization related to selling, general and administrative activities and retail specialty pharmacy store and administrative payroll, employee benefits and occupancy costs, remained flat at 1.5% of net revenues in 2013 compared to 1.5% in 2012, and decreased from 1.8% in 2011.

As you review our Pharmacy Services Segment's performance in this area, we believe you should consider the following important information:

- Operating expenses increased $22 million or 1.9%, to $1.2 billion, in the year ended December 31, 2013, compared to the prior year. The increase in operating expenses is primarily related to costs associated with the remediation of Medicare Part D sanctions and coverage determination issues discussed previously. The increase was partially offset by the Pharmacy Services Segment's $11 million share of a gain on a legal settlement recorded in the third quarter of 2013.

- During 2012, the increase in operating expenses of $70 million or 6.6%, to $1.1 billion compared to 2011, is primarily related to increased costs associated with the expansion of our Medicare Part D business. The decrease in operating expenses as a percentage of net revenues from 1.8% to 1.5% is primarily due to expense leverage from net revenue growth and expense control initiatives.

***Retail Pharmacy Segment***

The following table summarizes our Retail Pharmacy Segment's performance for the respective periods:

| *In millions* | Year Ended December 31, 2013 | 2012 | 2011 |
|---|---|---|---|
| Net revenues | $ 65,618 | $ 63,641 | $ 59,579 |
| Gross profit | $ 20,112 | $ 19,091 | $ 17,469 |
| Gross profit % of net revenues | 30.6 % | 30.0% | 29.3% |
| Operating expenses | $ 13,844 | $ 13,455 | $ 12,556 |
| Operating expenses % of net revenues | 21.1 % | 21.1% | 21.1% |
| Operating profit | $ 6,268 | $ 5,636 | $ 4,913 |
| Operating profit % of net revenues | 9.6 % | 8.9% | 8.2% |
| Retail prescriptions filled (90 Day = 1 prescription) | 734.3 | 717.4 | 657.7 |
| Retail prescriptions filled (90 Day = 3 prescriptions) [(1)] | 890.1 | 845.8 | 763.6 |
| Net revenue increase: | | | |
| Total | 3.1 % | 6.8% | 3.9% |
| Pharmacy | 4.1 % | 7.6% | 4.3% |
| Front Store | 1.0 % | 5.1% | 3.0% |
| Total prescription volume (90 Day = 1 prescription) | 2.4 % | 9.1% | 3.4% |
| Total prescription volume (90 Day = 3 prescriptions) [(1)] | 5.2 % | 11.0% | 5.5% |
| Same store sales increase: | | | |
| Total | 1.7 % | 5.6% | 2.3% |
| Pharmacy | 2.6 % | 6.6% | 3.0% |
| Front Store | (0.5)% | 3.4% | 0.8% |
| Prescription volume (90 Day = 1 prescription) | 1.5 % | 8.1% | 2.3% |
| Prescription volume (90 Day = 3 prescriptions) [(1)] | 4.4 % | 10.0% | 4.3% |
| Generic dispensing rates | 81.4 % | 79.2% | 75.6% |
| Pharmacy % of net revenues | 69.5 % | 68.8% | 68.3% |
| Third party % of pharmacy revenue | 97.9 % | 97.5% | 97.8% |

(1) Includes the adjustment to convert 90-day prescriptions to the equivalent of three 30-day prescriptions. This adjustment reflects the fact that these prescriptions include approximately three times the amount of product days supplied compared to a normal prescription.

***Net revenues*** increased approximately $2.0 billion, or 3.1%, to $65.6 billion for the year ended December 31, 2013, as compared to the prior year. This increase was primarily driven by a same store sales increase of 1.7% and net revenues from new and acquired stores, which accounted for approximately 130 basis points of our total net revenue percentage increase during the year. Additionally, we continued to see a positive impact on our net revenues due to the growth of our Maintenance Choice program.

Net revenues in our Retail Pharmacy Segment increased $4.1 billion, or 6.8% to $63.6 billion for the year ended December 31, 2012, as compared to the prior year. This increase was primarily driven by a same store sales increase of 5.6% and net revenues from new stores, which accounted for approximately 110 basis points of our total net revenue percentage increase during the year. Additionally, we continued to see a positive impact on our net revenues due to the growth of our Maintenance Choice program.

As you review our Retail Pharmacy Segment's performance in this area, we believe you should consider the following important information:

- Front store same store sales declined 0.5% in the year ended December 31, 2013, as compared to the prior year. 2013 had one less day as a result of 2012 being a leap year, which had a negative impact on front store same store sales of approximately 40 basis points. Front store same store sales were negatively impacted by a decrease in customer traffic, partially offset by an increase in basket size.

- Pharmacy same store sales rose 2.6% in the year ended December 31, 2013, as compared to the prior year. Pharmacy same store sales were positively impacted by increased prescription volume, partially offset by the negative impact of the increase in generic dispensing, reimbursement pressure, and the impact of 2013 having one fewer day as a result of 2012 being a leap year.

- Pharmacy revenues continue to be negatively impacted by the conversion of brand name drugs to equivalent generic drugs, which typically have a lower selling price. Pharmacy same store sales were negatively impacted by approximately 540 and 700 basis points for the years ended December 31, 2013 and 2012, respectively, due to recent generic introductions. The decrease in the impact from 2012 to 2013 was primarily due to a smaller impact from new generic drug introductions. In addition, our pharmacy growth has also been adversely affected by the lack of significant new brand name drug introductions, higher consumer co-payments and co-insurance arrangements and an increase in the number of over-the-counter remedies that were historically only available by prescription.

- As of December 31, 2013, we operated 7,660 retail stores compared to 7,458 retail stores as of December 31, 2012 and 7,327 retail stores as of December 31, 2011. Total net revenues from new stores (excluding acquired stores) contributed approximately 1.0%, 1.1% and 1.3% to our total net revenue percentage increase in 2013, 2012, and 2011, respectively.

- Pharmacy revenue growth continued to benefit from increased utilization by Medicare Part D beneficiaries, the ability to attract and retain managed care customers and favorable industry trends. These trends include an aging American population; many "baby boomers" are now in their fifties and sixties and are consuming a greater number of prescription drugs. In addition, the increased use of pharmaceuticals as the first line of defense for individual health care also contributed to the growing demand for pharmacy services. We believe these favorable industry trends will continue.

***Gross profit*** in our Retail Pharmacy Segment includes net revenues less the cost of merchandise sold during the reporting period and the related purchasing costs, warehousing costs, delivery costs and actual and estimated inventory losses.

Gross profit increased $1.0 billion, or 5.3%, to $20.1 billion in the year ended December 31, 2013, as compared to the prior year. Gross profit as a percentage of net revenues increased to 30.6% in year ended December 31, 2013, from 30.0% in 2012. The increase in gross profit dollars in the year ended December 31, 2013, was primarily driven by increases in the generic dispensing rate, same store sales and new store sales. The increase in gross profit as a percentage of net revenues was primarily driven by increased pharmacy margins due to the positive impact of increased generic dispensing rates and increased front store margins, partially offset by continued reimbursement pressure.

Gross profit increased $1.6 billion, or 9.3%, to $19.1 billion for the year ended December 31, 2012, as compared to the prior year. Gross profit as a percentage of net revenues increased to 30.0% for the year ended December 31, 2012, compared to 29.3% for the prior year. The increase in gross profit dollars in the year ended December 31, 2012, was primarily driven by same store sales increases. The increase in gross profit as a percentage of revenue was primarily driven by increased pharmacy margins due to the positive impact of increased generic drugs dispensed, partially offset by continued reimbursement pressure and lower front store margins.

As you review our Retail Pharmacy Segment's performance in this area, we believe you should consider the following important information:

- Gross profit was positively impacted by approximately $31 million for the year ended December 31, 2012 as a result of the change in inventory accounting methods described in Note 2 to our consolidated financial statements. The impact of this change on gross profit as a percentage of net revenues for the year ended December 31, 2012 was approximately five basis points.

- On average, our gross profit on front store revenues is generally higher than our gross profit on pharmacy revenues. Front store revenues were 30.5%, 31.2% and 31.7% of total revenues, in 2013, 2012 and 2011, respectively. Pharmacy revenues were 69.5%, 68.8% and 68.3% of total revenues, in 2013, 2012 and 2011, respectively. This shift in sales mix had a negative effect on our overall gross profit for the years ended December 31, 2013, 2012 and 2011, respectively. The negative effect was offset by increasing generic drug dispensing rates.

- Our pharmacy gross profit rates have been adversely affected by the efforts of managed care organizations, pharmacy benefit managers and governmental and other third party payors to reduce their prescription drug costs. In the event this trend continues, we may not be able to sustain our current rate of revenue growth and gross profit dollars could be adversely impacted.

- The increased use of generic drugs has positively impacted our gross profit margins but has resulted in third party payors augmenting their efforts to reduce reimbursement payments to retail pharmacies for prescriptions. This trend, which we expect to continue, reduces the benefit we realize from brand to generic product conversions.

- Sales to customers covered by third party insurance programs are a large component of our total pharmacy business. On average, our gross profit on third party pharmacy revenues is lower than our gross profit on cash pharmacy revenues. Third party pharmacy revenues were 97.9% of pharmacy revenues in 2013, compared to 97.5% and 97.8% of pharmacy revenues in 2012 and 2011, respectively.

- The Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act (collectively, "ACA") made several significant changes to Medicaid rebates and to reimbursement. One of these changes was the proposed revision of the definition of Average Manufacturer Price ("AMP") and the reimbursement formula for multi-source drugs. Changes in reporting of AMP or other adjustments that may be made regarding the reimbursement of drug payments by Medicaid and Medicare could impact our pricing to customers and other payors and/or could impact our ability to negotiate discounts or rebates with manufacturers, wholesalers, PBMs or retail and mail pharmacies. See "Government Regulation" within Part I, Item 1, Business, for additional information.

***Operating expenses*** in our Retail Pharmacy Segment include store payroll, store employee benefits, store occupancy costs, selling expenses, advertising expenses, depreciation and amortization expense and certain administrative expenses.

Operating expenses increased $389 million, or 2.9% to $13.8 billion, or 21.1% as a percentage of net revenues, in the year ended December 31, 2013, as compared to $13.5 billion, or 21.1% as a percentage of net revenues, in the prior year. Operating expenses increased $899 million, or 7.2%, to $13.5 billion, or 21.1% as a percentage of net revenues, in the year ended December 31, 2012, as compared to $12.6 billion, or 21.1% as a percentage of net revenues, in the prior year. Operating expenses as a percentage of net revenues remained consistent from 2011 through 2013 primarily due to disciplined cost control, despite the negative impact of generics on net revenues. The increase in operating expense dollars in 2013 and 2012 was the result of higher store operating costs associated with our increased store count. The increase was partially offset by the Retail Pharmacy Segment's $61 million share of a gain on a legal settlement recorded in the third quarter of 2013.

***Corporate Segment***

***Operating expenses*** increased $57 million, or 8.3%, to $751 million in the year ended December 31, 2013, as compared to the prior year. Operating expenses increased $78 million, or 12.5%, to $694 million in the year ended December 31, 2012. Operating expenses within the Corporate Segment include executive management, corporate relations, legal, compliance, human resources, corporate information technology and finance related costs. The increase in operating expenses in 2013 was primarily due to higher benefit costs and strategic initiatives. The increase in operating expenses in 2012 was primarily due to higher benefit costs and information technology expenses.

***Liquidity and Capital Resources***

We maintain a level of liquidity sufficient to allow us to cover our cash needs in the short-term. Over the long-term, we manage our cash and capital structure to maximize shareholder return, maintain our financial position and maintain flexibility for future strategic initiatives. We continuously assess our working capital needs, debt and leverage levels, capital expenditure requirements, dividend payouts, potential share repurchases and future investments or acquisitions. We believe our operating cash flows, commercial paper program, sale-leaseback program, as well as any potential future borrowings, will be sufficient to fund these future payments and long-term initiatives.

***Net cash provided by operating activities*** was $5.8 billion for the year ended December 31, 2013, compared to $6.7 billion in 2012, and $5.9 billion in 2011. The decrease in 2013 was primarily due to increased accounts receivable due to the timing of payments from CMS in connection with our Medicare Part D operations, partially offset by improved inventory management. The increase in 2012 was primarily due to the significant increase in net income, improved receivables management, improved payables management, and the timing of payments.

***Net cash used in investing activities*** was $1.8 billion in 2013 and 2012. This compares to approximately $2.4 billion in 2011. The decrease in 2012 was primarily due to the $1.3 billion acquisition of the Medicare prescription drug business of Universal American Corp. (the "UAM Medicare Part D Business") which occurred in April 2011.

In 2013, gross capital expenditures totaled approximately $2.0 billion, a decrease of $46 million compared to the prior year. During 2013, approximately 45% of our total capital expenditures were for new store construction, 25% were for store,

fulfillment and support facilities expansion and improvements and 30% were for technology and other corporate initiatives. Gross capital expenditures totaled approximately $2.0 billion during 2012, compared to approximately $1.9 billion in 2011. The increase in gross capital expenditures during 2012 was primarily due to the increased spending on store expansion and improvements. During 2012, approximately 45% of our total capital expenditures were for new store construction, 40% were for store expansion and improvements and 15% were for technology and other corporate initiatives.

Proceeds from sale-leaseback transactions totaled $600 million in 2013. This compares to $529 million in 2012 and $592 million in 2011. Under the sale-leaseback transactions, the properties are generally sold at net book value, which generally approximates fair value, and the resulting leases generally qualify and are accounted for as operating leases. The specific timing and amount of future sale-leaseback transactions will vary depending on future market conditions and other factors.

Below is a summary of our store development activity for the respective years:

| | 2013[2] | 2012[2] | 2011[2] |
|---|---|---|---|
| Total stores (beginning of year) | 7,508 | 7,388 | 7,248 |
| New and acquired stores[1] | 213 | 150 | 162 |
| Closed stores[1] | (19) | (30) | (22) |
| Total stores (end of year) | 7,702 | 7,508 | 7,388 |
| Relocated stores | 78 | 90 | 86 |

(1) Relocated stores are not included in new or closed store totals.

(2) Excludes specialty mail order facilities.

***Net cash used in financing activities*** was approximately $1.2 billion in 2013, compared to net cash used in financing activities of $4.9 billion in 2012 and $3.5 billion in 2011. Net cash used in financing activities decreased $3.7 billion in 2013 primarily due to greater net borrowings than in the prior year. Net cash used in financing activities increased $1.4 billion in 2012 primarily due to $1.3 billion more repurchases of common stock than in the prior year.

***Share repurchase programs*** — On December 17, 2013, the Company's Board of Directors authorized a new share repurchase program for up to $6.0 billion of outstanding common stock (the "2013 Repurchase Program"). On September 19, 2012, the Company's Board of Directors authorized a share repurchase program for up to $6.0 billion of outstanding common stock (the "2012 Repurchase Program"). Each of these share repurchase authorizations, which were effective immediately, permit the Company to effect repurchases from time to time through a combination of open market repurchases, privately negotiated transactions, accelerated share repurchase transactions, and/or other derivative transactions. The 2013 and 2012 Repurchase Programs may be modified or terminated by the Board of Directors at any time.

On August 23, 2011, our Board of Directors authorized a share repurchase program for up to $4.0 billion of outstanding common stock (the "2011 Repurchase Program"). This share repurchase authorization, which was effective immediately, permitted us to effect repurchases from time to time through a combination of open market repurchases, privately negotiated transactions, accelerated share repurchase transactions, and/or other derivative transactions. The 2011 Repurchase Program has been completed, as described below.

Pursuant to the authorization under the 2012 Repurchase Program, effective October 1, 2013, we entered into a $1.7 billion fixed dollar accelerated share repurchase ("ASR") agreement with Barclays Bank PLC ("Barclays"). Upon payment of the $1.7 billion purchase price on October 1, 2013, we received a number of shares of our common stock equal to 50% of the $1.7 billion notional amount of the ASR agreement or approximately 14.9 million shares at a price of $56.88 per share. The Company received approximately 11.7 million shares of common stock on December 30, 2013 at an average price of $63.83 per share, representing the remaining 50% of the $1.7 billion notional amount of the ASR agreement and thereby concluding the agreement. The total of 26.6 million shares of common stock delivered to the Company by Barclays over the term of the October 2013 ASR agreement were placed into treasury stock.

Pursuant to the authorizations under the 2011 and 2012 Repurchase Programs, on September 19, 2012, we entered into a $1.2 billion fixed dollar ASR agreement with Barclays. Upon payment of the $1.2 billion purchase price on September 20, 2012, we received a number of shares of our common stock equal to 50% of the $1.2 billion notional amount of the ASR agreement or approximately 12.6 million shares at a price of $47.71 per share. We received approximately 13.0 million shares of common stock on November 16, 2012 at an average price of $46.96 per share, representing the remaining 50% of the $1.2 billion notional amount of the ASR agreement and thereby concluding the agreement, and completing the 2011 Repurchase Program.

The total of 25.6 million shares of common stock delivered to us by Barclays over the term of the September 2012 ASR agreement were placed into treasury stock.

Pursuant to the authorization under the 2011 Repurchase Program, on August 24, 2011, we entered into a $1.0 billion fixed dollar ASR agreement with Barclays. The ASR agreement contained provisions that establish the minimum and maximum number of shares to be repurchased during its term. Pursuant to this ASR agreement, on August 25, 2011, we paid $1.0 billion to Barclays in exchange for Barclays delivering 20.3 million shares of common stock to us. On September 16, 2011, upon establishment of the minimum number of shares to be repurchased, Barclays delivered an additional 5.4 million shares of common stock to us. At the conclusion of the transaction, Barclays delivered a final installment of 1.6 million shares of common stock on December 29, 2011. The aggregate 27.3 million shares of common stock delivered to us by Barclays under the August 2011 ASR agreement, were placed into treasury stock. This represented all the repurchases that occurred during the year ended December 31, 2011 under the 2011 Repurchase Program.

During the years ended December 31, 2013 and 2012, we repurchased an aggregate of 66.2 million and 95.0 million shares of common stock for approximately $4.0 and $4.3 billion, respectively, under the 2012 and 2011 Repurchase Programs. As of December 31, 2013, there remained an aggregate of approximately $6.7 billion available for future repurchases under the 2013 and 2012 Repurchase Programs.

On June 14, 2010, our Board of Directors authorized a share repurchase program for up to $2.0 billion of our outstanding common stock (the "2010 Repurchase Program"). During the year ended December 31, 2011, we repurchased an aggregate of 56.4 million shares of common stock for approximately $2.0 billion, completing the 2010 Repurchase Program.

***Short-term borrowings*** - There was no commercial paper outstanding as of December 31, 2013. In connection with our commercial paper program, we maintain a $1.25 billion, four-year unsecured back-up credit facility, which expires on May 23, 2016, a $1.25 billion, five-year unsecured back-up credit facility, which expires on February 17, 2017, and a $1.0 billion, five-year unsecured back-up credit facility, which expires on May 23, 2018. The credit facilities allow for borrowings at various rates that are dependent, in part, on the Company's public debt ratings and require the Company to pay a weighted average quarterly facility fee of approximately 0.03%, regardless of usage. As of December 31, 2013, there were no borrowings outstanding under the back-up credit facilities.

***Long-term borrowings*** - On December 2, 2013, the Company issued $750 million of 1.2% unsecured senior notes due December 5, 2016; $1.25 billion of 2.25% unsecured senior notes due December 5, 2018; $1.25 billion of 4% unsecured senior notes due December 5, 2023; and $750 million of 5.3% unsecured senior notes due December 5, 2043 (the "2013 Notes") for total proceeds of approximately $4.0 billion, net of discounts and underwriting fees. The 2013 Notes pay interest semi-annually and may be redeemed, in whole at any time, or in part from time to time, at the Company's option at a defined redemption price plus accrued and unpaid interest to the redemption date. The net proceeds of the 2013 Notes were used to repay commercial paper outstanding at the time of issuance and to fund the acquisition of Coram LLC in January 2014. The remainder will be used for general corporate purposes.

On November 26, 2012, we issued $1.25 billion of 2.75% unsecured senior notes due December 1, 2022 (the "2012 Notes") for total proceeds of approximately $1.24 billion, net of discounts and underwriting fees. The 2012 Notes pay interest semi-annually and may be redeemed, in whole at any time, or in part from time to time, at our option at a defined redemption price plus accrued and unpaid interest to the redemption date. The net proceeds of the 2012 Notes were used for general corporate purposes and to repay certain corporate debt.

Also on November 26, 2012, we announced tender offers for any and all of the 6.6% Senior Notes due 2019, and up to a maximum amount of the 6.125% Senior Notes due 2016 and 5.75% Senior Notes due 2017, for up to an aggregate principal amount of $1.0 billion. In December 2012, we increased the aggregate principal amount of the tender offers to $1.325 billion and completed the repurchase for the maximum amount. We paid a premium of $332 million in excess of the debt principal in connection with the tender offers, wrote off $13 million of unamortized deferred financing costs and incurred $3 million in fees, for a total loss on the early extinguishment of debt of $348 million. The loss was recorded in income from continuing operations on the consolidated statement of income.

In connection with our acquisition of the UAM Medicare Part D Business in April 2011, we assumed $110 million of long-term debt in the form of Trust Preferred Securities that mature through 2037. During the years ended December 31, 2012 and 2011, we repaid $50 million and $60 million, respectively, of the Trust Preferred Securities at par.

On May 12, 2011, we issued $550 million of 4.125% unsecured senior notes due May 15, 2021 and issued $950 million of 5.75% unsecured senior notes due May 15, 2041 (collectively, the "2011 Notes") for total proceeds of approximately $1.5

billion, net of discounts and underwriting fees. The 2011 Notes pay interest semi-annually and may be redeemed, in whole at any time, or in part from time to time, at our option at a defined redemption price plus accrued and unpaid interest to the redemption date. The net proceeds of the 2011 Notes were used to repay commercial paper borrowings and certain other corporate debt, and were used for general corporate purposes.

In December 2011 and July 2012, we repurchased $958 million and $1 million of the principal amount of our Enhanced Capital Advantaged Preferred Securities ("ECAPS") at par. The fees and write-off of deferred issuance costs associated with the early extinguishment of the ECAPS were de minimis. The remaining $41 million of outstanding ECAPS are due in 2062 and had a fixed rate of interest of 6.302% per year until June 1, 2012, at which time we began paying interest based on a floating rate (2.3% and 2.59% at December 31, 2013 and 2012, respectively). The ECAPS pay interest semi-annually and may be redeemed at any time, in whole or in part, at a defined redemption price plus accrued interest.

Our backup credit facilities, unsecured senior notes and ECAPS (see Note 6 to the Consolidated Financial Statements) contain customary restrictive financial and operating covenants.

These covenants do not include a requirement for the acceleration of our debt maturities in the event of a downgrade in our credit rating. We do not believe the restrictions contained in these covenants materially affect our financial or operating flexibility.

As of December 31, 2013 and 2012, we had no outstanding derivative financial instruments.

***Debt Ratings*** - As of December 31, 2013, our long-term debt was rated "Baa1" by Moody's with a stable outlook and "BBB+" by Standard & Poor's with a stable outlook, and our commercial paper program was rated "P-2" by Moody's and "A-2" by Standard & Poor's. In assessing our credit strength, we believe that both Moody's and Standard & Poor's considered, among other things, our capital structure and financial policies as well as our consolidated balance sheet, our historical acquisition activity and other financial information. Although we currently believe our long-term debt ratings will remain investment grade, we cannot guarantee the future actions of Moody's and/or Standard & Poor's. Our debt ratings have a direct impact on our future borrowing costs, access to capital markets and new store operating lease costs.

***Quarterly Dividend Increase*** - In December 2013, our Board of Directors authorized a 22% increase in our quarterly common stock dividend to $0.275 per share. This increase equates to an annual dividend rate of $1.10 per share. In December 2012, our Board of directors authorized a 38% increase in our quarterly common stock dividend to $0.225 per share. This increase equated to an annual dividend rate of $0.90 per share. In December 2011, our Board of Directors authorized a 30% increase in our quarterly common stock dividend to $0.1625 per share. This increase equated to an annual dividend rate of $0.65 per share.

***Off-Balance Sheet Arrangements***

In connection with executing operating leases, we provide a guarantee of the lease payments. We also finance a portion of our new store development through sale-leaseback transactions, which involve selling stores to unrelated parties and then leasing the stores back under leases that generally qualify and are accounted for as operating leases. We do not have any retained or contingent interests in the stores, and we do not provide any guarantees, other than a guarantee of the lease payments, in connection with the transactions. In accordance with generally accepted accounting principles, our operating leases are not reflected on our consolidated balance sheets.

Between 1991 and 1997, we sold or spun off a number of subsidiaries, including Bob's Stores, Linens 'n Things, Marshalls, Kay-Bee Toys, This End Up and Footstar. In many cases, when a former subsidiary leased a store, the Company provided a guarantee of the store's lease obligations. When the subsidiaries were disposed of, the Company's guarantees remained in place, although each initial purchaser agreed to indemnify the Company for any lease obligations the Company was required to satisfy. If any of the purchasers or any of the former subsidiaries were to become insolvent and failed to make the required payments under a store lease, the Company could be required to satisfy these obligations.

As of December 31, 2013, we guaranteed approximately 73 such store leases (excluding the lease guarantees related to Linens 'n Things), with the maximum remaining lease term extending through 2026. Management believes the ultimate disposition of any of the remaining lease guarantees will not have a material adverse effect on the Company's consolidated financial condition or future cash flows. Please see "Loss from discontinued operations" previously in this document for further information regarding our guarantee of certain Linens 'n Things' store lease obligations.

Below is a summary of our significant contractual obligations as of December 31, 2013:

| | Payments Due by Period | | | | |
|---|---|---|---|---|---|
| *In millions* | Total | 2014 | 2015 to 2016 | 2017 to 2018 | Thereafter |
| Operating leases | $ 27,090 | $ 2,175 | $ 4,184 | $ 3,817 | $ 16,914 |
| Lease obligations from discontinued operations | 71 | 18 | 32 | 14 | 7 |
| Capital lease obligations | 789 | 46 | 93 | 94 | 556 |
| Long-term debt | 13,012 | 551 | 1,749 | 2,574 | 8,138 |
| Interest payments on long-term debt[(1)] | 7,821 | 596 | 1,111 | 915 | 5,199 |
| Other long-term liabilities reflected in our consolidated balance sheet | 514 | 54 | 158 | 81 | 221 |
| | $ 49,297 | $ 3,440 | $ 7,327 | $ 7,495 | $ 31,035 |

(1) Interest payments on long-term debt are calculated on outstanding balances and interest rates in effect on December 31, 2013.

## *Critical Accounting Policies*

We prepare our consolidated financial statements in conformity with generally accepted accounting principles, which require management to make certain estimates and apply judgment. We base our estimates and judgments on historical experience, current trends and other factors that management believes to be important at the time the consolidated financial statements are prepared. On a regular basis, we review our accounting policies and how they are applied and disclosed in our consolidated financial statements. While we believe the historical experience, current trends and other factors considered, support the preparation of our consolidated financial statements in conformity with generally accepted accounting principles, actual results could differ from our estimates, and such differences could be material.

Our significant accounting policies are discussed in Note 1 to our consolidated financial statements. We believe the following accounting policies include a higher degree of judgment and/or complexity and, thus, are considered to be critical accounting policies. We have discussed the development and selection of our critical accounting policies with the Audit Committee of our Board of Directors and the Audit Committee has reviewed our disclosures relating to them.

### Revenue Recognition

*Pharmacy Services Segment*

Our Pharmacy Services Segment sells prescription drugs directly through our mail service dispensing pharmacies and indirectly through our retail pharmacy network. We recognize revenues in our Pharmacy Services Segment from prescription drugs sold by our mail service dispensing pharmacies and under retail pharmacy network contracts where we are the principal using the gross method at the contract prices negotiated with our clients. Net revenue from our Pharmacy Services Segment includes: (i) the portion of the price the client pays directly to us, net of any volume-related or other discounts paid back to the client, (ii) the price paid to us ("Mail Co-Payments") or a third party pharmacy in our retail pharmacy network ("Retail Co-Payments") by individuals included in our clients' benefit plans, and (iii) administrative fees for retail pharmacy network contracts where we are not the principal. Sales taxes are not included in revenue.

We recognize revenue in the Pharmacy Services Segment when: (i) persuasive evidence of an arrangement exists, (ii) delivery has occurred or services have been rendered, (iii) the seller's price to the buyer is fixed or determinable, and (iv) collectability is reasonably assured. The following revenue recognition policies have been established for the Pharmacy Services Segment.

- Revenues generated from prescription drugs sold by mail service dispensing pharmacies are recognized when the prescription is delivered. At the time of delivery, the Pharmacy Services Segment has performed substantially all of its obligations under its client contracts and does not experience a significant level of returns or reshipments.

- Revenues generated from prescription drugs sold by third party pharmacies in the Pharmacy Services Segment's retail pharmacy network and associated administrative fees are recognized at the Pharmacy Services Segment's point-of-sale, which is when the claim is adjudicated by the Pharmacy Services Segment's online claims processing system.

We determine whether we are the principal or agent for our retail pharmacy network transactions on a contract by contract basis. In the majority of our contracts, we have determined we are the principal due to us: (i) being the primary obligor in the

arrangement, (ii) having latitude in establishing the price, changing the product or performing part of the service, (iii) having discretion in supplier selection, (iv) having involvement in the determination of product or service specifications, and (v) having credit risk. Our obligations under our client contracts for which revenues are reported using the gross method are separate and distinct from our obligations to the third party pharmacies included in our retail pharmacy network contracts. Pursuant to these contracts, we are contractually required to pay the third party pharmacies in our retail pharmacy network for products sold, regardless of whether we are paid by our clients. Our responsibilities under these client contracts typically include validating eligibility and coverage levels, communicating the prescription price and the co-payments due to the third party retail pharmacy, identifying possible adverse drug interactions for the pharmacist to address with the physician prior to dispensing, suggesting clinically appropriate generic alternatives where appropriate and approving the prescription for dispensing. Although we do not have credit risk with respect to Retail Co-Payments, we believe that all of the other indicators of gross revenue reporting are present. For contracts under which we act as an agent, we record revenues using the net method.

We deduct from our revenues the manufacturers' rebates that are earned by our clients based on their members' utilization of brand-name formulary drugs. We estimate these rebates at period-end based on actual and estimated claims data and our estimates of the manufacturers' rebates earned by our clients. We base our estimates on the best available data at period-end and recent history for the various factors that can affect the amount of rebates due to the client. We adjust our rebates payable to clients to the actual amounts paid when these rebates are paid or as significant events occur. We record any cumulative effect of these adjustments against revenues as identified, and adjust our estimates prospectively to consider recurring matters. Adjustments generally result from contract changes with our clients or manufacturers, differences between the estimated and actual product mix subject to rebates or whether the product was included in the applicable formulary. We also deduct from our revenues pricing guarantees and guarantees regarding the level of service we will provide to the client or member as well as other payments made to our clients. Because the inputs to most of these estimates are not subject to a high degree of subjectivity or volatility, the effect of adjustments between estimated and actual amounts have not been material to our results of operations or financial position.

We participate in the Federal Government's Medicare Part D program as a PDP through our SilverScript Insurance Company subsidiary. Our net revenues include insurance premiums earned by the PDP, which are determined based on the PDP's annual bid and related contractual arrangements with CMS. The insurance premiums include a beneficiary premium, which is the responsibility of the PDP member, but is subsidized by CMS in the case of low-income members, and a direct premium paid by CMS. Premiums collected in advance are initially deferred as accrued expenses and are then recognized ratably as revenue over the period in which members are entitled to receive benefits.

In addition to these premiums, our net revenues include co-payments, coverage gap benefits, deductibles and co-insurance (collectively, the "Member Co-Payments") related to PDP members' actual prescription claims. In certain cases, CMS subsidizes a portion of these Member Co-Payments and we are paid an estimated prospective Member Co-Payment subsidy, each month. The prospective Member Co-Payment subsidy amounts received from CMS are also included in our net revenues. We assume no risk for these amounts, which represented 7.0%, 7.7% and 3.1% of consolidated net revenues in 2013, 2012 and 2011, respectively. If the prospective Member Co-Payment subsidies received differ from the amounts based on actual prescription claims, the difference is recorded in either accounts receivable or accrued expenses. We account for fully insured CMS obligations and Member Co-Payments (including the amounts subsidized by CMS) using the gross method consistent with our revenue recognition policies for Mail Co-Payments and Retail Co-Payments. We have recorded estimates of various assets and liabilities arising from our participation in the Medicare Part D program based on information in our claims management and enrollment systems. Significant estimates arising from our participation in the Medicare Part D program include: (i) estimates of low-income cost subsidy and reinsurance amounts ultimately payable to or receivable from CMS based on a detailed claims reconciliation, (ii) an estimate of amounts payable to CMS under a risk-sharing feature of the Medicare Part D program design, referred to as the risk corridor and (iii) estimates for claims that have been reported and are in the process of being paid or contested and for our estimate of claims that have been incurred but have not yet been reported. Actual amounts of Medicare Part D-related assets and liabilities could differ significantly from amounts recorded. Historically, the effect of these adjustments has not been material to our results of operations or financial position.

*Retail Pharmacy Segment*

Our Retail Pharmacy Segment recognizes revenue from the sale of merchandise (other than prescription drugs) at the time the merchandise is purchased by the retail customer. Prior to the fourth quarter of 2013, revenue from the sale of prescription drugs was recognized at the time the prescription was filled as opposed to upon delivery as required under the Financial Accounting Standards Board ("FASB") Accounting Standards Codification 605, *Revenue Recognition*. For substantially all prescriptions, the fill date and the delivery date occur in the same reporting period. The effect on both revenue and income of recording prescription drug sales upon fill as opposed to delivery is immaterial. During the fourth quarter of 2013, the Company began

recognizing revenue from the sale of prescription drugs when the prescription is picked up by the customer. See Note 1 to our consolidated financial statements for the impact of this change.

Customer returns are not material. Revenue generated from the performance of services in our health care clinics is recognized at the time the services are performed. Sales taxes are not included in revenue.

**Vendor Allowances and Purchase Discounts**

*Pharmacy Services Segment*

Our Pharmacy Services Segment receives purchase discounts on products purchased. Contractual arrangements with vendors, including manufacturers, wholesalers and retail pharmacies, normally provide for the Pharmacy Services Segment to receive purchase discounts from established list prices in one, or a combination, of the following forms: (i) a direct discount at the time of purchase, (ii) a discount for the prompt payment of invoices or (iii) when products are purchased indirectly from a manufacturer (e.g., through a wholesaler or retail pharmacy), a discount (or rebate) paid subsequent to dispensing. These rebates are recognized when prescriptions are dispensed and are generally calculated and billed to manufacturers within 30 days of the end of each completed quarter. Historically, the effect of adjustments resulting from the reconciliation of rebates recognized to the amounts billed and collected has not been material to the results of operations. We account for the effect of any such differences as a change in accounting estimate in the period the reconciliation is completed. The Pharmacy Services Segment also receives additional discounts under its wholesaler contracts if it exceeds contractually defined annual purchase volumes. In addition, the Pharmacy Services Segment receives fees from pharmaceutical manufacturers for administrative services. Purchase discounts and administrative service fees are recorded as a reduction of "Cost of revenues".

*Retail Pharmacy Segment*

Vendor allowances received by the Retail Pharmacy Segment reduce the carrying cost of inventory and are recognized in cost of revenues when the related inventory is sold, unless they are specifically identified as a reimbursement of incremental costs for promotional programs and/or other services provided. Amounts that are directly linked to advertising commitments are recognized as a reduction of advertising expense (included in operating expenses) when the related advertising commitment is satisfied. Any such allowances received in excess of the actual cost incurred also reduce the carrying cost of inventory. The total value of any upfront payments received from vendors that are linked to purchase commitments is initially deferred. The deferred amounts are then amortized to reduce cost of revenues over the life of the contract based upon purchase volume. The total value of any upfront payments received from vendors that are not linked to purchase commitments is also initially deferred. The deferred amounts are then amortized to reduce cost of revenues on a straight-line basis over the life of the related contract.

We have not made any material changes in the way we account for vendor allowances and purchase discounts during the past three years.

**Inventory**

Effective January 1, 2012, the Company changed its methods of accounting for prescription drug inventories in the Retail Pharmacy Segment. Prior to 2012, the Company valued prescription drug inventories at the lower of cost or market on a first-in, first-out ("FIFO") basis in retail pharmacies using the retail inventory method and in distribution centers using the FIFO cost method. Effective January 1, 2012, all prescription drug inventories in the Retail Pharmacy Segment have been valued at the lower of cost or market using the weighted average cost method. These changes affected approximately 51% of consolidated inventories as of January 1, 2012.

These changes were made primarily to bring all of the pharmacy operations of the Company to a common inventory valuation methodology and to provide the Company with better information to manage its retail pharmacy operations. The Company believes the weighted average cost method is preferable to the retail inventory method and the FIFO cost method because it results in greater precision in the determination of cost of revenues and inventories by specific drug product and results in a consistent inventory valuation method for all of the Company's prescription drug inventories as the Pharmacy Services Segment's mail service and specialty pharmacies were already on the weighted average cost method. Most of these mail service and specialty pharmacies in the Pharmacy Services Segment were acquired in the Company's 2007 acquisition of Caremark Rx, Inc.

The Company recorded the cumulative effect of these changes in accounting principle as of January 1, 2012. The Company determined that retrospective application for periods prior to 2012 is impracticable, as the period-specific information

necessary to value prescription drug inventories in the Retail Pharmacy Segment under the weighted average cost method is unavailable. The Company implemented a new pharmacy cost accounting system to value prescription drug inventory as of January 1, 2012 and calculated the cumulative impact. The effect of these changes in accounting principle as of January 1, 2012 was a decrease in inventories of $146 million, an increase in current deferred income tax assets of $57 million and a decrease in retained earnings of $89 million.

The weighted average cost method continues to be used to determine cost of sales and inventory in our mail service and specialty pharmacies in our Pharmacy Services Segment. Front store inventory in our Retail Pharmacy Segment is stated at the lower of cost or market on a FIFO basis using the retail method of accounting to determine cost of sales and inventory, and the cost method of accounting on a FIFO basis to determine front store inventory in our distribution centers. Under the retail method, inventory is stated at cost, which is determined by applying a cost-to-retail ratio to the ending retail value of our inventory. Since the retail value of our inventory is adjusted on a regular basis to reflect current market conditions, our carrying value should approximate the lower of cost or market. In addition, we reduce the value of our ending inventory for estimated inventory losses that have occurred during the interim period between physical inventory counts. Physical inventory counts are taken on a regular basis in each store and a continuous cycle count process is the primary procedure used to validate the inventory balances on hand in each distribution center and mail facility to ensure that the amounts reflected in the accompanying consolidated financial statements are properly stated. The accounting for inventory contains uncertainty since we must use judgment to estimate the inventory losses that have occurred during the interim period between physical inventory counts. When estimating these losses, we consider a number of factors, which include, but are not limited to, historical physical inventory results on a location-by-location basis and current physical inventory loss trends.

Our total reserve for estimated inventory losses covered by this critical accounting policy was $240 million as of December 31, 2013. Although we believe we have sufficient current and historical information available to us to record reasonable estimates for estimated inventory losses, it is possible that actual results could differ. In order to help you assess the aggregate risk, if any, associated with the uncertainties discussed above, a ten percent (10%) pre-tax change in our estimated inventory losses, which we believe is a reasonably likely change, would increase or decrease our total reserve for estimated inventory losses by about $24 million as of December 31, 2013.

Although we believe that the estimates discussed above are reasonable and the related calculations conform to generally accepted accounting principles, actual results could differ from our estimates, and such differences could be material.

**Goodwill and Intangible Assets**

Identifiable intangible assets consist primarily of trademarks, client contracts and relationships, favorable leases and covenants not to compete. These intangible assets arise primarily from the determination of their respective fair market values at the date of acquisition.

Amounts assigned to identifiable intangible assets, and their related useful lives, are derived from established valuation techniques and management estimates. Goodwill represents the excess of amounts paid for acquisitions over the fair value of the net identifiable assets acquired.

We evaluate the recoverability of certain long-lived assets, including intangible assets with finite lives, but excluding goodwill and intangible assets with indefinite lives which are tested for impairment using separate tests, whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable. We group and evaluate these long-lived assets for impairment at the lowest level at which individual cash flows can be identified. When evaluating these long-lived assets for potential impairment, we first compare the carrying amount of the asset group to the asset group's estimated future cash flows (undiscounted and without interest charges). If the estimated future cash flows are less than the carrying amount of the asset group, an impairment loss calculation is prepared. The impairment loss calculation compares the carrying amount of the asset group to the asset group's estimated future cash flows (discounted and with interest charges). If required, an impairment loss is recorded for the portion of the asset group's carrying value that exceeds the asset group's estimated future cash flows (discounted and with interest charges). Our long-lived asset impairment loss calculation contains uncertainty since we must use judgment to estimate each asset group's future sales, profitability and cash flows. When preparing these estimates, we consider historical results and current operating trends and our consolidated sales, profitability and cash flow results and forecasts.

These estimates can be affected by a number of factors including, but not limited to, general economic and regulatory conditions, efforts of third party organizations to reduce their prescription drug costs and/or increased member co-payments, the continued efforts of competitors to gain market share and consumer spending patterns.

Goodwill and indefinitely-lived intangible assets are subject to annual impairment reviews, or more frequent reviews if events or circumstances indicate that the carrying value may not be recoverable.

Indefinitely-lived intangible assets are tested by comparing the estimated fair value of the asset to its carrying value. If the carrying value of the asset exceeds its estimated fair value, an impairment loss is recognized and the asset is written down to its estimated fair value.

Our indefinitely-lived intangible asset impairment loss calculation contains uncertainty since we must use judgment to estimate the fair value based on the assumption that in lieu of ownership of an intangible asset, the Company would be willing to pay a royalty in order to utilize the benefits of the asset. Value is estimated by discounting the hypothetical royalty payments to their present value over the estimated economic life of the asset. These estimates can be affected by a number of factors including, but not limited to, general economic conditions, availability of market information as well as the profitability of the Company.

Goodwill is tested for impairment on a reporting unit basis using a two-step process. The first step of the impairment test is to identify potential impairment by comparing the reporting unit's fair value with its net book value (or carrying amount), including goodwill. The fair value of our reporting units is estimated using a combination of the discounted cash flow valuation model and comparable market transaction models. If the fair value of the reporting unit exceeds its carrying amount, the reporting unit's goodwill is not considered to be impaired and the second step of the impairment test is not performed. If the carrying amount of the reporting unit exceeds its fair value, the second step of the impairment test is performed to measure the amount of impairment loss, if any. The second step of the impairment test compares the implied fair value of the reporting unit's goodwill with the carrying amount of the goodwill. If the carrying amount of the reporting unit's goodwill exceeds the implied fair value of the goodwill, an impairment loss is recognized in an amount equal to that excess.

The determination of the fair value of our reporting units requires the Company to make significant assumptions and estimates. These assumptions and estimates primarily include, but are not limited to, the selection of appropriate peer group companies; control premiums and valuation multiples appropriate for acquisitions in the industries in which the Company competes; discount rates, terminal growth rates; and forecasts of revenue, operating profit, depreciation and amortization, capital expenditures and future working capital requirements. When determining these assumptions and preparing these estimates, we consider each reporting unit's historical results and current operating trends and our consolidated revenues, profitability and cash flow results and forecasts. Our estimates can be affected by a number of factors including, but not limited to, general economic and regulatory conditions, our market capitalization, efforts of third party organizations to reduce their prescription drug costs and/or increase member co-payments, the continued efforts of competitors to gain market share and consumer spending patterns.

The carrying value of goodwill and other intangible assets covered by this critical accounting policy was $26.5 billion and $9.5 billion as of December 31, 2013, respectively. We did not record any impairment losses related to goodwill or other intangible assets during 2013, 2012 or 2011. During the third quarter of 2013, we performed our required annual impairment tests of goodwill and indefinitely-lived trademarks. The results of the impairment tests concluded that there was no impairment of goodwill or trademarks. The goodwill impairment test resulted in the fair value of our Pharmacy Services and Retail Pharmacy reporting units exceeding their carrying values by a significant margin. The carrying value of goodwill as of December 31, 2013, in our Pharmacy Services and Retail Pharmacy reporting units was $19.6 billion and $6.9 billion, respectively.

Although we believe we have sufficient current and historical information available to us to test for impairment, it is possible that actual results could differ from the estimates used in our impairment tests.

We have not made any material changes in the methodologies utilized to test the carrying values of goodwill and intangible assets for impairment during the past three years.

**Closed Store Lease Liability**

We account for closed store lease termination costs when a leased store is closed. When a leased store is closed, we record a liability for the estimated present value of the remaining obligation under the noncancelable lease, which includes future real estate taxes, common area maintenance and other charges, if applicable. The liability is reduced by estimated future sublease income.

The initial calculation and subsequent evaluations of our closed store lease liability contain uncertainty since we must use judgment to estimate the timing and duration of future vacancy periods, the amount and timing of future lump sum settlement payments and the amount and timing of potential future sublease income. When estimating these potential termination costs and their related timing, we consider a number of factors, which include, but are not limited to, historical settlement experience,

the owner of the property, the location and condition of the property, the terms of the underlying lease, the specific marketplace demand and general economic conditions.

Our total closed store lease liability covered by this critical accounting policy was $310 million as of December 31, 2013. This amount is net of $178 million of estimated sublease income that is subject to the uncertainties discussed above. Although we believe we have sufficient current and historical information available to us to record reasonable estimates for sublease income, it is possible that actual results could differ.

In order to help you assess the risk, if any, associated with the uncertainties discussed above, a ten percent (10%) pre-tax change in our estimated sublease income, which we believe is a reasonably likely change, would increase or decrease our total closed store lease liability by about $18 million as of December 31, 2013.

We have not made any material changes in the reserve methodology used to record closed store lease reserves during the past three years.

**Self-Insurance Liabilities**

We are self-insured for certain losses related to general liability, workers' compensation and auto liability, although we maintain stop loss coverage with third party insurers to limit our total liability exposure. We are also self-insured for certain losses related to health and medical liabilities.

The estimate of our self-insurance liability contains uncertainty since we must use judgment to estimate the ultimate cost that will be incurred to settle reported claims and unreported claims for incidents incurred but not reported as of the balance sheet date. When estimating our self-insurance liability, we consider a number of factors, which include, but are not limited to, historical claim experience, demographic factors, severity factors and other standard insurance industry actuarial assumptions. On a quarterly basis, we review our self-insurance liability to determine if it is adequate as it relates to our general liability, workers' compensation and auto liability. Similar reviews are conducted semi-annually to determine if our self-insurance liability is adequate for our health and medical liability.

Our total self-insurance liability covered by this critical accounting policy was $612 million as of December 31, 2013. Although we believe we have sufficient current and historical information available to us to record reasonable estimates for our self-insurance liability, it is possible that actual results could differ. In order to help you assess the risk, if any, associated with the uncertainties discussed above, a ten percent (10%) pre-tax change in our estimate for our self-insurance liability, which we believe is a reasonably likely change, would increase or decrease our self-insurance liability by about $61 million as of December 31, 2013.

We have not made any material changes in the accounting methodology used to establish our self-insurance liability during the past three years.

**New Accounting Pronouncements**

In July 2012, the FASB issued Accounting Standards Update ("ASU") 2012-02, *Testing Indefinite-Lived Intangible Assets for Impairment* ("ASU 2012-02"). ASU 2012-02 allows entities to use a qualitative approach to determine whether the existence of events and circumstances indicates that it is more likely than not that the indefinite-lived intangible asset is impaired. If, after assessing the totality of events and circumstances, an entity concludes that it is not more likely than not that the indefinite-lived intangible asset is impaired, then the entity is not required to take further action. However, if an entity concludes otherwise, then it is required to determine the fair value of the indefinite-lived intangible asset and perform the quantitative impairment test by comparing the fair value with the carrying amount and recognize an impairment loss, if any, to the extent the carrying value exceeds its fair value. ASU 2012-02 is effective for annual and interim impairment tests performed for fiscal years beginning after September 15, 2012. The adoption of ASU 2012-02 did not have a material effect on the Company's consolidated financial statements.

In February 2013, the FASB issued ASU 2013-02, *Reporting of Amounts Reclassified Out of Accumulated Other Comprehensive Income* ("ASU 2013-02"). ASU 2013-02 adds new disclosure requirements for items reclassified out of accumulated other comprehensive income. The additional disclosures include: (1) changes in accumulated other comprehensive income balances by component and (2) significant items reclassified out of accumulated other comprehensive income. The changes in accumulated other comprehensive income balance by component will be disaggregated to separately present reclassification adjustments and current-period other comprehensive income. Significant items reclassified out of accumulated other comprehensive income by component are required to be presented either on the face of the statement of income or as

separate disclosure in the notes to the financial statements. These additional disclosures may be presented before-tax or net-of-tax as long as the income tax benefit or expense attributed to each component of other comprehensive income and reclassification adjustments is presented in the financial statement or in the notes to the financial statements. ASU 2013-02 is effective for interim and annual periods beginning after December 15, 2012 and should be applied prospectively. The adoption of ASU 2013-02 did not have a material effect on the Company's consolidated financial statements. The expanded disclosures are included in Note 1 to the Consolidated Financial Statements.

**Recently Proposed Accounting Standard Update**

In May 2013, the FASB issued a revised proposed accounting standard update on lease accounting that will require entities to recognize assets and liabilities arising from lease contracts on the balance sheet. The proposed accounting standard update states that lessees and lessors should apply a "right-of-use model" in accounting for all leases. Under the proposed model, lessees would recognize an asset for the right to use the leased asset, and a liability for the obligation to make rental payments over the lease term. The lease term is defined as the noncancelable term that takes into account renewal options and termination options if there is a significant economic incentive for an entity to exercise or not exercise the option. The accounting by a lessor would reflect its retained exposure to the risks or benefits of the underlying leased asset. A lessor would recognize an asset representing its right to receive lease payments based on the expected term of the lease. The Company cannot presently determine the potential impact the proposed standard would have on its results of operations. While the Company believes that the proposed standard, as currently drafted, will likely have a material impact on its financial position, it will not have a material impact on its liquidity; however, until the proposed standard is finalized, such evaluation cannot be completed.

***Cautionary Statement Concerning Forward-Looking Statements***

The Private Securities Litigation Reform Act of 1995 (the “Reform Act”) provides a safe harbor for forward-looking statements made by or on behalf of CVS Caremark Corporation. The Company and its representatives may, from time to time, make written or verbal forward-looking statements, including statements contained in the Company’s filings with the SEC and in its reports to stockholders. Generally, the inclusion of the words “believe,” “expect,” “intend,” “estimate,” “project,” “anticipate,” “will,” “should” and similar expressions identify statements that constitute forward-looking statements. All statements addressing operating performance of CVS Caremark Corporation or any subsidiary, events or developments that the Company expects or anticipates will occur in the future, including statements relating to corporate strategy; revenue growth; earnings or earnings per common share growth; adjusted earnings or adjusted earnings per common share growth; free cash flow; debt ratings; inventory levels; inventory turn and loss rates; store development; relocations and new market entries; retail pharmacy business, sales trends and operations; PBM business, sales trends and operations; the Company's ability to attract or retain customers and clients; Medicare Part D competitive bidding, enrollment and operations; new product development; and the impact of industry developments, as well as statements expressing optimism or pessimism about future operating results or events, are forward-looking statements within the meaning of the Reform Act.

The forward-looking statements are and will be based upon management’s then-current views and assumptions regarding future events and operating performance, and are applicable only as of the dates of such statements. The Company undertakes no obligation to update or revise any forward-looking statements, whether as a result of new information, future events, or otherwise.

By their nature, all forward-looking statements involve risks and uncertainties. Actual results may differ materially from those contemplated by the forward-looking statements for a number of reasons, including, but not limited to:

- *Risks relating to the health of the economy in general and in the markets we serve, which could impact consumer purchasing power, preferences and/or spending patterns, drug utilization trends, the financial health of our PBM clients or other payors doing business with the Company and our ability to secure necessary financing, suitable store locations and sale-leaseback transactions on acceptable terms.*

- *Efforts to reduce reimbursement levels and alter health care financing practices, including pressure to reduce reimbursement levels for generic drugs.*

- *The possibility of PBM client loss and/or the failure to win new PBM business, including as a result of failure to win renewal of expiring contracts, contract termination rights that may permit clients to terminate a contract prior to expiration and early or periodic renegotiation of pricing by clients prior to expiration of a contract.*

- *The possibility of loss of Medicare Part D business and/or failure to obtain new Medicare Part D business, whether as a result of the annual Medicare Part D competitive bidding process or otherwise.*

- *Risks related to the frequency and rate of the introduction of generic drugs and brand name prescription products.*

- *Risks of declining gross margins in the PBM industry attributable to increased competitive pressures, increased client demand for lower prices, enhanced service offerings and/or higher service levels and market dynamics and regulatory changes that impact our ability to offer plan sponsors pricing that includes the use of retail "differential" or "spread."*

- *Regulatory changes, business changes and compliance requirements and restrictions that may be imposed by Centers for Medicare and Medicaid Services ("CMS"), Office of Inspector General or other government agencies relating to CVS Caremark's participation in Medicare, Medicaid and other federal and state government-funded programs, including sanctions and remedial actions that may be imposed by CMS on its Medicare Part D business.*

- *Risks and uncertainties related to the timing and scope of reimbursement from Medicare, Medicaid and other government-funded programs, including the impact of sequestration, the impact of other federal budget, debt and deficit negotiations and legislation that could delay or reduce reimbursement from such programs and the impact of any closure, suspension or other changes affecting federal or state government funding or operations.*

- *Possible changes in industry pricing benchmarks used to establish pricing in many of our PBM client contracts, pharmaceutical purchasing arrangements, retail network contracts, specialty payor agreements and other third party payor contracts.*

- *An extremely competitive business environment, including the uncertain impact of increased consolidation in the PBM industry, uncertainty concerning the ability of our retail pharmacy business to secure and maintain contractual relationships with PBMs and other payors on acceptable terms, uncertainty concerning the ability of our PBM business to secure and maintain competitive access, pricing and other contract terms from retail network pharmacies in an environment where some PBM clients are willing to consider adopting narrow or more restricted retail pharmacy networks.*

- *The Company's ability to fully integrate and to realize the planned benefits associated with the acquisition of Coram LLC in accordance with the expected timing.*

- *Risks relating to our ability to secure timely and sufficient access to the products we sell from our domestic and/or international suppliers.*

- *Reform of the U.S. health care system, including ongoing implementation of the Patient Protection and Affordable Care Act, continuing legislative efforts, regulatory changes and judicial interpretations impacting our health care system and the possibility of shifting political and legislative priorities related to reform of the health care system in the future.*

- *Risks relating to our failure to properly maintain our information technology systems, our information security systems and our infrastructure to support our business and to protect the privacy and security of sensitive customer and business information.*

- *Risks related to compliance with a broad and complex regulatory framework, including compliance with new and existing federal, state and local laws and regulations relating to health care, accounting standards, corporate securities, tax, environmental and other laws and regulations affecting our business.*

- *Risks related to litigation, government investigations and other legal proceedings as they relate to our business, the pharmacy services, retail pharmacy or retail clinic industries or to the health care industry generally.*

- *Other risks and uncertainties detailed from time to time in our filings with the SEC.*

The foregoing list is not exhaustive. There can be no assurance that the Company has correctly identified and appropriately assessed all factors affecting its business. Additional risks and uncertainties not presently known to the Company or that it currently believes to be immaterial also may adversely impact the Company. Should any risks and uncertainties develop into actual events, these developments could have a material adverse effect on the Company's business, financial condition and results of operations. For these reasons, you are cautioned not to place undue reliance on the Company's forward-looking statements.

**Management's Report on Internal Control Over Financial Reporting**

We are responsible for establishing and maintaining adequate internal control over financial reporting. Our Company's internal control over financial reporting includes those policies and procedures that pertain to the Company's ability to record, process, summarize and report a system of internal accounting controls and procedures to provide reasonable assurance, at an appropriate cost/benefit relationship, that the unauthorized acquisition, use or disposition of assets are prevented or timely detected and that transactions are authorized, recorded and reported properly to permit the preparation of financial statements in accordance with generally accepted accounting principles (GAAP) and receipt and expenditures are duly authorized. In order to ensure the Company's internal control over financial reporting is effective, management regularly assesses such controls and did so most recently for its financial reporting as of December 31, 2013.

We conducted an assessment of the effectiveness of our internal controls over financial reporting based on the criteria set forth in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (1992 Framework). This evaluation included review of the documentation, evaluation of the design effectiveness and testing of the operating effectiveness of controls. Our system of internal control over financial reporting is enhanced by periodic reviews by our internal auditors, written policies and procedures and a written Code of Conduct adopted by our Company's Board of Directors, applicable to all employees of our Company. In addition, we have an internal Disclosure Committee, comprised of management from each functional area within the Company, which performs a separate review of our disclosure controls and procedures. There are inherent limitations in the effectiveness of any system of internal controls over financial reporting.

Based on our assessment, we conclude our Company's internal control over financial reporting is effective and provides reasonable assurance that assets are safeguarded and that the financial records are reliable for preparing financial statements as of December 31, 2013.

Ernst & Young LLP, independent registered public accounting firm, is appointed by the Board of Directors and ratified by our Company's shareholders. They were engaged to render an opinion regarding the fair presentation of our consolidated financial statements as well as conducting an audit of internal control over financial reporting. Their accompanying reports are based upon an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States).

February 10, 2014

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Shareholders of CVS Caremark Corporation

We have audited CVS Caremark Corporation's internal control over financial reporting as of December 31, 2013, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (1992 framework) (the COSO criteria). CVS Caremark Corporation's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on CVS Caremark Corporation's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, CVS Caremark Corporation maintained, in all material respects, effective internal control over financial reporting as of December 31, 2013, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of CVS Caremark Corporation as of December 31, 2013 and 2012, and the related consolidated statements of income, comprehensive income, shareholders' equity and cash flows for each of the three years in the period ended December 31, 2013 of CVS Caremark Corporation and our report dated February 10, 2014 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP

Boston, Massachusetts
February 10, 2014

**Consolidated Statements of Income**

| In millions, except per share amounts | Year Ended December 31, 2013 | 2012 | 2011 |
|---|---|---|---|
| Net revenues | $ 126,761 | $ 123,120 | $ 107,080 |
| Cost of revenues | 102,978 | 100,632 | 86,518 |
| Gross profit | 23,783 | 22,488 | 20,562 |
| Operating expenses | 15,746 | 15,278 | 14,231 |
| Operating profit | 8,037 | 7,210 | 6,331 |
| Interest expense, net | 509 | 557 | 584 |
| Loss on early extinguishment of debt | — | 348 | — |
| Income before income tax provision | 7,528 | 6,305 | 5,747 |
| Income tax provision | 2,928 | 2,436 | 2,258 |
| Income from continuing operations | 4,600 | 3,869 | 3,489 |
| Loss from discontinued operations, net of tax | (8) | (7) | (31) |
| Net income | 4,592 | 3,862 | 3,458 |
| Net loss attributable to noncontrolling interest | — | 2 | 4 |
| Net income attributable to CVS Caremark | $ 4,592 | $ 3,864 | $ 3,462 |
| Basic earnings per common share: | | | |
| Income from continuing operations attributable to CVS Caremark | $ 3.78 | $ 3.05 | $ 2.61 |
| Loss from discontinued operations attributable to CVS Caremark | $ (0.01) | $ (0.01) | $ (0.02) |
| Net income attributable to CVS Caremark | $ 3.77 | $ 3.04 | $ 2.59 |
| Weighted average common shares outstanding | 1,217 | 1,271 | 1,338 |
| Diluted earnings per common share: | | | |
| Income from continuing operations attributable to CVS Caremark | $ 3.75 | $ 3.02 | $ 2.59 |
| Loss from discontinued operations attributable to CVS Caremark | $ (0.01) | $ (0.01) | $ (0.02) |
| Net income attributable to CVS Caremark | $ 3.74 | $ 3.02 | $ 2.57 |
| Weighted average common shares outstanding | 1,226 | 1,280 | 1,347 |
| Dividends declared per common share | $ 0.90 | $ 0.65 | $ 0.50 |

See accompanying notes to consolidated financial statements.

**Consolidated Statements of Comprehensive Income**

| In millions | Year Ended December 31, 2013 | 2012 | 2011 |
|---|---|---|---|
| Net income | $ 4,592 | $ 3,862 | $ 3,458 |
| Other comprehensive income (loss): | | | |
| Foreign currency translation adjustments, net of tax | (30) | — | — |
| Net cash flow hedges, net of income tax | 3 | 3 | (9) |
| Pension and other postretirement benefits, net of income tax | 59 | (12) | (20) |
| Total other comprehensive income (loss) | 32 | (9) | (29) |
| Comprehensive income | 4,624 | 3,853 | 3,429 |
| Comprehensive loss attributable to noncontrolling interest | — | 2 | 4 |
| Comprehensive income attributable to CVS Caremark | $ 4,624 | $ 3,855 | $ 3,433 |

See accompanying notes to consolidated financial statements.

**Consolidated Balance Sheets**

| In millions, except per share amounts | December 31, 2013 | 2012 |
|---|---|---|
| Assets: | | |
| Cash and cash equivalents | $ 4,089 | $ 1,375 |
| Short-term investments | 88 | 5 |
| Accounts receivable, net | 8,729 | 6,479 |
| Inventories | 11,045 | 11,032 |
| Deferred income taxes | 902 | 693 |
| Other current assets | 472 | 577 |
| Total current assets | 25,325 | 20,161 |
| Property and equipment, net | 8,615 | 8,632 |
| Goodwill | 26,542 | 26,395 |
| Intangible assets, net | 9,529 | 9,753 |
| Other assets | 1,515 | 1,280 |
| Total assets | $ 71,526 | $ 66,221 |
| Liabilities: | | |
| Accounts payable | $ 5,548 | $ 5,070 |
| Claims and discounts payable | 4,548 | 3,974 |
| Accrued expenses | 4,768 | 4,411 |
| Short-term debt | — | 690 |
| Current portion of long-term debt | 561 | 5 |
| Total current liabilities | 15,425 | 14,150 |
| Long-term debt | 12,841 | 9,133 |
| Deferred income taxes | 3,901 | 3,784 |
| Other long-term liabilities | 1,421 | 1,501 |
| Commitments and contingencies (Note 12) | — | — |
| Shareholders' equity: | | |
| Preferred stock, par value $0.01: 0.1 shares authorized; none issued or outstanding | — | — |
| Common stock, par value $0.01: 3,200 shares authorized; 1,680 shares issued and 1,180 shares outstanding at December 31, 2013 and 1,667 shares issued and 1,231 shares outstanding at December 31, 2012 | 17 | 17 |
| Treasury stock, at cost: 500 shares at December 31, 2013 and 435 shares at December 31, 2012 | (20,169) | (16,270) |
| Shares held in trust: 1 share at December 31, 2013 and 2012 | (31) | (31) |
| Capital surplus | 29,777 | 29,120 |
| Retained earnings | 28,493 | 24,998 |
| Accumulated other comprehensive loss | (149) | (181) |
| Total shareholders' equity | 37,938 | 37,653 |
| Total liabilities and shareholders' equity | $ 71,526 | $ 66,221 |

See accompanying notes to consolidated financial statements.

**Consolidated Statements of Cash Flows**

| In millions | December 31, 2013 | December 31, 2012 | December 31, 2011 |
|---|---|---|---|
| Cash flows from operating activities: | | | |
| Cash receipts from customers | $ 114,993 | $ 113,205 | $ 97,688 |
| Cash paid for inventory and prescriptions dispensed by retail network pharmacies | (91,178) | (90,032) | (75,148) |
| Cash paid to other suppliers and employees | (14,295) | (13,643) | (13,635) |
| Interest received | 8 | 4 | 4 |
| Interest paid | (534) | (581) | (647) |
| Income taxes paid | (3,211) | (2,282) | (2,406) |
| Net cash provided by operating activities | 5,783 | 6,671 | 5,856 |
| Cash flows from investing activities: | | | |
| Purchases of property and equipment | (1,984) | (2,030) | (1,872) |
| Proceeds from sale-leaseback transactions | 600 | 529 | 592 |
| Proceeds from sale of property and equipment and other assets | 54 | 23 | 4 |
| Acquisitions (net of cash acquired) and other investments | (415) | (378) | (1,441) |
| Purchase of available-for-sale investments | (226) | — | (3) |
| Maturity of available-for-sale investments | 136 | — | 60 |
| Proceeds from sale of subsidiary | — | 7 | 250 |
| Net cash used in investing activities | (1,835) | (1,849) | (2,410) |
| Cash flows from financing activities: | | | |
| Increase (decrease) in short-term debt | (690) | (60) | 450 |
| Proceeds from issuance of long-term debt | 3,964 | 1,239 | 1,463 |
| Repayments of long-term debt | — | (1,718) | (2,122) |
| Purchase of noncontrolling interest in subsidiary | — | (26) | — |
| Dividends paid | (1,097) | (829) | (674) |
| Derivative settlements | — | — | (19) |
| Proceeds from exercise of stock options | 500 | 836 | 431 |
| Excess tax benefits from stock-based compensation | 62 | 28 | 21 |
| Repurchase of common stock | (3,976) | (4,330) | (3,001) |
| Other | — | — | (9) |
| Net cash used in financing activities | (1,237) | (4,860) | (3,460) |
| Effect of exchange rate changes on cash and cash equivalents | 3 | — | — |
| Net increase (decrease) in cash and cash equivalents | 2,714 | (38) | (14) |
| Cash and cash equivalents at the beginning of the year | 1,375 | 1,413 | 1,427 |
| Cash and cash equivalents at the end of the year | $ 4,089 | $ 1,375 | $ 1,413 |
| | | | |
| Reconciliation of net income to net cash provided by operating activities: | | | |
| Net income | $ 4,592 | $ 3,862 | $ 3,458 |
| Adjustments required to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 1,870 | 1,753 | 1,568 |
| Stock-based compensation | 141 | 132 | 135 |
| Loss on early extinguishment of debt | — | 348 | — |
| Gain on sale of subsidiary | — | — | (53) |
| Deferred income taxes and other noncash items | (86) | (111) | 144 |
| Change in operating assets and liabilities, net of effects from acquisitions: | | | |
| Accounts receivable, net | (2,210) | (387) | (748) |
| Inventories | 12 | (853) | 586 |
| Other current assets | 105 | 3 | (420) |
| Other assets | (135) | (99) | (49) |
| Accounts payable and claims and discounts payable | 1,024 | 1,147 | 1,128 |
| Accrued expenses | 471 | 766 | 105 |
| Other long-term liabilities | (1) | 110 | 2 |
| Net cash provided by operating activities | $ 5,783 | $ 6,671 | $ 5,856 |

See accompanying notes to consolidated financial statements.

**Consolidated Statements of Shareholders' Equity**

| In millions | Shares | | | Dollars | | |
|---|---|---|---|---|---|---|
| | Year Ended December 31, | | | Year Ended December 31, | | |
| | 2013 | 2012 | 2011 | 2013 | 2012 | 2011 |
| Common stock: | | | | | | |
| Beginning of year | 1,667 | 1,640 | 1,624 | $ 17 | $ 16 | $ 16 |
| Stock options exercised and issuance of stock awards | 13 | 27 | 16 | — | 1 | — |
| End of year | 1,680 | 1,667 | 1,640 | $ 17 | $ 17 | $ 16 |
| Treasury stock: | | | | | | |
| Beginning of year | (435) | (340) | (259) | $ (16,270) | $ (11,953) | $ (9,030) |
| Purchase of treasury shares | (66) | (95) | (84) | (3,976) | (4,330) | (3,001) |
| Employee stock purchase plan issuances | 1 | 1 | 3 | 77 | 47 | 78 |
| Transfer of shares from shares held in trust | — | (1) | — | — | (34) | — |
| End of year | (500) | (435) | (340) | $ (20,169) | $ (16,270) | $ (11,953) |
| Shares held in trust: | | | | | | |
| Beginning of year | (1) | (2) | (2) | $ (31) | $ (56) | $ (56) |
| Transfer of shares to treasury stock | — | 1 | — | — | 25 | — |
| End of year | (1) | (1) | (2) | $ (31) | $ (31) | $ (56) |
| Capital surplus: | | | | | | |
| Beginning of year | | | | $ 29,120 | $ 28,126 | $ 27,610 |
| Stock option activity and stock awards | | | | 588 | 955 | 495 |
| Tax benefit on stock options and stock awards | | | | 69 | 28 | 21 |
| Transfer of shares held in trust to treasury stock | | | | — | 9 | — |
| Purchase of noncontrolling interest in subsidiary | | | | — | 2 | — |
| End of year | | | | $ 29,777 | $ 29,120 | $ 28,126 |
| Retained earnings: | | | | | | |
| Beginning of year | | | | $ 24,998 | $ 22,052 | $ 19,303 |
| Adjustment to opening balance (1) | | | | — | — | (39) |
| Beginning of year, as adjusted | | | | 24,998 | 22,052 | 19,264 |
| Changes in inventory accounting principles (Note 2) | | | | — | (89) | — |
| Net income attributable to CVS Caremark | | | | 4,592 | 3,864 | 3,462 |
| Common stock dividends | | | | (1,097) | (829) | (674) |
| End of year | | | | $ 28,493 | $ 24,998 | $ 22,052 |
| Accumulated other comprehensive loss: | | | | | | |
| Beginning of year | | | | $ (181) | $ (172) | $ (143) |
| Foreign currency translation adjustments, net of income tax | | | | (30) | — | — |
| Net cash flow hedges, net of income tax | | | | 3 | 3 | (9) |
| Pension and other postretirement benefits, net of income tax | | | | 59 | (12) | (20) |
| End of year | | | | $ (149) | $ (181) | $ (172) |
| Total shareholders' equity | | | | $ 37,938 | $ 37,653 | $ 38,013 |

(1) See Note 1 - Significant Accounting Policies (Revenue Recognition - Retail Pharmacy Segment).

See accompanying notes to consolidated financial statements.

## Notes to Consolidated Financial Statements

### 1 Significant Accounting Policies

**Description of business** - CVS Caremark Corporation and its subsidiaries (the "Company") is the largest integrated pharmacy health care provider in the United States based upon revenues and prescriptions filled. The Company currently has three reportable business segments, Pharmacy Services, Retail Pharmacy and Corporate, which are described below.

*Pharmacy Services Segment (the "PSS")* - The PSS provides a full range of pharmacy benefit management services including mail order pharmacy services, specialty pharmacy services, plan design and administration, formulary management and claims processing. The Company's clients are primarily employers, insurance companies, unions, government employee groups, managed care organizations and other sponsors of health benefit plans and individuals throughout the United States.

As a pharmacy benefits manager, the PSS manages the dispensing of pharmaceuticals through the Company's mail order pharmacies and national network of nearly 68,000 retail pharmacies, consisting of approximately 41,000 chain pharmacies and 27,000 independent pharmacies, to eligible members in the benefits plans maintained by the Company's clients and utilizes its information systems to perform, among other things, safety checks, drug interaction screenings and brand to generic substitutions.

The PSS' specialty pharmacies support individuals that require complex and expensive drug therapies. The specialty pharmacy business includes mail order and retail specialty pharmacies that operate under the CVS Caremark® and CarePlus CVS/pharmacy® names.

The PSS also provides health management programs, which include integrated disease management for 17 conditions, through the Company's Accordant® rare disease management offering.

In addition, through the Company's SilverScript Insurance Company ("SilverScript") subsidiary, the PSS is a national provider of drug benefits to eligible beneficiaries under the Federal Government's Medicare Part D program.

The PSS generates net revenues primarily by contracting with clients to provide prescription drugs to plan members. Prescription drugs are dispensed by the mail order pharmacies, specialty pharmacies and national network of retail pharmacies. Net revenues are also generated by providing additional services to clients, including administrative services such as claims processing and formulary management, as well as health care related services such as disease management.

The pharmacy services business operates under the CVS Caremark® Pharmacy Services, Caremark®, CVS Caremark®, CarePlus CVS/pharmacy®, RxAmerica®, Accordant®, SilverScript® and Novologix® names. As of December 31, 2013, the PSS operated 25 retail specialty pharmacy stores, 11 specialty mail order pharmacies and four mail service dispensing pharmacies located in 22 states, Puerto Rico and the District of Columbia.

*Retail Pharmacy Segment (the "RPS")* - The RPS sells prescription drugs and a wide assortment of general merchandise, including over-the-counter drugs, beauty products and cosmetics, photo finishing, seasonal merchandise, greeting cards and convenience foods, through the Company's CVS/pharmacy®, Longs Drugs® and Drogaria Onofre® retail stores and online through CVS.com® and Onofre.com.br.

The RPS also provides health care services through its MinuteClinic® health care clinics. MinuteClinics are staffed by nurse practitioners and physician assistants who utilize nationally recognized protocols to diagnose and treat minor health conditions, perform health screenings, monitor chronic conditions and deliver vaccinations.

As of December 31, 2013, the retail pharmacy business included 7,660 retail drugstores (of which 7,603 operated a pharmacy) located in 43 states, the District of Columbia, Puerto Rico and Brazil operating primarily under the CVS/pharmacy and Drogaria Onofre® names, the online retail websites, CVS.com and Onofre.com.br, and 800 retail health care clinics operating under the MinuteClinic® name (of which 792 were located in CVS/pharmacy stores).

*Corporate Segment* - The Corporate Segment provides management and administrative services to support the Company. The Corporate Segment consists of certain aspects of the Company's executive management, corporate relations, legal, compliance, human resources, corporate information technology and finance departments.

**Principles of consolidation** - The consolidated financial statements include the accounts of the Company and its majority owned subsidiaries. All intercompany balances and transactions have been eliminated.

**Use of estimates** - The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts in the consolidated financial statements and accompanying notes. Actual results could differ from those estimates.

**Fair value hierarchy** - The Company utilizes the three-level valuation hierarchy for the recognition and disclosure of fair value measurements. The categorization of assets and liabilities within this hierarchy is based upon the lowest level of input that is significant to the measurement of fair value. The three levels of the hierarchy consist of the following:

- Level 1 - Inputs to the valuation methodology are unadjusted quoted prices in active markets for identical assets or liabilities that the Company has the ability to access at the measurement date.
- Level 2 - Inputs to the valuation methodology are quoted prices for similar assets and liabilities in active markets, quoted prices in markets that are not active or inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the instrument.
- Level 3 - Inputs to the valuation methodology are unobservable inputs based upon management's best estimate of inputs market participants could use in pricing the asset or liability at the measurement date, including assumptions about risk.

**Cash and cash equivalents** - Cash and cash equivalents consist of cash and temporary investments with maturities of three months or less when purchased. The Company invests in short-term money market funds, commercial paper and time deposits, as well as other debt securities that are classified as cash equivalents within the accompanying consolidated balance sheets, as these funds are highly liquid and readily convertible to known amounts of cash. These investments are classified within Level 1 of the fair value hierarchy because they are valued using quoted market prices.

**Short-term investments** - The Company's short-term investments consist of certificate of deposits with initial maturities of greater than three months when purchased. These investments, which were classified as available-for-sale within Level 1 of the fair value hierarchy, were carried at fair value, which approximated historical cost at December 31, 2013 and 2012.

**Fair value of financial instruments** - As of December 31, 2013, the Company's financial instruments include cash and cash equivalents, short-term investments, accounts receivable, accounts payable and short-term debt. Due to the short-term nature of these instruments, the Company's carrying value approximates fair value. The carrying amount and estimated fair value of total long-term debt was $13.4 billion and $14.2 billion, respectively, as of December 31, 2013. The fair value of the Company's long-term debt was estimated based on quoted rates currently offered in active markets for the Company's debt, which is considered Level 1 of the fair value hierarchy. The Company had outstanding letters of credit, which guaranteed foreign trade purchases, with a fair value of $3.6 million as of December 31, 2013. There were no outstanding derivative financial instruments as of December 31, 2013 and 2012.

**Foreign currency translation and transactions** - For local currency functional locations, assets and liabilities are translated at end-of-period rates while revenues and expenses are translated at average rates in effect during the period. Equity is translated at historical rates and the resulting cumulative translation adjustments are included as a component of accumulated other comprehensive income/(loss).

For U.S. dollar functional currency locations, foreign currency assets and liabilities are remeasured into U.S. dollars at end-of-period exchange rates, except for non-monetary balance sheet accounts, which are remeasured at historical exchange rates. Revenue and expense are remeasured at average exchange rates in effect during each period, except for those expenses related to the nonmonetary balance sheet amounts, which are remeasured at historical exchange rates. Gains or losses from foreign currency remeasurement are included in income.

Gains and losses arising from foreign currency transactions and the effects of remeasurements were not material for all period presented.

**Accounts receivable** - Accounts receivable are stated net of an allowance for doubtful accounts. The accounts receivable balance primarily includes amounts due from third party providers (e.g., pharmacy benefit managers, insurance companies and governmental agencies), clients and members, as well as vendors and manufacturers. Charges to bad debt are based on both historical write-offs and specifically identified receivables.

The activity in the allowance for doubtful accounts receivable for the years ended December 31 is as follows:

| *In millions* | 2013 | 2012 | 2011 |
|---|---|---|---|
| Beginning balance | $ 243 | $ 189 | $ 182 |
| Additions charged to bad debt expense | 195 | 149 | 129 |
| Write-offs charged to allowance | (182) | (95) | (122) |
| Ending balance | $ 256 | $ 243 | $ 189 |

**Inventories** - Prior to 2012, inventories were stated at the lower of cost or market on a first-in, first-out basis using the retail inventory method in the retail pharmacy stores, the weighted average cost method in the mail service and specialty pharmacies, and the cost method on a first-in, first-out basis in the distribution centers. Effective January 1, 2012, the Company changed its methods of accounting for prescription drug inventories in the RPS to the weighted average cost method. See Note 2 for additional information regarding the accounting change. Physical inventory counts are taken on a regular basis in each store and a continuous cycle count process is the primary procedure used to validate the inventory balances on hand in each distribution center and mail facility to ensure that the amounts reflected in the accompanying consolidated financial statements are properly stated. During the interim period between physical inventory counts, the Company accrues for anticipated physical inventory losses on a location-by-location basis based on historical results and current trends.

**Property and equipment** - Property, equipment and improvements to leased premises are depreciated using the straight-line method over the estimated useful lives of the assets, or when applicable, the term of the lease, whichever is shorter. Estimated useful lives generally range from 10 to 40 years for buildings, building improvements and leasehold improvements and 3 to 10 years for fixtures, equipment and internally developed software. Repair and maintenance costs are charged directly to expense as incurred. Major renewals or replacements that substantially extend the useful life of an asset are capitalized and depreciated. Application development stage costs for significant internally developed software projects are capitalized and depreciated.

The following are the components of property and equipment at December 31:

| *In millions* | 2013 | 2012 |
|---|---|---|
| Land | $ 1,460 | $ 1,429 |
| Building and improvements | 2,694 | 2,614 |
| Fixtures and equipment | 8,419 | 7,928 |
| Leasehold improvements | 3,320 | 3,105 |
| Software | 1,515 | 1,230 |
| | 17,408 | 16,306 |
| Accumulated depreciation and amortization | (8,793) | (7,674) |
| Property and equipment, net | $ 8,615 | $ 8,632 |

The gross amount of property and equipment under capital leases was $260 million and $219 million as of December 31, 2013 and 2012, respectively. Accumulated amortization of property and equipment under capital lease was $74 million and $64 million as of December 31, 2013 and 2012, respectively. Amortization of property and equipment under capital lease is included within depreciation expense. Depreciation expense totaled $1.4 billion, $1.3 billion and $1.1 billion in 2013, 2012 and 2011, respectively.

**Goodwill and other indefinitely-lived assets** - Goodwill and other indefinitely-lived assets are not amortized, but are subject to impairment reviews annually, or more frequently if necessary. See Note 4 for additional information on goodwill and other indefinitely-lived assets.

**Intangible assets** - Purchased customer contracts and relationships are amortized on a straight-line basis over their estimated useful lives between 10 and 20 years. Purchased customer lists are amortized on a straight-line basis over their estimated useful lives of up to 10 years. Purchased leases are amortized on a straight-line basis over the remaining life of the lease. See Note 4 for additional information about intangible assets.

**Impairment of long-lived assets** - The Company groups and evaluates fixed and finite-lived intangible assets for impairment at the lowest level at which individual cash flows can be identified, whenever events or changes in circumstances indicate that the carrying value of an asset may not be recoverable. If indicators of impairment are present, the Company first compares the carrying amount of the asset group to the estimated future cash flows associated with the asset group (undiscounted and without interest charges). If the estimated future cash flows used in this analysis are less than the carrying amount of the asset group, an impairment loss calculation is prepared. The impairment loss calculation compares the carrying amount of the asset group to the asset group's estimated future cash flows (discounted and with interest charges). If required, an impairment loss is recorded for the portion of the asset group's carrying value that exceeds the asset group's estimated future cash flows (discounted and with interest charges).

**Redeemable noncontrolling interest** — Through June 29, 2012, the Company had an approximately 60% ownership interest in Generation Health, Inc. ("Generation Health") and consolidated Generation Health in its consolidated financial statements. The nonemployee noncontrolling shareholders of Generation Health held put rights for the remaining interest in Generation Health that if exercised would require the Company to purchase the remaining interest in Generation Health in 2015 for a minimum of $26 million and a maximum of $159 million, depending on certain financial metrics of Generation Health in 2014. Since the noncontrolling shareholders of Generation Health had a redemption feature as a result of the put rights, the Company had classified the redeemable noncontrolling interest in Generation Health in the mezzanine section of the consolidated balance sheet outside of shareholders' equity. On June 29, 2012, the Company acquired the remaining 40% interest in Generation Health from minority shareholders and employee option holders for $26 million and $5 million, respectively, for a total of $31 million.

The following is a reconciliation of the changes in the redeemable noncontrolling interest for the years ended December 31, 2012 and 2011:

| *In millions* | 2012 | 2011 |
|---|---|---|
| Beginning balance | $ 30 | $ 34 |
| Net loss attributable to noncontrolling interest | (2) | (4) |
| Purchase of noncontrolling interest | (26) | — |
| Reclassification to capital surplus in connection with purchase of noncontrolling interest | (2) | — |
| Ending balance | $ — | $ 30 |

**Revenue Recognition**

*Pharmacy Services Segment* - The PSS sells prescription drugs directly through its mail service dispensing pharmacies and indirectly through its retail pharmacy network. The PSS recognizes revenue from prescription drugs sold by its mail service dispensing pharmacies and under retail pharmacy network contracts where it is the principal using the gross method at the contract prices negotiated with its clients. Net revenues include: (i) the portion of the price the client pays directly to the PSS, net of any volume-related or other discounts paid back to the client (see "Drug Discounts" below), (ii) the price paid to the PSS by client plan members for mail order prescriptions ("Mail Co-Payments") and the price paid to retail network pharmacies by client plan members for retail prescriptions ("Retail Co-Payments"), and (iii) administrative fees for retail pharmacy network contracts where the PSS is not the principal as discussed below. Sales taxes are not included in revenue.

Revenue is recognized when: (i) persuasive evidence of an arrangement exists, (ii) delivery has occurred or services have been rendered, (iii) the seller's price to the buyer is fixed or determinable, and (iv) collectability is reasonably assured. The following revenue recognition policies have been established for the PSS:

- Revenues generated from prescription drugs sold by mail service dispensing pharmacies are recognized when the prescription is delivered. At the time of delivery, the PSS has performed substantially all of its obligations under its client contracts and does not experience a significant level of returns or reshipments.

- Revenues generated from prescription drugs sold by third party pharmacies in the PSS's retail pharmacy network and associated administrative fees are recognized at the PSS's point-of-sale, which is when the claim is adjudicated by the PSS's online claims processing system.

The PSS determines whether it is the principal or agent for its retail pharmacy network transactions on a contract by contract basis. In the majority of its contracts, the PSS has determined it is the principal due to it: (i) being the primary obligor in the arrangement, (ii) having latitude in establishing the price, changing the product or performing part of the service, (iii) having discretion in supplier selection, (iv) having involvement in the determination of product or service specifications, and (v) having credit risk. The PSS's obligations under its client contracts for which revenues are reported using the gross method are separate and distinct from its obligations to the third party pharmacies included in its retail pharmacy network contracts. Pursuant to these contracts, the PSS is contractually required to pay the third party pharmacies in its retail pharmacy network for products sold, regardless of whether the PSS is paid by its clients. The PSS's responsibilities under its client contracts typically include validating eligibility and coverage levels, communicating the prescription price and the co-payments due to the third party retail pharmacy, identifying possible adverse drug interactions for the pharmacist to address with the prescriber prior to dispensing, suggesting generic alternatives where clinically appropriate and approving the prescription for dispensing. Although the PSS does not have credit risk with respect to Retail Co-Payments, management believes that all of the other applicable indicators of gross revenue reporting are present. For contracts under which the PSS acts as an agent, revenue is recognized using the net method.

Drug Discounts - The PSS deducts from its revenues any rebates, inclusive of discounts and fees, earned by its clients. Rebates are paid to clients in accordance with the terms of client contracts, which are normally based on fixed rebates per prescription for specific products dispensed or a percentage of manufacturer discounts received for specific products dispensed. The liability for rebates due to clients is included in "Claims and discounts payable" in the accompanying consolidated balance sheets.

Medicare Part D - The PSS, through its SilverScript Insurance Company subsidiary, participates in the Federal Government's Medicare Part D program as a Prescription Drug Plan ("PDP"). Net revenues include insurance premiums earned by the PDP, which are determined based on the PDP's annual bid and related contractual arrangements with the Centers for Medicare and Medicaid Services ("CMS"). The insurance premiums include a direct premium paid by CMS and a beneficiary premium, which is the responsibility of the PDP member, but is subsidized by CMS in the case of low-income members. Premiums collected in advance are initially deferred in accrued expenses and are then recognized in net revenues over the period in which members are entitled to receive benefits.

In addition to these premiums, net revenues include co-payments, coverage gap benefits, deductibles and co-insurance (collectively, the "Member Co-Payments") related to PDP members' actual prescription claims. In certain cases, CMS subsidizes a portion of these Member Co-Payments and pays the PSS an estimated prospective Member Co-Payment subsidy amount each month. The prospective Member Co-Payment subsidy amounts received from CMS are also included in net revenues. The Company assumes no risk for these amounts. If the prospective Member Co-Payment subsidies received differ from the amounts based on actual prescription claims, the difference is recorded in either accounts receivable or accrued expenses.

The PSS accounts for CMS obligations and Member Co-Payments (including the amounts subsidized by CMS) using the gross method consistent with its revenue recognition policies for Mail Co-Payments and Retail Co-Payments (discussed previously in this document).

*Retail Pharmacy Segment* - The RPS recognizes revenue from the sale of merchandise (other than prescription drugs) at the time the merchandise is purchased by the retail customer. Prior to the fourth quarter of 2013, revenue from the sale of prescription drugs was recognized at the time the prescription was filled as opposed to upon delivery as required under the Financial Accounting Standards Board ("FASB") Accounting Standards Codification 605, *Revenue Recognition*. For substantially all prescriptions, the fill date and the delivery date occur in the same reporting period. The effect on both revenue and income of recording prescription drug sales upon fill as opposed to delivery is immaterial. During the fourth quarter of 2013, the Company began recognizing revenue from the sale of prescription drugs when the prescription is picked up by the customer. This immaterial error correction is reflected in all annual and quarterly financial statements presented. For the year ended December 31, 2012, the correction reduced net revenues and net income attributable to CVS Caremark by $13 million and $13 million. For the year ended December 31, 2011, the correction reduced net revenues by $20 million and increased net income attributable to CVS Caremark by $1 million. Diluted earnings per share from net income attributable to CVS Caremark was reduced by $0.01 for the year ended December 31, 2012. There was no impact on diluted earnings per share from net income attributable to CVS Caremark in any other annual or interim period impacted by the immaterial error correction. The adjustment increased total assets and total liabilities by $309 million and $360 million as of December 31, 2012 and decreased retained earnings by $38 million and $39 million as of December 31, 2011 and 2010, respectively.

Notes to Consolidated Financial Statements (continued)

Customer returns are not material. Revenue generated from the performance of services in the RPS's health care clinics is recognized at the time the services are performed. Sales taxes are not included in revenue.

See Note 13 for additional information about the revenues of the Company's business segments.

**Cost of revenues**

*Pharmacy Services Segment* - The PSS' cost of revenues includes: (i) the cost of prescription drugs sold during the reporting period directly through its mail service dispensing pharmacies and indirectly through its retail pharmacy network, (ii) shipping and handling costs, and (iii) the operating costs of its mail service dispensing pharmacies and client service operations and related information technology support costs including depreciation and amortization. The cost of prescription drugs sold component of cost of revenues includes: (i) the cost of the prescription drugs purchased from manufacturers or distributors and shipped to members in clients' benefit plans from the PSS' mail service dispensing pharmacies, net of any volume-related or other discounts (see "Vendor allowances and purchase discounts" below) and (ii) the cost of prescription drugs sold (including Retail Co-Payments) through the PSS' retail pharmacy network under contracts where it is the principal, net of any volume-related or other discounts.

*Retail Pharmacy Segment* - The RPS' cost of revenues includes: the cost of merchandise sold during the reporting period and the related purchasing costs, warehousing and delivery costs (including depreciation and amortization) and actual and estimated inventory losses.

See Note 13 for additional information about the cost of revenues of the Company's business segments.

**Vendor allowances and purchase discounts**

The Company accounts for vendor allowances and purchase discounts as follows:

*Pharmacy Services Segment* - The PSS receives purchase discounts on products purchased. The PSS' contractual arrangements with vendors, including manufacturers, wholesalers and retail pharmacies, normally provide for the PSS to receive purchase discounts from established list prices in one, or a combination, of the following forms: (i) a direct discount at the time of purchase, (ii) a discount for the prompt payment of invoices, or (iii) when products are purchased indirectly from a manufacturer (e.g., through a wholesaler or retail pharmacy), a discount (or rebate) paid subsequent to dispensing. These rebates are recognized when prescriptions are dispensed and are generally calculated and billed to manufacturers within 30 days of the end of each completed quarter. Historically, the effect of adjustments resulting from the reconciliation of rebates recognized to the amounts billed and collected has not been material to the PSS' results of operations. The PSS accounts for the effect of any such differences as a change in accounting estimate in the period the reconciliation is completed. The PSS also receives additional discounts under its wholesaler contracts if it exceeds contractually defined annual purchase volumes. In addition, the PSS receives fees from pharmaceutical manufacturers for administrative services. Purchase discounts and administrative service fees are recorded as a reduction of "Cost of revenues".

*Retail Pharmacy Segment* - Vendor allowances received by the RPS reduce the carrying cost of inventory and are recognized in cost of revenues when the related inventory is sold, unless they are specifically identified as a reimbursement of incremental costs for promotional programs and/or other services provided. Amounts that are directly linked to advertising commitments are recognized as a reduction of advertising expense (included in operating expenses) when the related advertising commitment is satisfied. Any such allowances received in excess of the actual cost incurred also reduce the carrying cost of inventory. The total value of any upfront payments received from vendors that are linked to purchase commitments is initially deferred. The deferred amounts are then amortized to reduce cost of revenues over the life of the contract based upon purchase volume. The total value of any upfront payments received from vendors that are not linked to purchase commitments is also initially deferred. The deferred amounts are then amortized to reduce cost of revenues on a straight-line basis over the life of the related contract. The total amortization of these upfront payments was not material to the accompanying consolidated financial statements.

**Insurance** - The Company is self-insured for certain losses related to general liability, workers' compensation and auto liability. The Company obtains third party insurance coverage to limit exposure from these claims. The Company is also self-insured for certain losses related to health and medical liabilities. The Company's self-insurance accruals, which include reported claims and claims incurred but not reported, are calculated using standard insurance industry actuarial assumptions and the Company's historical claims experience.

**Facility opening and closing costs** - New facility opening costs, other than capital expenditures, are charged directly to expense when incurred. When the Company closes a facility, the present value of estimated unrecoverable costs, including the remaining lease obligation less estimated sublease income and the book value of abandoned property and equipment, are charged to expense. The long-term portion of the lease obligations associated with facility closings was $246 million and $288 million in 2013 and 2012, respectively.

**Advertising costs** - Advertising costs are expensed when the related advertising takes place. Advertising costs, net of vendor funding (included in operating expenses), were $177 million, $221 million and $211 million in 2013, 2012 and 2011, respectively.

**Interest expense, net** - Interest expense, net of capitalized interest, was $517 million, $561 million and $588 million, and interest income was $8 million, $4 million and $4 million in 2013, 2012 and 2011, respectively. Capitalized interest totaled $25 million, $29 million and $37 million in 2013, 2012 and 2011, respectively.

**Shares held in trust** - The Company maintains grantor trusts, which held approximately 1 million shares of its common stock at December 31, 2013 and 2012, respectively. These shares are designated for use under various employee compensation plans. Since the Company holds these shares, they are excluded from the computation of basic and diluted shares outstanding.

**Accumulated other comprehensive loss** - Accumulated other comprehensive loss consists of changes in the net actuarial gains and losses associated with pension and other postretirement benefit plans, unrealized losses on derivatives from cash flow hedges executed in previous years associated with the issuance of long-term debt, and foreign currency translation adjustments. The amount included in accumulated other comprehensive loss related to the Company's pension and postretirement plans was $172 million pre-tax ($106 million after-tax) as of December 31, 2013 and $268 million pre-tax ($165 million after-tax) as of December 31, 2012. The net impact on cash flow hedges totaled $22 million pre-tax ($13 million after-tax) and $26 million pre-tax ($16 million after-tax) as of December 31, 2013 and 2012, respectively. Cumulative foreign currency translation adjustments at December 31, 2013 were $30 million.

Changes in accumulated other comprehensive income (loss) by component are shown below:

| | Year Ended December 31, 2013[(1)] | | | |
|---|---|---|---|---|
| ***In millions*** | **Losses on Cash Flow Hedges** | **Pension and Other Postretirement Benefits** | **Foreign Currency** | **Total** |
| Balance, December 31, 2012 | $ (16) | $ (165) | $ — | $ (181) |
| Other comprehensive income (loss) before reclassifications | — | — | (30) | (30) |
| Amounts reclassified from accumulated other comprehensive income [(2)] | 3 | 59 | — | 62 |
| Net other comprehensive income (loss) | 3 | 59 | (30) | 32 |
| Balance, December 31, 2013 | $ (13) | $ (106) | $ (30) | $ (149) |

(1) All amounts are net of tax.
(2) The amounts reclassified from accumulated other comprehensive income for cash flow hedges are recorded within interest expense, net on the consolidated statement of income. The amounts reclassified from accumulated other comprehensive income for pension and other postretirement benefits are included in operating expenses on the consolidated statement of income.

**Stock-based compensation** - Stock-based compensation is measured at the grant date based on the fair value of the award and is recognized as expense over the applicable requisite service period of the stock award (generally 3 to 5 years) using the straight-line method. Stock-based compensation is included in operating expenses.

**Related party transactions** - The Company has an equity method investment in SureScripts, LLC ("SureScripts"), which operates a clinical health information network. The Pharmacy Services and Retail Pharmacy segments utilize this clinical health information network in providing services to its client plan members and retail customers. The Company expensed fees of approximately $48 million, $32 million and $28 million in the years ended December 31, 2013, 2012 and 2011, respectively, for the use of this network.

The Company's investment in and equity in earnings in SureScripts for all periods presented is immaterial.

**Income taxes** - The Company provides for income taxes currently payable, as well as for those deferred because of timing differences between reported income and expenses for financial statement purposes versus income tax return purposes. Income tax credits are recorded as a reduction of income taxes. Deferred income tax assets and liabilities are recognized for the future tax consequences attributable to differences between the carrying amount of assets and liabilities for financial reporting purposes and the amounts used for income tax return purposes. Deferred income tax assets and liabilities are measured using the enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recoverable or settled. The effect of a change in income tax rates is recognized as income or expense in the period of the change.

**Earnings per common share** - Basic earnings per common share is computed by dividing: (i) net earnings by (ii) the weighted average number of common shares outstanding during the year (the "Basic Shares"). Diluted earnings per common share is computed by dividing: (i) net earnings by (ii) Basic Shares plus the additional shares that would be issued assuming that all dilutive stock awards are exercised. Options to purchase 6.2 million, 5.9 million and 30.5 million shares of common stock were outstanding as of December 31, 2013, 2012 and 2011, respectively, but were not included in the calculation of diluted earnings per share because the options' exercise prices were greater than the average market price of the common shares and, therefore, the effect would be antidilutive.

**New Accounting Pronouncements**

In July 2012, the FASB issued Accounting Standards Update ("ASU") 2012-02, *Testing Indefinite-Lived Intangible Assets for Impairment* ("ASU 2012-02"). ASU 2012-02 allows entities to use a qualitative approach to determine whether the existence of events and circumstances indicates that it is more likely than not that the indefinite-lived intangible asset is impaired. If, after assessing the totality of events and circumstances, an entity concludes that it is not more likely than not that the indefinite-lived intangible asset is impaired, then the entity is not required to take further action. However, if an entity concludes otherwise, then it is required to determine the fair value of the indefinite-lived intangible asset and perform the quantitative impairment test by comparing the fair value with the carrying amount and recognize an impairment loss, if any, to the extent the carrying value exceeds its fair value. ASU 2012-02 is effective for annual and interim impairment tests performed for fiscal years beginning after September 15, 2012. The adoption of ASU 2012-02 did not have a material effect on the Company's consolidated financial statements.

In February 2013, the FASB issued ASU 2013-02, *Reporting of Amounts Reclassified Out of Accumulated Other Comprehensive Income* ("ASU 2013-02"). ASU 2013-02 adds new disclosure requirements for items reclassified out of accumulated other comprehensive income. The additional disclosures include: (1) changes in accumulated other comprehensive income balances by component and (2) significant items reclassified out of accumulated other comprehensive income. The changes in accumulated other comprehensive income balance by component will be disaggregated to separately present reclassification adjustments and current-period other comprehensive income. Significant items reclassified out of accumulated other comprehensive income by component are required to be presented either on the face of the statement of income or as separate disclosure in the notes to the financial statements. These additional disclosures may be presented before-tax or net-of-tax as long as the income tax benefit or expense attributed to each component of other comprehensive income and reclassification adjustments is presented in the financial statement or in the notes to the financial statements. ASU 2013-02 is effective for interim and annual periods beginning after December 15, 2012 and should be applied prospectively. The adoption of ASU 2013-02 did not have a material effect on the Company's consolidated financial statements. The expanded disclosures have been included in Note 1 to these consolidated financial statements.

## 2 Changes in Accounting Principle

Effective January 1, 2012, the Company changed its methods of accounting for prescription drug inventories in the RPS. Prior to 2012, the Company valued prescription drug inventories at the lower of cost or market on a first-in, first-out ("FIFO") basis in retail pharmacies using the retail inventory method and in distribution centers using the FIFO cost method. Effective January 1, 2012, all prescription drug inventories in the RPS have been valued at the lower of cost or market using the weighted average cost method. These changes affected approximately 51% of consolidated inventories as of January 1, 2012.

These changes were made primarily to bring all of the pharmacy operations of the Company to a common inventory valuation methodology and to provide the Company with better information to manage its retail pharmacy operations. The Company believes the weighted average cost method is preferable to the retail inventory method and the FIFO cost method because it

results in greater precision in the determination of cost of revenues and inventories by specific drug product and results in a consistent inventory valuation method for all of the Company's prescription drug inventories as the PSS's mail service and specialty pharmacies were already on the weighted average cost method. Most of these mail service and specialty pharmacies in the PSS were acquired in the Company's 2007 acquisition of Caremark Rx, Inc.

The Company recorded the cumulative effect of these changes in accounting principle as of January 1, 2012. The Company determined that retrospective application for periods prior to 2012 is impracticable, as the period-specific information necessary to value prescription drug inventories in the Retail Pharmacy Segment under the weighted average cost method is unavailable. The Company implemented a new pharmacy cost accounting system to value prescription drug inventory as of January 1, 2012 and calculated the cumulative impact. The effect of these changes in accounting principle as of January 1, 2012 was a decrease in inventories of $146 million, an increase in current deferred income tax assets of $57 million and a decrease in retained earnings of $89 million.

Had the Company not made these changes in accounting principle, for the year ended December 31, 2012, income from continuing operations and net income attributable to CVS Caremark would have been approximately $19 million lower. For the year ended December 31, 2012, basic and diluted earnings per common share for income from continuing operations attributable to CVS Caremark and net income attributable to CVS Caremark would have been reduced by $0.01.

## 3 Discontinued Operations

On November 1, 2011, the Company sold its TheraCom, L.L.C. ("TheraCom") subsidiary to AmerisourceBergen Corporation for $250 million, plus a working capital adjustment of $7 million which the Company received in March 2012. TheraCom is a provider of commercialization support services to the biotech and pharmaceutical industries. The TheraCom business had historically been part of the Company's PSS. The results of the TheraCom business are presented as discontinued operations and have been excluded from both continuing operations and segment results for all periods presented.

In connection with certain business dispositions completed between 1991 and 1997, the Company retained guarantees on store lease obligations for a number of former subsidiaries, including Linens 'n Things which filed for bankruptcy in 2008. The Company's income (loss) from discontinued operations includes lease-related costs which the Company believes it will likely be required to satisfy pursuant to its Linens 'n Things lease guarantees.

Below is a summary of the results of discontinued operations for the years ended December 31:

| *In millions* | 2013 | 2012 | 2011 |
|---|---|---|---|
| Net revenues of TheraCom | $ — | $ — | $ 650 |
| Income from operations of TheraCom | $ — | $ — | $ 18 |
| Gain on disposal of TheraCom | — | — | 53 |
| Loss on disposal of Linens 'n Things | (12) | (12) | (7) |
| Income tax benefit (provision) | 4 | 5 | (95) |
| Loss from discontinued operations, net of tax | $ (8) | $ (7) | $ (31) |

## 4 Goodwill and Other Intangibles

Goodwill and other indefinitely-lived assets are not amortized, but are subject to annual impairment reviews, or more frequent reviews if events or circumstances indicate an impairment may exist.

When evaluating goodwill for potential impairment, the Company first compares the fair value of its two reporting units, the PSS and RPS, to their respective carrying amounts. The Company estimates the fair value of its reporting units using a combination of a future discounted cash flow valuation model and a comparable market transaction model. If the estimated fair value of the reporting unit is less than its carrying amount, an impairment loss calculation is prepared. The impairment loss calculation compares the implied fair value of a reporting unit's goodwill with the carrying amount of its goodwill. If the carrying amount of the goodwill exceeds the implied fair value, an impairment loss is recognized in an amount equal to the excess. During the third quarter of 2013, the Company performed its required annual goodwill impairment tests. The Company concluded there were no goodwill impairments as of the testing date. The carrying amount of goodwill was $26.5 billion and

$26.4 billion as of December 31, 2013 and 2012, respectively (see Note 13 for a breakdown of goodwill by segment). During the year ended December 31, 2013, goodwill increased $12 million in PSS and $135 million in RPS for a total increase of $147 million. The increase in PSS was primarily due to an immaterial acquisition. The $135 million net increase in RPS was due to an immaterial acquisition which increased goodwill by $160 million, which was partially offset by a decrease of $25 million related to foreign currency translation adjustments.

Indefinitely-lived intangible assets are tested for impairment by comparing the estimated fair value of the asset to its carrying value. The Company estimates the fair value of its indefinitely-lived trademark using the relief from royalty method under the income approach. If the carrying value of the asset exceeds its estimated fair value, an impairment loss is recognized and the asset is written down to its estimated fair value. During the third quarter of 2013, the Company performed its annual impairment test of the indefinitely-lived trademark and concluded there was no impairment as of the testing date. The carrying amount of its indefinitely-lived trademark was $6.4 billion as of December 31, 2013 and 2012.

The Company amortizes intangible assets with finite lives over the estimated useful lives of the respective assets, which have a weighted average useful life of 13.0 years. The weighted average useful lives of the Company's customer contracts and relationships and covenants not to compete are 12.5 years. The weighted average lives of the Company's favorable leases and other intangible assets are 17.1 years. Amortization expense for intangible assets totaled $494 million, $486 million and $452 million in 2013, 2012 and 2011, respectively. The anticipated annual amortization expense for these intangible assets for the next five years is $457 million in 2014, $427 million in 2015, $398 million in 2016, $375 million in 2017 and $357 million in 2018.

The following table is a summary of the Company's intangible assets as of December 31:

| | 2013 | | | 2012 | | |
|---|---|---|---|---|---|---|
| ***In millions*** | **Gross Carrying Amount** | **Accumulated Amortization** | **Net Carrying Amount** | **Gross Carrying Amount** | **Accumulated Amortization** | **Net Carrying Amount** |
| Trademark (indefinitely-lived) | $ 6,398 | $ — | $ 6,398 | $ 6,398 | $ — | $ 6,398 |
| Customer contracts and relationships and covenants not to compete | 5,840 | (3,083) | 2,757 | 5,745 | (2,812) | 2,933 |
| Favorable leases and other | 800 | (426) | 374 | 802 | (380) | 422 |
| | $ 13,038 | $ (3,509) | $ 9,529 | $ 12,945 | $ (3,192) | $ 9,753 |

## 5 Share Repurchase Programs

On December 17, 2013, the Company's Board of Directors authorized a new share repurchase program for up to $6.0 billion of outstanding common stock (the "2013 Repurchase Program"). On September 19, 2012, the Company's Board of Directors authorized a share repurchase program for up to $6.0 billion of outstanding common stock (the "2012 Repurchase Program"). On August 23, 2011, the Company's Board of Directors authorized a share repurchase program for up to $4.0 billion of outstanding common stock (the "2011 Repurchase Program"). On June 14, 2010, our Board of Directors authorized a share repurchase program for up to $2.0 billion of outstanding common stock (the "2010 Repurchase Program"). The share repurchase authorizations, each of which was effective immediately, permitted the Company to effect repurchases from time to time through a combination of open market repurchases, privately negotiated transactions, accelerated share repurchase transactions, and/or other derivative transactions. The 2013 and 2012 Repurchase Programs may be modified or terminated by the Board of Directors at any time. The 2011 and 2010 Repurchase Programs have been completed, as described below.

Pursuant to the authorization under the 2012 Repurchase Program, effective October 1, 2013, the Company entered into a $1.7 billion fixed dollar accelerated share repurchase ("ASR") agreement with Barclays Bank PLC ("Barclays"). Upon payment of the $1.7 billion purchase price on October 1, 2013, the Company received a number of shares of its common stock equal to 50% of the $1.7 billion notional amount of the ASR agreement or approximately 14.9 million shares at a price of $56.88 per share. The Company received approximately 11.7 million shares of common stock on December 30, 2013 at an average price of $63.83 per share, representing the remaining 50% of the $1.7 billion notional amount of the ASR agreement and thereby concluding the agreement. The total of 26.6 million shares of common stock delivered to the Company by Barclays over the term of the October 2013 ASR agreement were placed into treasury stock.

Pursuant to the authorizations under the 2011 and 2012 Repurchase Programs, on September 19, 2012, the Company entered into a $1.2 billion fixed dollar ASR agreement with Barclays. Upon payment of the $1.2 billion purchase price on September 20, 2012, the Company received a number of shares of its common stock equal to 50% of the $1.2 billion notional amount of the ASR agreement or approximately 12.6 million shares at a price of $47.71 per share. The Company received approximately 13.0 million shares of common stock on November 16, 2012 at an average price of $46.96 per share, representing the remaining 50% of the $1.2 billion notional amount of the ASR agreement and thereby concluding the agreement. The total of 25.6 million shares of common stock delivered to the Company by Barclays over the term of the September 2012 ASR agreement were placed into treasury stock.

Pursuant to the authorization under the 2011 Repurchase Program, on August 24, 2011, the Company entered into a $1.0 billion fixed dollar ASR agreement with Barclays. The ASR agreement contained provisions that establish the minimum and maximum number of shares to be repurchased during its term. Pursuant to the ASR agreement, on August 25, 2011, the Company paid $1.0 billion to Barclays in exchange for Barclays delivering 20.3 million shares of common stock to the Company. On September 16, 2011, upon establishment of the minimum number of shares to be repurchased, Barclays delivered an additional 5.4 million shares of common stock to the Company. At the conclusion of the transaction on December 28, 2011, Barclays delivered a final installment of 1.6 million shares of common stock on December 29, 2011. The aggregate 27.3 million shares of common stock delivered to the Company by Barclays, were placed into treasury stock. This represented all the repurchases that occurred during the year ended December 31, 2011 under the 2011 Repurchase Program.

Each of the ASR transactions described above were accounted for as an initial treasury stock transaction and a forward contract. The forward contract was classified as an equity instrument. The initial repurchase of the shares and delivery of the remainder of the shares to conclude each ASR, resulted in an immediate reduction of the outstanding shares used to calculate the weighted average common shares outstanding for basic and diluted net income per share.

During the year ended December 31, 2013, the Company repurchased an aggregate of 66.2 million shares of common stock for approximately $4.0 billion under the 2012 Repurchase Program, which includes shares received from the October 2013 ASR agreement described above. As of December 31, 2013, there remained an aggregate of approximately $6.7 billion available for future repurchases under the 2013 and 2012 Repurchase Programs.

During the year ended December 31, 2012, the Company repurchased an aggregate of 95.0 million shares of common stock for approximately $4.3 billion under the 2012 and 2011 Repurchase Programs, which includes shares received from the September 2012 ASR agreement described above. As of December 31, 2012, the 2011 Repurchase Program was complete.

During the year ended December 31, 2011, the Company repurchased an aggregate of 56.4 million shares of common stock for approximately $2.0 billion, completing the 2010 Repurchase Program.

## 6 Borrowing and Credit Agreements

The following table is a summary of the Company's borrowings as of December 31:

| *In millions* | 2013 | 2012 |
|---|---|---|
| Commercial paper | $ — | $ 690 |
| 4.875% senior notes due 2014 | 550 | 550 |
| 3.25% senior notes due 2015 | 550 | 550 |
| 1.2% senior notes due 2016 | 750 | — |
| 6.125% senior notes due 2016 | 421 | 421 |
| 5.75% senior notes due 2017 | 1,310 | 1,310 |
| 2.25% senior notes due 2018 | 1,250 | — |
| 6.6% senior notes due 2019 | 394 | 394 |
| 4.75% senior notes due 2020 | 450 | 450 |
| 4.125% senior notes due 2021 | 550 | 550 |
| 2.75% senior notes due 2022 | 1,250 | 1,250 |
| 4.0% senior notes due 2023 | 1,250 | — |
| 6.25% senior notes due 2027 | 1,000 | 1,000 |
| 6.125% senior notes due 2039 | 1,500 | 1,500 |
| 5.75% senior notes due 2041 | 950 | 950 |
| 5.3% senior notes due 2043 | 750 | — |
| Enhanced Capital Advantage Preferred Securities due 2062(1) | 41 | 41 |
| Deferred acquisition payables due 2015-2017(2) | 42 | — |
| Mortgage notes payable | 4 | 1 |
| Capital lease obligations | 390 | 171 |
| | 13,402 | 9,828 |
| Less: | | |
| Short-term debt (commercial paper) | — | (690) |
| Current portion of long-term debt | (561) | (5) |
| | $ 12,841 | $ 9,133 |

(1) The Enhanced Capital Advantage Preferred Securities ("ECAPS") had a stated rate of interest of 6.302% through June 1, 2012, at which time the rate converted to a variable rate which was 2.3% and 2.6% at December 31, 2013 and 2012.

(2) Deferred acquisition payables are denominated in Brazilian real and bear interest at the Brazilian interbank deposit certificate rate which was 9.77% at December 31, 2013.

The Company had no commercial paper outstanding as of December 31, 2013. In connection with its commercial paper program, the Company maintains a $1.25 billion, four-year unsecured back-up credit facility, which expires on May 23, 2016, a $1.25 billion, five-year unsecured back-up credit facility, which expires on February 17, 2017, and a $1.0 billion, five-year unsecured back-up credit facility, which expires on May 23, 2018. The credit facilities allow for borrowings at various rates that are dependent, in part, on the Company's public debt ratings and require the Company to pay a weighted average quarterly facility fee of approximately 0.03%, regardless of usage. As of December 31, 2013, there were no borrowings outstanding under the back-up credit facilities. The weighted average interest rate for short-term debt was 0.27% as of December 31, 2013 and 0.35% as of December 31, 2012.

On December 2, 2013, the Company issued $750 million of 1.2% unsecured senior notes due December 5, 2016; $1.25 billion of 2.25% unsecured senior notes due December 5, 2018; $1.25 billion of 4.0% unsecured senior notes due December 5, 2023; and $750 million of 5.3% unsecured senior notes due December 5, 2043 (the "2013 Notes") for total proceeds of approximately $4.0 billion, net of discounts and underwriting fees. The 2013 Notes pay interest semi-annually and may be redeemed, in whole at any time, or in part from time to time, at the Company's option at a defined redemption price plus accrued and unpaid interest to the redemption date. The net proceeds of the 2013 Notes were used to repay commercial paper outstanding at the time of issuance and to fund the acquisition of Coram LLC in January 2014 (See Note 15). The remainder will be used for general corporate purposes.

On November 26, 2012, the Company issued $1.25 billion of 2.75% unsecured senior notes due December 1, 2022 (the "2012 Notes") for total proceeds of approximately $1.24 billion, net of discounts and underwriting fees. The 2012 Notes pay interest semi-annually and may be redeemed, in whole at any time, or in part from time to time, at the Company's option at a defined redemption price plus accrued and unpaid interest to the redemption date. The net proceeds of the 2012 Notes were used for general corporate purposes and to repay certain corporate debt.

On November 26, 2012, the Company announced tender offers for any and all of the 6.6% Senior Notes due 2019, and up to a maximum amount of the 6.125% Senior Notes due 2016 and 5.75% Senior Notes due 2017, for up to an aggregate principal amount of $1.0 billion. In December 2012, the Company increased the aggregate principal amount of the tender offers to $1.325 billion and completed the repurchase for the maximum amount. The Company paid a premium of $332 million in excess of the debt principal in connection with the tender offers, wrote off $13 million of unamortized deferred financing costs and incurred $3 million in fees, for a total loss on the early extinguishment of debt of $348 million. The loss was recorded in income from continuing operations on the consolidated statement of income.

In connection with the Company's acquisition of the UAM Medicare Part D Business in April 2011, the Company assumed $110 million of long-term debt in the form of Trust Preferred Securities that mature through 2037. During the years ended December 31, 2012 and 2011, the Company repaid $50 million and $60 million, respectively, of the Trust Preferred Securities at par.

On May 12, 2011, the Company issued $550 million of 4.125% unsecured senior notes due May 15, 2021 and issued $950 million of 5.75% unsecured senior notes due May 15, 2041 (collectively, the "2011 Notes") for total proceeds of approximately $1.5 billion, net of discounts and underwriting fees. The 2011 Notes pay interest semi-annually and may be redeemed, in whole at any time, or in part from time to time, at the Company's option at a defined redemption price plus accrued and unpaid interest to the redemption date. The net proceeds of the 2011 Notes were used to repay commercial paper borrowings and certain other corporate debt, and were used for general corporate purposes.

In December 2011 and July 2012, the Company repurchased $958 million and $1 million of the principal amount of its ECAPS at par. The fees and write-off of deferred issuance costs associated with the early extinguishment of the ECAPS were de minimis. The remaining $41 million of outstanding ECAPS at December 31, 2013 are due in 2062. The ECAPS pay interest semi-annually and may be redeemed at any time, in whole or in part at a defined redemption price plus accrued interest.

The credit facilities, back-up credit facilities, unsecured senior notes and ECAPS contain customary restrictive financial and operating covenants. The covenants do not materially affect the Company's financial or operating flexibility.

The aggregate maturities of long-term debt for each of the five years subsequent to December 31, 2013 are $561 million in 2014, $576 million in 2015, $1.2 billion in 2016, $1.3 billion in 2017 and $1.3 billion in 2018.

## 7 Leases

The Company leases most of its retail and mail order locations, ten of its distribution centers and certain corporate offices under non-cancelable operating leases, typically with initial terms of 15 to 25 years and with options that permit renewals for additional periods. The Company also leases certain equipment and other assets under noncancelable operating leases, typically with initial terms of 3 to 10 years. Minimum rent is expensed on a straight-line basis over the term of the lease. In addition to minimum rental payments, certain leases require additional payments based on sales volume, as well as reimbursement for real estate taxes, common area maintenance and insurance, which are expensed when incurred.

The following table is a summary of the Company's net rental expense for operating leases for the years ended December 31:

| ***In millions*** | 2013 | 2012 | 2011 |
|---|---|---|---|
| Minimum rentals | $ 2,210 | $ 2,165 | $ 2,087 |
| Contingent rentals | 41 | 48 | 49 |
| | 2,251 | 2,213 | 2,136 |
| Less: sublease income | (21) | (20) | (19) |
| | $ 2,230 | $ 2,193 | $ 2,117 |

The following table is a summary of the future minimum lease payments under capital and operating leases as of December 31, 2013:

| *In millions* | Capital Leases | Operating Leases[(1)] |
|---|---|---|
| 2014 | $ 46 | $ 2,175 |
| 2015 | 46 | 2,129 |
| 2016 | 47 | 2,055 |
| 2017 | 47 | 1,964 |
| 2018 | 47 | 1,853 |
| Thereafter | 556 | 16,914 |
| Total future lease payments | 789 | $ 27,090 |
| Less: imputed interest | (399) | |
| Present value of capital lease obligations | $ 390 | |

(1) Future operating lease payments have not been reduced by minimum sublease rentals of $224 million due in the future under noncancelable subleases.

The Company finances a portion of its store development program through sale-leaseback transactions. The properties are generally sold at net book value, which generally approximates fair value, and the resulting leases generally qualify and are accounted for as operating leases. The operating leases that resulted from these transactions are included in the above table. The Company does not have any retained or contingent interests in the stores and does not provide any guarantees, other than a guarantee of lease payments, in connection with the sale-leaseback transactions. Proceeds from sale-leaseback transactions totaled $600 million in 2013, $529 million in 2012 and $592 million in 2011.

## 8 Medicare Part D

The Company offers Medicare Part D benefits through SilverScript, which has contracted with CMS to be a PDP and, pursuant to the Medicare Prescription Drug, Improvement and Modernization Act of 2003 (“MMA”), must be a risk-bearing entity regulated under state insurance laws or similar statutes.

SilverScript is a licensed domestic insurance company under the applicable laws and regulations. Pursuant to these laws and regulations, SilverScript must file quarterly and annual reports with the National Association of Insurance Commissioners (“NAIC”) and certain state regulators, must maintain certain minimum amounts of capital and surplus under a formula established by the NAIC and must, in certain circumstances, request and receive the approval of certain state regulators before making dividend payments or other capital distributions to the Company. The Company does not believe these limitations on dividends and distributions materially impact its financial position.

The Company has recorded estimates of various assets and liabilities arising from its participation in the Medicare Part D program based on information in its claims management and enrollment systems. Significant estimates arising from its participation in this program include: (i) estimates of low-income cost subsidy, reinsurance amounts, and coverage gap discount amounts ultimately payable to or receivable from CMS based on a detailed claims reconciliation that will occur in the following year; (ii) an estimate of amounts receivable from or payable to CMS under a risk-sharing feature of the Medicare Part D program design, referred to as the risk corridor and (iii) estimates for claims that have been reported and are in the process of being paid or contested and for our estimate of claims that have been incurred but have not yet been reported.

As of December 31, 2013 and 2012, amounts due from CMS included in accounts receivable were $2.4 billion and $0.7 billion, respectively.

## 9 Pension Plans and Other Postretirement Benefits

### Defined Contribution Plans

The Company sponsors voluntary 401(k) savings plans that cover substantially all employees who meet plan eligibility requirements. The Company makes matching contributions consistent with the provisions of the plans.

At the participant's option, account balances, including the Company's matching contribution, can be moved without restriction among various investment options. including the Company's common stock fund under one of the defined contribution plans. The Company also maintains a nonqualified, unfunded Deferred Compensation Plan for certain key employees. This plan provides participants the opportunity to defer portions of their eligible compensation and receive matching contributions equivalent to what they could have received under the CVS Caremark 401(k) Plan absent certain restrictions and limitations under the Internal Revenue Code. The Company's contributions under the above defined contribution plans were $235 million, $199 million and $187 million in 2013, 2012 and 2011, respectively.

**Other Postretirement Benefits**

The Company provides postretirement health care and life insurance benefits to certain retirees who meet eligibility requirements. The Company's funding policy is generally to pay covered expenses as they are incurred. For retiree medical plan accounting, the Company reviews external data and its own historical trends for health care costs to determine the health care cost trend rates. As of December 31, 2013 and 2012, the Company's other postretirement benefits have an accumulated postretirement benefit obligation of $27 million and $16 million, respectively. Net periodic benefit costs related to these other postretirement benefits were approximately $11 million in 2013 and $1 million in 2012 and 2011. The net periodic benefit costs for 2013 include a settlement loss of $8 million.

Pursuant to various labor agreements, the Company also contributes to multiemployer health and welfare plans that cover certain union-represented employees. The plans provide postretirement health care and life insurance benefits to certain employees who meet eligibility requirements. Total Company contributions to multiemployer health and welfare plans were $55 million, $50 million and $47 million in 2013, 2012 and 2011, respectively.

**Pension Plans**

During the year ended December 31, 2013, the Company sponsored ten defined benefit pension plans. Four of the plans are tax-qualified plans that are funded based on actuarial calculations and applicable federal laws and regulations. The other six plans are unfunded nonqualified supplemental retirement plans. Most of the plans were frozen in prior periods. During the years ended December 31, 2012 and 2011, the Company had a total of nine defined benefit pension plans.

As of December 31, 2013, the Company's pension plans had a projected benefit obligation of $694 million and plan assets of $568 million. As of December 31, 2012, the Company's pension plans had a projected benefit obligation of $758 million and plan assets of $527 million. Actual return on plan assets was $49 million and $62 million in 2013 and 2012, respectively. Net periodic pension costs related to these pension plans were $19 million, $31 million and $49 million in 2013, 2012 and 2011, respectively. The net periodic pension costs for 2012 include a curtailment loss of $2 million. The net periodic pension costs for 2011 include a settlement loss of $25 million due to the impact of lump sum payouts.

The discount rate is determined by examining the current yields observed on the measurement date of fixed-interest, high quality investments expected to be available during the period to maturity of the related benefits on a plan by plan basis. The discount rate for the plans was 4.75% in 2013 and 4.0% in 2012. The expected long-term rate of return on plan assets is determined by using the plan's target allocation and historical returns for each asset class on a plan by plan basis. The expected long-term rate of return for all plans was 7.25% in 2013, 2012 and 2011.

Historically, the Company used an investment strategy which emphasized equities in order to produce higher expected returns, and in the long run, lower expected expense and cash contribution requirements. The qualified pension plan asset allocation targets were 50% equity and 50% fixed income for 2012 and 2011. Beginning in 2013, the Company changed its investment strategy to be liability management driven. The qualified pension plan asset allocation targets in 2013 were revised to hold more fixed income investments based on the change in the investment strategy. Investment allocations for the four qualified defined benefit plans range from 60% to 85% in fixed income and 15% to 40% in equities as of December 31, 2013.

As of December 31, 2013, the Company's qualified defined benefit pension plan assets consisted of 23% equity, 76% fixed income and 1% money market securities of which 17% were classified as Level 1 and 83% as Level 2 in the fair value hierarchy. The Company's qualified defined benefit pension plan assets as of December 31, 2012 consisted of 50% equity, 48% fixed income and 2% money market securities of which 84% were classified as Level 1 and 16% as Level 2 in the fair value hierarchy.

The Company contributed $33 million, $36 million and $92 million to the pension plans during 2013, 2012 and 2011, respectively. The Company plans to make approximately $41 million in contributions to the pension plans during 2014.

The Company also contributes to a number of multiemployer pension plans under the terms of collective-bargaining agreements that cover its union-represented employees. The risks of participating in these multiemployer plans are different from single-employer pension plans in the following aspects: (i) assets contributed to the multiemployer plan by one employer may be used to provide benefits to employees of other participating employers, (ii) if a participating employer stops contributing to the plan, the unfunded obligations of the plan may be borne by the remaining participating employers, and (iii) if the Company chooses to stop participating in some of its multiemployer plans, the Company may be required to pay those plans an amount based on the underfunded status of the plan, referred to as a withdrawal liability.

None of the multiemployer pension plans in which the Company participates are individually significant to the Company. Total Company contributions to multiemployer pension plans were $13 million, $12 million and $11 million in 2013, 2012 and 2011, respectively.

## 10 Stock Incentive Plans

Stock-based compensation expense is measured at the grant date based on the fair value of the award and is recognized as expense over the applicable requisite service period of the stock award (generally three to five years) using the straight-line method. Stock-based compensation costs are included in selling, general and administrative expenses.

Compensation expense related to stock options, which includes the 2007 Employee Stock Purchase Plan (the “2007 ESPP”) totaled $100 million, $102 million and $112 million for 2013, 2012 and 2011, respectively. The recognized tax benefit was $32 million, $33 million and $38 million for 2013, 2012 and 2011, respectively. Compensation expense related to restricted stock awards totaled $41 million, $30 million and $21 million for 2013, 2012 and 2011, respectively.

The 2007 ESPP provides for the purchase of up to 15 million shares of common stock. In March 2013, the Board of Directors approved an amendment to the 2007 ESPP to provide an additional 15 million shares of common stock for issuance. Under the 2007 ESPP, eligible employees may purchase common stock at the end of each six month offering period at a purchase price equal to 85% of the lower of the fair market value on the first day or the last day of the offering period. During 2013, approximately 2 million shares of common stock were purchased under the provisions of the 2007 ESPP at an average price of $41.44 per share. As of December 31, 2013, approximately 17 million shares of common stock were available for issuance under the 2007 ESPP.

The fair value of stock-based compensation associated with the 2007 ESPP is estimated on the date of grant (the first day of the six month offering period) using the Black-Scholes Option Pricing Model.

The following table is a summary of the assumptions used to value the ESPP awards for each of the respective periods:

| | 2013 | 2012 | 2011 |
|---|---|---|---|
| Dividend yield[(1)] | 0.86% | 0.73% | 0.69% |
| Expected volatility[(2)] | 16.94% | 22.88% | 20.42% |
| Risk-free interest rate[(3)] | 0.10% | 0.10% | 0.15% |
| Expected life *(in years)*[(4)] | 0.5 | 0.5 | 0.5 |
| Weighted-average grant date fair value | $ 10.08 | $ 9.22 | $ 7.21 |

(1) The dividend yield is calculated based on semi-annual dividends paid and the fair market value of the Company’s stock at the grant date.
(2) The expected volatility is based on the historical volatility of the Company’s daily stock market prices over the previous six month period.
(3) The risk-free interest rate is based on the Treasury constant maturity interest rate whose term is consistent with the expected term of ESPP options (i.e., 6 months).
(4) The expected life is based on the semi-annual purchase period.

In May 2010, the Company’s Board of Directors adopted and the shareholders approved the 2010 Incentive Compensation Plan (the “2010 ICP”). The terms of the 2010 ICP provide for grants of annual incentive and long-term performance awards to executive officers and other officers and employees of the Company or any subsidiary of the Company. Payment of such annual incentive and long-term performance awards will be in cash, stock, other awards or other property, at the discretion of the Management Planning and Development Committee of the Company’s Board of Directors. The 2010 ICP allows for a

maximum of 74 million shares to be reserved and available for grants. The 2010 ICP is the only compensation plan under which the Company grants stock options, restricted stock and other stock-based awards to its employees, with the exception of the Company's 2007 ESPP. In November 2012, the Company's Board of Director's approved an amendment to the 2010 ICP to eliminate the share recycling provision of the 2010 ICP. As of December 31, 2013, there were approximately 38 million shares available for future grants under the 2010 ICP.

The Company's restricted awards are considered non-vested share awards and require no payment from the employee. Compensation cost is recorded based on the market price on the grant date and is recognized on a straight-line basis over the requisite service period. The Company granted 1,715,000, 1,811,000 and 1,121,000 restricted stock units with a weighted average fair value of $54.30, $44.80 and $34.84 in 2013, 2012 and 2011, respectively. As of December 31, 2013, there was $89 million of total unrecognized compensation cost related to the restricted stock units that are expected to vest. These costs are expected to be recognized over a weighted-average period of 2.1 years. The total fair value of restricted shares vested during 2013, 2012 and 2011 was $41 million, $81 million and $33 million, respectively.

The following table is a summary of the restricted stock unit and restricted share award activity for the year ended December 31, 2013.

| ***Units in thousands*** | **Units** | **Weighted Average Grant Date Fair Value** |
|---|---|---|
| Nonvested at beginning of year | 2,350 | $ 33.32 |
| Granted | 1,715 | 54.30 |
| Vested | (802) | 54.58 |
| Forfeited | (242) | 46.17 |
| Nonvested at end of year | 3,021 | $ 38.56 |

All grants under the 2010 ICP are awarded at fair market value on the date of grant. The fair value of stock options is estimated using the Black-Scholes Option Pricing Model and stock-based compensation is recognized on a straight-line basis over the requisite service period. Options granted through 2010 generally become exercisable over a three-year period from the grant date. Beginning in 2011, options granted generally become exercisable over a four-year period from the grant date. Options generally expire seven years after the grant date.

Excess tax benefits of $62 million, $28 million and $21 million were included in financing activities in the accompanying consolidated statements of cash flow during 2013, 2012 and 2011, respectively. Cash received from stock options exercised, which includes the 2007 ESPP, totaled $500 million, $836 million and $431 million during 2013, 2012 and 2011, respectively. The total intrinsic value of options exercised was $282 million, $321 million and $161 million in 2013, 2012 and 2011, respectively. The total fair value of options vested during 2013, 2012 and 2011 was $329 million, $386 million and $452 million, respectively.

The fair value of each stock option is estimated using the Black-Scholes option pricing model based on the following assumptions at the time of grant:

| | **2013** | **2012** | **2011** |
|---|---|---|---|
| Dividend yield[1] | 1.65% | 1.44% | 1.43% |
| Expected volatility[2] | 30.96% | 32.49% | 32.62% |
| Risk-free interest rate[3] | 0.73% | 0.84% | 1.81% |
| Expected life *(in years)*[4] | 4.7 | 4.7 | 4.7 |
| Weighted-average grant date fair value | $ 12.50 | $ 11.12 | $ 9.19 |

(1) The dividend yield is based on annual dividends paid and the fair market value of the Company's stock at the grant date.
(2) The expected volatility is estimated using the Company's historical volatility over a period equal to the expected life of each option grant after adjustments for infrequent events such as stock splits.
(3) The risk-free interest rate is selected based on yields from U.S. Treasury zero-coupon issues with a remaining term equal to the expected term of the options being valued.
(4) The expected life represents the number of years the options are expected to be outstanding from grant date based on historical option holder exercise experience.

As of December 31, 2013, unrecognized compensation expense related to unvested options totaled $170 million, which the Company expects to be recognized over a weighted-average period of 2.1 years. After considering anticipated forfeitures, the Company expects approximately 19 million of the unvested options to vest over the requisite service period.

The following table is a summary of the Company's stock option activity for the year ended December 31, 2013:

| ***Shares in thousands*** | Shares | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Term | | Aggregate Intrinsic Value |
|---|---|---|---|---|---|---|
| Outstanding at December 31, 2012 | 40,929 | $ | 36.57 | 4.34 | $ | 482,249,000 |
| Granted | 8,556 | $ | 54.60 | — | | — |
| Exercised | (12,568) | $ | 35.04 | — | | — |
| Forfeited | (1,619) | $ | 41.87 | — | | — |
| Expired | (560) | $ | 31.18 | — | | — |
| Outstanding at December 31, 2013 | 34,738 | $ | 41.40 | 4.39 | $ | 1,047,976,191 |
| Exercisable at December 31, 2013 | 14,573 | $ | 35.21 | 2.95 | $ | 529,832,395 |
| Vested and expected to vest at December 31, 2013 | 33,601 | $ | 41.17 | 4.34 | $ | 1,021,486,782 |

## 11 Income Taxes

The income tax provision for continuing operations consisted of the following for the respective years:

| ***In millions*** | | 2013 | | 2012 | | 2011 |
|---|---|---|---|---|---|---|
| Current: | | | | | | |
| Federal | $ | 2,623 | $ | 2,226 | $ | 1,807 |
| State | | 437 | | 410 | | 338 |
| | | 3,060 | | 2,636 | | 2,145 |
| Deferred: | | | | | | |
| Federal | | (115) | | (182) | | 101 |
| State | | (17) | | (18) | | 12 |
| | | (132) | | (200) | | 113 |
| Total | $ | 2,928 | $ | 2,436 | $ | 2,258 |

The following table is a reconciliation of the statutory income tax rate to the Company's effective income tax rate for continuing operations for the respective years:

| | 2013 | 2012 | 2011 |
|---|---|---|---|
| Statutory income tax rate | 35.0% | 35.0% | 35.0% |
| State income taxes, net of federal tax benefit | 4.0 | 3.9 | 3.9 |
| Other | (0.1) | (0.3) | 0.4 |
| Effective income tax rate | 38.9% | 38.6% | 39.3% |

The following table is a summary of the significant components of the Company's deferred tax assets and liabilities as of December 31:

| *In millions* | 2013 | 2012 |
|---|---|---|
| Deferred tax assets: | | |
| Lease and rents | $ 344 | $ 336 |
| Inventories | — | 141 |
| Employee benefits | 213 | 202 |
| Allowance for doubtful accounts | 79 | 137 |
| Retirement benefits | 172 | 115 |
| Net operating losses | 10 | 5 |
| Depreciation | 192 | — |
| Other | 598 | 430 |
| Valuation allowance | (3) | — |
| Total deferred tax assets | 1,605 | 1,366 |
| Deferred tax liabilities: | | |
| Inventories | (69) | — |
| Depreciation and amortization | (4,512) | (4,457) |
| Total deferred tax liabilities | (4,581) | (4,457) |
| Net deferred tax liabilities | $ (2,976) | $ (3,091) |

Net deferred tax assets (liabilities) are presented on the consolidated balance sheets as follows:

| *In millions* | 2013 | 2012 |
|---|---|---|
| Deferred tax assets—current | $ 902 | $ 693 |
| Deferred tax assets—noncurrent (included in other assets) | 23 | — |
| Deferred tax liabilities—noncurrent | (3,901) | (3,784) |
| Net deferred tax liabilities | $ (2,976) | $ (3,091) |

The Company believes it is more likely than not the deferred tax assets will be realized during future periods.

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows:

| *In millions* | 2013 | 2012 | 2011 |
|---|---|---|---|
| Beginning balance | $ 80 | $ 38 | $ 35 |
| Additions based on tax positions related to the current year | 19 | 15 | 3 |
| Additions based on tax positions related to prior years | 37 | 42 | 13 |
| Reductions for tax positions of prior years | (1) | (2) | — |
| Expiration of statutes of limitation | (17) | (12) | (7) |
| Settlements | (1) | (1) | (6) |
| Ending balance | $ 117 | $ 80 | $ 38 |

The Company and most of its subsidiaries are subject to U.S. federal income tax as well as income tax of numerous state and local jurisdictions. The Internal Revenue Service ("IRS") is currently examining the Company's 2012 and 2013 consolidated U.S. federal income tax returns under its Compliance Assurance Process ("CAP") program. The CAP program is a voluntary program under which participating taxpayers work collaboratively with the IRS to identify and resolve potential tax issues through open, cooperative and transparent interaction prior to the filing of their federal income tax return.

The Company and its subsidiaries are also currently under income tax examinations by a number of state and local tax authorities. As of December 31, 2013, no examination has resulted in any proposed adjustments that would result in a material change to the Company's results of operations, financial condition or liquidity.

Substantially all material state and local income tax matters have been concluded for fiscal years through 2008. The Company and its subsidiaries anticipate that a number of state and local income tax examinations will be concluded and statutes of limitation for open years will expire over the next twelve months, which may result in the utilization or reduction of the Company's reserve for uncertain tax positions of up to approximately $13 million.

The Company recognizes interest accrued related to unrecognized tax benefits and penalties in income tax expense. During the years ended December 31, 2013, 2012 and 2011, the Company recognized interest of approximately $4 million, $4 million and $2 million, respectively. The Company had approximately $10 million accrued for interest and penalties as of December 31, 2013 and 2012.

There are no material uncertain tax positions as of December 31, 2013 the ultimate deductibility of which is highly certain but for which there is uncertainty about the timing of such deductibility. If present, such items would impact deferred tax accounting, not the annual effective income tax rate, and would accelerate the payment of cash to the taxing authority to a period earlier than expected.

The total amount of unrecognized tax benefits that, if recognized, would affect the effective income tax rate is approximately $95 million, after considering the federal benefit of state income taxes.

## 12 Commitments and Contingencies

### Lease Guarantees

Between 1991 and 1997, the Company sold or spun off a number of subsidiaries, including Bob's Stores, Linens 'n Things, Marshalls, Kay-Bee Toys, Wilsons, This End Up and Footstar. In many cases, when a former subsidiary leased a store, the Company provided a guarantee of the store's lease obligations. When the subsidiaries were disposed of, the Company's guarantees remained in place, although each initial purchaser has agreed to indemnify the Company for any lease obligations the Company was required to satisfy. If any of the purchasers or any of the former subsidiaries were to become insolvent and failed to make the required payments under a store lease, the Company could be required to satisfy these obligations.

As of December 31, 2013, the Company guaranteed approximately 73 such store leases (excluding the lease guarantees related to Linens 'n Things, which are discussed in Note 3), with the maximum remaining lease term extending through 2026. Management believes the ultimate disposition of any of the remaining guarantees will not have a material adverse effect on the Company's consolidated financial condition, results of operations or future cash flows.

### Legal Matters

The Company is a party to legal proceedings, investigations and claims in the ordinary course of its business, including the matters described below. The Company records accruals for outstanding legal matters when it believes it is probable that a loss will be incurred and the amount can be reasonably estimated. The Company evaluates, on a quarterly basis, developments in legal matters that could affect the amount of any accrual and developments that would make a loss contingency both probable and reasonably estimable. If a loss contingency is not both probable and estimable, the Company does not establish an accrued liability. None of the Company's accruals for outstanding legal matters are material individually or in the aggregate to the Company's financial position.

The Company's contingencies are subject to significant uncertainties, including, among other factors: (i) the procedural status of pending matters; (ii) whether class action status is sought and certified; (iii) whether asserted claims or allegations will survive dispositive motion practice; (iv) the extent of potential damages, fines or penalties, which are often unspecified or indeterminate; (v) the impact of discovery on the legal process; (vi) whether novel or unsettled legal theories are at issue; (vii) the settlement posture of the parties, and/or (viii) in the case of certain government agency investigations, whether a sealed *qui tam* lawsuit ("whistleblower" action) has been filed and whether the government agency makes a decision to intervene in the lawsuit following investigation.

Except as otherwise noted, the Company cannot predict with certainty the timing or outcome of the legal matters described below, and is unable to reasonably estimate a possible loss or range of possible loss in excess of amounts already accrued for these matters.

- Caremark (the term "Caremark" being used herein to generally refer to any one or more pharmacy benefit management subsidiaries of the Company, as applicable) was a defendant in a *qui tam* lawsuit initially filed by a relator on behalf of various state and federal government agencies in Texas federal court in 1999. The case was unsealed in May 2005. The case sought monetary damages and alleged that Caremark's processing of Medicaid and certain other government claims on behalf of its clients (which allegedly resulted in underpayments from our clients to the applicable government agencies) on one of Caremark's adjudication platforms violated applicable federal or state false claims acts and fraud statutes. The United States and the States of Texas, Tennessee, Florida, Arkansas, Louisiana and California intervened in the lawsuit, but Tennessee and Florida withdrew from the lawsuit in August 2006 and May 2007, respectively. Thereafter, in 2008, the Company prevailed on several motions for partial summary judgment and, following an appellate ruling from the Fifth Circuit Court of Appeals in 2011 which affirmed in part and reversed in part these prior rulings, the claims asserted in the case against Caremark were substantially narrowed. In December 2013, this case was dismissed following a settlement between the Company and the plaintiffs.

  In a related matter, in December 2007, the Company received a document subpoena from the Office of Inspector General ("OIG") within the U.S. Department of Health and Human Services ("HHS"), requesting information relating to the processing of Medicaid and other government agency claims on a different adjudication platform of Caremark. The Company has provided documents and other information in response to this request for information. The Company has been conducting discussions with the United States Department of Justice ("DOJ") and the OIG regarding a possible settlement of this matter.

- Caremark was named in a putative class action lawsuit filed in October 2003 in Alabama state court by John Lauriello, purportedly on behalf of participants in the 1999 settlement of various securities class action and derivative lawsuits against Caremark and others. Other defendants include insurance companies that provided coverage to Caremark with respect to the settled lawsuits. The Lauriello lawsuit seeks approximately $3.2 billion in compensatory damages plus other non-specified damages based on allegations that the amount of insurance coverage available for the settled lawsuits was misrepresented and suppressed. A similar lawsuit was filed in November 2003 by Frank McArthur, also in Alabama state court, naming as defendants Caremark, several insurance companies, attorneys and law firms involved in the 1999 settlement. This lawsuit was stayed as a later-filed class action, but McArthur was subsequently allowed to intervene in the Lauriello action. Following the close of class discovery, the trial court entered an Order on August 15, 2012 that granted the plaintiffs' motion to certify a class pursuant to Alabama Rule of civil Procedures 23(b)(3) but denied their request that the class also be certified pursuant to Rule 23(b)(1). In addition, the August 15, 2012 Order appointed class representatives and class counsel. The defendants' appeal and plaintiffs' cross-appeal are pending before the Alabama Supreme Court. The proceedings in the trial court are stayed by statute pending a decision on the appeal and cross-appeal by the Alabama Supreme Court.

- Various lawsuits have been filed alleging that Caremark has violated applicable antitrust laws in establishing and maintaining retail pharmacy networks for client health plans. In August 2003, Bellevue Drug Co., Robert Schreiber, Inc. d/b/a Burns Pharmacy and Rehn-Huerbinger Drug Co. d/b/a Parkway Drugs #4, together with Pharmacy Freedom Fund and the National Community Pharmacists Association filed a putative class action against Caremark in Pennsylvania federal court, seeking treble damages and injunctive relief. This case was initially sent to arbitration based on the contract terms between the pharmacies and Caremark. In October 2003, two independent pharmacies, North Jackson Pharmacy, Inc. and C&C, Inc. d/b/a Big C Discount Drugs, Inc., filed a putative class action complaint in Alabama federal court against Caremark and two PBM competitors, seeking treble damages and injunctive relief. The North Jackson Pharmacy case against two of the Caremark entities named as defendants was transferred to Illinois federal court, and the case against a separate Caremark entity was sent to arbitration based on contract terms between the pharmacies and Caremark. The Bellevue arbitration was then stayed by the parties pending developments in the North Jackson Pharmacy court case.

  In August 2006, the Bellevue case and the North Jackson Pharmacy case were both transferred to Pennsylvania federal court by the Judicial Panel on Multidistrict Litigation for coordinated and consolidated proceedings with other cases before the panel, including cases against other PBMs. Caremark appealed the decision which vacated an order compelling arbitration and staying the proceedings in the Bellevue case and, following the appeal, the Court of Appeals reinstated the order compelling arbitration of the Bellevue case. Following remand, plaintiffs in the Bellevue

case sought dismissal of their complaint to permit an immediate appeal of the reinstated order compelling arbitration and pursued an appeal to the Third Circuit Court of Appeals. In November 2012, the Third Circuit Court reversed the district court ruling and directed the parties to proceed in federal court. Motions for class certification in the coordinated cases within the multidistrict litigation, including the North Jackson Pharmacy case, remain pending, and the court has permitted certain additional class discovery and briefing. The consolidated action is now known as the In Re Pharmacy Benefit Managers Antitrust Litigation.

- In November 2009, a securities class action lawsuit was filed in the United States District Court for the District of Rhode Island purportedly on behalf of purchasers of CVS Caremark Corporation stock between May 5, 2009 and November 4, 2009. Plaintiffs subsequently amended the lawsuit to allege a class period beginning October 30, 2008. The lawsuit names the Company and certain officers as defendants and includes allegations of securities fraud relating to public disclosures made by the Company concerning the PBM business and allegations of insider trading. In addition, a shareholder derivative lawsuit was filed in December 2009 in the same court against the directors and certain officers of the Company. This lawsuit, which was stayed pending developments in the related securities class action, includes allegations of, among other things, securities fraud, insider trading and breach of fiduciary duties and further alleges that the Company was damaged by the purchase of stock at allegedly inflated prices under its share repurchase program. In January 2011, both lawsuits were transferred to the United States District Court for the District of New Hampshire. In June 2012, the court granted the Company's motion to dismiss the securities class action. The plaintiffs subsequently appealed the court's ruling on the motion to dismiss. In May 2013, the First Circuit Court of Appeals vacated the prior ruling and remanded the case to the district court for further proceedings. In December 2013, the district court denied the Company's renewed motion to dismiss the lawsuit. The derivative lawsuit will remain stayed until the Company answers the securities class action complaint.

- In March 2010, the Company learned that various State Attorneys General offices and certain other government agencies were conducting a multi-state investigation of certain of the Company's business practices similar to those being investigated at that time by the U.S. Federal Trade Commission ("FTC"). Twenty-eight states, the District of Columbia and the County of Los Angeles are known to be participating in this investigation. The prior FTC investigation, which commenced in August 2009, was officially concluded in May 2012 when the consent order entered into between the FTC and the Company became final. The Company has cooperated in the multi-state investigation.

- In March 2010, the Company received a subpoena from the OIG requesting information about programs under which the Company has offered customers remuneration conditioned upon the transfer of prescriptions for drugs or medications to the Company's pharmacies in the form of gift cards, cash, non-prescription merchandise or discounts or coupons for non-prescription merchandise. The subpoena relates to an investigation of possible false or otherwise improper claims for payment under the Medicare and Medicaid programs. The Company has provided documents and other information in response to this request for information.

- The Company received a subpoena from the U.S. Securities and Exchange Commission ("SEC") in February 2011 and subsequently received additional subpoenas and other requests for information. The SEC's requests related to, among other things, public disclosures made by the Company during 2009, transactions in the Company's securities by certain officers and employees of the Company during 2009 and the purchase accounting for the Longs Drug Stores acquisition. The Company has provided the documents and other information requested by the SEC and has been cooperating with the SEC in this investigation. The Company has reached an agreement in principle with the staff of the Boston Regional Office of the SEC to settle certain allegations that, during the third and fourth quarters of 2009, the Company violated certain provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934, including certain anti-fraud provisions of those statutes. The agreement in principle will be entered into by the Company on a "no admit or deny" basis, and the Company will not be restating its financial statements for any reporting period. The Company has agreed to pay a $20 million civil penalty when the settlement is finalized, and this amount has been fully reserved in the Company's financial statements. The Company will continue to cooperate with the SEC to document the settlement terms, and the settlement remains subject to approval by the Commission and federal court as required.

- In January 2012, the United States District Court for the Eastern District of Pennsylvania unsealed a first amended *qui tam* complaint filed in August 2011 by an individual relator, who is described in the complaint as having once been employed by a firm providing pharmacy prescription benefit audit and recovery services. The complaint seeks monetary damages and alleges that Caremark's processing of Medicare claims on behalf of one of its clients violated

the federal false claims act. The United States, acting through the U.S. Attorney's Office in Philadelphia, Pennsylvania, declined to intervene in the lawsuit. Caremark filed a motion to dismiss the amended complaint and the DOJ filed a Statement of Interest with regard to Caremark's motion to dismiss. In December 2012, the court denied Caremark's motion to dismiss the amended complaint.

- In January 2012, the Company received a subpoena from the OIG requesting information about its Health Savings Pass program, a prescription drug discount program for uninsured or underinsured individuals, in connection with an investigation of possible false or otherwise improper claims for payment involving HHS programs. In February 2012, the Company also received a civil investigative demand from the Office of the Attorney General of the State of Texas requesting a copy of information produced under this OIG subpoena and other information related to prescription drug claims submitted by the Company's pharmacies to Texas Medicaid for reimbursement. The Company is providing documents and other information in response to these requests for information.

- A purported shareholder derivative action was filed on behalf of nominal defendant CVS Caremark Corporation against certain of the Company’s officers and members of its Board of Directors. The action, which alleged a single claim for breach of fiduciary duty relating to the Company's alleged failure to properly implement internal regulatory controls to comply with the Controlled Substances Act and the Combat Methamphetamine Epidemic Act, was originally filed in June 2012. In addition, an amended complaint was filed in November 2012 and a Supplemental Complaint was filed in April 2013. In October 2013, the court granted the Company's motion to dismiss and entered judgment dismissing the action, without prejudice. Following dismissal of the action, the same purported shareholder sent a letter to the Company's Board of Directors demanding that the Board investigate her allegations and pursue legal action against certain directors and officers of the Company. A committee of the Board of Directors is conducting a review and intends to respond to the letter as appropriate.

- In November 2012, the Company received a subpoena from the OIG requesting information concerning automatic refill programs used by pharmacies to refill prescriptions for customers. The Company has been cooperating and providing documents and other information in response to this request for information.

The Company is also a party to other legal proceedings, inquiries and audits arising in the normal course of its business, none of which is expected to be material to the Company. The Company can give no assurance, however, that its business, financial condition and results of operations will not be materially adversely affected, or that the Company will not be required to materially change its business practices, based on: (i) future enactment of new health care or other laws or regulations; (ii) the interpretation or application of existing laws or regulations as they may relate to the Company's business, the pharmacy services, retail pharmacy or retail clinic industries or to the health care industry generally; (iii) pending or future federal or state governmental investigations of the Company’s business or the pharmacy services, retail pharmacy or retail clinic industry or of the health care industry generally; (iv) institution of government enforcement actions against the Company; (v) adverse developments in any pending *qui tam* lawsuit against the Company, whether sealed or unsealed, or in any future *qui tam* lawsuit that may be filed against the Company; or (vi) adverse developments in other pending or future legal proceedings against the Company or affecting the pharmacy services, retail pharmacy or retail clinic industry or the health care industry generally.

**13 Segment Reporting**

The Company currently has three reportable segments: Pharmacy Services, Retail Pharmacy and Corporate.

The Company evaluates its Pharmacy Services and Retail Pharmacy segment performance based on net revenue, gross profit and operating profit before the effect of certain intersegment activities and charges. The Company evaluates the performance of its Corporate Segment based on operating expenses before the effect of discontinued operations and certain intersegment activities and charges. See Note 1 for a description of the Pharmacy Services, Retail Pharmacy and Corporate segments and related significant accounting policies.

The following table is a reconciliation of the Company's business segments to the consolidated financial statements:

| *In millions* | Pharmacy Services Segment(1)(2) | Retail Pharmacy Segment(2) | Corporate Segment | Intersegment Eliminations(2) | Consolidated Totals |
|---|---|---|---|---|---|
| 2013: | | | | | |
| Net revenues | $ 76,208 | $ 65,618 | $ — | $ (15,065) | $ 126,761 |
| Gross profit | 4,237 | 20,112 | — | (566) | 23,783 |
| Operating profit | 3,086 | 6,268 | (751) | (566) | 8,037 |
| Depreciation and amortization | 560 | 1,217 | 93 | — | 1,870 |
| Total assets | 38,343 | 30,191 | 4,420 | (1,428) | 71,526 |
| Goodwill | 19,658 | 6,884 | — | — | 26,542 |
| Additions to property and equipment | 313 | 1,610 | 61 | — | 1,984 |
| 2012: | | | | | |
| Net revenues | $ 73,444 | $ 63,641 | $ — | $ (13,965) | $ 123,120 |
| Gross profit | 3,808 | 19,091 | — | (411) | 22,488 |
| Operating profit | 2,679 | 5,636 | (694) | (411) | 7,210 |
| Depreciation and amortization | 517 | 1,153 | 83 | — | 1,753 |
| Total assets | 36,057 | 29,492 | 1,408 | (736) | 66,221 |
| Goodwill | 19,646 | 6,749 | — | — | 26,395 |
| Additions to property and equipment | 422 | 1,555 | 53 | — | 2,030 |
| 2011: | | | | | |
| Net revenues | $ 58,874 | $ 59,579 | $ — | $ (11,373) | $ 107,080 |
| Gross profit | 3,279 | 17,469 | — | (186) | 20,562 |
| Operating profit | 2,220 | 4,913 | (616) | (186) | 6,331 |
| Depreciation and amortization | 433 | 1,060 | 75 | — | 1,568 |
| Total assets | 35,704 | 28,632 | 1,121 | (605) | 64,852 |
| Goodwill | 19,657 | 6,801 | — | — | 26,458 |
| Additions to property and equipment | 461 | 1,353 | 58 | — | 1,872 |

(1) Net revenues of the Pharmacy Services Segment include approximately $7.9 billion, $8.4 billion and $7.9 billion of Retail co-payments for the years ended December 31, 2013, 2012 and 2011, respectively.

(2) Intersegment eliminations relate to two types of transactions: (i) Intersegment revenues that occur when Pharmacy Services Segment clients use Retail Pharmacy Segment stores to purchase covered products. When this occurs, both the Pharmacy Services and Retail Pharmacy segments record the revenue on a standalone basis and (ii) Intersegment revenues, gross profit and operating profit that occur when Pharmacy Services Segment clients, through the Company's intersegment activities (such as the Maintenance Choice program), elect to pick up their maintenance prescriptions at Retail Pharmacy Segment stores instead of receiving them through the mail. When this occurs, both the Pharmacy Services and Retail Pharmacy segments record the revenue, gross profit and operating profit on a standalone basis. Beginning in the fourth quarter of 2011, the Maintenance Choice eliminations reflect all discounts available for the purchase of mail order prescription drugs. The following amounts are eliminated in consolidation in connection with the item (ii) intersegment activity: net revenues of $4.3 billion, $3.4 billion and $2.6 billion for the years ended December 31, 2013, 2012 and 2011, respectively; gross profit and operating profit of $566 million, $411 million and $186 million for the years ended December 31, 2013, 2012 and 2011, respectively.

## 14 Earnings Per Common Share

The following is a reconciliation of basic and diluted earnings per common share for the respective years:

| *In millions, except per share amounts* | 2013 | 2012 | 2011 |
|---|---|---|---|
| Numerator for earnings per common share calculation: | | | |
| Income from continuing operations | $ 4,600 | $ 3,869 | $ 3,489 |
| Net loss attributable to noncontrolling interest | — | 2 | 4 |
| Income from continuing operations attributable to CVS Caremark, basic | 4,600 | 3,871 | 3,493 |
| Loss from discontinued operations, net of tax | (8) | (7) | (31) |
| Net income attributable to CVS Caremark, basic and diluted | $ 4,592 | $ 3,864 | $ 3,462 |
| Denominator for earnings per common share calculation: | | | |
| Weighted average common shares, basic | 1,217 | 1,271 | 1,338 |
| Stock options | 8 | 8 | 8 |
| Restricted stock units | 1 | 1 | 1 |
| Weighted average common shares, diluted | 1,226 | 1,280 | 1,347 |
| Basic earnings per common share: | | | |
| Income from continuing operations attributable to CVS Caremark | $ 3.78 | $ 3.05 | $ 2.61 |
| Loss from discontinued operations attributable to CVS Caremark | $ (0.01) | $ (0.01) | $ (0.02) |
| Net income attributable to CVS Caremark | $ 3.77 | $ 3.04 | $ 2.59 |
| Diluted earnings per common share: | | | |
| Income from continuing operations attributable to CVS Caremark | $ 3.75 | $ 3.02 | $ 2.59 |
| Loss from discontinued operations attributable to CVS Caremark | $ (0.01) | $ (0.01) | $ (0.02) |
| Net income attributable to CVS Caremark | $ 3.74 | $ 3.02 | $ 2.57 |

## 15 Subsequent Event

On January 16, 2014, the Company acquired Coram LLC ("Coram"), the specialty infusion services and enteral nutrition business unit of Apria Healthcare Group Inc. for approximately $2.1 billion. Coram is one of the nation's largest providers of comprehensive infusion services, caring for approximately 165,000 patients annually. Coram has approximately 4,600 employees, including approximately 600 nurses and 250 dietitians, operating primarily through 85 branch locations and six centers of excellence for patient intake. Coram's results of operations will be included in the Company's Pharmacy Services Segment beginning January 16, 2014.

## 16 Quarterly Financial Information (Unaudited)

| *In millions, except per share amounts* | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Year |
|---|---|---|---|---|---|
| 2013: | | | | | |
| Net revenues | $ 30,751 | $ 31,248 | $ 31,932 | $ 32,830 | $ 126,761 |
| Gross profit | 5,577 | 5,841 | 6,027 | 6,338 | 23,783 |
| Operating profit | 1,694 | 1,972 | 2,154 | 2,217 | 8,037 |
| Income from continuing operations | 954 | 1,125 | 1,255 | 1,266 | 4,600 |
| Loss from discontinued operations, net of tax | — | (1) | (6) | (1) | (8) |
| Net income | 954 | 1,124 | 1,249 | 1,265 | 4,592 |
| Net loss attributable to noncontrolling interest | — | — | — | — | — |
| Net income attributable to CVS Caremark | $ 954 | $ 1,124 | $ 1,249 | $ 1,265 | $ 4,592 |
| Basic earnings per common share: | | | | | |
| Income from continuing operations attributable to CVS Caremark | $ 0.77 | $ 0.92 | $ 1.03 | $ 1.06 | $ 3.78 |
| Loss from discontinued operations attributable to CVS Caremark | $ — | $ — | $ — | $ — | $ (0.01) |
| Net income attributable to CVS Caremark | $ 0.77 | $ 0.92 | $ 1.03 | $ 1.06 | $ 3.77 |
| Diluted Earnings per common share: | | | | | |
| Income from continuing operations attributable to CVS Caremark | $ 0.77 | $ 0.91 | $ 1.02 | $ 1.05 | $ 3.75 |
| Loss from discontinued operations attributable to CVS Caremark | $ — | $ — | $ — | $ — | $ (0.01) |
| Net income attributable to CVS Caremark | $ 0.77 | $ 0.91 | $ 1.02 | $ 1.05 | $ 3.74 |
| Dividends per common share | $ 0.2250 | $ 0.2250 | $ 0.2250 | $ 0.2250 | $ 0.9000 |
| Stock price: (New York Stock Exchange) | | | | | |
| High | $ 56.07 | $ 60.70 | $ 62.36 | $ 71.99 | $ 71.99 |
| Low | $ 49.00 | $ 53.94 | $ 56.68 | $ 56.32 | $ 49.00 |

| *In millions, except per share amounts* | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Year |
|---|---|---|---|---|---|
| 2012: | | | | | |
| Net revenues | $ 30,792 | $ 30,694 | $ 30,237 | $ 31,397 | $ 123,120 |
| Gross profit | 5,106 | 5,443 | 5,645 | 6,294 | 22,488 |
| Operating profit | 1,397 | 1,702 | 1,812 | 2,299 | 7,210 |
| Income from continuing operations | 772 | 962 | 1,010 | 1,125 | 3,869 |
| Income (loss) from discontinued operations, net of tax | (1) | (1) | (5) | — | (7) |
| Net income | 771 | 961 | 1,005 | 1,125 | 3,862 |
| Net loss attributable to noncontrolling interest | 1 | 1 | — | — | 2 |
| Net income attributable to CVS Caremark | $ 772 | $ 962 | $ 1,005 | $ 1,125 | $ 3,864 |
| Basic earnings per common share: | | | | | |
| Income from continuing operations attributable to CVS Caremark | $ 0.60 | $ 0.75 | $ 0.80 | $ 0.91 | $ 3.05 |
| Income (loss) from discontinued operations attributable to CVS Caremark | $ — | $ — | $ — | $ — | $ (0.01) |
| Net income attributable to CVS Caremark | $ 0.59 | $ 0.75 | $ 0.79 | $ 0.91 | $ 3.04 |
| Diluted Earnings per common share: | | | | | |
| Income from continuing operations attributable to CVS Caremark | $ 0.59 | $ 0.75 | $ 0.79 | $ 0.90 | $ 3.02 |
| Income (loss) from discontinued operations attributable to CVS Caremark | $ — | $ — | $ — | $ — | $ (0.01) |
| Net income attributable to CVS Caremark | $ 0.59 | $ 0.75 | $ 0.79 | $ 0.90 | $ 3.02 |
| Dividends per common share | $ 0.1625 | $ 0.1625 | $ 0.1625 | $ 0.1625 | $ 0.650 |
| Stock price: (New York Stock Exchange) | | | | | |
| High | $ 45.88 | $ 46.93 | $ 48.69 | $ 49.80 | $ 49.80 |
| Low | $ 41.01 | $ 43.08 | $ 43.65 | $ 44.33 | $ 41.01 |

See Note 1 - Significant Accounting Policies (Revenue Recognition - Retail Pharmacy Segment).

## Five-Year Financial Summary

| *In millions, except per share amounts* | 2013 | 2012[4] | 2011 | 2010 | 2009 |
|---|---|---|---|---|---|
| Statement of operations data: | | | | | |
| Net revenues | $ 126,761 | $ 123,120 | $ 107,080 | $ 95,766 | $ 98,144 |
| Gross profit | 23,783 | 22,488 | 20,562 | 20,215 | 20,348 |
| Operating expenses | 15,746 | 15,278 | 14,231 | 14,082 | 13,933 |
| Operating profit | 8,037 | 7,210 | 6,331 | 6,133 | 6,415 |
| Interest expense, net | 509 | 557 | 584 | 536 | 525 |
| Loss on early extinguishment of debt | — | 348 | — | — | — |
| Income tax provision[1] | 2,928 | 2,436 | 2,258 | 2,178 | 2,196 |
| Income from continuing operations | 4,600 | 3,869 | 3,489 | 3,419 | 3,694 |
| Income (loss) from discontinued operations, net of tax benefit[2] | (8) | (7) | (31) | 2 | (4) |
| Net income | 4,592 | 3,862 | 3,458 | 3,421 | 3,690 |
| Net loss attributable to noncontrolling interest[3] | — | 2 | 4 | 3 | — |
| Net income attributable to CVS Caremark | $ 4,592 | $ 3,864 | $ 3,462 | $ 3,424 | $ 3,690 |
| Per common share data: | | | | | |
| Basic earnings per common share: | | | | | |
| Income from continuing operations attributable to CVS Caremark | $ 3.78 | $ 3.05 | $ 2.61 | $ 2.50 | $ 2.58 |
| Loss from discontinued operations attributable to CVS Caremark | $ (0.01) | $ (0.01) | $ (0.02) | $ — | $ — |
| Net income attributable to CVS Caremark | $ 3.77 | $ 3.04 | $ 2.59 | $ 2.50 | $ 2.57 |
| Diluted earnings per common share: | | | | | |
| Income from continuing operations attributable to CVS Caremark | $ 3.75 | $ 3.02 | $ 2.59 | $ 2.49 | $ 2.55 |
| Loss from discontinued operations attributable to CVS Caremark | $ (0.01) | $ (0.01) | $ (0.02) | $ — | $ — |
| Net income attributable to CVS Caremark | $ 3.74 | $ 3.02 | $ 2.57 | $ 2.49 | $ 2.55 |
| Cash dividends per common share | $ 0.900 | $ 0.650 | $ 0.500 | $ 0.350 | $ 0.305 |
| Balance sheet and other data: | | | | | |
| Total assets | $ 71,526 | $ 66,221 | $ 64,852 | $ 62,457 | $ 61,919 |
| Long-term debt | $ 12,841 | $ 9,133 | $ 9,208 | $ 8,652 | $ 8,755 |
| Total shareholders' equity | $ 37,938 | $ 37,653 | $ 38,014 | $ 37,662 | $ 35,732 |
| Number of stores (at end of year) | 7,702 | 7,508 | 7,388 | 7,248 | 7,095 |

See Note 1 to the consolidated financial statements - Significant Accounting Policies (Revenue Recognition - Retail Pharmacy Segment) to the consolidated financial statements.

(1) Income tax provision includes the effect of the following: (i) in 2010, the recognition of $47 million of previously unrecognized tax benefits, including interest, relating to the expiration of various statutes of limitation and settlements with tax authorities and (ii) in 2009, the recognition of $167 million of previously unrecognized tax benefits, including interest, relating to the expiration of various statutes of limitation and settlements with tax authorities.

(2) As discussed in Note 3 to the consolidated financial statements, the results of the TheraCom business are presented as discontinued operations and have been excluded from continuing operations for all periods presented.

In connection with certain business dispositions completed between 1991 and 1997, the Company retained guarantees on store lease obligations for a number of former subsidiaries, including Linens 'n Things which filed for bankruptcy in 2008. The Company's income (loss) from discontinued operations includes lease-related costs which the Company believes it will likely be required to satisfy pursuant to its Linens 'n Things lease guarantees.

Below is a summary of the results of discontinued operations:

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| ***In millions*** | **2013** | **2012** | **2011** | **2010** | **2009** |
| Income from operations of TheraCom | $ — | $ — | $ 18 | $ 28 | $ 13 |
| Gain on disposal of TheraCom | — | — | 53 | — | — |
| Loss on disposal of Linens 'n Things | (12) | (12) | (7) | (24) | (19) |
| Income tax benefit (provision) | 4 | 5 | (95) | (2) | 2 |
| Income (loss) from discontinued operations, net of tax | $ (8) | $ (7) | $ (31) | $ 2 | $ (4) |

(3) Represents the minority shareholders' portion of the net loss from our majority owned subsidiary, Generation Health, Inc., acquired in the fourth quarter of 2009. In June 2012, the Company acquired the remaining 40% interest in Generation Health, Inc. from minority shareholders and employee option holders for $26 million and $5 million, respectively, for a total of $31 million.

(4) Effective January 1, 2012, the Company changed its methods of accounting for prescription drug inventories in the Retail Pharmacy Segment. Additional details of the accounting change are discussed in Note 2 to the consolidated financial statements.

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Shareholders of CVS Caremark Corporation

We have audited the accompanying consolidated balance sheets of CVS Caremark Corporation as of December 31, 2013 and 2012, and the related consolidated statements of income, comprehensive income, shareholders' equity, and cash flows for each of the three years in the period ended December 31, 2013. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of CVS Caremark Corporation at December 31, 2013 and 2012, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2013, in conformity with U.S. generally accepted accounting principles.

As discussed in Note 2 to the consolidated financial statements, the Company has elected changes in its methods of accounting for prescription drug inventories in the Retail Pharmacy Segment effective January 1, 2012.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), CVS Caremark Corporation's internal control over financial reporting as of December 31, 2013, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (1992 framework) and our report dated February 10, 2014 expressed an unqualified opinion thereon.

/s/ Ernst & Young LLP

Boston, Massachusetts
February 10, 2014

**Exhibit 21**

## SUBSIDIARIES OF THE REGISTRANT

As of December 31, 2013, CVS Caremark Corporation had the following significant subsidiaries:

Caremark, L.L.C. (a California limited liability company)
CaremarkPCS Health, L.L.C. (a Delaware limited liability company)
Caremark PhC, L.L.C. (a Delaware limited liability company)
Caremark Rx, L.L.C. (a Delaware limited liability company)[2]
CVS Albany, L.L.C. (a New York limited liability company)
CVS Caremark Part D Services, L.L.C. (a Delaware limited liability company)
CVS Pharmacy, Inc. (a Rhode Island corporation)[1]
Drogaria Onofre Ltda. (a Brazil limited liability company)
Garfield Beach CVS, L.L.C. (a California limited liability company)
Holiday CVS, L.L.C. (a Florida limited liability company)
Longs Drug Stores California, L.L.C. (a California limited liability company)
MemberHealth LLC (a Delaware limited liability company)
Pennsylvania CVS Pharmacy, L.L.C. (a Pennsylvania limited liability company)
RxAmerica, LLC (a Delaware limited liability company)
SilverScript Insurance Company (a Tennessee corporation)

(1) Caremark Rx, L.L.C., the parent of the Registrant's pharmacy services subsidiaries, is the immediate or indirect parent of several mail order, specialty mail and retail specialty pharmacy subsidiaries, all of which operate in the United States and its territories.

(2) CVS Pharmacy, Inc. is the immediate or indirect parent of approximately 45 entities that operate drugstores, all of which drugstores are in the United States and its territories.

**Exhibit 23**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

(1) Registration Statement (Form S-3 No. 333-165672) of CVS Caremark Corporation, and
(2) Registration Statements (Form S-8 Nos. 333-49407, 333-34927, 333-28043, 333-91253, 333-63664, 333-139470, 333-141481 and 333-167746) of CVS Caremark Corporation;

of our reports dated February 10, 2014, with respect to the consolidated financial statements of CVS Caremark Corporation and the effectiveness of internal control over financial reporting of CVS Caremark Corporation, incorporated by reference in this Annual Report (Form 10-K) of CVS Caremark Corporation for the year ended December 31, 2013, and to the reference to our firm under the heading "Selected Financial Data", included therein.

/s/ Ernst & Young LLP

Boston, Massachusetts
February 10, 2014

**Exhibit 31.1**

**Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, Larry J. Merlo, President and Chief Executive Officer of CVS Caremark Corporation, certify that:

1. I have reviewed this annual report on Form 10-K of CVS Caremark Corporation;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   - (a) Designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   - (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   - (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   - (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:
   - (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   - (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 10, 2014

By: /s/ LARRY J. MERLO

**Larry J. Merlo**
**President and**
**Chief Executive Officer**

**Exhibit 31.2**

**Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002**

I, David M. Denton, Executive Vice President and Chief Financial Officer of CVS Caremark Corporation, certify that:

1. I have reviewed this annual report on Form 10-K of CVS Caremark Corporation;
2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
   (a) Designed such disclosure controls and procedures or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
   (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
   (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
   (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors:
   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 10, 2014

By: /s/ DAVID M. DENTON

**David M. Denton**
**Executive Vice President and Chief Financial Officer**

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

The certification set forth below is being submitted in connection with the Annual Report of CVS Caremark Corporation (the "Company") on Form 10-K for the period ended December 31, 2013 (the "Report"), for the purpose of complying with Rule 13(a)-14(b) or Rule 15d-14(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Section 1350 of Chapter 63 of Title 18 of the United States Code.

I, Larry J. Merlo, President and Chief Executive Officer of the Company, certify that, to the best of my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Exchange Act; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

February 10, 2014

/s/ Larry J. Merlo

**Larry J. Merlo**
**President and
Chief Executive Officer**

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO 18 U.S.C. SECTION 1350,
AS ADOPTED PURSUANT TO
SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

The certification set forth below is being submitted in connection with the Annual Report of CVS Caremark Corporation (the "Company") on Form 10-K for the period ended December 31, 2013 (the "Report"), for the purpose of complying with Rule 13(a)-14(b) or Rule 15d-14(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Section 1350 of Chapter 63 of Title 18 of the United States Code.

I, David M. Denton, Executive Vice President and Chief Financial Officer of the Company, certify that, to the best of my knowledge:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Exchange Act; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

February 10, 2014

/s/ David M. Denton

**David M. Denton**
**Executive Vice President and Chief Financial Officer**